# Ex. 1

## DECLARATION OF KATHERINE PORTERFIELD, Ph.D.

I, KATHERINE PORTERFIELD, Ph.D., declare as follows:

1) I am a clinical psychologist, licensed to practice in the State of New York.

2) I received my Ph.D. in clinical psychology from the University of Michigan in 1998. My pre-doctoral and postdoctoral training included extensive training in the evaluation and diagnosis of mental disorders.

3) Since 1998, I have worked as a psychologist at Bellevue Hospital and NYU School of Medicine at the Bellevue/NYU Program for Survivors of Torture. I have evaluated, treated and supervised the treatment of numerous children, adolescents and adults who have experienced war trauma and torture. I have served as an expert in matters before several federal and state Courts, the International Criminal Court in the Hague and for the Office of Military Commissions at Guantanamo Bay, as well as for immigration proceedings in courts through the Executive Office of Immigration Review. I have trained hundreds of health professionals and attorneys nationally and internationally on the evaluation and treatment of survivors of war trauma and torture and have lectured or conducted seminars on issues of torture and complex trauma sponsored by a wide variety of organizations, including human rights organizations, governmental entities, universities, and the International Criminal Court.

4) I have co-authored several publications pertaining to the assessment and treatment of torture and trauma survivors and traumatic stress in children, including as a contributor to the United Nations' Istanbul Protocol: Manual on the effective investigation and documentation of torture and other cruel, inhuman, or degrading treatment or punishment and The Cambridge Handbook of Psychology and Human Rights.  I have contributed to peer-reviewed articles published in textbooks and professional journals, including *The Journal of Nervous and Mental Disease; The Prevention Researcher; Psychiatry: Interpersonal and Biological Processes; OMEGA -Journal of Death and Dying;* and *Journal of the American Academy of Child & Adolescent Psychiatry.* I serve as an ad- hoc reviewer on several peer-reviewed journals and presses, including *Anxiety, Stress, and Coping: An International Journal, Cambridge University Press Medical Group, International Journal of Law and Psychiatry, Journal of Clinical Child and Adolescent Psychology,* and *Journal of Clinical Psychology.*

5) In this declaration, I will :

- summarize the history of pervasive, chronic trauma inflicted on Mrs. Montgomery by her caregivers (Section A);
- present my original clinical conclusions from my evaluation in 2016, regarding Mrs. Montgomery's psychological condition (Section B);
- describe the conditions of confinement in which Mrs. Montgomery is currently housed since being informed of her execution (Section C);
- opine on Mrs. Montgomery's psychological vulnerability, given the current conditions of confinement (Section D);
- opine on the probable effect of the proposed transfer of Mrs. Montgomery form FMC Carswell to USP Terre Haute for execution (Section E).

**A: Lisa Montgomery's life history is rife with sustained, chronic trauma that was catastrophic to her psychological and emotional development, creating severe, lifelong impairments.**

6) Lisa Montgomery's life is characterized by a catastrophic accumulation of damaging and disturbing life events, beginning in her early childhood and culminating in the tragic events of the current offense. The kinds of traumatic life events that Lisa experienced--including extensive emotional,  physical and sexual abuse, neglect, domestic violence, and deeply exploitative adult caregiver behaviors--are likely to create developmental impairments in the victim across multiple aspects of functioning over the lifespan. Below, I will review risk factors, defined as life events that increase the likelihood that an individual who experiences them will suffer adverse outcomes, in Lisa's life that contributed to her severe psychological and emotional problems throughout her life.

- ***Risk Factor: Genetic vulnerability to mental illness:*** Lisa's paternal and maternal sides of her family have a significant history of psychiatric and neurologic impairments that place them at increased risk for developing mental disorders. While there is not an extensive record of people in the family seeking mental health care, there are many examples of family members acting in strange and disturbed ways. Lisa's paternal grandmother experienced blackouts and uncontrollable emotions, attacking others and having no

subsequent memory of it. A paternal half-uncle had depression and developed uncontrollable emotions similar to his mother's blackouts. Lisa's maternal aunt underwent a craniotomy at the age of 50, and experienced grand mal seizures throughout her life. A paternal cousin was placed in special education in school, had trouble learning, and had auditory hallucinations of "angry voices" and thoughts. Another paternal cousin attempted suicide and was noted to have depression.

Lisa's father, John, a veteran of Vietnam, manifested numerous behavioral and emotional problems throughout his life, including erratic behavior, drinking excessively, sleeping poorly, having nightmares and night terrors.

The maternal side of Lisa's family also demonstrated substantial mental health and neurologic symptoms, starting as far back as Lisa's maternal great grandmother who was described as "strange" and reported to have "hid" when she became upset. One of Lisa's great uncles had reported intellectual disability, and another's unusual behavior was attributed to a brain tumor. A maternal cousin has been diagnosed with bipolar mood disorder with psychosis and has been hospitalized multiple times, as has her daughter. Another maternal cousin was hospitalized, treated with antipsychotic medication, and diagnosed with psychotic disorder, and his daughter has been hospitalized for mental illness. Two of Lisa's maternal half-brothers have received treatment for substance abuse, have been incarcerated for criminal behavior, and have acted violently towards others. One of the half-brothers has received antipsychotic medication for his nightmares, racing thoughts, auditory hallucinations, paranoia and flashbacks. Two of Lisa's grandchildren have been diagnosed with autism and pervasive developmental disabilities.

Lisa's mother, Judy, lived a chaotic and destructive life, demonstrating behaviors highly suggestive of mental disturbance, including aggression, irritability, impulsivity, mood instability, and alcohol abuse. While she did not appear to receive mental health counseling, her profoundly dysfunctional life clearly begged for such intervention, in terms of almost all domains-parenting, marriage, self-regulation, and substance use.

- **_Risk Factor: Physical abuse:_** Lisa experienced severe and chronic physical abuse and violence at the hands of her mother and stepfather throughout her life, as well as witnessing brutal abuse of her siblings. During her early childhood, when her half-sister still lived with her and her mother, Lisa and Diane were both abused by Judy, including being beaten, hit with objects, and smacked. Diane described Judy throwing her into the shower by her hair and turning the taps on cold. Teddy remembers Judy holding Lisa and Diane under cold water in the shower. Judy reportedly hit Lisa's half-sister's head with a broom stick.

  Lisa's mother slapped Lisa and her sister in their faces, strapped them on the backs of their legs, and pulled their hair. Lisa's mother used stress positions as punishment when Lisa did not eat all her food. She reportedly left Lisa strapped into her highchair for hours. Lisa's mother limited food intake, and when Lisa's half-sister was hungry, forced her to eat disliked food until she gagged. Judy regularly berated and yelled at the sisters. Once, Teddy remembers Judy holding a knife to his sister, Jerri Jo's, tongue and threatening to cut it off. Astonishingly, a family story involves Judy's finding humor in the fact that Lisa's first words as a toddler were, "Don't spank me."

  Lisa's stepfather, Jack Kleiner, entered her life when she was 5 years old and he was severely physically abusive of her, including raping her for much of her early adolescence. Jack Kleiner is described as frightening and cruel, and those who encountered him learned to stay away from him. He hit and smacked children without provocation, assaulted them with household objects like a telephone receiver, shoved their heads through cabinets and beat them when they cried. Lisa's stepfather did not allow her mother to leave the house with all the children because he feared she would run away. On one occasion, he tied her sister's feet with phone cord to keep her sister from moving her feet. A cousin recalled witnessing Lisa's stepfather break a broom stick on Lisa's head. He forced false confessions from the children for perceived wrong doings and yelled and screamed at Lisa and her sisters. His son, Teddy, recalls him turning out the lights and beating him brutally and repeatedly in the dark.

4

Once, he reportedly lifted one of Lisa's sisters up by her pig tails, and beat her with a belt for soiling her pants. Lisa's mother encouraged her stepfather to beat Lisa and her sister and encouraged the sisters to beat each other.

- ***Risk Factor: Sexual abuse:*** Lisa experienced severe sexual abuse throughout her life, first when being exposed to the rape of her half-sister in the same room as her and later when her stepfather raped and controlled her sexually from early to mid-adolescence. Her adult relationships were also colored by dynamics of coercion, control and violent sex.

As a small child, Lisa shared a bedroom with her half-sister, Diane. Judy's involvement with multiple men at this time resulted in men coming in and out of the home. Diane vividly recalls a man coming into the bedroom more than once and molesting her. Lisa, age three, was in the bed next to her half-sister while this frightening abuse took place.

As Lisa entered late childhood and early adolescence, she became the victim of a chronic campaign of coercive sexual abuse and objectification by her stepfather. This abuse took the form of Lisa being literally singled out and placed in an external room in the home where she could be accessed by her stepfather for regular and severe sexual abuse. Lisa's abuse by her stepfather is corroborated by court proceedings and 1998 records in which it is verified by numerous individuals and, yet, no legal action took place. Jack Kleiner began having intercourse with Lisa when she was in approximately 8th grade and did so "weekly" for several years. One record notes that Jack Kleiner threatened that he would sexually assault Lisa's little sister if Lisa did not submit to what he was doing. Counseling files say no legal action was taken because Judy brought Lisa to counseling, though this counseling appears to have only lasted approximately 4 months. Additionally, Jack brought a man into the home from his work who appears to have sexually abused both Lisa and her brother, Teddy.

Further, Lisa was the victim of extreme, repeated, sexual assaults by adult men, as many as four at a time. The men forced her to submit to anal, oral, and vaginal intercourse and took turns, one after the other. The men physically punished Lisa if "she wasn't doing it right."

As a final humiliation, the men urinated on Lisa.   Lisa's mother told Lisa that she had to engage in sex acts with the plumber, electrician, and other workers.  Lisa's mother required Lisa to "pay the bills" by letting these various repairmen engage in sexual acts with her. Her mother blamed Lisa for this abuse, saying things like "you wanted your own room, well you have to pay for it." "Paying for it" meant doing whatever the men asked of her. In addition to the sex acts, 'hitting was allowed. Lisa had to wear long dresses and pants to cover bruising on her legs. When Lisa reported these repeated rapes, which occurred on more than one occasion, to a cousin in law enforcement, Lisa begged him not to report the abuse because "Jack would kill her" if it were reported.

Later, during her two marriages, Lisa's husbands sexually exploited her by engaging in coercive and violent sexual acts with her. Lisa's second husband, Kevin, reported that he tied up Lisa in the barn and had sexual intercourse with her. Lisa reported that he used items designed to cause pain during sex, such as clamps, hot wax, and whips on Lisa's body. Lisa noted that Carl used Jack's rapes of Lisa against her by telling her she "had done things for Jack and she should do it for him." Lisa, speaking about sex with Carl, noted that she "resented it a lot, I hated it". Lisa noted that she didn't think Carl had a right "to do to me what he was doing," but that she felt unable to stop him. Lisa's brother told the FBI he had seen a video tape of Carl raping his sister while she cried.

- **_Risk Factor: Emotional abuse:_** Lisa's childhood is marked by a stunning amount of cruelty and abuse by her mother and other caregivers towards her and other children. Her childhood is punctuated with constant situations of denigration and coercive control. Lisa's half-sister Diane recalls Judy's capacity for sadistic cruelty, remembering that Judy threatened to give her up for adoption (something she ultimately did) by putting her out on the porch, nude, and telling her that people were coming to get her and take her away. Lisa's father recalls that Judy screamed at and belittled the girls on purpose, something he wishes that he would have stopped.  Lisa's first husband, Carl, noted Judy's intense cruelty towards Lisa, saying: "[Judy] put down Lisa, humiliated her and verbally abused her. Judy made her feel

inferior. Lisa felt terrible about herself and did not think she was worth anything."

Lisa was isolated from peers, restricted in bringing friends home, forced to dress in a peculiar manner, and singled out for scapegoating. Her mother and stepfather did not allow her to develop normal competencies such as shopping for groceries, getting her hair cut, and purchasing school clothes. They cursed her, told her she was worthless, and blamed her for the family misfortunes. At one point, Lisa's mother duct taped Lisa's mouth closed, as a punishment for speaking. Lisa's brother Teddy remembers Lisa's mother attacking and killing the children's dog with a shovel, because it had eaten one of the chickens, an event witnessed by Lisa. Teddy remembered how disturbing it was to see the dog killed in front of him.

Perhaps no event captures the level of emotional abuse and perversity in the family more than Lisa's mother's discovery of Lisa's sexual victimization by her stepfather. Upon discovering Lisa being raped by her father, Lisa's mother got a gun, held it to Lisa's head and screamed, "How could you do this to me?" When this is reported in a counseling session, Lisa's mother stated that she pointed the gun at Jack. However, Lisa recalls the event as a moment of profound threat, as her mother seemed to be blaming her for having sex with her husband. Carl remembers that Judy blamed Lisa for the sexual abuse, saying she would tell people that Lisa slept with her husband. In a telling excerpt from the notes of the counselor who briefly treated the family after Jack's abuse was discovered, Lisa's mother is quoted as denigrating her children and saying that they will be asking for money for a track meet because they are "always wanting something," leading Judy to say she is "unappreciated." For a parent who only months earlier had discovered her spouse raping her minor child to be focusing in a counseling session on the children's lack of appreciation for her demonstrates a staggering amount of narcissism and denial.  The counselor directly noted that Judy had a "lack of empathy" for Lisa. It is not surprising that, later in life, Lisa articulated a sense that her mother believed she had stolen her husband from  her.

- ***Risk Factor: Head injuries/Seizures:*** Lisa survived chronic blows to her head, face and body during her developmental years at the hands of her caregivers. Her mother and stepfather slapped, shook, and hit her frequently. As a teenager, her stepfather hit her head against the concrete floor when he sexually assaulted her. One of her stepbrothers threw a battery and wounded her in the back of head. As a young adult, she had several car accidents that involved head injuries including in 1988, 1990, 1993 and again in 1998. She reports that she hit her head while on a trampoline in 1999 and had to go to the hospital. She has been diagnosed with seizures and she has a chronic history of migraine headaches since adolescence. An evaluation by Dr. Siddhartha Nadkarni resulted in his conclusion that Lisa suffered from seizures and neurological dysfunction, likely due to multiple head injuries, trauma, and genetic vulnerability.

- ***Risk Factor: Poverty:*** Poverty exacerbated the strife, conflict, and fear in Lisa's daily life. Her mother and step fathers were uneducated, unskilled, and alcoholic, all of which compromised their ability to support their large families financially. In childhood and elementary school, Lisa lived in the inner city or in rural impoverished and underserved areas. Lisa moved approximately 16 times by the time she was a teenager, a pattern of frequent, impulsive moves that would repeat in her parenting of her own children. Although poverty was high in the areas where the family lived, the Kleiner family's poverty stood out. Lisa wore hand-me-down clothes with holes in them, and she was often dirty. A community teacher and program organizer described Lisa's status in relation to the larger community: "A disproportionate number of families in Sperry were stressed by physical and sexual abuse, domestic violence, blended families with ongoing disputes, untreated mental illness, and substance abuse. The community was extremely poor, and Lisa Montgomery's family was poorer than most." Lisa's brother Teddy recalls having to get shoes out of a dumpster when he was young. Lisa recalls the elementary school calling Judy because Lisa's shoes were held together with duct tape.

- ***Risk Factor: Domestic violence and family conflict:*** Multiple marriages, infidelities, divorces, violence and destructive alliances among family members characterized

the functioning of Lisa's chaotic and disturbed family unit. Lisa's father married six times; her mother married seven times to six men. Judy and her second husband Jack Kleiner both drank excessively, violently fought with each other, and threatened children in the home. Lisa's younger half-brother, Teddy, remembered Lisa protecting him when his parents had "violent brawls." He also remembered the police being called to the house on two occasions, during one of which Judy's teeth were knocked out by her husband after she hit him across the face with a frying pan.

As discussed above, Lisa's childhood of coercive abuse by caregivers was recapitulated in her relationships with men. Specifically, her first marriage was characterized by coercive abuse by her husband, Carl. Her second marriage also was characterized by sexual degradation.

- ***Risk Factor: Multigenerational family patterns of child objectification, abduction and abandonment:*** Lisa's family history is remarkable for the prevalence of themes of child objectification, kidnapping and abandonment. There are numerous examples of individuals in Lisa's extended family absconding with children, threatening to take children away from parents and guardians, abandoning children, and actually taking children from their parents. This chilling pattern of the objectification of children as pawns to be used in disturbed adult conflicts resonated throughout Lisa's life and profoundly shaped her sense of self and relationships.

Lisa's paternal grandfather kidnapped Lisa's father, John Patterson, from his mother and kept him hidden for over a year when he was approximately 5 years old. Lisa's father's paternal grandparents took her father back and returned the child to his mother with no explanation of where he had been for the year. Once he was returned, Lisa's father never saw his own father or paternal grandparents again.

On the maternal side of Lisa's family, her great grandmother, Maude, had "six or seven" children with her first husband Ed, beginning when she was 13 years old. Maude decided to leave Ed and, in response, his family hid all of the children except one, a baby named Viola. Maude absconded with Viola, abandoning her hidden children and

moving to Kansas where she married another man and had three children with him.

During Lisa's life, her father, John, took her and her half-sister and hid them from Lisa's mother, Judy. This event, the details of which are different, depending on who reported it, captures yet another incident of a caregiver hiding children from another caregiver. By the time, Lisa was three, John completely abandoned her and her older half-sister, Diane.

When Judy divorced Jack Kleiner, Lisa's stepfather who had raped her, Jack threatened his own biological children with abandonment, saying that if they sided with their mother, they would never see him again. Thus, Lisa's victimization became the source of yet another family rupture and threatened abandonment.

Lisa's mother, throughout Lisa's life, used threats of abandonment and child abduction against her. As a child, Lisa learned that her mother's threats were very real when Judy precipitously "gave away" Lisa's beloved half-sister Diane. Diane described being given up, at age 8:

> The case worker assigned to me sat and talked to Judy. They talked about places that I could go and live and have a permanent home. Judy told the social worker that my Grandma Marie was dead. The social worker took me away! As I was leaving, Judy leaned over and told me that I was being taken away from her because I was bad. She told me it was my fault! What a terrifying thing for a young girl to hear. I clung to Lisa as I was leaving. I knew deep down that if I left for good the sexual abuse that I had continually experienced while living with Judy would start to happen to Lisa. I knew that when I left no one would take care of baby Patty. Lisa was only four years old so I knew that she couldn't care for a new baby.

This event resonated throughout Lisa's life, as she knew that her mother's threats of abandonment were very real. Throughout Lisa's adulthood, Judy threatened to and at

times did take Lisa's children from her. On more than one occasion, Lisa's first husband and her mother removed one or more of the children from Lisa's care and disappeared with them. Lisa's brother recalls how he and Judy and Carl Boman (first husband and step-brother) took Lisa's children from her in California and fled with them to Texas.

A cousin of Lisa's stayed with the family when Lisa was a young child. The young man discovered while staying there that his girlfriend had given birth in a field and discarded her infant there. Lisa was aware of this event and recalled her mother forbidding the cousin from getting the baby, even though he was the father.

After the birth of Lisa's fourth child, her mother told her, "I'm not going to attach to that baby if she's not Carl's baby." Here, an infant child is threatened with removal of affection and attachment as punishment for Lisa's supposed infidelity, yet another message to her about the power of family members to discard children.

In 2004, Lisa took the side of her brother in a custody dispute with their mother, Judy. Judy won the custody battle and later that year threatened to take Lisa's children away from her. In fact, Lisa describes her mother frequently threatening to take away her children, saying things to her like, "If you want to keep your kids, you'll do what I say." Her ex-husband, Carl, reported that, at times, he colluded with Judy to take the children from Lisa, until he realized she was trying to get custody.

- ***Summary of risk factors:*** Lisa Montgomery's life is characterized by exposure to multiple traumatic stressors, including severe physical abuse, chronic and violent sexual abuse, cruel and degrading emotional abuse, exposure to domestic violence by adult caregivers, intergenerational patterns of exploiting and abducting children, poverty and environmental stress, and multiple traumatic head injuries. The above-mentioned risk factors-chronic, longstanding, severe and overwhelming-are each a source of traumatic stress on the developing child, even if they occurred in isolation. However, for Lisa, these traumatic events were intertwined with one another, each exacerbating the impact of the others. For example, a child who experiences severe

11

sexual abuse from an adult will likely suffer serious biopsychosocial consequences of such a trauma. However, the presence of a protective, nurturing adult who responds lovingly to the child and who brings in appropriate systemic resources for the child after the sexual abuse is discovered could be an ameliorating protective factor that facilitates healing and recovery for the child. For Lisa, quite the opposite was true. Her sexual victimization was longstanding and brutal and, when it was discovered, her mother blamed her for the abuse and brought about no systemic response to charge the perpetrator. This combination of sexual abuse and emotional neglect and abuse by her mother served to heighten the impact of the trauma on the adolescent Lisa. In much the same way, other risk factors suffered by Lisa were exponentially intensified by the presence of so much other toxic stress and adversity.

Child sexual abuse has been specifically linked to multiple psychological problems in development. Evidence shows that adults who were sexually abused as children manifest higher rates of a number of psychiatric syndromes and symptoms, even than individuals who suffered other types of child abuse. Abuse that is characterized as "contact abuse," meaning that it involves genital contact between the child and the perpetrator has been shown to be a particularly toxic influence on children's mental health and development.[1] Lisa's severe and chronic sexual victimization by her stepfather for several years of her early adolescence constitutes such "contact abuse" at a severe level. Summarizing the range of problems faced by child sexual abuse survivors, Putnam, citing DeBellis et al., (1999) said:

> As a group, individuals with histories of
> childhood sexual abuse (CSA), irrespective of their
> psychiatric diagnosis, manifest significant
> problems with affect regulation, impulse control,
> somatization, sense of self, cognitive distortions,
> and problems with socialization. Many of these
> processes are believed to have developmentally

---

[1] Beitchman, J. et al., (1992) A review of the long-term effects of child sexual abuse, *Child Abuse & Neglect* . (16) 101; Putnam, F. (2003). Ten year research update review: Child sexual abuse. *Journal of the American Academy of Child and Adolescent Psychiatry,* 42 (3): 269-278.

sensitive neuronal and behavioral periods related to brain maturation and early caretaker interactions (Putnam, 2003).

Scientific research has shown that damage and alterations in the neurochemical and neuroendocrine systems, as well as the architecture of the brain are present in individuals with a high loading or "dose" of risk factors, especially childhood sexual abuse, family violence, and neglect. These brain abnormalities are implicated in the numerous emotional, behavioral and physical problems that individuals with histories of severe child abuse later manifest. One study noted:

> Now, converging evidence from neurobiology and epidemiology suggests that early life stress such as abuse and related adverse experiences cause enduring brain dysfunction that, in turn, affects health and quality of life throughout the lifespan.

The U.S. Department of Health and Human Services (2009) reported on the often long- lasting effects of child maltreatment on the developing brain. The majority of brain development occurs after birth, with critical periods of development occurring for certain functions, such as language acquisition, attachment, and abstract reasoning. Research has shown that the child's developing brain can be altered by environmental stressors that occur during these periods, such as child abuse and neglect, and that the neurochemical and neuroendocrine processes that are disrupted may be permanently destroyed or damaged.[2]

Thus, this preponderance of severe and toxic risk factors, present throughout Lisa Montgomery's childhood and adolescence, is implicated in the adverse outcomes that characterize her life and functioning. Though with intensive intervention, Mrs. Montgomery's symptoms can be

---

[2] U.S. Department of Health and Human Services (2009), Understanding the Effects of Child Maltreatment on Brain Development, *Child Welfare Information Gateway,* Washington, D.C. (https://www.childwelfare.gov/survey/publications/index.cfm.)

managed, her clinical condition, which I assessed after she had been medicated by the BOP for a number of years, is a chronic condition. The severe impairments she suffers, in emotional regulation, interpersonal capacities and self-perception are likely to remain as chronic, pervasive problems and are also likely to be exacerbated by situational stressors. Below, I will review my clinical conclusions regarding Mrs. Montgomery.

## B: Lisa Montgomery's clinical condition: Complex posttraumatic stress disorder and bipolar disorder

7) In March and September of 2016, I evaluated Mrs. Montgomery over the course of three days, totaling approximately 17 hours. I also reviewed voluminous material in the form of records and declarations provided to me.[3] I also interviewed Mrs. Montgomery's cousin who corroborated her adolescent sexual abuse. I diagnosed Mrs. Montgomery with **complex post-traumatic stress disorder,** the characteristics of which will be discussed below. She was diagnosed additionally with bipolar disorder with psychotic features, complex partial seizures and other brain impairment and depression, across multiple records.[4] Mrs. Montgomery's clinical

---

[3] A list of material I reviewed is appended as Appendix A.

[4] Since being incarcerated in CCA and the Federal Bureau of Prisons, Mrs. Montgomery has had substantial contact with mental health services. A review of her records indicates several diagnoses, including several "rule-out" diagnoses (diagnoses that a clinician recommends needing further evaluation in order to determine). Throughout 2005-2007, she was diagnosed by a clinician at CCA with bipolar disorder, NOS, dysthymic disorder, and alcohol abuse. Two rule/out diagnoses were also included: brief psychotic episode and dissociative disorder. Mrs. Montgomery's records indicate that she has taken Bupropion (2006), Wellbutrin (2006), Valproic Acid (2006), and Amitriptyline (2006).
Since January 2007, the BOP has diagnosed her with borderline personality disorder and classified her as "Men Ill." She has been prescribed Zoloft, Depakote, and Elavil. In 9/25/2012, Mrs. Montgomery was diagnosed with depression, NOS and personality disorder, NOS by Dr. Nallely Galvan and classified as a high risk for suicide. These records reflect that she was also taking an antipsychotic medication, Risperdal. In 2012, Mrs. Montgomery attempted suicide; the discharge summary from that hospitalization reflects that N. Lorenzi, M.D. diagnosed Mrs. Montgomery with bipolar disorder and PTSD.
At the time of my evaluation in 2016, the BOP was treating her with Risperidone, Prozac, Elavil, Lipitor, Diltiazem, Isosorbide Mononitrate, Levothyroxine Sodium, Omeprazole, and Aspirin. She also had an Albuterol inhaler, Nitroglycerin pills, and Hydrocortisone cream prescribed for use as

presentation was noteworthy for **severe dissociative symptoms,** reported across multiple contexts, by numerous reporters, including herself, and dating back to her adolescent years. This dissociative symptomatology will also be discussed in detail below.

8) Mrs. Montgomery's clinical presentation and history is consistent with the developmental and emotional impairments of individuals who have experienced severe childhood maltreatment and trauma.[5] While the multiple diagnoses ascribed to her over the last several years of her incarceration are useful in capturing some of her symptoms (such as depressive thinking, mood instability, behavioral dysregulation, and anxiety), the most comprehensive diagnosis for her condition is complex posttraumatic stress disorder (CPTSD).[6] Individuals with complex

---

needed. According to the psychiatric records, early in 2020, the BOP added Remeron to the combination of psychotropic drugs.

In addition to the BOP records, I am aware of the expert opinions of Dr. Siddhartha Nadkarni (neurologist) and Dr. George Woods (neuropsychiatrist). I have consulted with Drs. Nadkarni and Woods about Mrs. Montgomery, have reviewed their reports and relied on their medical opinions to inform my own opinions. Dr. Nadkarni diagnosed Mrs. Montgomery with complex partial seizures finding evidence of cerebellar, frontal and possible temporal dysfunction. Dr. Woods noted that Mrs. Montgomery has significant neurologic deficits, including cerebellar dysfunction that is likely the result of exposure to high levels of alcohol in utero. In his expert medical opinion, her behavior and symptomology meet the criteria for bipolar I disorder, most recent episode depressed, severe with psychotic features.

While I have not interviewed Mrs. Montgomery since 2016, my review of the updated BOP psychiatric and psychological records confirms the Mrs. Montgomery continues to suffer from complex post-traumatic stress disorder and continues to struggle with increased symptomology when facing increased stressors.

[5] Herman, J. (1992). Complex PTSD: A Syndrome in survivors of prolonged and repeated trauma, *J. Traumatic Stress*(5) 377.

[6] Cloitre, M., Stolbach, B. C., Herman, J. L., Kolk, B. V. D., Pynoos, R., Wang, J., & Petkova, E. (2009). A developmental approach to complex PTSD: Childhood and adult cumulative trauma as predictors of symptom complexity. *Journal of traumatic stress*, *22*(5), 399-408; Cloitre, M., Garvert, D., Brewin, C., Bryant, R., & Maercker, A. (2013). Evidence for proposed ICD-11 PTSD and complex PTSD: A latent profile analysis. *European Journal of Psychotraumatology*, 4; D'Andrea, W., Ford, J. D., Stolbach, B., Spinazzola, J., & van der Kolk, B. (2012). Phenomenology of symptoms following interpersonal trauma exposure in children: An empirically based rationale for enhancing diagnostic parsimony. *American Journal of Orthopsychiatry*, 82, 187–200.

posttraumatic stress disorder manifest difficulties in the regulation of multiple emotional, interpersonal, cognitive and behavioral capacities.[7] Complex posttraumatic stress disorder is a chronic condition that also likely exacerbates other mental disorders and conditions. Thus, the bipolar and depressive disorder that is well-documented in Mrs. Montgomery's prison records is likely to have been worsened by the emotional dysregulation that is prominent in her complex traumatic stress condition. Below, I will outline the symptoms that Mrs. Montgomery exhibits of complex post-traumatic stress disorder:

- ***Emotional dysregulation:*** Individuals who have experienced chronic trauma and victimization in childhood often demonstrate difficulties recognizing and managing their own emotions. Specifically, survivors of childhood trauma are often erratic in their emotional presentation, self-injurious, and unable to handle their feeling states. Mrs. Montgomery has demonstrated this type of emotional dysregulation, particularly in terms of becoming overwhelmed and unable to manage her emotions, much of her life. Her first husband described her as erratic in her presentation in her late teens and twenties, sometimes talking excessively at people without stopping and other times retreating to her room to read for days on end. As a teenager, she is remembered as shy and withdrawn and then suddenly outgoing and talkative. Mrs. Montgomery's emotional turmoil resulted in her attempting suicide as a teenager after her sexual abuse by her stepfather was discovered.  As a young adult, she managed her overwhelming feelings with alcohol abuse and hypersexual behaviors. She is reported by many family members as drinking excessively in adulthood, often becoming drunk and unable to care for her children or handle the most basic aspects of adult life. She also reportedly engaged in multiple sexual encounters throughout her late adolescence and adulthood.

- ***Disturbed sense of self:*** Survivors of chronic trauma, particularly trauma that occurred over a long period of

---

[7] Cloitre, M., Stolbach, B. C., Herman, J. L., Kolk, B. V. D., Pynoos, R., Wang, J., & Petkova, E. (2009). A developmental approach to complex PTSD: Childhood and adult cumulative trauma as predictors of symptom complexity. *Journal of traumatic stress*, *22*(5), 399-408.

time by trusted caregivers often demonstrate a highly disturbed self-concept. This can include feelings of being damaged, distorted, or inferior to others.

Throughout adulthood, Mrs. Montgomery demonstrated a profoundly disturbed sense of self. This was evident in her distorted relationship to her body and pregnancy. Multiple individuals noted that Mrs. Montgomery presented with several impossible pregnancies and an identity as a pregnant woman that was completely unbelievable. Family members avoided confronting the truth of this presentation, essentially allowing Mrs. Montgomery to enact a delusional version of herself as a pregnant woman. For Mrs. Montgomery, the role as a pregnant woman created a purpose for her, even when it was patently obvious that it was not true. Her construction of stories to explain away the pregnancies, such as babies that were "absorbed" back into her body or delivered and then discarded, defied credulity, and pointed to her fragile hold on reality. For Mrs. Montgomery, her sense of self was so distorted that it was easier to create completely outlandish explanations that supported her fragile identity as a mother than to accept the reality of her life as an overburdened mother of growing children.

This type of identity distortion, while unusual, is consistent with the dynamics of Mrs. Montgomery's family. In her family, relatives use children as ways to gain power and control over one another and to punish each other for perceived grievances. As a pregnant woman, Mrs. Montgomery possessed potential value in the form of a child who could not be taken from her. Indeed, when talking about her tubal fulguration and her confusion about whether this procedure took place, Mrs. Montgomery noted that having children was "the only thing I'm good for," thereby underscoring how threatening to her sense of self this procedure was.

- ***Interpersonal Disturbances:*** Individuals who suffer chronic childhood victimization experience relationships as threatening and unstable, a source of tremendous anxiety and distress. Mrs. Montgomery's descriptions of

her life are replete with images, stories and perceptions of relationships as fraught with violence, coercion, control and manipulation. Throughout the course of the evaluation, she told stories of family members conspiring against one another, attempting to harm one another and betraying one another with cruel and exploitative acts. Many of these stories anchored around people attempting to take, or actually taking, each other's children. Her mother serves as the fulcrum around which this interpersonal abuse and exploitation centers. Her mother first abused and degraded Mrs. Montgomery as a child, demonstrating with her abandonment of Diane that she is completely capable of giving a child away, and then essentially handed Mrs. Montgomery over to her stepfather for sexual abuse, later blaming her for this horrific exploitation. With this kind of disturbed parental relationship structure, it was almost inevitable that Mrs. Montgomery would develop deeply distorted relationships in adulthood. She married men who sexually abused her, engaged in multiple extramarital sexual relationships, and could barely function as a parent to her four children. This kind of interpersonal ineffectiveness was the byproduct of her lifelong experience of victimization and emotional exploitation and abuse.

- ***Hyperarousal and re-experiencing of traumatic events:*** Mrs. Montgomery described hyperarousal symptoms that are consistent with post-traumatic nervous system activation. She noted that she periodically has intrusive images of her stepfather's sexual assault of her. For example, she described how having her face in her pillow will result in her becoming frightened because she is reminded of being face down while her stepfather raped her from behind. Her first husband, who was married to her shortly after her adolescent abuse, noted that she had frequent nightmares and difficulty sleeping, because she would wake up crying. Her description of physiological discomfort, such as heart racing, gag reflex, and feeling afraid is consistent with post-traumatic arousal in the face of trauma reminders. Notably, because her clinical condition is so dominated by dissociation (which will be discussed below), her report of experienced hyperarousal and intrusive remembering is less frequent than it would likely otherwise

18

be.

9) The most pronounced manifestation of Mrs. Montgomery's extensive trauma history is her dissociative symptomatology and manner of managing stress. Dissociation is a process of the human nervous system in which neurochemical reactions to excessive stress lead to alterations in consciousness and perceptions of senses, the environment, and the self. Dissociation represents a lowering of consciousness, sometimes to the point of actual rupture of consciousness and awareness.[8]

10) Clinical models of dissociation demonstrate that humans, like animals, when under severe threat, will sometimes experience the release of anesthetic neurochemicals that lower the experience of pain and fear. When humans experience this peritraumatic ("during the trauma") dissociation however, they are often left with residual difficulties after the trauma, such as amnesia, fragmentation of memory, and other disturbances. If the individual suffers multiple traumatic events that lead to frequent and lengthy periods of peritraumatic dissociation, the after-effects will likely be more pervasive and more severe. These can include altered states of consciousness that linger after the traumatic events, such as time distortions, cognitive confusion, bodily symptoms (depersonalization and derealization) and emotional numbing.[9] Dissociative symptoms can reach the level of psychosis, as when an individual suffers hallucinatory phenomena, such as hearing voices talking at him or her in an attacking manner.

11) Mrs. Montgomery's extensive childhood history of physical, sexual and emotional abuse by trusted caregivers throughout the course of her neurobiological development likely created the conditions that led to her profound and pervasive dissociative symptoms. She has additional vulnerability to dissociative symptoms, according to the evaluation by Dr. Siddhartha Nadkarni. Dr. Nadkarni noted that Mrs. Montgomery suffers from complex partial seizures and neurophysiologic dysfunction that manifest as dissociative and psychotic symptoms.

12) The dissociative symptoms that are prevalent in Mrs.

[8] Lanius, U., Paulsen, S., & Corrigan, F. (2014). Neurobiology and Treatment of Traumatic Dissociation: Toward an Embodied Self. Springer: New York.
[9] Frewen, P. & Lanius, R. (2014). Trauma related altered states of consciousness: Exploring the 4-D model. Journal of Trauma and Dissociation. 15: (436-456.).

Montgomery's functioning fall into categories listed below:

- **Confused thought process.** At the time of my evaluation, Mrs. Montgomery's thought process was grossly intact, with her demonstrating awareness of time, place and circumstance. However, she frequently manifested confused thinking, indicating questions about the reality of certain past events and perceptions. She noted substantial confusion about events around her body and her pregnancy history. For example, when asked about the story told by her ex-husband that she had told him she had an abortion or gave up a child as a teenager, she stared blankly at the examiner and repeated, "I don't know about that."

  Additionally, when asked about "false pregnancies" or past events where she told others she was pregnant, Mrs. Montgomery became tearful and said "I don't know. I don't know." Finally, when asked about the reported tubal fulguration documented in her medical records, Mrs. Montgomery noted that she came home from the procedure and did not think it had really happened. She noted that if her mother said something was true and she thought something else was true, she had no way of knowing what the actual truth was. Mrs. Montgomery's presentation as a vague and confused reporter is consistent with her profoundly dissociated state, and it is something that others who knew her throughout her life recall about her.

- **Disengagement:** Dissociation can manifest as an experience of being inattentive or "out of it." Multiple friends and family members note that this was a prevalent quality in Mrs. Montgomery's functioning. A classmate described her as "spacing out" in high school and needing to be brought back to attention by a teacher yelling at her. Her stepfather Richard Boman who came into her life towards the end of her mother's second marriage, described her as "in a world of her own," and "just star[ing] into space." Her first husband, Carl, described Mrs. Montgomery as "not emotionally present…she was in her own world and distant from everything." Carl described her staying in bed for days at a time, repeatedly reading the same books. Her half-brother noted that she was "in her own little world" and that "the house could burn down around Mrs. Montgomery and she wouldn't notice." Her second husband, Kevin, also described her becoming disengaged: " ... she got a blank look

on her face and didn't respond. I wondered if she was daydreaming. I could tell she didn't hear me: it was like she wasn't even there." Mrs. Montgomery's daughter Kayla described her mother as fundamentally absent, even when she was with her children. She noted: "She was always distracted and seemed to be thinking about something else. Her body was around, but her mind was not with me or playing with me." Kayla noted that the first time she had a "real" conversation with her mother when her mother seemed to be able to focus and listen was in 2012, when her mother was taking psychotropic medication. Mrs. Montgomery noted that she has struggled much of her life with absent-mindedness and feeling as though she is in her own world. She gave examples of being at her job and not remembering how she got there, often feeling like she lost track of time, and during the year before her arrest, feeling that she would need to write what day it was on her hand in order to stay oriented.

- **Depersonalization:** Depersonalization occurs when an individual feels detached from her own body or like she does not belong in her body. Mrs. Montgomery is described by numerous family members as being "filthy" and smelling bad, a possible indicator of a depersonalized state in which she could not care for her own body. She noted strong symptoms of depersonalization around sexual activity. She described sex with her husband and her feeling that "you could not be there," a description of her mental disconnect from her body, as well as her viewing herself in the second person, "you", rather than the first person, "I". She noted that sex with her husband caused her to re-experience the trauma of being raped by her step-father. She said even consensual sex would "take me back to Jack." Mrs. Montgomery noted that sometimes she felt "like I'm separate" from the world and would have to tell herself, "I'm here...I'm walking."

- **Derealization:** Derealization is a form of dissociation in which the person feels that his or her surroundings are not familiar and, in some cases, not even real. Mrs. Montgomery described often feeling that she is unsure whether her environment is real. She described the world feeling "dreamy" to her at times and noted that there were days that were "nonexistent" to her. Mrs. Montgomery recalled receiving letters and not knowing if they were real

or not when she was incarcerated. She described how she learned to develop "strategies" to "show me this is where I am." She described looking out her window and seeing a tree and feeling she was able to tell herself that she *knew* she was seeing a real tree. Mrs. Montgomery described a fundamental sense of unreality that shapes her perception of the world and the logic she uses to try to assess reality: "I can feel it, so I know it's real. If I can't feel it, I'm not sure it's real." This weak hold on reality pervades much of Mrs. Montgomery's consciousness and has been prevalent in her functioning since she was a teenager. According to her, things started to get "less real" after her stepfather began raping her. With some hesitation, she described not being sure if she really had her children or not, saying, " . . . like being a mom-did I really have them? I had them, I don't remember that period of time but I won't know if I really had them. I have to remember but I can't. I have an idea of it, but I'm not sure if it happened." Mrs. Montgomery's confused and illogical language here demonstrates the rupture in her sense of reality.

- **Identity dissociation:** Dissociation can include a split in an individual's identity where the person feels like she has different people inside herself or like there are people inside who are talking to her. Mrs. Montgomery describes how she struggled for many years with her mother's voice in her head, saying "You can't do anything right," and telling her she was a "bad girl." This experience of a voice that is not one's own but that is speaking in second person and disparaging the individual is a hallmark sign of the altered consciousness of trauma-induced dissociation.[10]  She describes a split in her identity that has recurred since she was a teenager and her mother discovered her stepfather's sexual abuse of her. At that time, her mother cut her hair, an event that she links to being viewed as "bad." Since that time, Mrs. Montgomery describes several occasions where she has become preoccupied with cutting her hair as a way to demonstrate the "bad" part of herself. Her first husband stated that when Judy would verbally mock and abuse her,

---

[10] Frewen, P. & Lanius, R. (2014). Trauma related altered states of consciousness: Exploring the 4-D model. Journal of Trauma and Dissociation. 15: (436-456).

Mrs. Montgomery would appear to get "a different look on her face," something he described as her "going someplace else mentally." Mrs. Montgomery noted that the uterine fulguration that she underwent was also part of her being "bad" because she had been unfaithful to Carl and had another man's child. Mrs. Montgomery's split identity is also evident in her description of herself as "only good for having babies."

Family members report that Mrs. Montgomery also demonstrated identity confusion in relation to her cousin, whom she began to emulate as an adult. Notably, the cousin, who Mrs. Montgomery described in the evaluation as "the perfect mom" and who her mother reportedly said "was a better mom than me," had reversed a tubal ligation and gone on to have two children after the procedure. Mrs. Montgomery has at times been reported to have said that she too had a tubal fulguration reversed. Additionally, in 2004, Mrs. Montgomery is reported to have gone to court during the custody battle with her mother over her brother's baby and dressed and had her hair notably like this cousin's. Mrs. Montgomery also used the name Abigail for Mrs. Stinnet's baby, a name that her cousin said would be her next child's name. During this time in 2004, Mrs. Montgomery's ex-husband noted that she was "spaced out and getting a lot worse," something that he noted seemed related to her false pregnancy. He noted that Mrs. Montgomery was so "strange" at this point that her children did not want to have people come to their home and see her.

- **Memory disturbance:** Individuals who dissociate often describe impaired memory functioning, including blank spells and loss of time. Numerous family members describe Mrs. Montgomery as forgetful and scattered. Her years of parenting young children are described as chaotic and her ability to run a household with even a modicum of organization was nonexistent. Her home was described as filthy, disorganized and replete with unfinished projects. Mrs. Montgomery described going to the grocery store and coming home with items that the family already had. She noted that her ability to follow through on an activity was very poor, until she began taking Risperdal in the BOP. Mrs. Montgomery described her fundamental inability to remember major events of her life. She stated, "I know I graduated from high school, but I have no memory of it."

23

She also noted that she has no memory of marrying her first husband and almost no memory of testifying in court about her stepfather's sexual abuse of her.

- **Emotional constriction:** Dissociative symptoms can include restricted or limited emotional experience, including numbness and lack of appropriate positive or negative feelings. Mrs. Montgomery described intense emotional constriction, particularly around her body and childbirth. She noted that she held her daughter after returning from the hospital and thought, "I should feel love and I'm not feeling anything." She recalled how she didn't cry about her stepfather raping her because it was "going on for years and I learned not to deal with it." Later, her emotional constriction was used against her by her mother who told her, "If you hadn't wanted [the sexual abuse] to happen, you would have cried." Thus, Mrs. Montgomery's blunted emotional response to years of violent sexual abuse was ultimately used against her by her primary caregiver. As a young mother, Mrs. Montgomery described struggling to connect to her children, saying, "the emotions weren't there." When a friend said that she was worried about Mrs. Montgomery's husband, she noted that she had to "stop and think about it-I had to try to connect to his emotions." Mrs. Montgomery's extensive victimization likely affected her capacity to tolerate emotions. Individuals with high rates of dissociation have been shown to have difficulty with recognizing emotions in others. This difficulty with reading other's emotions has been linked to neurobiological dysfunction that occurs in the limbic system of emotion regulation in dissociative states.[11]

12) Mrs. Montgomery's life history demonstrates the tragic and devastating consequences of abuse and exploitation of children by those who should protect and nurture them. Raised within a family whose treatment of children as objects to be used in internecine family conflicts spanned multiple generations, Mrs. Montgomery grew up learning that she, too, was an object to be exploited and abused by her caregivers. Her childhood, in which she was brutally beaten, humiliated, and ultimately raped for several years by her stepfather, created conditions for her to

---

[11] Lanius, U., Paulsen, S., & Corrigan, F. (2014). <u>Neurobiology and Treatment of Traumatic Dissociation: Toward an Embodied Self</u>. Springer: New York.

develop profoundly distorted perceptions of interpersonal relationships, human emotions and even her own body. Mrs. Montgomery, like many survivors of severe sexual abuse, developed a dissociative response to her feelings and body states that stayed with her throughout her life. While this dissociation can protect a child from the actual sensations of a disturbing rape, it can, if required frequently enough, result in a rupture of the child's developing sense of self, the world and relationships. Mrs. Montgomery's development suffered such distortions, and she grew into adulthood with a disconnected sense of her emotions, a tenuous hold on reality, a completely warped view of human relationships, and a split and damaged sense of herself and of her body. These developmental impairments had tragic consequences in this woman's life and the life of those around her.

## C: Mrs. Montgomery's current conditions of confinement since October 16, 2020

13) Mrs. Montgomery's counsel have advised me of Mrs. Montgomery's conditions of confinement since October 16, 2020 when she was informed that she will be executed on December 8, 2020.  The conditions as they have been reported to me include:

14) She is held in a suicide precautions cell that includes only a cement bunk, a rubber mattress, a suicide precaution (no-tear) blanket, and a sink/toilet combo.

15) The lights in the cell remain illuminated twenty-four hours a day. I am told that one light bulb was removed, and the cell is now slightly dimmer than it was initially, however the lighting does not vary with normal circadian rhythms of daytime/nighttime—or at all.

16) She is dressed only in a "Ferguson Safety Smock" and is not permitted any undergarments. That is, she is allowed neither a bra nor underwear.

17) She is not allowed shoes or socks while in her cell and is only allowed shower shoes while walking to the shower or an attorney visit. Her feet are cold in her cell.

18) She has been provided two no-tear blankets, but when she is not wrapped in the blankets (for instance when standing at her door to converse with the assessors and psychologists, or when in an attorney visit) she is cold.

19) She has been provided access to a shower only three times a week, and no access to lotion or other basic hygiene requirements.

20) She is provided only four squares of toilet paper each time she uses the bathroom.

21) Her cell is always monitored by video surveillance, including by male guards and staff.

22) She has been denied access to her CPAP machine which was prescribed by physicians as necessary to address her sleep apnea and with which she is accustomed to sleeping for the past several years.

23) Though she has recently been allowed one paperback book to read and a television has been positioned outside her cell for her to stand at the door and watch a movie each day through the window of the cell, she has been denied any other form of mental stimulation: her access to listening to music, to any form of art—coloring, painting, crafts have been cut off.  She is allowed five pieces of paper and half a black crayon as a writing implement.

24) She has been denied any access to outdoor recreation or fresh air.

25) Because her cell is cold and she has no shoes, she is essentially cut off from any exercise or physical activity in her cell as she remains huddled under the blankets for warmth and to lessen the sensation of obtrusive surveillance of her body created by the continuous monitoring.

26) She has been denied access to her eyeglasses.

27) Her wedding ring was forcibly and painfully removed from her hand by use of a lubricant by a large male staff member and not returned.

## D: Impact of Mrs. Montgomery's current conditions of confinement since October 16, 2020

28) I have examined and treated survivors of torture over the past 22 years in multiple contexts (immigration courts, criminal proceedings, international courts, civil proceedings). This work has involved opining on the impact of various confinement conditions and maltreatment that was enacted on an individual. My area of clinical expertise includes identifying the impact of maltreatment and conditions that rise to the legal level of torture.

29) It is my clinical opinion that Mrs. Montgomery's current conditions of confinement will have an impact tantamount to the impact of torture on her. I will outline why below.

30) Mrs. Montgomery's early adolescent experiences of chronic sexual assault by her stepfather, as well as gang rape in the context of being trafficked to other adult men is essential to understanding her response to the current conditions of confinement.  Essentially, she is a victim of sexual torture who is being placed into a context of bodily exposure, degradation, lack of control and deprivation that is highly likely to trigger her early experiences of sexual violence. The triggering of past victimization is an expected response when a survivor is placed in conditions that mirror aspects of the earlier traumas.  The response is involuntary when this occurs—that is, it takes place through nervous system and endocrine system reactions that activate a stress response that was required during the earlier trauma.  This response can be an "uproar" response involving hyperarousal and explicit fear responses (fight or flight) or a "shutdown" response, which involves disconnecting from one's environment and one's sensations (dissociation). It is also possible for individuals to fluctuate between these two types of responses.  Mrs. Montgomery has a history of both types: uproar and shutdown responses. Her responses have been severe enough in the past that she has been psychotic—that is, unable to perceive reality in an accurate and stable fashion. Below, I will indicate the aspects of this current condition that are likely to trigger these responses.

31) *Bodily Exposure:* Since being told she is being executed, Mrs. Montgomery has been kept in a lit room in a heavy quilted but ill-fitting smock with constant surveillance by male guards.  She is forced to request toilet paper for her sanitary needs and she is not permitted to wear undergarments.  These conditions are remarkably parallel to the conditions when she was being sexually victimized by her stepfather and multiple men.  Specifically, her stepfather created a separate room, with an exit only to the outside of the house and which provided him the opportunity to watch her through a bathroom window. It was in this room that Mrs. Montgomery was frequently raped by her stepfather and other men.  She specifically recalled the men putting money on her dresser after raping her. Thus, Mrs. Montgomery's current segregation confinement is horrifically similar to what she suffered for years in her adolescence. It is likely that such sickening reminders will make her psychologically deteriorate.

32) *Environmental manipulation:*  The constant light in Mrs. Montgomery's cell, as well as the cold temperature with inadequate

coverings for Mrs. Montgomery (both clothing and blankets appear to be inadequate to keep her warm) are the types of environmental conditions that can deteriorate a prisoner's daily functioning. The interaction between such conditions—the temperature keeping Mrs. Montgomery physically uncomfortable and the light preventing her from experiencing circadian rhythms of arousal and rest—exacerbates the assault on her senses of each of the conditions. The conditions then are likely to affect sleep patterns in Mrs. Montgomery. Sleep deprivation is widely known to lead to fairly rapid deterioration in an individual's cognitive and emotional functioning, as well as increase the risk of medical problems.[12] Mrs. Montgomery uses a CPAP machine for apnea, and without this machine, her sleep deprivation and subsequent deterioration will likely be more severe.

33) *Control/Deprivation:* Mrs. Montgomery's current treatment is, even in the context of incarceration, an astonishingly controlled and deprived environment, with almost no recognition of this woman's many years of compliant behavior as an inmate. She is smocked; her room is constantly lit and cold; she has no comfort items; she is given no exercise or outside recreation opportunity; she must request toilet paper; she is denied medically necessary supplies such as her CPAP and eyeglasses. This kind of removal of basic human amenities creates a sense of helplessness and powerlessness. In essence, these conditions reduce Mrs. Montgomery to a state of her most basic human functioning only—keeping herself warm, toileting, and eating. These conditions mirror Mrs. Montgomery's adolescent experience of being under the complete coercive control of her mother and stepfather. The state of helplessness is likely to become another trigger that will compromise Mrs. Montgomery's functioning.

34) *Degradation*: Mrs. Montgomery's treatment since being told she will be killed, has been degrading and humiliating. As has been discussed above, her nudity except for a smock, ability to shower only three times a week and having to ask for squares of toilet paper each time she uses the bathroom would be humiliating for almost any individual. Upon being told she was being executed, a correction officer smeared Vaseline on Mrs. Montgomery's finger and forced off her wedding ring, an act that is highly questionable as a necessary precaution for a prisoner's safety. The prison's removal of Mrs. Montgomery's wedding

[12] M. Mullington JM. Sustained sleep restriction reduces emotional and physical well-being. *Pain*. 2005 Dec 15;119(1-3); Kim DJ, Lee HP, Kim MS, Park YJ, Go HJ, Kim KS, Lee SP, Chae JH, Lee CT. The effect of total sleep deprivation on cognitive functions in normal adult male subjects. *Int J Neurosci*. 2001 Jul;109(1-2):127-37.

band was degrading to Mrs. Montgomery's sense of self and her right to customary respect for her marriage. The destruction and defiling of treasured objects is widely known as a method used by regimes who torture in order to create a condition of annihilation of the sense of self of the victim.[13]

35) Sexual abuse victims' suffering is, of course, physical in nature, as the body is intruded upon, manipulated and harmed, but the psychological degradation and humiliation of sexual violence often leaves an even more painful imprint. Sexual assault victims struggle with overwhelming feelings of being damaged and objectified, often turning against themselves in the aftermath of the abuse. This makes them even more vulnerable to feeling humiliated or degraded, as they respond to their environment with these self-attacking meanings. Thus, these conditions described above are likely to worsen Mrs. Montgomery's tenuous sense of herself and contribute to further deterioration.

36) *Overall worsening of her mental health condition:* Mrs. Montgomery's severely impairing clinical conditions of complex posttraumatic stress disorder and bipolar disorder are likely to be exacerbated by the conditions that have been laid out above. Specifically, for a survivor of gang rape and chronic sexual assault to be isolated and left without proper clothing or undergarments while being surveilled on camera would be highly triggering to her fear arousal and threat-detection systems. It is likely that these conditions will make Mrs. Montgomery vulnerable to psychotic levels of dissociation, as her brain reacts to the bodily threat that she is perceiving. Mrs. Montgomery's life history demonstrates that her dissociation has reached the level of psychosis at many points throughout her life in which she has been unable to accurately perceive the state of her body (depersonalization), her environment (derealization) and her emotional states (disengagement). Being thrown into isolated, exposing conditions of confinement within moments of being told she will be executed would be severely destabilizing to a healthy individual, much less a person with massively impairing dissociative mental illness.

37) There is extensive scientific evidence that conditions of solitary confinement can exacerbate mental illness. Reviewing the literature, Metzner and Fellner (2010) argue that:

> The adverse effects of solitary confinement are especially significant for persons with serious mental illness, (e.g. schizophrenia, bipolar disorder, major

---

[13] Herman, Judith (1992). <u>Trauma and Recovery</u>, Basic Books: New York 80-81.

depressive disorder) that is usually characterized by psychotic symptoms and/or significant functional impairments. The stress, lack of meaningful social contact, and unstructured days can exacerbate symptoms of illness or provoke recurrence.[14]

Numerous researchers and clinicians have emphasized the particular dangers of solitary confinement on prisoners with mental illness, including worsening existing psychiatric disorders by making symptoms more severe and more pervasive.[15]  For example, a prisoner who struggles (as Mrs. Montgomery does) with keeping a clear hold on reality is vulnerable to a worsening of this condition (psychosis) by being deprived of the social contact and environmental contexts that reinforce reality.

### E. Impact of the proposed transfer of Mrs. Montgomery from FMC Carswell to USP Terre Haute

38) I am told that Mrs. Montgomery has been advised through her counsel of the intent to transfer her from FMC Carswell where she has been held since 2008 to USP Terre Haute for execution. I am generally familiar with both institutions because I have evaluated prisoners in both locations. I am aware that FMC Carswell houses only women and that, as such, Mrs. Montgomery has been surrounded by other female inmates since her incarceration there. I am aware that USP Terre Haute is a male institution, housing, in the normal course of business, only male inmates.

39) This proposed transfer, following on the heels of the traumatizing conditions in which she has been held, is likely to have a profoundly devastating impact on Mrs. Montgomery.  As described above, Mrs. Montgomery's posttraumatic stress from chronic sexual abuse and gang rape by men makes her highly vulnerable to triggers that make her feel unsafe.  Being moved to a men's prison, while she awaits her execution will likely create unbearably terrifying circumstances for Mrs. Montgomery. It is likely that her perception that she will be

---

[14] Metzner, J. & Fellner, J. (2010).  Solitary confinement and mental illness in US prisons: A challenge for medical ethics. *J Am Acad Psychiatry Law.* 38:104–8.

[15] Haney, C. (2003). Mental health issues in long-term solitary and "supermax" confinement. *Crime & Delinquency*, 49(2), 124-156; Kurki, L., & Morris, N. (2001). The purposes, practices, and problems of supermax prisons. *Crime and Justice: A Review of Research*, 28, 385-424.; Haney, C. (1993). "Infamous punishment": The psychological consequences of isolation. *National Prison Project Journal*, 8(2), 3-7, 21.

assaulted in this environment will be triggered, leading to an increase in symptoms of dissociation and possibly psychosis and self-harm or suicidality. It is not difficult to imagine how any female inmate placed in an all-male prison could feel afraid for her safety. For Mrs. Montgomery, whose adolescence was in fact characterized by violent sexual assaults by multiple men, this perception of sexual threat is a recapitulation of her prior trauma.

40) *Summary:* As discussed above, Mrs. Montgomery's conditions of confinement are highly likely to contribute to her severe psychological deterioration. As a survivor of repeated and severe sexual assaults, including gang rape and sex trafficking as an adolescent, Mrs. Montgomery is likely to be deleteriously affected by the bodily exposure, environmental manipulation, extreme control measures and degrading treatment that she is experiencing in confinement.  Her mental illness, specifically complex posttraumatic stress disorder and bipolar disorder, is at great risk of worsening if she is kept in these conditions. Finally, her transfer to a men's penitentiary where she will be held as the only female inmate, in anticipation of being executed, is also a highly traumatizing experience which will likely cause her to deteriorate significantly.

41) I am available to review further information if it becomes available.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Katherine Porterfield, Ph.D.
Executed this 9th day of November, 2020.

APPENDIX A

Index of Documents Used

1. Declaration of Thomas Allen Hedberg, 1.19.13

2. Harborview Medical Records of Mary Lee Coleman

3. Declaration of Heather Hedberg, 1.19.13

4. Declaration of John Patterson, 1.20.13

5. Declaration of Lisa Rickert with incorporating documents

    a. Interview with Karl Lundmark- 5.31.05

    b. Interview with Teddy Kleiner 7.29.05, p. 6

    c. Report of Telephone call with Marie Stelma

    d. Interview of Judy Shaughnessy 3.14.05

    e. Interview of Brett Owens, 6.17.05

6. Kenneth Dale Alexander TX Dept of Mental Health & Mental Retardation Competency Exam 1.13.89, p. 13;

7. Kenneth Dale Alexander Florida State Hospital records

8. Kenneth Dale Alexander San Antonio State Hospital 3.25.08;

9. Kenneth Dale Alexander SSDI records;

10. Kenneth Dale Alexander Snowy Range Consulting, LLC Status exam, 5.29.09;

11. Kenneth Dale Alexander Wyoming Behavioral Institute 5.13.10

12. Declaration of Marvin Alexander, 1.12.13

13. Teddy J. Kleiner Kansas Dept of Corrections, Mental Health Evaluation 1.1.04;

14. State of Kansas v. Tommy Kleiner, District Ct. for Osage Co., No. 2003-CR·23·2·11·2003

15. Tommy Kleiner, Franklin Co. 2003 misc. court records

16. Bartlesville Public School Records , Caden Veal-MEEGS testing - 5.20.11
    17. Bartlesville Public School Records, Landon Veal - MEEGS testing- 3.9.12

18. Declaration of Diane Rae Hedberg Mattingly, 1.9.13

19. Declaration of Mary Lee Coleman, 1.17.13

20. Lisa Montgomery 1984 counseling records with Nancy Walentiny

21. Kleiner v. Kleiner divorce transcripts

22. Declaration of Carl Boman, 2.13.13

23. Declaration of James N. Miller, 4.14.16

24. Declaration of Teddy Kleiner, 2.15.13

25. Declaration of Becky Perky, 2.26.13

26. Declaration of Wendy Treibs 2.23.13

27. Declaration of Penny Craig, 2.27.13

28. Interview of Carl Boman 4.14.05

29. BOP Mental Health Records

30. CCA Mental Health Records

31. Report of Dr. Daniel Martell

32. Biopsychosocial evaluation by Jan Vogelsang

33. Supplemental Declaration of Jan Vogelsang

34. Declaration of Linda Baker

35. Declaration of Wesley Gann

36. Declaration of David Kidwell

37. Supplemental Declaration of Carl Boman

38. Interrogatory Answers of Judy Kleiner in the divorce case of Kleiner v. Kleiner

39. Obituary of Gerald "Shorty" Shipley

40. Handwritten note of Lisa Montgomery with the names of two perpetrators

41. .Report of Dr. Park Dietz

42. Report of Dr. George Woods

43. Declaration of Kayla Boman, 2.21.13

44. Declaration of Mary Osborn Hodges, 1.30.13