# Ex. 4

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

LISA M. MONTGOMERY,                    )
                                       )
                    Movant,            )
                                       )
        vs.                            )   Case No.
                                       )   12-CV-08001-GAF
UNITED STATES OF AMERICA,              )
                                       )
                    Respondent.        )


              TRANSCRIPT OF PROCEEDINGS - VOLUME VI
               BEFORE THE HONORABLE GARY A. FENNER
                  UNITED STATES DISTRICT JUDGE
                      NOVEMBER 7, 2016
                    KANSAS CITY, MISSOURI


FOR THE MOVANT:
      MS. KELLEY J. HENRY
      MS. AMY D. HARWELL
      Office of the Federal Public Defender
      810 Broadway Street, Suite 200
      Nashville, Tennessee 37203

      MS. LISA G. NOURI
      526 Holmes
      Kansas City, Missouri 64108




      Proceedings recorded by mechanical stenography, transcript
produced by computer




              KATHERINE A. CALVERT, RMR, CRR
               FEDERAL OFFICIAL COURT REPORTER
              CHARLES EVANS WHITTAKER COURTHOUSE
                   400 EAST NINTH STREET
                 KANSAS CITY, MISSOURI 64106

```
                          APPEARANCES
                          (continued)

FOR THE RESPONDENT:
      MR. JEFFREY E. VALENTI
      MR. DAVID M. KETCHMARK
      United States Attorney's Office
      400 East Ninth Street, Suite 5510
      Kansas City, Missouri 64106
```

I N D E X                                    Page

OCTOBER 31, 2016

VOLUME I

MOVANT'S EVIDENCE

RUSSELL STETLER
     Direct examination by Ms. Harwell. . . . . . . . . .   55
     Cross-examination by Mr. Valenti . . . . . . . . . .  135
     Redirect examination by Ms. Harwell. . . . . . . . .  156
     Recross-examination by Mr. Valenti . . . . . . . . .  157

MARC BOOKMAN
     Direct examination by Ms. Henry. . . . . . . . . . .  159
     Cross-examination by Mr. Valenti . . . . . . . . . .  215

I N D E X                                      Page
(continued)

NOVEMBER 1, 2016

VOLUME II

RONALD E. WURTZ
     Direct examination by Ms. Henry. . . . . . . . . .   276

BRET DILLINGHAM
     Direct examination by Ms. Henry. . . . . . . . . .   288
     Cross-examination by Mr. Valenti . . . . . . . . .   308
     Redirect examination by Ms. Henry. . . . . . . . .   312

ANITA BURNS
     Direct examination by Ms. Nouri. . . . . . . . . .   313

STEPHANIE ELLIOTT
     Direct examination by Ms. Nouri. . . . . . . . . .   330

TROY SCHNACK
     Direct examination by Ms. Nouri. . . . . . . . . .   361
     Cross-examination by Mr. Valenti . . . . . . . . .   383

SUSAN HUNT
     Direct examination by Ms. Nouri. . . . . . . . . .   386
     Cross-examination by Mr. Valenti . . . . . . . . .   423

LISA RICKERT
     Direct examination by Ms. Harwell. . . . . . . . .   428
     Cross-examination by Mr. Ketchmark . . . . . . . .   453

KURT LIPANOVICH
     Direct examination by Ms. Harwell. . . . . . . . .   460
     Cross-examination by Mr. Valenti . . . . . . . . .   470

I N D E X                                            Page
(continued)

NOVEMBER 2, 2016

VOLUME III

RICHARD BURR
     Direct examination by Ms. Henry. . . . . . . . . .   523
     Cross-examination by Mr. Ketchmark . . . . . . . .   594
     Redirect examination by Ms. Henry. . . . . . . . .   607
     Recross-examination by Mr. Ketchmark . . . . . . .   611

JUDY CLARKE
     Direct examination by Ms. Henry. . . . . . . . . .   612

LAINE CARDARELLA
     Direct examination by Ms. Nouri. . . . . . . . . .   683

HOLLY JACKSON
     Direct examination by Ms. Harwell. . . . . . . . .   693

DEBRA GARVEY
     Direct examination by Ms. Henry. . . . . . . . . .   719
     Cross-examination by Mr. Valenti . . . . . . . . .   761

I N D E X                                        Page
(continued)

NOVEMBER 3, 2016

VOLUME IV

DAVID FREEDMAN
        Direct examination by Ms. Henry. . . . . . . . . .   811
        Cross-examination by Mr. Ketchmark . . . . . . . .   855

ROBERT PETER FUCETOLA
        Direct examination by Ms. Henry. . . . . . . . . .   862
        Cross-examination by Mr. Valenti . . . . . . . . .   885

ERIN GARMAN
        Direct examination by Ms. Henry. . . . . . . . . .   897
        Cross-examination by Mr. Ketchmark . . . . . . . .   908

CHRIS ARMSTRONG
        Direct examination by Ms. Henry. . . . . . . . . .   911

WILLIAM LOGAN
        Direct examination by Ms. Henry. . . . . . . . . .   920
        Cross-examination by Mr. Valenti . . . . . . . . .   971

MARILYN ANN HUTCHINSON
        Direct examination by Ms. Henry. . . . . . . . . .   982
        Cross-examination by Mr. Valenti . . . . . . . . .  1060

I N D E X                              Page
(continued)

NOVEMBER 4, 2016

VOLUME V

CHRISTOS DAVATZIKOS
        Direct examination by Ms. Henry. . . . . . . . . .  1120
        Cross-examination by Mr. Valenti . . . . . . . . .  1165
        Redirect examination by Ms. Henry. . . . . . . . .  1179

ANDREW NEWBERG
        Direct examination by Ms. Henry. . . . . . . . . .  1182
        Cross-examination by Mr. Valenti . . . . . . . . .  1236

CAMILLE ELIZABETH KEMPKE
        Direct examination by Ms. Henry. . . . . . . . . .  1245
        Cross-examination by Mr. Valenti . . . . . . . . .  1254

RUTH BOUTIN KUNCEL
        Direct examination by Ms. Henry. . . . . . . . . .  1255
        Cross-examination by Mr. Valenti . . . . . . . . .  1290
        Redirect examination by Ms. Henry. . . . . . . . .  1302

I N D E X                                    Page
(continued)

NOVEMBER 7, 2016

VOLUME VI

CHARLES N. SANISLOW
     Direct examination by Ms. Henry. . . . . . . . . . 1363
     Cross-examination by Mr. Valenti . . . . . . . . . 1441
     Redirect examination by Ms. Henry. . . . . . . . . 1455
     Recross-examination by Mr. Valenti . . . . . . . . 1456

JANET VOGELSANG
     Direct examination by Ms. Harwell. . . . . . . . . 1460
     Cross-examination by Mr. Ketchmark . . . . . . . . 1531
     Redirect examination by Ms. Harwell. . . . . . . . 1534
     Recross-examination by Mr. Ketchmark . . . . . . . 1535

DIANE MATTINGLY
     Direct examination by Ms. Harwell. . . . . . . . . 1538

DANIELLE WALLER
     Direct examination by Ms. Harwell. . . . . . . . . 1553

KATHERINE PORTERFIELD
     Direct examination by Ms. Henry. . . . . . . . . . 1577

```
                    I N D E X                          Page
                   (continued)

                NOVEMBER 8, 2016

                  VOLUME VII
```

KATHERINE PORTERFIELD (resumed)
    Direct examination by Ms. Henry (cont'd.). . . . . . 1636
    Cross-examination by Mr. Ketchmark . . . . . . . . . 1706
    Redirect examination by Ms. Henry. . . . . . . . . . 1709

SIDDHARTHA NADKARNI
    Direct examination by Ms. Harwell. . . . . . . . . . 1711
    Cross-examination by Mr. Valenti . . . . . . . . . . 1740
    Redirect examination by Ms. Harwell. . . . . . . . . 1744

GEORGE WASHINGTON WOODS, JR.
    Direct examination by Ms. Harwell. . . . . . . . . . 1746
    Cross-examination by Mr. Valenti . . . . . . . . . . 1847
    Redirect examination by Ms. Harwell. . . . . . . . . 1861

JOHN O'CONNOR
    Direct examination by Ms. Henry. . . . . . . . . . . 1864

I N D E X                                    Page
(continued)

NOVEMBER 9, 2016

VOLUME VIII

JOHN O'CONNOR (resumed)
      Direct examination by Ms. Henry (cont'd.). . . . . .  1951
      Cross-examination by Mr. Valenti . . . . . . . . .    1994
      Redirect examination by Ms. Henry. . . . . . . . .    2022
      Recross-examination by Mr. Valenti . . . . . . . .    2025

RUBEN GUR
      Direct examination by Ms. Henry. . . . . . . . . .    2028
      Cross-examination by Mr. Valenti . . . . . . . . .    2098
      Redirect examination by Ms. Henry. . . . . . . . .    2127
      Recross-examination by Mr. Valenti . . . . . . . .    2129

GEORGE PARNHAM
      Direct examination by Ms. Henry. . . . . . . . . .    2131

DAVID OWEN
      Direct examination by Ms. Henry. . . . . . . . . .    2136
      Cross-examination by Mr. Valenti . . . . . . . . .    2153
      Redirect examination by Ms. Henry. . . . . . . . .    2177
      Recross-examination by Mr. Valenti . . . . . . . .    2186

FRED DUCHARDT
      Direct examination by Ms. Harwell. . . . . . . . .    2189

I N D E X                                                    Page
(continued)

NOVEMBER 10, 2016

VOLUME IX

FRED DUCHARDT
        Direct examination by Ms. Harwell (cont'd.). . . . .  2263
        Cross-examination by Mr. Ketchmark . . . . . . . . .  2273

BEN LEONARD
        Direct examination by Ms. Henry. . . . . . . . . . .  2324
        Cross-examination by Mr. Valenti . . . . . . . . . .  2327

Movant's closing argument . . . . . . . . . . . . . . . . .  2331

Respondent's closing argument . . . . . . . . . . . . . . .  2359

Movant's rebuttal closing argument. . . . . . . . . . . . .  2374

```
                     INDEX OF EXHIBITS

EXHIBIT
  NO.              DESCRIPTION              OFFERED     RECEIVED

FOR THE MOVANT:

    1        Declaration and
             supplemental declaration
             of Janet Vogelsang              52           52

  1-1        Declaration of Thomas
             Allen Hedberg                   52           52

  1-2        Declaration of Lisa
             Rickert with interviews         52           52

  1-3        Birth certificate of
             Marie Josephine Miller          52           52

  1-4        Death certificate of
             Marie Josephine Miller          52           52

  1-5        Declaration of Mary
             Lee Coleman                     52           52

  1-6        Declaration of John
             Joseph Patterson                52           52

  1-7        Military records of
             John Joseph Patterson           52           52

  1-8        Declaration of Christina
             Juarez Patterson                52           52

  1-9        Declaration of Diane
             Rae Mattingly                   52           52

  1-10       Medical records of Mary
             Lee Coleman                     52           52

  1-11       Declaration of Heath
             Hedberg                         52           52

  1-12       Declaration of Lon Mac
             Hedberg Yates                   52           52

  1-13       Mary Lee Hedberg Coleman
             Gray Junior High               52           52
```

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-14 | School records of Desiree Boman | 52 | 52 |
| 1-15 | Marriage certificate of Robert Lee Patterson and Marie Miller | 52 | 52 |
| 1-16 | Birth certificate of Robert Lee Patterson | 52 | 52 |
| 1-17 | Draft card of Robert Lee Patterson | 52 | 52 |
| 1-18 | Declaration of Grace A. Figg Baum | 52 | 52 |
| 1-19 | Declaration of Wendy Alexander Treibs | 52 | 52 |
| 1-20 | Death certificate of Robert Patterson | 52 | 52 |
| 1-21 | Declaration of Ronald J. Figg | 52 | 52 |
| 1-22 | Enlistment records of Gordon Hedberg | 52 | 52 |
| 1-23 | Marriage license of John Hedberg/Joyce Hammer | 52 | 52 |
| 1-24 | Welfare report on Diane Hedberg | 52 | 52 |
| 1-25 | Riley County records on Diane Hedberg | 52 | 52 |
| 1-26 | Letter from Kings County on Diane Hedberg | 52 | 52 |
| 1-27 | Home Study on Hope Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-28 | Birth certificate of Judy Rignell | 52 | 52 |
| 1-29 | Testimony of Desiree Boman | 52 | 52 |
| 1-30 | Interview of Ron Gieck | 52 | 52 |
| 1-31 | Declaration of Teddy Kleiner | 52 | 52 |
| 1-32 | SSA earnings of Judy Shaughnessy | 52 | 52 |
| 1-33 | Certificate of still birth | 52 | 52 |
| 1-34 | Divorce decree of Leo Barabash/Judy Rignell | 52 | 52 |
| 1-35 | Divorce decree of John Hedberg/Judy Hedberg | 52 | 52 |
| 1-36 | Certificate of live birth of Lisa Marie Hedberg | 52 | 52 |
| 1-37 | Interview of Patty Hedberg | 52 | 52 |
| 1-38 | Marriage certificate of Jack Kleiner/Judy Hedberg | 52 | 52 |
| 1-39 | Divorce transcript of Kleiner v. Kleiner | 52 | 52 |
| 1-40 | Interview of Jerri Jo Kleiner Leonard | 52 | 52 |
| 1-41 | Second declaration of Tommy Lee Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-42 | Marriage license of Judy Boman/Hector Ochoa | 52 | 52 |
| 1-43 | Petition for divorce in Ochoa v. Ochoa | 52 | 52 |
| 1-44 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-45 | Declaration of Dani Waller | 52 | 52 |
| 1-46 | Declaration of Jessica Marie Robinson Thompson Brown | 52 | 52 |
| 1-47 | Mental health report of Diane Hedberg | 52 | 52 |
| 1-48 | Interview of Diane Rae Hedberg Mattingly | 52 | 52 |
| 1-49 | Death certificate of Jack Kleiner | 52 | 52 |
| 1-50 | Obituary information of Jack Kleiner | 52 | 52 |
| 1-51 | Records on Penny Craig | 52 | 52 |
| 1-52 | Divorce of Willadean Kleiner/Jack Kleiner | 52 | 52 |
| 1-53 | Telephone call summary of Josie Kleiner | 52 | 52 |
| 1-54 | Interview of Teddy Kleiner | 52 | 52 |
| 1-55 | Interview with Penny Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-56 | Interview with Tommy Kleiner | 52 | 52 |
| 1-57 | Declaration of Holly Jackson | 52 | 52 |
| 1-58 | Mental health exam of Teddy Kleiner | 52 | 52 |
| 1-59 | Vacation Bible School certificate | 52 | 52 |
| 1-60 | School records for Lisa Montgomery | 52 | 52 |
| 1-61 | School records for Lisa Montgomery | 52 | 52 |
| 1-62 | Declaration of John Francisco | 52 | 52 |
| 1-63 | Art certificate for Lisa Montgomery | 52 | 52 |
| 1-64 | Reading certificate for Lisa Montgomery | 52 | 52 |
| 1-65 | Medical records for Lisa Montgomery | 52 | 52 |
| 1-66 | Spelling award for Lisa Montgomery | 52 | 52 |
| 1-67 | Good citizenship award for Lisa Montgomery | 52 | 52 |
| 1-68 | Lisa Montgomery report to parents | 52 | 52 |
| 1-69 | Declaration of Eunice Copeland | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-70 | Declaration of Kenneth Alexander | 52 | 52 |
| 1-71 | Medical records for Kenneth Alexander | 52 | 52 |
| 1-72 | Kenneth Alexander Florida State Hospital | 52 | 52 |
| 1-73 | SSDI records for Kenneth Alexander | 52 | 52 |
| 1-74 | Kenneth Alexander Snowy Range Consulting | 52 | 52 |
| 1-75 | Kenneth Alexander Wyoming Behavioral | 52 | 52 |
| 1-76 | Kenneth Alexander Wyoming State Hospital | 52 | 52 |
| 1-77 | Kenneth Alexander admission note | 52 | 52 |
| 1-78 | School transcript for Lisa Montgomery | 52 | 52 |
| 1-79 | Declaration of Chelsea Boman Veal | 52 | 52 |
| 1-80 | Declaration of Jonathan Caleb Thompson | 52 | 52 |
| 1-81 | Declaration of Marvin Alexander | 52 | 52 |
| 1-82 | Declaration of Becky Perkey | 52 | 52 |
| 1-83 | Declaration of Jacqueline Moffett | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-84 | Declaration of Jeff Batson | 52 | 52 |
| 1-85 | Declaration of Penny Craig | 52 | 52 |
| 1-86 | Declaration of David L. Owen, Jr. | 52 | 52 |
| 1-87 | Declaration of Alice Mae Derry | 52 | 52 |
| 1-88 | Declaration of Mary Osborn Hodges | 52 | 52 |
| 1-89 | Declaration of Janet McNickle Eastman | 52 | 52 |
| 1-90 | Declaration of Rachael Bowman Johnson | 52 | 52 |
| 1-91 | Declaration of Brenda Cox | 52 | 52 |
| 1-92 | Interview with Lewis Priest | 52 | 52 |
| 1-93 | Tarrant County records of Jeff Batson | 52 | 52 |
| 1-94 | Interview of Allen Baldwin | 52 | 52 |
| 1-95 | Death certificate of Nils Rignell | 52 | 52 |
| 1-96 | Interview of Susan Barrow-Swartz | 52 | 52 |
| 1-97 | Declaration of Susan Barrow-Swartz | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-98 | Declaration of Nita Milburn Montgomery | 52 | 52 |
| 1-99 | Lisa Montgomery, Project Upward Bound | 52 | 52 |
| 1-100 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-101 | Interview of Patty Baldwin | 52 | 52 |
| 1-102 | Counseling records of Lisa Montgomery | 52 | 52 |
| 1-103 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-104 | Divorce file of Boman v. Boman | 52 | 52 |
| 1-105 | Declaration of Carl James Boman | 52 | 52 |
| 1-106 | Declaration of Richard Leroy Boman | 52 | 52 |
| 1-107 | School transcript of Lisa Montgomery | 52 | 52 |
| 1-108 | Enlistment records of Lisa Montgomery | 52 | 52 |
| 1-109 | School records of Michael Boman | 52 | 52 |
| 1-110 | School records of Michael Boman | 52 | 52 |
| 1-111 | State of Kansas v. Carl Boman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-112 | Declaration of Ann Walker-King | 52 | 52 |
| 1-113 | Michael Boman Mar Vista High School | 52 | 52 |
| 1-114 | Declaration of David J. Stadler | 52 | 52 |
| 1-115 | Marriage certificate of Carl Boman/Lisa Hedberg | 52 | 52 |
| 1-116 | Birth certificate of Desiree Boman | 52 | 52 |
| 1-117 | Declaration of Darlene Alexander | 52 | 52 |
| 1-118 | C.J. Boman Deming School records | 52 | 52 |
| 1-119 | Birth certificate of C.J. Boman | 52 | 52 |
| 1-120 | SS statement of Lisa Montgomery | 52 | 52 |
| 1-121 | 1988 datebook | 52 | 52 |
| 1-122 | Birth records of C.J. Boman Jane Phillips | 52 | 52 |
| 1-123 | Competency exam of Kenneth Alexander | 52 | 52 |
| 1-124 | Jane Phillips - early labor for C.J. | 52 | 52 |
| 1-125 | 1989 datebook | 52 | 52 |
| 1-126 | Scripps Memorial Hospital Operative Report | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-127 | Medical records of Carl Boman | 52 | 52 |
| 1-128 | Carl Boman - C.B. Pettigrew, D.O. | 52 | 52 |
| 1-129 | Declaration of Gerald Upshaw | 52 | 52 |
| 1-130 | Birth records of Kayla Boman | 52 | 52 |
| 1-131 | Post-birth records of Kayla Boman | 52 | 52 |
| 1-132 | Kayla Boman Children's Hospital San Diego | 52 | 52 |
| 1-133 | C.J. Boman admitting physical exam | 52 | 52 |
| 1-134 | Desiree Boman, H&P exam | 52 | 52 |
| 1-135 | Children's Hospital San Diego | 52 | 52 |
| 1-136 | C.J. Boman Children's Hospital San Diego | 52 | 52 |
| 1-137 | Chelsea Boman, Scripps Memorial Hospital | 52 | 52 |
| 1-138 | Children's Hospital San Diego concussion | 52 | 52 |
| 1-139 | Discharge summary for Desiree Boman | 52 | 52 |
| 1-140 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-141 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-142 | Lisa Montgomery, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-143 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-144 | School records of Desiree Boman | 52 | 52 |
| 1-145 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-146 | C.J. Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-147 | Declaration of Eithol Marie Boman Towery | 52 | 52 |
| 1-148 | Order Author. Disc of Records under protective order | 52 | 52 |
| 1-149 | Telephone interview of Brett Owens | 52 | 52 |
| 1-150 | Lisa Montgomery statement to Dr. Brian Shane | 52 | 52 |
| 1-151 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-152 | Divorce file in Boman v. Boman | 52 | 52 |
| 1-153 | Divorce decree of Kenneth Alexander/ Kimberly Alexander | 52 | 52 |
| 1-154 | Radiology report of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-155 | School records of Desiree Boman | 52 | 52 |
| 1-156 | Lisa Montgomery Tulsa Community College | 52 | 52 |
| 1-157 | School records of Desiree Boman | 52 | 52 |
| 1-158 | School records of Chelsea Boman | 52 | 52 |
| 1-159 | School records of Desiree Boman | 52 | 52 |
| 1-160 | Interview of Carl Boman | 52 | 52 |
| 1-161 | Interview of Roberta and James Upshaw | 52 | 52 |
| 1-162 | Medical records of Lisa Montgomery | 52 | 52 |
| 1-163 | School records of Chelsea Boman | 52 | 52 |
| 1-164 | School records of Kayla Boman | 52 | 52 |
| 1-165 | School records of Desiree Boman | 52 | 52 |
| 1-166 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-167 | Declaration of Kayla Deanne Boman | 52 | 52 |
| 1-168 | Declaration of Carl James Boman II | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-169 | Tommy Kleiner, Case No. 99-CR-3250 | 52 | 52 |
| 1-170 | C.J. Boman, Stormont Vail Regional Health | 52 | 52 |
| 1-171 | Lisa Montgomery, St. Francis records | 52 | 52 |
| 1-172 | Kevin Montgomery, St. Francis records | 52 | 52 |
| 1-173 | Montgomery v. Montgomery No. 97D-192 | 52 | 52 |
| 1-174 | Declaration of Kevin Montgomery | 52 | 52 |
| 1-175 | School records of Desiree Boman | 52 | 52 |
| 1-176 | School records of Chelsea Boman | 52 | 52 |
| 1-177 | School records of C.J. Boman | 52 | 52 |
| 1-178 | School records of Kayla Boman | 52 | 52 |
| 1-179 | Medical records of Kayla Boman | 52 | 52 |
| 1-180 | Workers' Comp claim of Lisa Montgomery | 52 | 52 |
| 1-181 | Interview of Teddy Kleiner | 52 | 52 |
| 1-182 | Medical records of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-183 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-184 | Motion to temporarily stay child support | 52 | 52 |
| 1-185 | SS statement of Kevin Montgomery | 52 | 52 |
| 1-186 | C.J. Boman, St. Francis Hospital | 52 | 52 |
| 1-187 | Chelsea Boman, St. Francis Hospital | 52 | 52 |
| 1-188 | Desiree Boman, St. Francis Hospital | 52 | 52 |
| 1-189 | Lisa Montgomery, Lawrence Memorial Hos. | 52 | 52 |
| 1-190 | Kevin Montgomery, St. Francis Hospital | 52 | 52 |
| 1-191 | Alias citation in contempt | 52 | 52 |
| 1-192 | Medical records of Desiree Boman | 52 | 52 |
| 1-193 | USA v. Montgomery No. 05-06-002 | 52 | 52 |
| 1-194 | Lisa Montgomery, St. Francis Hospital | 52 | 52 |
| 1-195 | School transcript of Desiree Boman | 52 | 52 |
| 1-196 | Kayla Boman, Carroll High School | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-197 | Declaration of Vanita June Boman | 52 | 52 |
| 1-198 | Declaration of Cheryl Fine | 52 | 52 |
| 1-199 | Notes of Dr. Sallye Wilkinson | 52 | 52 |
| 1-200 | Physical exam of Kayla Boman | 52 | 52 |
| 1-201 | Physical exam of C.J. Boman | 52 | 52 |
| 1-202 | Physical exam of Chelsea Boman | 52 | 52 |
| 1-203 | Chelsea Boman, Newman Memorial Co. Hospital | 52 | 52 |
| 1-204 | Sports physical of Kayla Boman | 52 | 52 |
| 1-205 | School records of Chelsea Boman | 52 | 52 |
| 1-206 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-207 | Justin Kleiner, The Farm History | 52 | 52 |
| 1-208 | Bonnie Jean Taylor and Teddy Kleiner Power of Attorney | 52 | 52 |
| 1-209 | Hospital records of C.J. Boman | 52 | 52 |
| 1-210 | Teddy Kleiner, intake and social history | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-211 | The Farm Court Report on Justin Kleiner | 52 | 52 |
| 1-212 | Interview of Lori Colwell | 52 | 52 |
| 1-213 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-214 | Interstate Compact on placement of children | 52 | 52 |
| 1-215 | Bonding out of Tommy Kleiner | 52 | 52 |
| 1-216 | Tommy Kleiner, Frankin County | 52 | 52 |
| 1-217 | Shaughnessy home study | 52 | 52 |
| 1-218 | Screening records of Justin Kleiner | 52 | 52 |
| 1-219 | Justin Kleiner, case log for monthly family contact | 52 | 52 |
| 1-220 | Hospital records for Chelsea Boman | 52 | 52 |
| 1-221 | Employment records of Lisa Montgomery | 52 | 52 |
| 1-222 | Cotton O'Neal Clinic | 52 | 52 |
| 1-223 | Kansas v. Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-224 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-225 | Kansas v. Tommy Kleiner, No. 98-CR-1335 | 52 | 52 |

1336

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-226 | Interview of Kevin Montgomery | 52 | 52 |
| 1-227 | Death certificate of Lori Diane Blalock | 52 | 52 |
| 1-228 | Declaration of Jenny Hays | 52 | 52 |
| 1-229 | Request for leave form | 52 | 52 |
| 1-230 | State of OK v. Teddy Kleiner, No. CM-1999-3081 | 52 | 52 |
| 1-231 | Mental health and class report on Teddy Kleiner | 52 | 52 |
| 1-232 | Letter to Kevin from Lisa | 52 | 52 |
| 1-233 | Coffey Health Systems v. Montgomery, No. 2004-LM-0108 | 52 | 52 |
| 1-234 | James McMurray, DDS account history rpt. | 52 | 52 |
| 1-235 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-236 | Montgomery v. Shaughnessy, No. 2004-DM-23 | 52 | 52 |
| 1-237 | Patient discharge sheet of Chelsea Boman | 52 | 52 |
| 1-238 | Chelsea Boman, Waverly Medical Clinic | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-239 | School transcript of C.J. Boman | 52 | 52 |
| 1-240 | Medical records of Desiree Boman | 52 | 52 |
| 1-241 | Discharge from duty for Chelsea Boman | 52 | 52 |
| 1-242 | Discharge from duty for Kayla Boman | 52 | 52 |
| 1-243 | Tommy Kleiner v. Nina Green, No. 05-DM-226 | 52 | 52 |
| 1-244 | Interview of Cheryl Fine | 52 | 52 |
| 1-245 | Interview of Lisa Green | 52 | 52 |
| 1-246 | Kansas v. Tommy Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-247 | Interview of Katheryn Dewey | 52 | 52 |
| 1-248 | School transcript of Kayla Boman | 52 | 52 |
| 1-249 | Interview of Kayla Boman | 52 | 52 |
| 1-250 | Interview of Mona Marcotte | 52 | 52 |
| 1-251 | Physical evidence glove box 1B15(18) | 52 | 52 |
| 1-252 | Evidence retrieved from house | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-253 | School records of Desiree Boman | 52 | 52 |
| 1-254 | Hospital records of Mary Lee Coleman | 52 | 52 |
| 1-255 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-256 | Interview of Lisa Green | 52 | 52 |
| 1-257 | Home study of Judy Shaughnessy | 52 | 52 |
| 1-258 | Diane Rae Hedberg adoption registry | 52 | 52 |
| 1-259 | Central Assembly of God church, promotion beginner to primary | 52 | 52 |
| 1-260 | Central Assembly of God church, promotion primary to junior dept. | 52 | 52 |
| 1-261 | Pease Middle School records | 52 | 52 |
| 1-262 | Medical records for Wendy Treibs | 52 | 52 |
| 1-263 | Email from Lisa Montgomery to Lori Colwell | 52 | 52 |
| 1-264 | Home study on Judy and Danny Shaughnessy | 52 | 52 |
| 1-265 | Shield of Service discharge summary for Teddy Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-266 | Montgomery v. Kleiner No. 03-DM-198 | 52 | 52 |
| 1-267 | Motion for modification of child support | 52 | 52 |
| 1-268 | History and physical of Carl Boman | 52 | 52 |
| 1-269 | Waiver of parental rights for Justin Kleiner | 52 | 52 |
| 1-270 | Case activity log for monthly family contact for Justin Kleiner | 52 | 52 |
| 1-271 | Psychiatric evaluation for Lisa Montgomery | 52 | 52 |
| 1-272 | Department of Human Services report | 52 | 52 |
| 1-272-1 | Neuropsychological evaluation of Lisa Montgomery | 52 | 52 |
| 1-273 | Jim Dale Eastom sex offender registry | 52 | 52 |
| 1-274 | Declaration of Dylan Montgomery | 52 | 52 |
| 1-275 | Residences chart of Lisa Montgomery | 52 | 52 |
| 1-276 | Declaration of Dustin Montgomery | 52 | 52 |
| 1-277 | Child abuse-neglect referral form | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-278 | Report to the district attorney | 52 | 52 |
| 1-279 | Child abuse-neglect referral form | 52 | 52 |
| 1-280 | Photograph | 52 | 52 |
| 1-281 | Declaration of Ben Leonard | 52 | 52 |
| 1-282 | 1999 Oklahoma DHS records | 52 | 52 |
| 1-283 | Interview of David Kidwell, Sr. | 52 | 52 |
| 1-284 | Declaration of Carl Boman | 52 | 52 |
| 1-285 | Declaration of Leon Michael Barabash | 52 | 52 |
| 1-286 | Declaration of James N. Miller | 52 | 52 |
| 1-287 | Declaration of Michael Harlow | 52 | 52 |
| 1-288 | Declaration of Sang Ye Seiffert | 52 | 52 |
| 1-289 | Declaration of Dr. Sallye Wilkinson | 52 | 52 |
| 1-291 | Declaration of Bret Dillingham | 52 | 52 |
| 1-292 | Declaration of Desiree Boman Offutt | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-293 | Chronology of disruption of child custody | 52 | 52 |
| 2 | Curriculum vitae of Janet Vogelsang | 52 | 52 |
| 3 | Residential map of Lisa Montgomery | 52 | 52 |
| 4 | Genogram | 52 | 52 |
| 5 | Chart of mental health symptoms | 52 | 52 |
| 6 | Chart of traumatic events | 52 | 52 |
| 7 | Report of Katherine Porterfield | 52 | 52 |
| 8 | Addendum to report of Katherine Porterfield | 52 | 52 |
| 9 | Curriculum vitae of Katherine Porterfield | 52 | 52 |
| 10 | Declaration of David Kidwell | 52 | 52 |
| 11 | Declaration of Ben Leonard re: David Kidwell | 52 | 52 |
| 12 | Declaration of Wesley Gann | 52 | 52 |
| 13 | Declaration of Carl Boman | 52 | 52 |
| 14 | Declaration of Linda Baker | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 15 | Declaration of Ben Leonard re: Linda Baker | 52 | 52 |
| 16 | Lisa Montgomery handwritten note | 52 | 52 |
| 17 | Kleiner v. Kleiner divorce proceedings | 52 | 52 |
| 18 | Obituary of Gerald "Shorty" Shipley | 52 | 52 |
| 19 | Declaration of Carl McClain | 52 | 52 |
| 20 | Report of George Woods | 52 | 52 |
| 21 | Addendum to report of George Woods | 52 | 52 |
| 22 | Curriculum vitae of George Woods | 52 | 52 |
| 23 | Report of Siddhartha Nadkarni | 52 | 52 |
| 24 | Declaration of Diane Bradford | 52 | 52 |
| 25 | Curriculum vitae of Diane Bradford | 52 | 52 |
| 26 | Declaration of Charles Sanislow | 52 | 52 |
| 27 | Curriculum vitae of Charles Sanislow | 52 | 52 |
| 28 | Reports of Ruben Gur | 52 | 52 |
| 29 | 2016 addendum to report of Ruben Gur | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 30 | Curriculum vitae of Ruben Gur | 52 | 52 |
| 31 | Curriculum vitae of Andrew Newberg | 52 | 52 |
| 32 | Testimony of Helen Mayberg | 52 | 52 |
| 33 | Testimony of Alan Evans | 52 | 52 |
| 34 | Report of Helen Mayberg and Alan Evans | 52 | 52 |
| 35 | Curriculum vitae of Christos Davatzikos | 52 | 52 |
| 36 | Deposition of V.S. Ramachandran | 52 | 52 |
| 37 | March 2005 letter of Marilyn Hutchinson | 52 | 52 |
| 38 | Curriculum vitae of Marilyn Hutchinson | 52 | 52 |
| 39 | 3/7/05 report of William Logan | 52 | 52 |
| 40 | 5/15/07 report of William Logan | 52 | 52 |
| 41 | Declaration of William Logan | 52 | 52 |
| 42 | Curriculum vitae of William Logan | 52 | 52 |
| 43 | Report of Ruth Kuncel | 52 | 52 |
| 44 | Curriculum vitae of Ruth Kuncel | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 45 | Report of Robert Fucetola | 52 | 52 |
| 46 | Curriculum vitae of Robert Fucetola | 52 | 52 |
| 47 | Declaration of Russell Stetler | 52 | 52 |
| 48 | Supplemental declaration of Russell Stetler | 52 | 52 |
| 49 | Curriculum vitae of Russell Stetler | 52 | 52 |
| 50 | Declaration of Denise Leboeuf | 52 | 52 |
| 51 | Curriculum vitae of Marc Bookman | 52 | 52 |
| 52 | Report of Lawrence Fox | 52 | 52 |
| 53 | Curriculum vitae of Lawrence Fox | 52 | 52 |
| 54 | Lisa Rickert resignation letter | 52 | 52 |
| 55 | Email from David Owen to Holly Jackson | 52 | 52 |
| 56 | Holly Jackson mitigation themes chart | 52 | 52 |
| 57 | To-do list of Deb Garvey | 52 | 52 |
| 58 | 4/3/07 transcript of proceedings | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59 | 4/5/07 transcript of proceedings | 52 | 52 |
| 60 | Declaration of Susan Hunt | 52 | 52 |
| 61 | Declaration of Phil Thompson | 52 | 52 |
| 62 | Affidavit of David Owen | 52 | 52 |
| 63 | Declaration of Judy Clarke | 52 | 52 |
| 64 | Declaration of Deb Garvey | 52 | 52 |
| 65 | 4/30/06 letter from Susan Hunt to Richard Burr | 52 | 52 |
| 66 | 4/21/06 transcript of proceedings | 52 | 52 |
| 67 | 4/25/06 transcript of proceedings | 52 | 52 |
| 68 | 5/3/06 transcript of proceedings | 52 | 52 |
| 69 | Order banning Judy Clarke from CCA | 52 | 52 |
| 70 | Order regarding Judy Clarke's telephone number | 52 | 52 |
| 71 | Letter from Lisa Montgomery to Judge Fenner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 72 | Deposition of Ray Conrad | 52 | 52 |
| 73 | Declaration of Linda McCandless | 52 | 52 |
| 74 | Declaration of Ben Leonard re: Linda McCandless | 52 | 52 |
| 75 | Declaration of Charles Dedmon | 52 | 52 |
| 76 | Declaration of Melody Brannon | 52 | 52 |
| 77 | 4/5/07 transcript of In Chambers hearing | 52 | 52 |
| 78 | Stipulation regarding Denise Baker | 52 | 52 |
| 79 | Stipulation regarding Hugh Rineer | 52 | 52 |
| 80 | Declaration of James Brooks | 52 | 52 |
| 81 | Grand jury testimony of Park Dietz | 52 | 52 |
| 82 | Billing records of Fred Duchardt | 52 | 52 |
| 83 | Declaration of Chris Armstrong | 52 | 52 |
| 84 | Billing records of John O'Connor | 52 | 52 |
| 85 | CCA visitation records | 52 | 52 |
| 86 | ABA Guidelines 1989 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 87 | Supplementary Guidelines 2008 | 52 | 52 |
| 88 | Guide to Judiciary Policy 2016 | 52 | 52 |
| 89 | Summary of deleted history | 52 | 52 |
| 90 | Amended plan for implementing the Criminal Justice Act | 52 | 52 |
| 91 | Order appointing Federal Public Defender | 52 | 52 |
| 92 | Motion to withdraw | 52 | 52 |
| 93 | Order appointing additional counsel | 52 | 52 |
| 94 | Motion to withdraw | 52 | 52 |
| 95 | 1/27/05 letter from Susan Hunt to CCA Warden | 52 | 52 |
| 96 | Mitigation Investigation: A Duty that Demands Expert Help but Can't Be Delegated | 52 | 52 |
| 97 | Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment | 52 | 52 |
| 98 | Curriculum vitae of David Freedman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 99 | Letter to Susan Hunt from Reuben Camper Cahn | 52 | 52 |
| 100 | The Mystery of Mitigation | 52 | 52 |
| 101 | Records requested chart | 52 | 52 |
| 102 | Witnesses interviewed chart | 52 | 52 |
| 103 | ABA Guidelines 2003 | 52 | 52 |
| 104 | The Defense Team in Capital Cases 2003 | 52 | 52 |
| 105 | A New Profession for an Old Need 2003 | 52 | 52 |
| 106 | Mitigation Evidence in Death Penalty cases | 52 | 52 |
| 107 | Mental Disabilities and Mitigation | 52 | 52 |
| 108 | Commentary on Counsel's Duty to Seek and Negotiate a Disposition | 52 | 52 |
| 109 | Unknown Story of a Motherless Child | 52 | 52 |
| 110 | The ABA Guidelines and Norms | 52 | 52 |
| 111 | Mental Health Evidence and the Capital Defense Function | 52 | 52 |
| 112 | The ABA Guidelines: A Historical Perspective | 52 | 52 |

```
                         INDEX OF EXHIBITS
                            (continued)
```

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 113 | New Strategies for the Defense of Capital Cases | 52 | 52 |
| 114 | The Trial for Life | 52 | 52 |
| 115 | The Penalty Phase Trial | 52 | 52 |
| 116 | The Nelson Case | 52 | 52 |
| 117 | Using the Mitigation Specialist and the Team Approach | 52 | 52 |
| 118 | The Mental Health Evaluation in Capital Cases: Standards of Practice | 52 | 52 |
| 119 | Mitigation Investigation | 52 | 52 |
| 120 | Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation | 52 | 52 |
| 121 | Cultural Competency in Capital Mitigation | 52 | 52 |
| 122 | Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases | 52 | 52 |
| 123 | Why Capital Cases Require Mitigation Specialists | 52 | 52 |
| 124 | Memo from Stephanie Elliott to defense team | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 125 | Curriculum vitae of Siddhartha Nadkarni | 52 | 52 |
| 126 | Affidavit of Lisa Rickert | 52 | 52 |
| 127 | 1/6/05 letter from Lisa Rickert to Ron Ninemire | 52 | 52 |
| 128 | Hallmarks of bipolar disorder | 52 | 52 |
| 129 | Contract of Dani Waller | 52 | 52 |
| 130 | 9/12/06 memo from Dani Waller to team | 52 | 52 |
| 131 | Chart of similar cases | 52 | 52 |
| 132 | 3/5/05 letter from Susan Hunt to Isaac Johnson | 52 | 52 |
| 133 | Attorney timeline | 52 | 52 |
| 134 | Letter from John David Luton | 52 | 52 |
| 135 | The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert/Lay Testimony | 52 | 52 |
| 136 | U.S.D.C. Docket sheet | 52 | 52 |
| 137 | Notes by Roseann Ketchmark | 52 & 1954 | 52 & 1954 |
| 138 | Notes by Roseann Ketchmark | 52 & 1962 | 52 & 1962 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 139 | Fred Duchardt's email to Department of Justice | 52 | 52 |
| 140 | Dillingham billing statement | 295 | 296 |
| 141 | Dillingham billing statement | 297 | 297 |
| 142 | Deposition of Tommy Kleiner | 475 | 476 |
| 143 | Report of Robert Fucetola | 876 | 876 |
| 144 | Chart | 885 | 885 |
| 145 | Contact notes | 905 | 905 |
| 146 | MMPI-2 report | 1070 | 1070 |
| 147 | Raw data | 1070 | 1070 |
| 148 | Printout from MIMneuro | 1232 | 1233 |
| 152 | Robert Fucetola's MMPI report | 1421 | 1421 |
| 153 | PAI report | 1456 | 1456 |
| 154 | Janet Vogelsang's Biopsychosocial History report | 1530 | 1530 |
| 155 | Katherine Porterfield's report | 1705 | 1705 |
| 157 | Memo of Fred Duchardt | 1988 | 1988 |
| 158 | Leona Hayes file | 1965 | 1965 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 159 | Dr. Woods PowerPoint | 2216 | 2216 |
| 160 | 2/12/07 fax memo from Fred Duchardt | 2323 | 2324 |
| 161 | Declaration of Torres | 2327 | 2327 |
| 162 | Torres jury questionnaire | 2326 | 2326 |

FOR THE RESPONDENT:

| | | | |
|---|---|---|---|
| 41 | Statement of John O'Connor | 2022 | 2022 |
| 42 | Statement of Fred Duchardt | 2277 | 2277 |
| 44 | 2014 truncated transcript | 2329 | 2330 |
| 45 | Judge Gaitan's order on Nelson 2255 | 2329 | 2330 |

```
 1                      NOVEMBER 7, 2016

 2                      MORNING SESSION

 3            (Court in session at 8:55 a.m.)

 4            THE COURT:  Good morning.

 5            Ms. Henry, I'm told that you have some matters you

 6   wanted to discuss before we begin?

 7            MS. HENRY:  Yes, Your Honor, if I may.

 8            THE COURT:  All right.

 9            MS. HENRY:  May it please the Court.  We just have a

10   few housekeeping matters and an issue with respect to one of

11   our witnesses that the government was kind enough to let me

12   know they might move to exclude, and they thought perhaps it

13   would be best to take that up first thing this morning.

14            THE COURT:  All right.

15            MS. HENRY:  With respect to the witnesses, I would

16   like to let the Court know that we have substantially cut down

17   our witness list, and I have advised Ms. Moore of the witnesses

18   that we will not be intending to call in this matter.  Given

19   that and conversations that I had with Mr. Valenti after court

20   on Friday, it appears clear to us that we will be through all

21   of our proof this week.  So that's good news, I hope.

22            With respect to the witness matter, Mr. Valenti -- I

23   emailed him Friday afternoon and asked if there were any other

24   witnesses that the government thought they might be moving to

25   exclude; and after informing me that their cross-examinations
```

1    this week will be much the same as their cross-examinations

2    last week, except for with respect to Dr. Woods and Mr.

3    Duchardt and perhaps Mr. Owen, Mr. Valenti informed me that the

4    government's position that a witness by the name of George

5    Parnham -- that's P-a-r-n-h-a-m -- will be the subject of a

6    motion to exclude, and so he thought that perhaps it would be

7    best to have that discussion this morning if that's okay with

8    Your Honor.

9              THE COURT:  All right.

10             MS. HENRY:  Your Honor, as you are aware, one of the

11   issues upon which we had been granted an evidentiary hearing at

12   page 190 to 192 of the 2255 motion in this case involves our

13   allegations that trial counsel failed to conduct an

14   out-of-court investigation and, therefore, was ineffective in

15   their cross-examination of government witness Park Dietz.

16             For context, Dr. Park Dietz testified on direct

17   examination by questioning from Assistant United States

18   Attorney Matt Whitworth regarding the subject of the Andrea

19   Yates case.  The government brought out on direct that Dr.

20   Dietz' testimony had been found to be false in that case

21   causing the case to be reversed.  Dr. Dietz gave a version on

22   direct of his involvement with that false testimony in the

23   Yates case, which upon investigation proved to be inaccurate.

24             Then on cross-examination Mr. Duchardt was asked

25   further questions about the grand jury investigation that was

1    initiated by the grand jury in Harris County, Texas,

2    contemplating charges of aggravated perjury against Dr. Dietz,

3    among others.

4            In that testimony Dr. Dietz testified, we say,

5    inaccurately or even falsely about that grand jury testimony

6    and the subject of the grand jury to Mrs. Montgomery's trial.

7    First, Dr. Dietz testified that the grand jury was a, quote,

8    runaway jury.  He used that phrase three times.  He stated that

9    the jury had thrown out the prosecution.  He testified that the

10   grand jury investigation into his perjury in the Yates case was

11   instigated by Attorney George Parnham.

12           We have subsequently spoken with Mr. Parnham, and we

13   have also spoken with the prosecutor, Joe Ownby, in the Yates

14   case.  We have obtained a copy of the grand jury testimony of

15   Dr. Dietz in the Yates case.  Mr. Parnham would testify that

16   that grand jury testimony, which is in evidence already in this

17   matter, was public and available in 2007.  That was confirmed

18   by myself and my investigator, Ben Leonard, when we spoke to

19   Mr. Owmby.  So the grand jury testimony Your Honor has is a

20   public record that would have been available to trial counsel

21   at the time.  That grand jury testimony in and of itself

22   impeaches some of the testimony provided by Dr. Dietz about his

23   involvement in the Yates case before the Montgomery jury.

24           Mr. Parnham would also testify that he did not

25   instigate the grand jury proceedings against Dr. Dietz.

1356

1    There's further information in that grand jury testimony that

2    could have been used to impeach Dr. Dietz that would not

3    necessarily be the subject of Mr. Parnham's testimony; but,

4    however, Mr. Parnham would also impeach Dr. Dietz' testimony

5    before Lisa Montgomery's jury that he had been the one to bring

6    to the attention his false testimony to the prosecution.  That,

7    in fact, it was a reporter by the name of Suzanne O'Malley who

8    was in the courtroom when Dr. Dietz testified in the Yates

9    case.  Ms. O'Malley also happened to be a writer for the TV

10   show Law & Order.

11          After Dr. Dietz testified, Suzanne O'Malley called

12   Dick Wolf, who was the creator of Law & Order, to ask him if he

13   recalled such an episode that Dr. Dietz had testified about.

14   He did not.  He was quite angry.

15          Mr. Parnham can testify that he spoke with Dick Wolf

16   by phone and that he was prepared to come to testify in the

17   Yates matter before the NBC lawyers got involved.  That's a

18   completely different story and impression than what Dr. Dietz

19   presented to Mrs. Montgomery's jury where he presented himself

20   as having made a simple error of memory, and that he was the

21   one who acted to correct his testimony.

22          We would offer that testimony in very limited

23   fashion.  I don't anticipate it lasting more than ten minutes

24   and certainly not extending the evidentiary hearing in this

25   matter for any length of time.  We believe it is relevant to

1   the claim that this court did grant an evidentiary hearing on.

2   As the Court knows the standard of granting an evidentiary

3   hearing is that our allegations, if true, would entitle Ms.

4   Montgomery to relief.  Having the Court already considered this

5   to be a relevant matter for hearing, we believe Mr. Parnham's

6   testimony is relevant.

7          THE COURT:  You are saying that Mr. Parnham will

8   establish that he did not instigate the grand jury inquiry into

9   Dr. Dietz' testimony?  Is that the essence of what you want to

10  establish with him?

11         MS. HENRY:  That and that the grand jury transcript

12  itself was a public record that was available to trial counsel.

13  If trial counsel would have asked him for it, he would have

14  given him that transcript.

15         THE COURT:  Isn't that a matter of record?  Do you

16  need to have somebody testify about that?

17         MS. HENRY:  I don't know that it's a matter of

18  record in this court, and I don't know if this court can take

19  judicial notice of matters of record in a Texas state court.

20  If the State wants to stipulate -- or the government wants to

21  stipulate to that, that would be fine with us as well.

22         MR. VALENTI:  Your Honor, before I would be prepared

23  to stipulate, I have not done any fact investigation about the

24  availability of the Texas grand jury transcript.

25         THE COURT:  Could you --

1    MR. VALENTI:  I have not done any fact investigation
2  about the availability of the Texas grand jury transcript.  I
3  would have to look at that before I would be willing to
4  stipulate to it.
5    But, regardless, we've admitted the grand jury
6  transcript for purposes of this evidentiary hearing.  In my
7  mind, Mr. Parnham's testimony is a collateral issue.  I'm not
8  sure that it would ever rise to the level of proper impeachment
9  under Rule 609.  It's uncharged criminal conduct.  He was
10  investigated for it.  Quite frankly, you have the transcript
11  before you.  It looks like it was totally motivated so Harris
12  County could get their fee back.  Whether that's true or not, I
13  don't know, but it's available to the Court.
14    I don't know that uncharged criminal conduct of Dr.
15  Dietz would have been properly admitted as proper
16  cross-examination for impeachment purposes.  I don't think it's
17  necessary here.  If you want to look at the transcript, it's
18  certainly available in the packet of materials that has
19  previously been submitted.  I think bringing the attorney up
20  here to talk about what he did or did not instigate in his own
21  cross-examination of Dr. Dietz is a collateral issue that we
22  don't need to waste his time to fly up, and I don't think you
23  need to listen to it.
24    THE COURT:  Well, I'll think about it.  You know, my
25  initial reaction, without giving it too much thought, is that

1    it seems to be pretty collateral.  It seems to be quite a

2    stretch as to the significance one way or another of who may or

3    may not have instigated a grand jury inquiry against Dr. Dietz

4    as being of much, if any, significance in terms of

5    cross-examining Dr. Dietz, but I'll give it some thought and

6    I'll let you know through the course of the day.  Is this

7    something you're going to present today?

8            MS. HENRY:  No, sir.  I did neglect one citation as

9    the Court considers the government's argument.  I would direct

10   the Court's attention to the Eighth Circuit decision, United

11   States v. Purkey with respect to this matter.

12           THE COURT:  What's that say?

13           MS. HENRY:  Your Honor, in United States v. Purkey

14   the Eighth Circuit Court of Appeals found that the exclusion of

15   the -- I can't quote it directly, but they basically found that

16   this court had erred in a case where Mr. Duchardt had sought to

17   impeach Dr. Dietz regarding his work in the Yates case, and the

18   Court found that to be error, nonetheless, harmless error.

19           And I appreciate the Court taking the time to think

20   about that.

21           THE COURT:  Do you have the cite to that?

22           MS. HENRY:  Let me call that up very quickly, Your

23   Honor.  I'm sorry.

24           THE COURT:  It's not exactly the same issue we have

25   here, but I'll look at it.

1       MS. HENRY:  Yes, sir.  Yes, sir.  I would agree it's
2   not exactly straight on point.  The difference being, of
3   course, that here, as in Purkey, the government introduced the
4   issue into evidence.
5       But the pinpoint cite is 428 F.3d 738 at 759.
6   That's a 2005 case.
7       THE COURT:  All right.  I'll get back to you on that
8   today.
9       MS. HENRY:  Thank you, sir.
10      With respect to our next witness, Your Honor, I
11  would just like to provide two minutes of context because his
12  testimony is complex and complicated.
13      Our next expert is a gentleman by the name of
14  Charles Sanislow, S-a-n-s-i-l-o-w.  Dr. Sanislow -- the Court's
15  probably seen the development -- we split our evidence into
16  sufficient performance versus prejudice, and we started
17  bridging that gap this week into the prejudice aspect of things
18  and a smattering of all our other 50 issues within these
19  witnesses' testimony.
20      Dr. Sanislow goes not only to our claims about trial
21  counsel's failure to file pretrial motions but also their
22  failure to competently cross-examine Dr. Martell and Dr. Dietz.
23  Some of Dr. Sanislow's testimony will be highly technical, and
24  I don't want the Court to have the impression that we are
25  suggesting that such highly technical information should

1  necessarily have been presented in front of the jury. Instead,

2  some of the technical information would have been appropriate

3  for pretrial motion practice such as a motion under 12.2 to

4  limit the evaluation of Mrs. Montgomery by Dr. Martell

5  challenging whether or not an MMPI was even appropriate for

6  someone like Mrs. Montgomery; and, of course, that presupposes

7  that the proper mental health defense had been pled in the

8  first place.

9  In addition, Dr. Sanislow's testimony would have

10  been relevant to a pretrial Daubert hearing to challenge the

11  admissibility of testimony from Dr. Martell and Dr. Dietz

12  regarding the MMPI.

13  Further, Dr. Sanislow's testimony is relevant as to

14  trial counsel's failure to seek competent mental health

15  assistance in preparing for trial and to cross-examine Dr.

16  Dietz and Dr. Martell; and, finally, someone such as Dr.

17  Sanislow certainly could have testified to rebut the

18  testimonies of Dr. Dietz and Dr. Martell should all of those

19  measures had been unsuccessful and that testimony presented in

20  front of the jury.

21  So this testimony is related to several issues, the

22  crux of which goes to the fact that Dr. Martell testified that

23  the MMPI showed Mrs. Montgomery to be a malingerer. Dr. Dietz

24  piggybacked on that testimony and devastated the defense by

25  arguing that Mrs. Montgomery was not in any way mentally ill

1    with the exception of having PTSD from the crime itself and

2    was, therefore, not believable.

3            So that is the reason why this is going to get a

4    little bit complicated, and I wanted to give you that context,

5    and I thank you for that opportunity.

6            The movant calls, with the Court's permission, Dr.

7    Charles Sanislow.

8            THE COURT:  All right.

9    CHARLES N. SANISLOW, being sworn by the courtroom deputy,

10   testified:

11   DIRECT EXAMINATION BY MS. HENRY:

12   Q    Good morning, Dr. Sanislow.  Would you have a seat for

13   us.  And there's some water right there in front of you should

14   you need it.

15           Could you state your name for the record and spell

16   your last name, please.

17   A    Charles N. Sanislow, S-a-n-i-s-l-o-w.

18   Q    And, Dr. Sanislow, what is your occupation?

19   A    I'm a clinical psychologist and I'm an associate

20   professor of neuroscience and behavior and of psychology at

21   Wesleyan University.

22   Q    Dr. Sanislow, are you licensed to practice anywhere?

23   A    I'm licensed to practice in the state of Connecticut.

24   Q    And how long have you held that license to practice?

25   A    I believe since 1995.

1   Q       And prior to -- in addition to your work at Wesleyan

2   University, are you also an adjunct faculty member anywhere?

3   A       I'm an adjunct faculty member of the Department of

4   Psychiatry at the Yale University School of Medicine.

5   Q       And at the Yale University School of Medicine, do you

6   collaborate with faculty in the psychiatry/psychology

7   department?

8   A       Yes, I do.

9   Q       What is it that you study there?

10   A       I study the cognitive mechanisms of psychopathology.  I

11   study diagnosis and assessment and classification of

12   psychopathology.  And I study posttraumatic stress disorder.

13   Q       What do you mean by cognitive mechanisms?

14   A       Cognitive mechanisms are features of the way the mind

15   works that impact symptomatic behavior.  Those are the ones I'm

16   most interested in.  When they're working well, people are able

17   to do well and feel good.  When they're not working well -- for

18   instance, if somebody's memory's impaired or they're depressed

19   or if they're not able to experience pleasure, those cognitive

20   systems are potentially connected to our psychiatric or

21   clinical symptoms, and that's what I mean by the cognitive

22   mechanisms.

23   Q       Are you also a consultant to the National Center for

24   PTSD?

25   A       Yes, I am.

1364

1    Q      Can you explain to the Court, please, your educational

2    background?

3    A      Starting with my undergraduate degree?

4    Q      Sure.

5    A      I was educated in psychology, a psychology major at

6    Northern Michigan University in the Upper Peninsula of

7    Michigan.  I began studying genetics and biochemistry but

8    became very interested in psychology when I got a work study

9    job at the Cox Counseling Center and was taught about how

10   science really could be used in immediate ways to help people,

11   and that's where my interest grew late in my career, graduate

12   career actually.

13          I next obtained a master's degree from Ball State

14   University in Muncie, Indiana, and following that I went on to

15   get my Ph.D. in clinical psychology at Duke University.  When

16   someone takes a clinical degree -- doctoral degree in clinical

17   psychology, an internship is required.  I did my internship at

18   the Yale University School of Medicine.  Then that was followed

19   by one year of postdoctoral study, which was required for me to

20   become a licensed clinical psychologist.

21   Q      While you were at Duke University obtaining your Ph.D.

22   in clinical psychology, did you have the opportunity to work

23   with some of the country 's foremost experts in the area of

24   MMPI?

25   A      Yes.  Specifically two.  One was my research mentor, my

1    dissertation supervisor, Professor Robert Carson, who has
2    written extensively on the MMPI and also devoted much of his
3    work as a professor training graduate students and also those
4    in the psychiatry department how to use the MMPI for clinical
5    purposes.
6              I had the good fortune in the triangle area to be
7    close to UNC Chapel Hill where I was able to also take
8    coursework from a Grant Dahlstrom and have him help me to learn
9    more about the MMPI, and Grant Dahlstrom is one of the
10   originators of the MMPI.
11   Q     He helped design the MMPI?
12   A     He helped design the later versions of the MMPI.  He
13   also was involved in the effort to bring the MMPI up to date
14   when a new version was released, the MMPI-2.
15   Q     How do you spell Dr. Dahlstrom's last name?
16   A     D-a-h-l-s-t-r-o-m.
17   Q     Thank you.  I didn't tell you there would be a spelling
18   test.
19             Because of your interest in the MMPI, were you
20   actually invited to teach about the MMPI to post doc students
21   while you were at Duke?
22   A     To graduate students while I was at Duke, yes.  So the
23   personality assessment course that we were taught had a section
24   on the MMPI, and when I first -- when I was actually in that
25   course, the instructor realized my interest, and so for the

1366

1  entire time that I was there he brought me back to the class to

2  teach to the graduate students how to use the MMPI.

3  Q      And while at Duke obtaining your training on

4  assessing and performing psychotherapy, did that focus on

5  difficult-to-treat patients?

6  A      Yes.

7  Q      And what does that mean, difficult-to-treat patients?

8  A      Difficult-to-treat patients are patients that are most

9  notably characterized by the failure of their treatments; in

10  other words, they fail past treatments, whether they are

11  psychotherapy or medication treatments.

12          The severity of their psychiatric illness often

13  reflects the presence of multiple disorders, which is one of

14  the complications of treating -- one of the things that makes

15  it difficult to treat patients with such severe

16  psychopathology; in other words, people can run around from

17  diagnosis to diagnosis and not get to the heart of the matter,

18  by looking at the entire clinical picture.

19  Q      And so when you say multiple diagnoses, is that

20  something that you refer to as comorbid mental illnesses?

21  A      Yes.  We could call it comormid or co-occurring mental

22  illnesses and both terms are used interchangeably.  There are

23  some people -- and I think that this is a good point to make --

24  that at our level of understanding of how connections between

25  clinical syndromes and the mechanisms such that I described

1    earlier have not been completely clarified, it's safe to say

2    co-occurring disorders.  If they were comormid, we would

3    understand fully how the mechanisms worked today.  That said,

4    it's common to use the terms interchangeably.

5    Q      And that experience will be relevant to our discussion

6    of Mrs. Montgomery a little bit later; is that right?

7    A      Yes.

8    Q      Did you also have the experience of using the MMPI with

9    the Durham Police Department?

10   A      Yes.  For part of our training the Duke Psychology

11   Clinic had a contract to do appointment screening with

12   candidates for positions in the Durham Police Department, and

13   we were trained to use the MMPI to do that, and I -- yes.  And

14   also when I was clinical coordinator, I did more of those

15   assessments for two years as coordinator of the Duke Psychology

16   Clinic.

17   Q      And while you were at Yale, did you have the experience

18   of developing a treatment program for duly-diagnosed

19   adolescents?

20   A      Yes, I did.

21   Q      Can you describe that program?

22   A      So my training -- and stop me if I'm going into too

23   much detail -- but my training and my predoctoral/postdoctoral

24   studies at Yale was developing adult -- was working on adult

25   dual-diagnosis units and there were no such services for

1    adolescents, and so one of my first jobs was to devise such a

2    program for adolescents who were experiencing both mental

3    disorders and substance abuse disorders, something we call

4    double trouble.  The problem is that you cannot treat one thing

5    without -- the one problem without the other, so this is

6    another example of comorbidity.  And oftentimes it's very

7    difficult to treat duly diagnosed individuals because the

8    tendency is to focus on one side of the problem or the other

9    side of the problem when you need to be working with both

10   problems simultaneously.

11   Q     I forgot to ask you, and I think it's relevant to your

12   testimony today, if you would describe for the Court your

13   doctoral dissertation.

14   A     My doctoral dissertation was looking at personality

15   characteristics and interpersonal behaviors that created

16   vulnerabilities for psychopathology, in particular depressive

17   symptomatology and those features had to do with trying to

18   derive other ways to classify depressive symptomatology that

19   reflected things that were related to what we would call

20   achievement failure and also what we might call problems in the

21   social world and that would be vulnerabilities in individuals

22   on both fronts.

23              That's a great example of how somebody might come to

24   their clinician and say they feel depressed, but for one person

25   it's more prone to address their achievement failures or

1  conflicts around those for somebody else, the social problems

2  are more apt to try to help the person and prove and reduce the

3  gender differences where the social interactions tend to be

4  more relevant for women and girls.

5  Q      I'd like to turn now to your teaching career.  Did you

6  begin your teaching career at Yale?

7  A      I actually taught graduate seminars and the interaction

8  of genes and behavior.  They were very small seminars at Duke,

9  and really my teaching career did begin at Yale teaching

10  psychiatric residents, social workers, and mostly clinical

11  psychology in terms of the American Psychological Association

12  approved clinical internship training program there.

13  Q      And then did you move on from being a clinical

14  instructor on the faculty to an associate professor of

15  psychiatry really within one year of joining the Yale faculty?

16  A      Actually assistant professor of psychiatry.

17  Q      Okay.  Thank you.

18         And there did you become a director of the Yale

19  Bridgeport Juvenile Detention Mental Health Program?

20  A      Yes.

21  Q      In July of 2001 did you become the director of the

22  Personality Disorders Research Program at Yale?

23  A      Yes.

24  Q      Can you describe that further?

25  A      Should I describe the detention program?  I don't know.

1   If I'm out of place, stop me.

2   Q      Why don't you tell us about the Juvenile Detention

3   Program.

4   A      Okay.  So the Juvenile Detention Program was a program

5   that was a grant that we were able to get as a consent

6   decree -- that came up as a consent decree from the state of

7   Connecticut because children becoming adolescents would be

8   brought into the detention center.  There are two unfortunate

9   cases.  One where an adolescent came in and was released the

10  next day, whereupon, he committed suicide.  Then another

11  example included several cases where people were adolescents

12  and sometimes -- mostly 12 to 16 would be suffering from a

13  psychotic disorder, and just by virtue of the staff members at

14  the Bridgeport Juvenile Detention Center they did not have the

15  background to understand the nature of these problems and

16  understandably found them overwhelming, and so often would

17  resort to things like praying to help the demons or the voices

18  go away with the children.

19          So I did two things.  One was that I worked with the

20  staff in training for them to understand those problems that

21  the children were experiencing, then I set up a screening where

22  every child who came in was evaluated through a screening

23  protocol by the staff and then seen by me the following morning

24  unless I was called in on call to triage somebody who was

25  acutely distressed or suicidal, and the program bridged both

1    the prosecution and the defense in that we provided a neutral

2    psychological evaluation for both parties to help the child get

3    the care that they needed.

4    Q      And then with the -- you had held that position for

5    about five years and then in July of 2001 became the director

6    of the Personality Disorders Research Program?

7    A      That's correct.

8    Q      At Yale.  And what did that entail?

9    A      So there are two things.  It was in large part because

10   we received -- during that time in my career, I was receiving

11   grant funding, and then there was a large program to study the

12   biological or the biology of what would normally be classified

13   as personality disorders, and my job in that program was to

14   oversee the diagnoses of patients who were coming in for

15   imaging studies and their emotional dysregulation and a number

16   of other factors, and this was a collaborative effort with

17   Rockefeller University, Columbia, and University of Basel and

18   Cornell, and we were working as a team to try to develop, to

19   understand the mechanisms of personality disorders which had

20   been neglected prior to that time in the hope for a cure.

21   Q      And while you were at Yale, did you teach a course

22   annually regarding the MMPI-2?

23   A      Yes.  I taught courses in psychological assessment and

24   in particular the use of the MMPI to the clinical psychology

25   interns and, in addition, supervised them in the use of that

1   and other tests.

2   Q      And was that course titled Psychological Assessment

3   Clinical Interpretation Using the MMPI-2?

4   A      That's correct.

5   Q      And then did you at some point take leave from Yale to

6   join the National Institute of Mental Health?

7   A      I did.  I had an opportunity.  I was contacted after

8   getting some more grant funding to see if I was interested to

9   work in what's called the Extramural Research Programs, and

10  that program was the program that oversees the portfolio of

11  funding for all NIMH-funded research in the United States, and

12  my job was to oversee the specific portfolio for mood-related

13  and sleep disorders.

14          That was in the translational research division of

15  NIMH that in simple straightforward terms is in between basic

16  research where people are studying animal models and how cell

17  systems work and services for research where people are trying

18  to develop treatments that will help people right away.  So the

19  translational division is the bridge between basic research and

20  clinical service research and that was the area that I worked

21  in.

22          Again, looking to encourage and to oversee research

23  that was being carried out across the U.S. to build better

24  connections between what we know in basic science and how that

25  can be translated to what's in traditional medicine called the

1   bedside to help the person who is suffering.

2   Q      When you mention mood disorders, does that include

3   bipolar disorder?

4   A      Yes, it does.

5   Q      And depressive disorder?

6   A      Yes.  I oversaw the bipolar grants in the United States

7   and all the major depressive disorder grants in the United

8   States and in translational research.

9   Q      And in order to get that position, did you have to get

10  national security clearance?

11  A      I did have a national security clearance for that

12  position.

13  Q      Did that position lead to your work with something

14  that's called RDoC?

15  A      Yes.  One of the initiatives in our division that we're

16  talking about and also that the director of the National

17  Institute of Mental Health at that time, Dr. Thompson, was

18  interested in was figuring out a way that researchers could do

19  translational research where they would define the study groups

20  or their patient groups based more on the mechanisms of

21  psychiatric illness and not on clinical syndromes, and that was

22  in part because there had been a large drop in the development

23  of the pharmacologic agents because the syndrome diagnoses, or

24  what they call in the research were phenotypes, were too

25  diffuse and too distal from any neurobiologic mechanisms.

1    So in March 2009 as part of the National Institute

2  of Mental Health's strategic plan I became part of an internal

3  working group to devise a research system, not a diagnostic

4  system to replace the DSM, because the DSM was so important for

5  how we communicate, how we get reimbursement, how we know who

6  needs special needs, for instance, autistic children, but this

7  would be a parallel system that researchers could use to

8  conduct research that would help and form the development and

9  improvement of future DSM editions.

10  Q    Did you in fact come to Kansas City from one of those

11  meetings?

12  A    I did.  We are in the process now.  There are five

13  domains of pathology in the RDoC; negative valence and positive

14  valence and cognitive systems, social processes, and arousal

15  systems.  So you can understand just by those descriptions how

16  they might fit with the basic things that our brain and body

17  does to function successfully, when they go wrong, how they

18  might relate to somebody's subjective distress or inability to

19  function.

20    After we launched the initial project, we were

21  getting feedback from the field that we may be missing

22  something by not including something called motor systems, and

23  so we spent the days that I was meeting at NIMH with leading

24  experts in motor systems to decide if that should become part

25  of our system for classifying psychopathology by motor systems.

1    I mean, things like tics or stereotypies that you see in

2    autistic children, to what extent are those part of the

3    disorder.

4    Q       And then after you left your position with NIMH, did

5    you join the faculty at Wesleyan?

6    A       I did.

7    Q       And what is your position at Wesleyan?

8    A       At Wesleyan I'm the associate professor of psychology

9    and neuroscience and behavior.

10   Q       Is that a tenured position?

11   A       It is a tenured position.

12   Q       Do you continue to teach in the area of the MMPI and

13   interpretation of the MMPI?

14   A       I consult with the MMPI and I use on occasion the MMPI

15   in my laboratory for assessment, and I teach my undergraduate

16   students about the MMPI in the assessment section of my

17   psychopathology course.

18   Q       And have you also participated in peer-reviewed

19   research studies, theoretical articles, and applications for

20   funding?

21   A       Yes.

22   Q       In addition to that, have you served as a consulting

23   editor for the Journal of Abnormal Psychology?

24   A       Yes, and I still do.

25   Q       Are you on any editorial boards?

1    A       Editorial boards include Personality Disorders, PDTRT,

2    Personality Disorders: Theory, Research, and Treatment, and the

3    Journal of Personality Disorders.

4    Q       So you are on the editorial board of two journals that

5    have to do with personality disorders?

6    A       That's correct.

7    Q       And have you published scientific peer-reviewed

8    articles on personality disorders and the MMPI?

9    A       I have.

10   Q       And what is your primary research focus?

11   A       My primary research focus is studying assessment and

12   diagnosis and looking at ways -- over the years it's been

13   looking at ways that we could reorganize symptoms to come up

14   with more valid diagnoses for psychiatric illnesses.

15          I've studied the ways that clinicians use diagnosis,

16   because any changes or any ideas about how you might change our

17   diagnostic system is incumbent on a clinician's ability to be

18   able to use that system, and in the more recent past been

19   shifting to understanding the mechanisms of psychopathology.

20   So, for instance, in the example I gave before thinking about

21   depression as a problem with reward processing or a memory

22   problem.

23          Another example would be there's a construct called

24   anhedonia we see in schizophrenia and we see it in depression.

25   It might be very different.  It might involve very different

1    brain systems, but a clinician would get the report, same

2    report from the patient.

3            So to give an example, if I'm depressed and I'm

4    thirsty and there's a glass of water there, I might not have

5    the energy to reach for it.  If I'm suffering from the

6    anhedonia that we typically see in schizophrenic disorders,

7    their glass of water could be there and even if I reach for it,

8    I wouldn't appreciate how good it would taste to me.

9            So that's an example of the mechanisms, and this is

10   part of what I'm using as a member of the internal working

11   group to help develop this research framework, the research

12   domain criteria which we call RDoC for short.  That's probably

13   the most central thing that I'm working on right now.

14   Q       In addition to your work as an academic professor,

15   researcher, writer, editorial board server, person who serves

16   on committees, have you also consulted with attorneys in the

17   medicolegal context to educate them on personality disorders

18   and the use of the MMPI?

19   A       Yes, I have done that.

20   Q       How long have you done that?

21   A       I believe that the very first time I did that was in

22   1994.

23   Q       And in addition to educating attorneys in the area of

24   personality disorders and MMPIs, have you also written

25   declarations to be submitted to Courts?

1    A        Yes, I have.

2    Q        Do you know about how many times?

3    A        I can give you an estimate, and I would qualify the

4    estimate with sometimes the declarations are brief regarding a

5    specific question, and in some instances they've been more

6    extensive and included a history of more psychiatric history.

7              In total, I can tell you that I'm absolutely certain

8    it's under 40 in the years since I began doing this.  I would

9    guess that it's probably closer to 30 because not always do I

10   provide a written product.  I can tell you I've had less than

11   40 consultations, and some of those consultations have been

12   telephone calls, and a handful of those consultations have been

13   where I interview the clients, the attorneys' clients more

14   extensive.  I can try to be more specific if it would help.

15   Q        No, that's great.  So it's fair to say that consulting

16   with attorneys is a pretty small part of the work that you do,

17   pretty fair to say?

18   A        Yes.  Typically, yes.  A couple, one or two times per

19   year sometimes there's overlap because cases go on.

20   Q        And you have testified not very many times; is that

21   correct?

22   A        This is the third time that I've testified.

23   Q        The other two times that you've testified, were you

24   accepted as an expert witness?

25   A        Yes, I was.

1    Q      And were those in federal court or State court or do

2    you know?

3    A      I believe -- I'm quite certain one was in federal

4    court, and I think that the other one was in federal court

5    as -- I don't know.  I think it might have been a district

6    court.  The other one was a number of years ago.

7    Q      And I think it's important to make a distinction

8    between clinical psychology and forensic psychology.  You do

9    not hold yourself out to be a forensic psychologist; is that

10   correct?

11   A      I am not a forensic psychologist.

12   Q      Describe for the Court what it means for you the type

13   of clinical psychologist you are.

14   A      I'm most interested in the science of clinical

15   psychology and the interest of assessing and conceptualizing

16   psychiatric diagnoses in the most scientifically defensible

17   way.

18          I've been asked many times, for instance, to do

19   forensic work for custody evaluations or for determining

20   whether or not somebody is competent or not, and I've never

21   accepted or agreed to do any of that type of testimony.

22          My work is really focused on the standards of

23   reliable and assessment of valid -- the reliable and valid

24   assessment of psychopathology as it is for clinical work I've

25   done.

1   Q      Is there a difference between fact reliability and fact

2   validity?

3   A      Yes.  It's both simple and complicated in some ways

4   because it's so simple.  I'll try to say this very

5   straightforward.  Reliability is best captured if you and I

6   were to see a patient independently and both come to a

7   conclusion, had agreed our diagnosis would be reliable.

8              Validity quite simply is understanding something is

9   real.  So, for instance, many of the mental disorder constructs

10  that we work with are things that are a good idea or

11  approximation of somebody's psychiatric illness, but the extent

12  to which they are valid is unclear because we've had no way to

13  find direct correspondence to the internal mechanisms or, in

14  other words, how their biological and brain and memory or

15  cognitive systems work.

16  Q      We've discussed a summary of your professional

17  accomplishments, and I'd like to show you on the Elmo now, Dr.

18  Sanislow, a copy of Movant's Exhibit 27, which has already been

19  introduced into evidence.  Do you recognize that as your

20  curriculum vitae?

21  A      Yes.  That is my CV, yes.

22  Q      And I believe that it is 25 pages in length.  Does that

23  sound right?

24  A      That sounds right.

25  Q      Because you're an academic, you have to keep these

1    things pretty up-to-date; is that fair to say?

2    A      Sad to say every day I have to turn that in, yes.

3    Q      Okay.  Does your curriculum vitae fairly and accurately

4    summarize your professional experiences?

5    A      Very accurately.

6           MS. HENRY:  Your Honor, at this time I would move

7    that Dr. Sanislow be accepted as an expert in the area of

8    clinical psychology, MMPI personality disorders, interpretation

9    of MMPIs.

10          MR. VALENTI:  No objection as it relates to the

11   clinical psychologist.  I don't know if you'd call him an

12   expert on MMPI and interpretation.  He's a licensed

13   professional and expert as it relates to clinical psychology.

14          THE COURT:  All right.  I will consider his

15   opinions.

16          MS. HENRY:  Thank you, Your Honor.

17   Q      (By Ms. Henry)  Dr. Sanislow, I want to move now to the

18   referral question in Mrs. Montgomery's case.  Okay?  Did I

19   contact you and ask you to evaluate the 2005 and 2007 MMPIs

20   that were administered to Ms. Montgomery?

21   A      Yes.

22   Q      And after you evaluated the 2005 and 2007 MMPIs of Mrs.

23   Montgomery, what we've called the compiled test data of those

24   two MMPIs, did you prepare a written declaration?

25   A      Yes, I did.

1    Q     And I'm showing you now on the monitor Movant's

2    Exhibit 26.  Is that a copy of your declaration?

3    A     Yes.

4    Q     And that is 34 pages in length.  Is that your signature

5    on page 34?

6    A     Yes.

7    Q     Does that declaration summarize your findings with

8    respect to the 2005 and 2007 MMPI?

9    A     Yes.

10   Q     Now, I'm mentioning two MMPIs.  You're aware of the

11   fact that three MMPIs were actually administered to Mrs.

12   Montgomery; is that correct?

13   A     Yes.

14   Q     And did I share with you that the raw data for the

15   middle MMPI from Dr. Kuncel was not available to us?

16   A     That's correct.

17   Q     And I also informed you that all the parties agreed

18   that it was not a valid administration of the MMPI and so I did

19   not ask you to take a look at that; is that fair to say?

20   A     That's correct.

21   Q     The referral question in this case was actually quite

22   detailed; is that also fair to say?

23   A     Yes.

24   Q     So would it assist -- do you know it by heart or do you

25   need to look at it on the report?

1   A      Well, I have -- I have it here so I could give

2   highlights what would be most helpful.

3   Q      Could you share with the Court your referral question?

4   A      So the referral question was to describe results from

5   two MMPI-2s administered to Ms. Montgomery.  One in 2005, the

6   second in 2007.

7           I was also asked to address conclusions reached from

8   the MMPI-2 administered by Dr. Daniel Martell in 2007.  I was

9   also asked to look at Dr. Martell's written report including

10  other psychological tests that he administered and to his

11  conclusion specifically based -- or that were related to the

12  MMPI-2 and to the earlier MMPI as well.

13  Q      When you refer to the earlier MMPI, I have -- since

14  your declaration was prepared on October the 13th of 2016, it's

15  come to our attention that while we used Dr. Hutchinson's MMPI,

16  we've since learned that it was not Dr. Hutchinson's MMPI but

17  actually a Dr. Willing's MMPI; is that your understanding?

18  A      I did not know that when I wrote the declaration.

19  Q      And for purposes of your declaration, does it really

20  make any difference to you whether it was Dr. Hutchinson or Dr.

21  Willing?

22  A      No.  I'm just looking at the MMPI report.  So I don't

23  believe so.

24  Q      And so for purposes of your testimony today will you

25  cap it at 2005 and 2007; 2005 being Dr. Willing's and 2007

1    being Dr. Martell's?

2    A      Yes.

3    Q      Just so the record is clear what we're talking about.

4           In order to answer the referral question, did I

5    provide you with some documents?

6    A      You provided me with some other test data as well as

7    some testimony by both Dr. Dietz and Dr. Martell, and

8    particularly I believe that Dr. Martell's testimony was

9    important for the referral questions.

10   Q      But also to make clear for the record as well, I did

11   not ask you to look at the biopsychosocial history, for

12   example?

13   A      No.

14   Q      Or provide you with the opinions of Dr. Porterfield or

15   Dr. Woods or Dr. Gur, any of those?

16   A      I don't know anything about any of those opinions.

17   Q      So we asked you to just narrowly focus on the MMPI and

18   the other testing that Dr. Martell gave as it relates to the

19   conclusions that Dr. Martell testified at Mrs. Montgomery's

20   trial?

21   A      That's correct.

22   Q      And we're going to go through the compiled test data

23   with some detail, but could you summarize for the Court your

24   conclusions with respect to your review of the Dr. Martell's --

25   the MMPI data in Dr. Martell's testimony?

1    A        So for the basic conclusion I in my report expressed

2    concern that the MMPI -- the conclusions reached based on the

3    MMPI focused on one single possibility that Ms. Montgomery was

4    exaggerating symptoms, and in interpreting the MMPI and looking

5    at those results, there are a number of possibilities that

6    would be reasonable explanations in the context of other data,

7    be it from clinical interviews, psychosocial history, and other

8    tests that in the most ideal clinical standard of care would be

9    integrated into that conclusion.

10            So briefly my memory is that there was a statement

11   in the report that dismissed the MMPI as invalid due to

12   exaggeration, and I believe in the testimony there was some

13   comment about one particular scale pertaining to validity that

14   was pertinent, and I did not see other information in the

15   reports or the testimony that explored possibilities

16   specifically related to the range of problems that the MMPI may

17   or may not be telling us about Ms. Montgomery or at least to be

18   completely accurate that would suggest important clinical

19   hypotheses that would need to be corroborated or disconfirmed.

20   Q        And some of those hypotheses that you saw in the test

21   data indicated that Mrs. Montgomery may in fact suffer from

22   several severe mental illnesses; is that correct?

23   A        That's correct.

24   Q        As well as possible neurological difficulties?

25   A        That's possible as well.

1    Q      And, again, that's just from your review of the

2    compiled test data and your recommendation would be that other

3    mental health professionals be brought in to evaluate the

4    psychosocial history, clinical data, and the observations of

5    Ms. Montgomery's behavior and perhaps neuroimaging studies?

6    A      That would be good.  At the very least the hypotheses

7    that are suggested by the MMPI-2 would need to be considered in

8    a clinical report to meet a standard of care.

9    Q      So the standard of care requires a psychologist who's

10   reporting results of an MMPI to consider these other factors

11   and report that he's considered those other factors?  That's

12   the standard of care?

13   A      That's the standard of care that these tests suggest

14   clinical hypotheses.  It can get complicated because there are

15   varying degrees of certainty for the clinical hypotheses.  Not

16   fulfilling the standard of care, though, would be to use one's

17   judgment, to focus on one to the exclusion of others.  That

18   certainly could be the case that it would be okay to focus on

19   one to the exclusion of others if an evidence case --

20   evidence-based case were made to do that and the other

21   possibilities would rule it out.  So that would be what I mean

22   by the standard of care.

23   Q      Thank you very much.

24          Now, in order to understand the conclusions that you

25   have drawn in your report with respect to what information we

1   can glean from the 2005 and 2007 MMPIs, is it important to have

2   a detailed understanding of the MMPI, how it's administered,

3   how it's interpreted?

4   A      That's important to have.

5   Q      So what I would like to do now, Dr. Sanislow, is direct

6   your attention to a discussion of exactly how the MMPI is

7   structured and administered.  Could you share that with the

8   Court, please?

9   A      May I ask a question?

10  Q      Sure.

11  A      At what level of detail should I proceed with this?

12  Q      Let's start out and see how far we go --

13  A      Okay.

14  Q      -- exactly.

15  A      So please correct me if I'm --

16  Q      How many questions are in the MMPI?

17  A      The MMPI-2 --

18         THE COURT:  Doctor, I can say as little and direct

19  as possible to clearly explain what you're asked.

20         THE WITNESS:  Okay.  Okay.  Thank you, Your Honor.

21  A      The MMPI-2 has 567 items in it.  I will say

22  historically, I think it's fairly important to understand that

23  this test was developed in the '40s was different from other

24  tests in that clinicians culled statements from patients'

25  charts and began to develop the test that was called a criteria

1    keyed scoring report.  So, in other words, they looked for

2    items that people who were diagnosed with clinical depression

3    would answer in a particular way no matter whether the item had

4    anything to do with depression or not.

5            And so this was a major advance to promote science

6    and the service of clinical assessment, and this was at a time

7    of what was globally called armchair psychology where

8    hypotheses could routinely be reconfigured if a patient said

9    something.  So this was to elevate the standard of care.

10           And so the test over many years has been -- has

11   grown in the number of items and in the reliability of the

12   scales.  Some things have not changed.  The scale names have

13   pretty much stayed the same, even though the meaning of the

14   scales have changed to some extent.

15           There have been -- there have been many, many

16   studies to develop new scales, for instance, for posttraumatic

17   stress disorder or for addiction potential, and those scales

18   for the replication of studies come to be included in later

19   generations of the report, of the clinical scored report.

20           So over time there's been a lot of improvement in

21   the MMPI.  There were significant problems at the very

22   beginning.  The first goal was to identify whether somebody had

23   disorder X or disorder Z, for instance, and they quickly

24   realized that that was not possible, that patients taking the

25   MMPI would often show multiple problems.  They were quite

1    concerned with that at the time.  It's something that they were

2    quite comfortable about.  That's the idea of comorbidity or

3    co-occurrence that we talked about that in severe mental

4    illness we often see multiple things.  So on the MMPI we often

5    see in severe cases of psychopathology multiple scales

6    elevated.

7    Q       (By Ms. Henry)  Let me stop you right there, Dr.

8    Sanislow.

9    A       Okay.

10   Q       When the MMPI is given to a patient, it's a

11   paper-and-pencil test; is that correct?

12   A       Yes.

13   Q       And the patient, unless the patient is illiterate,

14   reads the question and fills in the answer sheet on their own;

15   is that correct?

16   A       Yes.  There are other versions, including recorded

17   versions, and also it can be administered at a computer

18   terminal as well, but yes.

19   Q       But if the patient can read and write and understand,

20   then the person administering the test does not give any

21   interpretation of the questions that are being asked.  The

22   person reads it.  They have to come up with their own opinion

23   about what the question is asking, then mark true or false?

24   A       One exception would be to encourage the patient to try

25   to answer all of the questions the best they can by deciding

1    whether they're mostly true or mostly false.

2    Q    And then after the patient fills out the answer sheet,

3    that answer sheet is what -- there's a difference.  I think

4    it's important to talk about the different reports and what's

5    raw data and what's a report and that sort of thing, because

6    that's an issue in this case.  The bubble sheet, that would be

7    considered the raw data?

8    A    That's correct.

9    Q    And then that raw data is put into a computer that

10   spits out a report; is that --

11   A    That's correct.  It actually can also be scored by

12   hand, but that's rarely done, and it's most often computer

13   scored or compiled by a computer to compute scores of validity,

14   clinical and various research of subscales.

15   Q    So that was my next question.  There are different

16   types of scales that are going to be reported in these.  Is

17   there a difference between an interpretive report and a

18   computerized report?  I may be getting confused.

19   A    Well, there are a number of reports for certain

20   settings.  So there are correctional reports.  There are

21   forensic reports to look for mostly disability claims is what

22   those have been developed that are most widely used for.  And

23   there are reports for personnel, if somebody's doing hiring.

24   There are reports that -- many of these reports are

25   interpretive in that they have statements that accompany the

1    results of the testing.  And then there are other reports that

2    provide merely the compiled data in the scale.  Those reports

3    are typically referred to as the extended score report so that

4    it does not pick statements that may to some degree of

5    probability be associated with the test results.

6    Q      So we're going to want to talk about the statements

7    that are in the correctional report a little bit later, but to

8    orient ourselves to Mrs. Montgomery's case, the 2005 MMPI

9    carries with it a correctional report; is that correct?

10   A      That's correct.

11   Q      As part of the compiled test data?

12   A      I would have to double check.  I believe it's a

13   correctional report and not a forensic report, and I can do

14   that very quickly.

15   Q      Okay.  Do you have a copy of the 2005 compiled test

16   data in front of you?

17   A      I do.

18   Q      And would it assist you in your testimony to refer to

19   that?

20   A      I can confirm it's the correctional interpretive

21   report.

22   Q      Thank you.

23          MS. HENRY:  And that's for the record Movant's

24   Exhibit 153.

25   Q      (By Ms. Henry)  And with respect to the 2007 report

1    that Dr. Martell gave, that contains the extended score report;

2    is that correct?

3     A      That's correct.

4     Q      And so none of those statements are contained in Dr.

5    Martell's report?

6     A      That's correct.

7     Q      And you mentioned that there are scales that are

8    reported either with the correctional report or the extended

9    score report.  What are those scales?

10    A      Well, broadly speaking the scales are validity scales

11   which help to understand how the client or patient approach the

12   report, and they are very informative for understanding the

13   clinical scales in different ways.  For instance, the validity

14   scale and K scale, correction scale can add elevations to some

15   of the clinical scales if a person is potentially

16   underreporting.

17           Then there are ten basic clinical scales from the

18   original MMPI as well as a number of other research scales, as

19   I mentioned, for instance, for addiction potential, for PTSD,

20   for a type of anxiety that's more of a state anxiety that comes

21   and goes as opposed to a more trained anxiety which is

22   reflected on Scale 7 of the MMPI.

23           And then there are a number of subscales of the

24   basic clinical scales which have been around for a long time

25   that help the clinician decompose a scale elevation to see what

1    might be driving that elevation.

2              And then last there are some other scales as well

3    about traits and there are a number of critical items that are

4    typically printed out on those reports.

5              And I should say that there are a variety of these

6    computer reports.  These are all now owned and licensed by the

7    regents of the University of Minnesota; and depending on the

8    version of the report and also the copywriter of the software,

9    the output can vary and largely in significant ways.  The most

10   central scales that are presented are the core validity scales

11   and the core clinical scales, supplementary clinical scales, as

12   well as traditional subscales, and then the critical items.

13   Q    And is it important when you're interpreting an MMPI

14   that on its -- superficially appears to have scales that are

15   elevated, is it important to then for the clinician to look at

16   these subscales and compare those subscales with social history

17   data to determine whether or not the patient is actually

18   exaggerating their symptoms or whether or not there's something

19   seriously mentally ill with that person?

20   A    So I'll say yes.  I'd like to say something more.  I

21   think it is important to say that in many instances when we do

22   not see high levels of psychopathology, there is some

23   specificity at the most higher order of interpretation or the

24   actuarial level.  Even in those cases if there's one or two

25   high-point clinical scales, which may be characteristic of a

1    particular diagnostic group, then it's oftentimes useful to go

2    look at the subscales to see what may be driving an elevation.

3    It's especially important when so many scales are elevated on

4    an MMPI to look at these other features.

5            Now, I will caution that the highest scientific

6    standard of the MMPI would be the actuarial interpretation.

7    For instance, if you had a population of acute hospitalized

8    inpatients and they were presenting a specific profile, you

9    could assign a probability statement that they likely meet

10   criteria for one, two, or three specific diagnoses on the basis

11   of many studies.

12           However, when multiple scales are elevated, it's

13   difficult to determine, again, this relates to the problem of

14   co-occurrence or comorbidity, what the nature of the

15   psychopathology is.  It's something we're seeing an overlap of

16   many different problems that are coming together.  It could be

17   labeled in different ways, and in those instances it's

18   particularly important to look at the subscales.  The

19   information that we would glean from the subscales is important

20   information, but you might think about it as a second order

21   hypothesis because it's not based on the highest standard of

22   the actuarial interpretation.

23   Q     But it's, nonetheless, clinically important?

24   A     It's very important.

25   Q     And you mentioned that the MMPI reports critical items,

1    which I think we're going to be talking about with respect to

2    Mrs. Montgomery.  What is the significance of the critical

3    items?

4     A      Well, when we're deriving psychometric tests, one of

5    the things that we do is have a collection of items that are

6    broad enough that when we put them together as a whole, we

7    reliably assess a particular problem.  So people, for instance,

8    who are suffering from depression may answer one question one

9    way or another question another way, but collectively the scale

10   produces a reliable measure of their level of depression.  So

11   that is how most -- how all the scales are composed on the

12   MMPI.

13            That said, if a person answers a question that I

14   frequently feel like killing myself, it's hard to know how

15   reliable that is because that's just the one question.  It's

16   not a collection of things.  But this is a case where as a

17   clinician if somebody told you that, you really would want to

18   follow up.  So you're willing to risk the fact that once you

19   understood that the person was not actively planning to kill

20   themselves at the time but answered it for perhaps some

21   spurious reason or even a mistake just by the way they colored

22   in the bubble on the test, you could determine that.

23            So the critical items are there because they tap

24   into very serious clinical problems, some of which could be

25   acute and some of which could have an impact on the immediate

1    safety, for instance, if the person was psychotic or suicidal.

2    So, for instance, when I use the MMPI for adolescents on our

3    Inpatient Psychiatric Institute or also in the Bridgeport

4    Detention Center, one of the things that I first do after

5    scoring it is immediately check those items, then bring the

6    child or adolescent back in to talk to them about why they

7    answered that item in a particular way.

8                 That said, you can't make a judgment without talking

9    to the person in that case because we don't have the full

10   complement of items that give us a degree of confidence in the

11   reliability of just that one single answer that might have

12   occurred for any number of reasons.

13   Q      So we're going to talk about the critical items and

14   their relationship to determining whether or not an

15   individual's symptoms are actually exaggerated.  But is it fair

16   to summaries at this point in your testimony that the critical

17   items are there to alert the clinician that there might be

18   something seriously wrong and imminently wrong with the patient

19   and they need to stand up and take notice?

20   A      Absolutely.  And precisely the need for follow-up is

21   precisely because we don't know why the critical items have

22   been endorsed, but the potential harm is so great that it rises

23   above that and that's why the follow-up is important.

24   Q      With respect to these various scales on the MMPI, we

25   heard a little bit last week but not a lot about T-scores, and

1    the MMPI uses T-scores; is that correct?

2    A       That's correct.

3    Q       Can you explain the T-scores on the MMPI and how those

4    are used in the interpretation?

5    A       So I'll try to do this very simply.  The purpose of the

6    T-scores is essentially to calibrate the range of the

7    elevations; and so by looking at the variance across any

8    particular score in relationship to normative data, we can see

9    that the distance from population or patient means might vary,

10   and by standardizing them as T-scores by incorporating features

11   of the variance that we see, in other words, how many items

12   does it take for an elevation since the scales have different

13   items, what we see is the ability to produce scales that once

14   they hit a certain point on the MMPI-2, it's 1.5 standard

15   deviations from the mean, that would be a clinical cutoff.

16           If we didn't have T-scores, there would be different

17   clinical cutoffs for every scale and that's one reason why

18   they're useful.  The T-score is simply a way of standardizing

19   scores, and with T-scores the mean score is 50 and a standard

20   deviation is ten points.

21   Q       So would 65 be the cutoff?

22   A       Sixty-five is the cutoff on the MMPI-2.  It was

23   actually two standard deviations or 70 on the MMPI-1.

24   Q       Is the MMPI-2 an X ray of personality or can it

25   establish the presence or absence of a specific mental illness?

1   A       One of the first things I was taught by Grant Dahlstrom

2   is the MMPI is not an X ray of personality, and the reason why

3   harkens back to our earlier discussion about mechanisms.  So

4   we, as a field of clinical psychiatry and the field of

5   psychiatry, have become very good at describing meaningful

6   clinical syndromes that are very helpful to at least get us on

7   the right path to try to help people and understand their

8   problems, but it's a collection of what is reported on the

9   surface, and that's what all of our pathology, all of our

10  diagnoses are based on these days, and that's what the MMPI is

11  picking up on what the patient is reporting in terms of their

12  distress.

13          If the MMPI were an X ray of personality or

14  psychopathology, because it measures psychopathology as well,

15  it would be able to tell us something inside.  So if you think

16  about an X ray, if we have -- I'm not a medical doctor so bear

17  with me.  Say if I had a CAT scan and it was determined my

18  appendix was inflamed, that would be the way that we would use

19  an X ray.

20          When we give the MMPI, we don't see inside the

21  person to know what's going on.  So if somebody's depressed, we

22  don't know if it's because they have a severe history of

23  trauma.  We don't know if it's because of neurological

24  problems.  We don't know if it's because their memory systems

25  are not operating properly or their attentional systems are

1  disrupted or if they had problems with reward processing, all

2  things that could lead to somebody coming in and describing

3  their clinical state in almost exactly the same way to a

4  psychiatrist, psychologist, or social worker.

5  Q      Is that a frequent mistake that you see in your field,

6  psychologists who don't have the experience that you have

7  referring to the MMPI as being like an X ray?

8  A      No.  People who are trained in psychometrics rarely

9  would make that kind of mistake, especially training in

10 clinical psychology because we're taught that we're using

11 constructs as I described before that these are our best ideas

12 of a problem, and we trust that we say something like

13 depression is a problem because we have so many things that we

14 observe that are tied to both what the patient describes.  So,

15 no, I don't think that that's a mistake that would typically be

16 made.

17 Q      By somebody who knew what they were talking about?

18 A      Who was trained in psychometric and test construction

19 and the administration of psychological tests.

20 Q      You refer in your declaration, Dr. Sanislow, to --

21 well, let me ask you.  You refer to a research scale.  Are the

22 research scales in the MMPI relevant to what we have to discuss

23 today about Mrs. Montgomery?

24 A      It's a fine line because the -- you can think about

25 scales as being beta testing and then as they become more --

1    I'm sorry, let me start again.

2            You can think of research scales as scales that are

3    developed to target a particular problem, the assessment of a

4    particular problem or a clinical cluster of symptoms or

5    diagnosis, and they move along a research assembly line where

6    once there's sufficient replication, then they become more

7    accepted; and once they become more accepted, they become more

8    utilized and tend to be included on the MMPI.

9            So there probably are research scales here that are

10   relevant for Ms. Montgomery, some more than others.  And,

11   again, if we think about the highest standard, some of the

12   newer research scales that haven't been around as long, even

13   though they've gained acceptance, they're very important and

14   very informative and may require more corroboration depending

15   on the number of studies that have replicated the utility of

16   the research scales.

17   Q     So they may be another piece of the puzzle of

18   understanding Ms. Montgomery?

19   A     Absolutely they are.

20   Q     You refer in your declaration to something called

21   colloquially as MMPI cookbooks.  Can you explain what that is?

22   A     Well, before the time of computers there were a number

23   of books.  My dissertation adviser, Professor Robert Carson at

24   Duke University, wrote one such cookbook.  Professor Grant

25   Dahlstrom wrote one such cookbook.

1      And what the cookbooks are are a collection or

2  review of the literature that cite various studies of profile

3  patterns produced by certain subject populations.  So the

4  example I gave earlier was on what you might see if somebody

5  was coming into an acute inpatient unit suffering from a

6  pretty -- or psychotic or schizophrenia spectrum disorder.  You

7  might see a certain pattern of elevation, for instance, 2, 7,

8  and 8 scales would likely be elevated; and when you see it in a

9  population where that it's close or at least close on the level

10  of mental or psychiatric illnesses, then you have a more or

11  less degree of confidence that your person that you're

12  assessing may possess similar characteristics to that group.

13  Q      And do those anecdotes that came out of the cookbooks,

14  are they now sort of incorporated into the, for example, the

15  correctional interpretive report we see in Ms. Montgomery's

16  case?

17  A      So broadly speaking all of the research -- well, I

18  don't know that I could say all of the research, but the

19  research that was used to derive those cookbooks as well as a

20  number of -- a number of subsequent studies, especially with

21  the transition to the MMPI-2, are a part of what is in the

22  computer programs.  So depending on the item response patterns

23  instead of going to a cookbook and looking things up manually

24  for what the pattern is and making your own comparison and

25  judgment about the population, the computer-scoring programs

1402

1    compile that information and oftentimes will select that

2    information based on both the setting and the type of report

3    that's being selected.  So those things are in there.

4             It's unfortunate that unlike the cookbooks where

5    it's possible to see how those were derived, you can actually

6    see the literature, it's more difficult to do that with the

7    MMPI computer-scoring programs that are interpretive to see

8    where they're selecting and not selecting from on the

9    cookbooks.  Now, many of the -- I should say where they are

10   selecting or not selecting from in the literature.

11            I will say that interpretive reports will give the

12   most prominent featured research, but because this is

13   proprietary information at the University of Minnesota, it's

14   impossible to gain access to how the selection of certain

15   research studies are made and to what extent there might be

16   other research studies that have some influence on how

17   statements are chosen.

18   Q    Does that introduce the possibility of bias into the

19   interpretive report?

20   A    Well, there's two ways.  So what I just described

21   potentially could introduce bias, but that's not a question

22   that I could answer without understanding exactly how things

23   were chosen.  I could in fact and people could in fact go to

24   the literature and try to sort out what's there and to make

25   their own judgments and other people have written programs in

1403

1    the past to do that, but that still wouldn't open the door to

2    see what is in the -- all the residents used for a particular

3    interpretive report.

4           The second possibility for the introduction of bias

5    is that -- is one that is a little bit ironic.  So oftentimes

6    computer-generated reports will provide a number of statements,

7    and in some instances these statements may more or less be

8    contradictory or have different emphasis, and so a clinician

9    can look at a computerized report and if there's a confirmation

10   bias or bias looking toward the test results that are compiled

11   by the report, they could focus on the particular statements

12   that make sense for what they believe about the particular

13   person that they're working with.

14          And I said that this is ironic because this was not

15   something that happened before the times of the computerized

16   reports because things were more transparent and a case would

17   have to be made by the clinician and also that this test, which

18   this test, the MMPI, or this assessment device, was developed

19   to stop speculative interpretation of how one conceptualized --

20   how a clinician conceptualized a psychiatric illness or

21   disorder in a person.

22   Q      Would a trained clinician recognize that these

23   interpretive reports are not in fact the opinions of the

24   individual who administered the MMPI?

25   A      Yes, absolutely.  The standard of care within the

1    psychological association is that these reports are meant for

2    professional-to-professional consultation only for that reason.

3    It's also in the best case scenario one would hope that a

4    report would be included with MMPI results that would address

5    the interpretive statements with, as I've said before,

6    corroborating evidence.

7              Understandably there are instances, for instance, on

8    acute psychiatric inpatient units where a decision needs to be

9    made by the team, and the standard there would be to enter a

10   chart note that accompanied the test data and oftentimes some

11   annotations on the actual interpretive printout of the report,

12   and that holds for the reports like the Personality Assessment

13   Inventory or similar reports.

14             In the American Psychological Association ethical

15   statements pertains to computerized-generated reports

16   generally, not specifically to the MMPI.

17   Q      So there's actually an ethical statement --

18   A      Yes.

19   Q      -- about not doing this?

20             And I think I confused again the raw data and the

21   interpretive reports and the score reports.  The score report

22   is different from an interpretive report; is that correct?

23   A      That's correct.

24   Q      So the raw data, the score report, and the interpretive

25   report are the compiled test data?

1    A       Those are all instances of compiled test data, but they
2    don't rise to the level of a clinician's report.
3    Q       Okay.  So they're still not the ultimate report of the
4    clinician?
5    A       Correct.
6    Q       I want to now get into the area of validity scales.
7    Okay?
8    A       Okay.
9    Q       Can you explain to the Court the purpose of the
10   validity scales?  Let's just start with the purpose, then after
11   that, we're going to go into the different validity scales.
12   A       Okay.
13   Q       What's the purpose of the validity scales?
14   A       The purpose of the validity scales is to ascertain to
15   what extent the person is presenting a valid response set the
16   MMPI, and it can vary in a number of ways.  So, for instance,
17   somebody who's unable to read could fill out the test
18   completely randomly and that would be shown in the validity
19   scales.
20           Another example would be somebody could be worried,
21   say in a custody hearing, that they might be seen as suffering
22   and so they might underreport or try to report themselves in
23   the best possible light.
24           Another instance is they may indeed do what has
25   sometimes been called a cry for help or exaggerate their

1    symptoms.

2    Q       And what does that mean, cry for help?

3    A       A cry for help is something that is somebody who is

4    experiencing a lot of distress.  So, for instance, with PTSD

5    studies don't -- actually, the one who's now leading the MMPI

6    has found that people who have not been responded to by

7    clinicians where they've been asking for help will often be

8    saying the very worst of things that they're experiencing to

9    draw attention to their desire to get some kind of clinical

10   care.

11            We often see this in adolescents both in behaviors

12   and reports where -- when they're in an environment where

13   they're experiencing much distress, they'll do something that

14   will get them into the hospital, which is actually -- while

15   this is in many ways dysfunctional, quite functional because it

16   gets them out of an unsafe situation even though they've done a

17   cry for help, for instance, taken some pills or something like

18   that to warrant hospitalization.

19   Q       What are the different validity scales that we see on

20   the MMPI-2?

21   A       So on the MMPI-2 the original validity scales --

22   there's actually one that's not talked about much.  It's called

23   the cannot say scale, and the first thing to do is to see if a

24   person answered all the questions or if they've double marked

25   any items and so you count up those number of items, and

1    through the years there's been various cutoffs about what's

2    acceptable.  Sometimes that varies depending on the population,

3    but usually somewhere between 17 and 30 on the answered items

4    you can still score a valid test.  Ideally you want all the

5    questions answered and the cannot say items actually are

6    informative in the very same way the critical items are.  You

7    want to find out why somebody didn't answer those items so you

8    would follow up with them about that.

9            And then there are three basic validity scales that

10   are called the L, F, and K scales.  The L scale is -- has

11   colloquially been referred to as the lie scale where it's

12   looking to see if somebody's presenting themself in a favorable

13   light, so much so that they may be claiming virtues that are

14   unrealistic virtues.  I always tell the truth.  I always never

15   tell a white lie, for instance, or my table manners are just as

16   good at my home eating alone than when I'm out to dinner at a

17   formal event would be examples of that.

18           The K scale is a correction scale, and it has more

19   sophisticated questions about how one might defend against

20   psychological pain.  So that might be some kind of outright

21   denial of psychological problems.  In part, it could be because

22   it was trying to present themselves in a very positive light,

23   but it oftentimes reflects the fact that it's difficult for

24   them to even face their own psychological problems, and so the

25   K scale, the corrections scale has added -- that score is added

1    to certain clinical scales to correct what's assumed to be an

2    underreporting of psychopathology.

3            And then there's a general distress scale called the

4    F scale which is derived from the infrequency of items that are

5    reported.  And the F scale is -- the F scale is reporting -- it

6    includes items of general distress, items that overlap with

7    other scales of severe psychopathology but items that would be

8    rarely answered by somebody who's not suffering from a severe

9    psychiatric illness or extreme traumatic reaction.

10           Those are the three basic clinical scales plus the

11   cannot say scale that we used for years on the MMPI-1 and also

12   the early stages of the MMPI-2, and it became clear that those

13   scales were not adequate to capture and classify people on

14   whether or not they were validly reporting psychopathology.

15   Q     So I want to ask you then about the F scale in

16   particular.  Does the research and science bear out -- am I

17   correct in understanding that individuals who have a serious

18   and severe trauma history, and particularly women, do we expect

19   to see high elevations in those populations on the F scale?

20   A     It's very typical to see such high elevations.  Jim

21   Butcher has published studies that when association is included

22   in the traumatic responses that we see, a high F elevation,

23   from the example I gave earlier, you could imagine in an

24   adolescent who is completing the MMPI who's experienced child

25   sexual abuse would be crying for help by saying they're

1    experiencing a lot of distress, and then there's been a number

2    of studies by researchers -- these have mostly been published

3    in the Journal of Traumatic Stress and Danny Kaloupek would be

4    one person who's done this work that shows that when there is

5    severe trauma or PTSD, that the F scales are often elevated to

6    a higher extent.

7    Q      I believe you were about to start talking about the

8    different types of F scale.  There's an F(b) and F(p) and those

9    were developed --

10            THE COURT:  Ms. Henry, I think we'll do that when we

11   come back from break.

12            We're going to take a break until ten minutes till

13   eleven.

14            (Recess taken.)

15            THE COURT:  Ms. Henry, you can continue.

16            MS. HENRY:  Thank you, Your Honor.  May it please

17   the Court.

18   CHARLES N. SANISLOW resumed the stand and testified

19   DIRECT EXAMINATION (continued) BY MS. HENRY:

20   Q      Dr. Sanislow, I want to ask you about something called

21   the F minus K index.  Can you explain what that is?

22   A      Yes.  That's a measure that was used for some time to

23   look to see if somebody was, quote-unquote, faking bad by

24   looking at the difference between the two validity scales; and

25   so if the difference was substantial, then it was thought to be

1    an index that indeed that was what was happening.

2              Over the years the cutoffs for that what would

3    constitute, quote-unquote, faking bad changed and then a number

4    of studies suggested that the scale was no longer useful, and I

5    believe it was concluded by Jim Butcher in his book that had

6    fallen out of disfavor because it provided no additional

7    information on validity.

8    Q    So were there more sophisticated indicators that began

9    to develop?

10   A    Yes.  So one of the things that happened with the --

11   one of the goals of the development of the MMPI-2 was to have

12   more sophisticated validity indicators, and so some of those

13   included looking at the F scale, some F scale items.  Remember

14   the F scale is the infrequent items that are endorsed by people

15   who are often suffering psychiatric illness, and one of these

16   was the back half of the F scale, and so that's useful to see

17   if a person, for instance, just gives up on the test because

18   it's long and they start randomly responding.

19             Oftentimes it can indicate if you see -- if you see

20   the F scale items going in one direction, the person is either

21   becoming overwhelmed and shutting down and reporting less

22   distress or if it goes in an elevated direction, that they're

23   actually becoming more distressed just by the process of taking

24   the test.  Those are, again, what I would call a second order

25   hypothesis that you would want to follow up with.

1    Q      Is that back half of the test scale called the F lower

2    case b scale?

3    A      It varies.  It's in the literature and on reports.

4    Typically lower case b, but I've seen it both ways.

5    Q      Is there also an F lower case p scale?

6    A      Yes.  And that scale was derived for assessing general

7    distress or infrequent responding associated with general

8    distress in populations where there was a base rate of mental

9    illness, most noted in psychiatric populations because F scales

10   were almost always invalid.

11          That was my experience at the Yale Psychiatric

12   Institute and also the VA when somebody was in acute distress,

13   and so a new set of items were constructed that were infrequent

14   for people who were in populations where -- to begin with most

15   of the comparison groups were suffering from psychiatric

16   problems.

17   Q      So the lower case p stands for psychiatric?

18   A      Or psychopathology or psychiatric, yeah.

19   Q      And then is there a scale called the, all caps, FBS

20   scale?

21   A      The Fake Bad Scale, yes.

22   Q      What is the Fake Bad Scale?

23   A      The Fake Bad Scale was developed primarily for

24   disability situations where people were worried about --

25   clinicians were worried about a client's feigning

 1    psychopathology for disability.  The extent to which it's been

 2    studied in other populations I can't comment on other than to

 3    say I believe that research is limited.  There's been studies

 4    by Paul Lees-Haley and by Jim Butcher.  Paul Lees-Haley was the

 5    person who constructed the fake bad scale who both have noted

 6    that the fake bad scale turns out to not be particularly good

 7    at detecting fake bad responding, and so it's recommended that

 8    it either not be used or be taken with a grain of salt.

 9            It turns out that, according to Jim Butcher,

10    especially in populations where there are trauma histories --

11    and there's another study, and I'm sorry I don't know if this

12    is Haley or Butcher, where if there's -- this might be somebody

13    else actually in JTS.  I apologize.  Where if there's

14    dissociation present, then we see a higher elevation as well,

15    particularly in females.

16    Q      And when you say JTS, is that --

17    A      I'm sorry.  Journal of Traumatic Stress.

18    Q      So it's a publication?

19    A      And it's a scientific peered-reviewed journal.

20    Q      Beyond those scales, are there two other scales that

21    are relevant for our discussion today?  That's the VRIN scale

22    and the TRIN scale?

23    A      Right.  So both of those scales complement the other

24    scales because they look at the consistency of responding.  So

25    you could imagine if somebody was trying to say everything is

1    wrong or present themselves in the worst possible light, they

2    may randomly respond to everything, endorsing everything rather

3    than focus on specific problems to the exclusion of others, or

4    you might imagine somebody who's unable to read or who has

5    severe neurologic problems or maybe even cultural issues that

6    would cause an elevation because they're not understanding the

7    items, and so both of those scales are constructed of items

8    that have to do with response consistency to look if there's a

9    lot of contradictory responding going on with the patient.

10   Q       What does VRIN stand for?

11   A       Variable Response Inconsistency scale.

12   Q       And what does TRIN stand for?

13   A       True Response Inconsistency scale.  And that actually

14   can be false response as well.

15   Q       So does the VRIN look for the consistency and then TRIN

16   look for naysaying, for example?

17   A       That's true.  Yes.  The consistency between pairs of

18   items.  So it looks like when there's consistency is saying yes

19   all the time or no all the time or false.

20   Q       If the F scale is elevated but the VRIN scale is not

21   elevated, what does that tell you clinically?

22   A       That tells you that the patient or the client

23   approached the test in a consistent manner.

24   Q       What does the F, lower case, b scale tell you about the

25   client's level of distress?

1    A        The lower case b is the back half.

2    Q        I'm sorry.  We'll skip that.  I apologize.

3    A        Okay.

4    Q        Skip ahead now to -- well, you mentioned the Lees-Haley

5    fake bad scale.  Is one of the problems that has developed in

6    forensic populations been that it overestimates malingering?

7    A        Yes, it does, and that's the publication both by James

8    Butcher, Jim Butcher -- James Butcher as well as Paul

9    Lees-Haley.

10   Q        And are females in particular subject to being

11   overclassified as malingering?

12   A        Yes.  That's true.  And more so if there's

13   dissociation.

14   Q        Can you tell us about the S scale?

15   A        The S scale is the superlative scale, and I believe

16   that it was added for two reasons.  One because the K scale

17   items, which also have to do with presenting one in a positive

18   light or defended manner, occur at the beginning of the MMPI

19   test and so they wanted to spread items out across the test to

20   have a broader reach, and the second reason was more practical,

21   and I believe it was in evaluating airline pilots.  They wanted

22   to see to what extent they were trying to overrepresent

23   themselves in a positive light.

24   Q        And just as is with the clinical scales, is it

25   important when one is interpreting the validity scales to

1415

1    compare them to one another and also take into account clinical

2    data as well as clinical observations in interpreting what --

3    A       Right.  So, again, this is the principle of the MMPI is

4    you do want to look at the first level of interpretation at the

5    constellation of symptoms.  So, for instance, if the S scale is

6    elevated and the variable response inconsistency scale is not

7    elevated, it would suggest that the examinee comprehended and

8    responded consistently to the items on the F scale.

9    Q       And is it true when we now think about the clinical

10   scales -- and we're about to move into Mrs. Montgomery's

11   specific testing, but when we think about the clinical scales

12   and the labels that those are given, are those labels at least

13   antiquated?

14   A       Antiquated would be a good word to describe those

15   labels.  So those labels reflected the psychiatric nomenclature

16   when the test was developed.

17   Q       I want to now ask you about the different approaches to

18   interpretation of MMPI data when you get an interpretive report

19   or score report that tells you, Hey, we've got a lot of symptom

20   exaggeration here, the clinician should proceed with caution.

21   Is there a concept that you discussed in your declaration

22   called -- I'm going to mispronounce it -- configural analysis?

23   A       Yes.

24   Q       What is configural analysis?

25   A       So configural analysis was -- configural analysis is to

1    look at essentially the constellation of the profile, to look

2    at combinations of high-point elevations, scale elevations, and

3    so if you think about the scales as tapping certain

4    psychological or psychiatric problems, those problems could be

5    put together in different puzzles to explain what's going on

6    with the patient that you're testing.

7    Q      I have one more area to cover before we get straight

8    into Ms. Montgomery's test scores, and that is you note several

9    different hazards with the interpretation of the MMPI, one of

10   which you said making diagnostic conclusions based on the

11   administration alone.  I think we've covered that.

12   A      Yes.

13   Q      There's another hazard that you discuss, which is

14   making an interpretation from select clinical scales alone

15   without taking into context the validity scales, other clinical

16   scales, or examining the subscales or content scales together.

17   Why is that a hazard?

18   A      So that's a hazard because the clinical scales have

19   dynamic relations with one another.  So what is being suggested

20   by one clinical scale may in fact inform how something is

21   expressed in another clinical scale.  So, for instance, if

22   somebody is converting a lot of bodily symptoms -- I'm sorry --

23   on Scales 1 or 3 which would suggest that somebody's converting

24   their psychological problems into physical problems in varying

25   degrees and they are also disorganized, that would help us to

1    understand Scale 8, which more generally measures confusion.

2           There is one exception to this rule and that is the

3    depression scale.  The depression scale should be interpreted

4    in relation to the other scales, but it does, regardless, tend

5    to correlate fairly well with other measures of depression

6    despite what other psychopathology may be present.

7    Q      Is there another hazard, a third hazard that you

8    mention, which is an automatic determination that when an

9    administration of the MMPI demonstrates elevations on multiple

10   scales, the individual's response pattern -- or the clinician

11   might consider that their response pattern is automatically

12   invalid and just throw out the entire test?

13   A      So to be clear about this, when the elevations are so

14   extreme in some cases, what's termed a floating profile, it's

15   reporting an incredibly high level of distress and so this

16   warrants caution.  A high level of distress is one possibility.

17   This warrants a certain caution as to what one does next, and

18   the first caution is that when multiple scales are elevated,

19   it's hard or it's improper to pick out what the two high-point

20   scales are because the statistically significant differences

21   between the scales when they're all elevated are not

22   necessarily reliable, so this is a type of margin of error, and

23   it makes it difficult to make comparison to carefully defined

24   study groups where it's been determined that certain specific

25   scales and only those scales are elevated.

1              So, for instance, if you had elevations that

2     indicated paranoid schizophrenia with 8 being elevated in a

3     patient population but the other scale is not being elevated

4     for an individual with many scales elevated, there are many

5     other things going on so there cannot be that degree of

6     precision.

7     Q      So am I understanding you correctly that you can't just

8     pick the two highest points and -- if you have, as we have in

9     Mrs. Montgomery's case, several scales that are elevated above

10    that 65-point cutoff, you don't just pick the top two but you

11    have to consider all of them?

12    A      I would agree.  I believe that's a good statement.  And

13    I would go one step further to say that even going across all

14    of the scales would be something that you'd want to do with a

15    certain degree of caution because at that point the actuarial

16    guidelines that were established for comparison to very

17    carefully defined study groups are modeled by the degree of

18    psychopathology.  This gets back to the comorbidity problem in

19    that the boundaries represented by the scales aren't reflecting

20    the boundaries that the scales were intended to capture since

21    the elevation is so great.

22    Q      Thank you.

23             Now, with respect to Mrs. Montgomery's reports,

24    we've already discussed Petitioner's -- or Movant's

25    Exhibit 146, which is already in evidence.  I'd like to

1    direct your attention to Movant's Exhibit 152 --

2             MS. HENRY:  And I would note for the Court, as I'm

3    about to put this up on the Elmo, this particular exhibit, like

4    Movant's 146, was produced subject to a protective order from

5    Dr. Fucetola's file, and I'm going to ask Dr. Sanislow to

6    identify it, then I'm going to ask the Court order that it be

7    put into the record.

8    Q      (By Ms. Henry)  Dr. Sanislow, do you recognize that

9    document?

10   A      Probably but let me check, please.

11   Q      Sure.

12   A      Yes, I do.

13   Q      Does this appear to be the MMPI score report --

14   extended score report from the MMPI by Dr. Martell in 2007?

15   A      Yes.  You have a new number up there, the 152.  That's

16   not what I have.

17   Q      You don't have one with the exhibit sticker on top of

18   it?

19   A      That's correct.  If you turn the page, just the top

20   corner.  Yes.  Okay.

21   Q      Thank you.

22   A      That's that report.

23   Q      And would referring to this report assist you in

24   explaining your interpretation of the extended score report of

25   Dr. Martell's?

1    A       Yes.

2               MS. HENRY:  Your Honor, I would move that Movant's

3    Exhibit 152 be accepted into evidence.

4               MR. VALENTI:  No objection.

5               THE COURT:  Received.

6    Q       (By Ms. Henry)  So, Dr. Sanislow, we've got both of

7    those compiled test datas into the record, but let's start with

8    the MMPI that was administered in 2005, if we may.  And I want

9    to talk with you first about the validity scales.  Placing up

10   on the monitor -- although I think you have -- did you bring a

11   copy of those scales as well?

12   A       The 2005 --

13   Q       Yes.

14   A       -- report?  We have 727500.  Yeah.

15   Q       Okay.  Using your expertise in the area of the MMPI,

16   what does this particular score report tell you?

17   A       It first tells me that Ms. Montgomery was reporting a

18   significant amount of psychological distress.  The first scale

19   that I'm looking at is the F or the infrequency scale, which

20   I see elevated to just before -- below within 100T, and then I

21   look at the B report and I see that -- although it's not

22   significant -- probably not significantly more, that she's

23   consistently providing an ordered set of responses that are

24   consistent about that level of distress.

25   Q       And what is the significance -- was that the F(b) scale

1   that you just --

2    A      That was -- I first spoke about the F scale, then I

3   spoke about the F(b) scale, the back half of the test.

4    Q      What about the F(p) scale?

5    A      So the F(p) scale -- if we look at the F(p) scale, that

6   score -- that scale score is 81, and so you can see that it

7   crosses the clinical line substantially from 65T and is

8   consistent with what you would expect to see for somebody who

9   was entering a treatment unit -- a person with psychiatric

10  illness entering a treatment unit.

11   Q      So the F(p) scale was just the one designed to measure

12  folks who are in a psychiatric population.  If Mrs. Montgomery

13  had been in a psychiatric hospital, that score is about what

14  you would expect it to be?

15   A      Right, or anyplace where there was a high base rate of

16  psychopathology.

17   Q      Now, are there any other scales that are elevated on

18  the validity scales other than those?

19   A      So the other thing that I would call your attention to

20  are both the VRIN and the TRIN scale are the variable and true

21  response consistency scales are near -- are in normal limits at

22  least for the -- for the VRIN and right on the border for the

23  TRIN scale.  The F scale suggests that she on these items

24  tended to be denying psychopathology rather than endorsing

25  psychopathology.  So the -- in combination of the high F scale

```
 1    it would imply some degree of selectivity of the problems that

 2    she's reporting.

 3    Q      I think you meant to say the TRIN scale instead of the

 4    F scale.  So let's back up just a second.  The VRIN scale,

 5    that's the variable response indicator?

 6    A      Yes.

 7    Q      And that's within normal limits?

 8    A      Yes.

 9    Q      And as you mentioned before, when you see somebody who

10    has the VRIN within normal limits and an elevated F scale,

11    that's an indicator to you as the clinician that this may be

12    someone who is in quite a bit of psychological distress?

13    A      And not just to me, but that's what is in the

14    literature, yes.

15    Q      And the TRIN is the one right -- that's right on the

16    border?

17    A      That's correct.

18    Q      And is that the one that shows that she may be

19    naysaying, in other words, denying?

20    A      Exactly.

21    Q      So the TRIN is indicating that she's not trying to look

22    sicker than she is?

23    A      Correct.

24    Q      In fact, she's trying to look better?

25    A      And more specifically on some uncertain things she's
```

1423

1    trying to look better.  I'm sorry.  And that's why I was

2    suggesting that there was some specificity to the distress that

3    she's reporting; in other words, she's not endorsing

4    indiscriminately all level -- all types of distress.

5    Q      So reviewing the validity pattern that we're seeing on

6    this particular administration of the MMPI on January 2005,

7    though the MMPI interpretive report suggests that it may be an

8    invalid profile considering that validity pattern, is it

9    generally accepted in the psychological community that you

10   could move forward and look at the clinical scales to get some

11   relevant information about Mrs. Montgomery's psychological

12   functioning?

13   A      Well, it also -- it depends on the population.  So the

14   answer is yes.  The answer is that one would proceed with

15   caution and one would look at the literature.  So, for

16   instance, when I did my master's thesis in 1987, there were

17   studies that suggested 90T was within normal limits for an F

18   scale if there were trauma history.  So she's by those

19   standards not that far off, and recent studies by Kaloupek and

20   others have suggested it would be considerably higher and,

21   again, dissociation can increase that as well.

22   Q      So dissociation and trauma could explain her T-score on

23   the F scale meaning that it's actually within normal limits

24   given her history if the clinical history bears that out?

25   A      I wouldn't say within normal limits.  I would say that

1    it's reflecting real psychiatric illness that needed to be

2    investigated and also that it would help us to understand what

3    we would see on Scale 8 which measures various kinds of

4    cognitive confusion.

5    Q       Thank you.  This is why you are an expert and I am not.

6            So is it appropriate now, then, for us to look at

7    the clinical scales?

8    A       Well, if I could.

9    Q       Sure.

10   A       There is this statement here that says -- may I read

11   this?

12   Q       Please.

13   A       "Client has responded to the MMPI-2 items in an

14   exaggerated manner endorsing a variety of inconsistent symptoms

15   and attitudes.  They may stem from a number of factors that

16   include falsely claiming psychological problems, low reading

17   level, a plea for help, acute difficulty adjusting to

18   incarceration, or a confused state."  And then it raises the

19   question about the validity of the profile.  And to be fair,

20   what we see here are that there's a range of reasons why we

21   have those elevations, including a confused state,

22   incarceration, and these things can be ruled out, for instance,

23   low reading level, as I understand from the intellectual

24   testing as well, and this statement is -- the second point

25   about this statement is this statement in another interpretive

1  report would read differently if it were not rendered from the

2  forensic population.  So this is an example where statements

3  are chosen based on the population and included in this

4  interpretive part of the report.

5  Q      Thank you.

6           I'm going to show you page 8 of the correctional

7  interpretive report.  Does that include the clinical and

8  supplemental scale profile?  Let me ask you this:  Is it more

9  helpful to look at the chart or is it more helpful to look at

10 the actual --

11 A      My page numbers aren't matching up.

12 Q      Okay.

13 A      Is that 6?

14 Q      Yes, it's 6.  I should have put my glasses on.  I'm

15 sorry.  Page 6.

16 A      Yes.  This is that, yes.

17 Q      Okay.  What does -- does that show you the ten clinical

18 scales there?

19 A      Correct, labeled one through zero.

20 Q      And what are you able to determine from those clinical

21 scales based on your education, training, research, and

22 experience?

23 A      So, first of all, going through these scales, we see

24 that Scale 4 is elevated and Scale 8 is elevated, and those

25 are two high-point elevations here.  As I said earlier -- I'm

1    sorry -- let me first say.  I'm just focusing on the first ten

2    scales.

3    Q       Sure.

4    A       So the profile -- the interpretive report would base

5    their considerations on those two points mainly through the

6    computer-generated program, but then there's also elevations in

7    the problems that I described earlier, including that of

8    paranoia and what's called psychasthenia, which is simply what

9    we probably now would call burnout.  It's a straight -- a trait

10   like anxiety.

11          And then I would note two other things.  One, that

12   depression is moderately elevated as is a scale called

13   conversion hysteria, which is often associated with

14   dissociative problems.  The scale was originally developed with

15   people who had something called glove anesthesia where their

16   hand would be paralyzed.  They would be indifferent to it, but

17   the neurological -- the nerves would not be to where the

18   paralysis began and end.

19          In short, though, has become an understanding of

20   when people are faced with psychological pain that's too

21   difficult to tolerate.  For instance, during the course of

22   experiencing a trauma or remembering a trauma, the

23   psychological pain gets converted into a physical problem.  The

24   social interversion upscale is just below the border, but that

25   scale is very rarely elevated, and so that to me would speak to

1    something in combination with what we see with the depression.

2             So I see a constellation of problems because of the

3    extreme elevation.  This would be a second order interpretation

4    that would emphasize even more so the need to look for

5    corroborating data because there are significant problems that

6    are being reported here and that we can't go straight to a

7    cookbook or to a high point -- simply because there are so many

8    things reported here in the manner I described earlier was not

9    possible.

10   Q     So did I understand your testimony accurately that this

11   computer printout report that spits out a correctional

12   interpretive report, what they're going to spit out is based on

13   the two high points?

14   A     Yes.  It will say -- it can say something about that

15   and probably with a cautionary note.  So either says the report

16   was developed using the PDSC.  That would be the 4 and 8

17   subscales as a prototype, and it says individuals with this

18   extreme MMPI-2 profile tend to be quite disturbed

19   psychologically.  The client appears to be extremely alienated,

20   nonconforming, long-standing antisocial and sometimes

21   behavioral bizarre -- sometimes bizarre behavioral problems,

22   and then it goes on.  And I could go on.  But it's choosing

23   them in the context of other elevations that are accounted for

24   in this description because it's the best that it can do.

25   Q     So the computer does what it does, but you as a

1   clinician looking at this data say, Wait a minute, 4 and 8 are

2   elevated but we need to look at all the other scales that are

3   elevated to figure out what's going on with this?

4   A      Exactly.  So I wouldn't throw this out.  I would look

5   at this, and this is telling me there's very serious problems,

6   but there's no way -- there's no way that I would make a

7   clinical judgment based on this without considering the other

8   data; and because of the elevations, it would be more important

9   to look at other test data and clinical data as well.

10  Q      Including some of the subscales that produced these

11  T-scores?

12  A      The subscales can then offer another level of

13  information that you could consider to be somewhere between the

14  critical items, which would be the lowest level of reliability

15  but very clinically important, and the subscales, which are

16  smaller sets of the MMPI scales obviously cannot be as reliable

17  because there's fewer number of items constructed in those

18  scales.  And so it often depends on how clear a pattern one

19  might see within those subscales to understand what the

20  elevation is, what accounts for the elevation in the parent

21  scale.

22  Q      We're going to talk about the subscales in just a

23  moment, but did you -- were you able to reach a conclusion

24  about the number of potential mental illnesses that may be

25  suggested as a result of the data here?

1    A       So looking at this profile in the context of the

2    validity scales, I would make a list of things, of hypotheses

3    that I would want to follow up in terms of psychiatric

4    illnesses.  This for me, because of my background and approach

5    to psychopathology, I would also want to look at how these

6    disorders interrelate.

7              So by that I mean -- and I do believe that this is

8    the standard in most hospital settings these days.  A person

9    doesn't just have one diagnosis.  The epidemiologic evidence

10   studies by Kathleen Merikangas, for instance, have demonstrated

11   that the more severely disabled somebody is, the more DSM

12   diagnoses they meet criteria for, as have the national

13   comorbidity studies of mental illness.  So in going forward to

14   look at this list of hypotheses for potential problems, it's

15   not finding the one true disorder but looking at the

16   combination of disorders or DSM psychiatric mental disorders

17   that Ms. Montgomery would meet criteria for.  So I would

18   qualify -- I would say with that.

19             And then the things that are most notable here are,

20   one, the Scale 8 which is elevated that originally was termed

21   schizophrenia scale.  It's been suggested, as we talked about

22   before, may have talked about before, that the scale should be

23   referred to by numbers because the meaning of the scales have

24   changed and the schizophrenia scale more aptly measures states

25   of confusion, disorganization, bizarre thinking, the kinds of

1   things that you would often see in schizophrenia but could see

2   in a range of other psychiatric illnesses, and this is

3   significant and it's significant to a level that is not off the

4   chart.

5          So if somebody were exaggerating their

6   psychopathology reporting that they had all manner of problems

7   and you saw high elevated F, if they were randomly endorsing,

8   this scale would be even higher.  So the fact that this scale

9   is at a clinically significant range that you would expect to

10  see for somebody who was hospitalized for a severe dissociative

11  or psychotic spectrum or bipolar spectrum disorder, this would

12  not be unusual or if the person was suffering from delusions.

13  So those lists of problems would be things I would be

14  investigating with other data.

15         Scale 4 is elevated as well and so it's important to

16  turn attention to that to try to understand why that might be

17  elevated.  When I worked for the Durham Police Department to

18  evaluate police officers, one of the things that we were taught

19  was we wanted to select police officers whose Scale 4 was

20  subclinically but moderately elevated, and I don't mean to be

21  telling a joke about this, but if somebody had a very low scale

22  score, you might think of somebody like the character Barney

23  from the old Andy Griffith show who was very rigid, and so you

24  need a police officer who can think on their feet and do things

25  and not cause undue burden by focusing --

1    THE COURT:  Ms. Henry, can we get back on track with

2  Ms. Montgomery?

3    THE WITNESS:  I'm sorry.

4    MS. HENRY:  Sure.  I should say in context with

5  Scale 4 as used by Dr. Martell to say some things about Mrs.

6  Montgomery.

7    THE COURT:  Well, I understand that but I don't need

8  all the examples of how that works.  I think we've heard all of

9  that and now we're at what he sees with Ms. Montgomery.

10    MS. HENRY:  Thank you.

11  Q    (By Ms. Henry)  So with respect to Scale 4 -- is

12  Scale 4 something you can also see elevated with individuals

13  who have had pervasive trauma?

14  A    I can be very clear.  This scale can be elevated for

15  any number of reasons, essentially that people grow up in

16  different environments where all bets are off for the rules of

17  society.  It can be elevated in people who have criminal

18  histories.  We see that.  When it's elevated in people who

19  exhibit something like psychopathy -- this is an old term

20  that's no longer used -- it's only elevated with Scale 9

21  typically, and that would be if we were to think about a

22  business person.

23    For Ms. Montgomery's case we would want to know how

24  much of this elevation was due to perhaps substance abuse which

25  is correlated with it, perhaps her inability to connect with

1    treatment systems or the availability of them, or perhaps a

2    history of abuse, especially chronic abuse.

3    Q      Did you see in the test data evidence of -- I'll list

4    these and you can tell me if I'm wrong; posttraumatic stress

5    disorder, mood disorder, dissociative disorder, somatoform

6    disorder, psychosis, and neurological problems?

7    A      I would say yes to all of those.  I would say for

8    neurological problems, I could not make that determination, but

9    that would be one possibility that I would want to know about

10   before making a determination by consulting with a

11   neuropsychologist or at least looking to a history to see if

12   that were warranted.

13   Q      So you would want to then take that profile and go to a

14   multidisciplinary team and discuss what you saw?

15   A      That's exactly what I would do, and that's exactly what

16   we do on the clinical units at the hospital.

17   Q      So we've talked about how the clinical scales

18   established the hypotheses of extreme distress, possible

19   dissociation, possible psychosis.  Is there anything else --

20   mood disorder and somatoform disorder.  Is there anything else

21   on this particular scale that's important to understand for the

22   Court in terms of what you would -- what possible hypotheses

23   you would want to look at with Ms. Montgomery?

24   A      On this profile rather, so combination of scales, so to

25   the right you can see more recent scales that were at one time

1    research scales and have become scales that are widely

2    accepted, and that's why they're now included in this front

3    section, and the one thing that I would point your attention to

4    would be the MacAndrew scale, which is above addiction

5    potential, it does not speak to whether or not somebody is

6    addicted.  It's subclinically elevated but there's been some

7    controversy about what the exact cutoff is.

8              Then the two other notable things here would be

9    marital distress scale but most notably a PK scale, which is a

10   measure of PTSD -- for a measure of PTSD, which is elevated in

11   her case.  I will say that although it's been determined very

12   useful for detecting PTSD.  When there's other psychopathology,

13   it blends.  It tends to pick up other psychopathology as well

14   as PTSD.  So there's some issues with this specificity.  So for

15   that scale, that would be a red flag to go and look at other

16   measures of PTSD.

17   Q     And is it in fact normal and expected to see substance

18   abuse and substance use in individuals who have multiple severe

19   psychiatric illnesses?

20   A     Absolutely.  And that goes back to when I was speaking

21   earlier about dual diagnosis of mental and substance abuse

22   disorders.  So particularly in bipolar disorders we see people

23   medicate with alcohol, for instance, and it's very difficult --

24              THE COURT:  I think he's answered the question.

25              MS. HENRY:  Thank you.

1   Q       (By Ms. Henry)  Now, with respect to looking at the

2   subscales -- let me ask you if you can briefly summarize the

3   importance of what we see on the content scales profile?

4   A       On the content scales I'll -- I'm just going to be as

5   focused -- very focused here.  What's really notable here is

6   that we see high levels of anxiety, depression, and low

7   self-esteem as well as problems with family, work, and being

8   able to engage in treatment.

9   Q       Now, I want to focus -- particularly we were talking

10  about Scale 4 earlier, which is often referred to as the

11  psychopathic deviate scale.  You talked about the importance of

12  looking at the subscales in order to clinically make a

13  determination about why that scale may be elevated.  Do you see

14  the subscales there?

15  A       I do.

16  Q       What subscales are elevated under the psychopathic

17  deviate scale for Mrs. Montgomery?

18          MR. VALENTI:  Ms. Henry, can you for the record

19  indicate which doctor gave the test?  So we can follow along on

20  the record.

21          MS. HENRY:  Sure.  And I think we're going to figure

22  out pretty quickly that -- we're on the 2005, and the 2007 is

23  going to be a little bit shorter.

24          MR. VALENTI:  Okay.  I just want to make sure the

25  record is clear.

1    Q      (By Ms. Henry)  So we're on 2005, January of 2005,

2    shortly after the arrest, and we're looking at page 8 of the

3    correctional interpretive report, going down to the

4    psychopathic deviate scale.  What items do you see elevated

5    there?

6    A      So the subscales that are elevated there, and you'll --

7    I would draw your attention to the T scale scores.

8    Q      Yes, sir.

9    A      And beyond 65T is a clinical elevation.  Familial

10   discord, which reflects a history of a home life of family

11   problems and conflict and oftentimes violence in the home, is

12   at 86T which is the most elevated of the subscale score.

13          The next -- the two next most highest elevations are

14   self-alienation and social alienation, and those have to do

15   with the ability to be able to communicate and connect with

16   other people and not feel isolated and estranged, and those are

17   symptoms -- reflects symptoms that are often reflected in

18   depressive and sometimes schizophrenia spectrum disorders.

19   That accounts for the lion's share of the elevation on Scale 4.

20          The two scales that are not elevated are authority

21   problems, which is within normal limits, and social

22   imperturbability.  Authority problems is clear.  Social

23   imperturbability refers to the ability of somebody to be

24   charming and glib in the way that we might think of an example

25   of a psychopath from a movie.

1    Q       And Mrs. Montgomery wasn't elevated on those scales?

2    A       Correct.

3    Q       But was she elevated on the scales that research

4    indicates you would expect there to be elevations that she had

5    a pervasive chronic and severe trauma history?

6    A       Yes, we see those elevations.

7    Q       Particularly social alienation and family discord, for

8    example?

9    A       Yes.

10   Q       If there had been violence in the home?

11   A       Yes.

12   Q       And so is that an area where before you label somebody

13   as having antisocial features, you would want to see whether

14   the responses were consistent with a history of chronic and

15   severe trauma?

16   A       Yes.  And it would go to one other place too.

17   Q       Okay.

18   A       And I would look at -- when I see that elevation on

19   Scale 4, I would look at these component scales and go to

20   antisocial practices subscales, and you'll notice there is on

21   page 10 -- I'll let you -- and so here on page 10 you see two

22   subscales.  One is antisocial attitudes and one is antisocial

23   behavior.  If you look across to the T-scores, you'll see that

24   antisocial attitudes is at 45, well within normal limits.  If

25   you look at antisocial behavior, you will see the T-score is

1    extremely elevated at 81; and when I see that pattern there,

2    it's indicating to me that we're not observing trait-like

3    behaviors of antisocial behavior in the client or the patient

4    who's being tested when that's within normal limits.  When I

5    see the elevation of antisocial behavior in conjunction with a

6    lack of the elevation of antisocial traits, I see somebody

7    who's honestly and forthrightly reporting bad things that

8    they've done in their life.

9    Q     And is that something that you could take into

10   consideration when you were trying to make a determination of

11   whether or not this was a malingered profile?

12   A     Absolutely.  This would be another example of

13   specificity.

14   Q     And without going through each and every subscale and

15   content scale, Dr. Sanislow, is it fair to say that when you

16   drill down into the content and subscales that are reflected in

17   this report, which is introduced into evidence, that that would

18   be further evidence in support of having seen at least some

19   data -- I mean, this is just a piece of the puzzle, but data

20   that would suggest we've got PTSD, a mood disorder,

21   dissociation, psychosis, somatoform disorder, and possibly

22   neurological problems?

23   A     Yes.  We have a very long list of possibilities that

24   need to be investigated in addition to malingering, but I would

25   say that there's some pretty compelling evidence that are

1    second and third order hypotheses.  The extent and consistency

2    of them would point to the need to look to other test data and

3    clinical information.

4    Q      Moving now to Movant's Exhibit No. 152, which is the

5    2007 MMPI-2 extended score reports from Dr. Martell regarding

6    the test given on June 6th, 2007.  When you looked at the

7    validity profile here -- well, let me first say that the way

8    the score -- these charts look is a little bit different.  Is

9    that because of the different use of the report that was chosen

10   by the administrator?

11   A      Right.  That's all that is.  So we see here combined

12   the MMPI-2 validity and clinical scale profile.  So these are

13   the most accepted validity scales along with the ten clinical

14   scales that are segregated here.

15          I don't believe we need to go into this, but there's

16   a non-K corrected page on the next page.  I would be happy to

17   talk about it but it's fairly consistent.  In fact, there's no

18   difference.

19   Q      So for purposes of shortening up your testimony this

20   morning, Dr. Sanislow, is it fair to say that when you compare

21   the 2007 MMPI with the 2005 MMPI, it appears that Mrs.

22   Montgomery is reporting consistently between the two?

23   A      These profiles are incredibly consistent.  The one

24   thing that I would note is that the F(b) scale actually does

25   seem to increase toward the end of the testing period.  That

1    I've seen when a test situation is stressful for the client, in

2    other words, being asked those questions and being asked a lot

3    of questions can make it more difficult to persist through the

4    end of the test.

5    Q      And so when you say when the testing situation might be

6    more stressful, if I were to ask you hypothetically if, for

7    example, the test examiner is an individual who has been

8    identified to Mrs. Montgomery as someone who has been hired on

9    behalf of the government which is seeking the death penalty and

10   who has examined her over a period of a number of days, one of

11   which she became emotionally overwhelmed and had to stop the

12   testing, could that be consistent with a stressful test

13   situation?

14   A      That would be one example.  Another example that I

15   would add to that is if you -- there's been an extent of

16   literature of interviewing people with PTSD and childhood

17   sexual abuse in the manner in which that's done and if it's

18   done in a way that's not sensitive to the history and in fact

19   there is a substantial trauma history, the questioning could be

20   insensitive -- the questioning could be stressful if it did not

21   take into account the possibility that the interview itself

22   would be reminiscent of the trauma, in other words, people

23   being in control of the client and that would be a second case.

24   So I agree with what you said and wanted to add that as well.

25   Q      Thank you.

1    I would like to ask you now about the critical items

2  that were endorsed by Ms. Montgomery, and we'll just summarize.

3  We'll talk about both, the 2005 and 2007, because my question

4  is not to go through each of those critical items but rather

5  it's this:  If a number of critical items are endorsed and data

6  is available to objectively demonstrate that Mrs. Montgomery's

7  answers on those critical items were truthful, what would that

8  tell you about the validity of -- whether or not the fact the

9  scales are exaggerated and malingering?

10  A    That would tell me that Ms. Montgomery was doing her

11  best to portray the most accurate sense of herself when

12  presenting her ordered -- her ordered set of responses on the

13  MMPI-2.

14  Q    Thank you.

15  A    May I say that the psychopathic deviate subscale that

16  we talked about as well as the antisocial practices are

17  identical on this test as well.

18  Q    Thank you.

19        MS. HENRY:  If I could have just one moment, please.

20        Dr. Sanislow, I thank you very much for your time

21  this morning.  Mr. Valenti or Mr. Ketchmark may have some

22  questions for you.

23        MR. VALENTI:  May it please the Court.

24        THE COURT:  Mr. Valenti.

25  CROSS-EXAMINATION BY MR. VALENTI:

1    Q       Dr. Sanislow, as I understand when you talked about

2    testifying, you've testified two other occasions you recall in

3    cases; is that correct?

4    A       Yes.

5    Q       What were those cases?

6    A       I don't know that I can say what those cases are.

7    Q       Are they criminal matters?

8    A       I honestly don't know that I can say that and I really

9    don't --

10   Q       In the sense you don't know?

11   A       In the sense that I'm not able to answer the question.

12   Forgive me.  I'm not an attorney but because of the cases --

13              MS. HENRY:  Excuse me, Your Honor, may I interject

14   an objection and may we approach the bench?

15              THE COURT:  Yes.  Well, you don't have to approach

16   because we don't have a jury here.  I mean, if there's

17   something you want to talk about.

18              MS. HENRY:  Well, there are other people in the

19   courtroom.

20              THE COURT:  They're all on your team, aren't they?

21              MS. HENRY:  The matter is under seal and does not

22   involve my team.  I'll do whatever you want.  I believe that

23   what Mr. Sanislow is trying to say is that he has testified in

24   other matters before other Courts and those transcripts are

25   under seal and he's not allowed by court orders in other

1    federal courts to discuss his testimony in those other cases.

2              THE COURT:  Well, can't they at least be identified

3    as criminal or civil without giving any underlying information?

4              MS. HENRY:  He's not a lawyer.  If you could

5    instruct him.

6              THE COURT:  Okay.  Well, do you know?

7              MS. HENRY:  All I know is I think they're criminal

8    cases that he consulted, but I'm not allowed to know about

9    these other 12.2 proceedings.

10             THE COURT:  All right.  Well, Doctor, I don't see

11   any problem with confidentiality in identifying the nature of

12   the case either being criminal or civil, so I'll direct you to

13   answer that question.

14             THE WITNESS:  Thank you.

15   A      Yes, they're criminal.

16   Q      (By Mr. Valenti)  In both occasions were you hired by

17   the defense in those cases?

18   A      Yes.

19   Q      You've indicated, though, that you're a clinical

20   psychologist, correct?

21   A      Yes.

22   Q      And associate professor?

23   A      Yes.

24   Q      You understand the difference between that and the

25   forensic psychologist, correct?

1    A      Yes.

2    Q      A forensic psychologist is one who receives additional

3    board certifications that you do not possess?

4    A      Yes.

5    Q      The goal of a forensic psychologist is somewhat

6    different from that of a clinical psychologist, isn't it?

7    A      Yes.

8    Q      The clinical psychologist, if I understand correctly,

9    has the goal of trying to assess the patient to determine what

10   is wrong with him or her, then to try to come up with a regimen

11   of treatment, correct?

12   A      Or arrive at a diagnosis.  But, yes, I do agree.

13   Q      A diagnostic inquiry with a goal to helping the

14   patient?

15   A      Yes.

16   Q      Okay.  Whereas, forensic psychologist, because he or

17   she has a role of trying to explain things to lawyers, to

18   Courts and maybe even juries, has to be able to have a

19   conversation and a -- I don't want to say a dumbed-down version

20   but in a less technical format; is that correct?

21   A      I don't understand your question.

22   Q      Well, forensic psychologist has to ultimately have a

23   goal of diagnostically looking at a person.  Instead of it

24   being a patient, it's usually a defendant or someone in a civil

25   case, correct?

1    A      I believe so.

2    Q      And a forensic psychologist is not going to create a

3    treatment plan for that person if they're interviewing them,

4    are they?

5    A      I don't know.

6    Q      Would you agree that a forensic psychologist's goal is

7    to assess someone's mental health and then to be able to apply

8    that mental health and facts to the law as it applies in a

9    case?

10   A      Or their mental illness, yes.

11   Q      Correct.  So would you agree with me, then, that a

12   forensic psychologist and a clinical psychologist have

13   different goals when they are called in to work on a case?

14   A      Oh, yes, absolutely.

15   Q      Okay.  And whereas a -- you used the analogy of X rays

16   that relates to medical doctors.  You would agree with me that

17   an X ray for a medical doctor is a tool for them to help make a

18   diagnosis, correct?

19   A      Yes.

20   Q      A blood test for a medical doctor is a potential

21   diagnostic tool to help figure out what's going on with the

22   person's body?

23   A      Yes.

24   Q      Whereas, for a forensic psychologist or

25   neuropsychologist they use diagnostic tools like psychometric

1    testing, MMPI and such, correct?

2    A       They use diagnostic tools such as forensic -- such as

3    psychometric testing and MMPIs, yes.

4    Q       MMPI would be one such diagnostic tool that a forensic

5    psychologist or neuropsychologist would use?

6    A       Yes.

7    Q       Okay.  And so the psychologist, the neuropsychologist

8    uses one set of tools; fair?

9    A       Yes.

10   Q       And medical doctors use a separate set of tools?

11   A       Yes.

12   Q       Okay.  As I mentioned to you earlier, a forensic

13   psychologist has to, then, explain those findings, not to other

14   medical professionals in a clinical setting or in a treatment

15   setting, but to judges, lawyers, juries; would you agree with

16   that?

17   A       That sounds correct.

18   Q       Okay.  When you did your work in this case, you did not

19   conduct any psychometric testing, did you?

20   A       I did not.

21   Q       You did not conduct clinical interviews of Ms.

22   Montgomery, did you?

23   A       No.

24   Q       Instead, you reviewed the materials provided to you by

25   defense for the referral question; is that fair?

1    A       Yes.

2    Q       Okay.  And you prepared I believe it's 34 pages -- yes,

3    34-page affidavit or declaration kind of explaining what you

4    were asked to do and what you did; is that fair?

5    A       Yes.

6    Q       And the first 20-odd pages are kind of laying out

7    similar to the testimony you did today, and then you're asked

8    to review and you do review the neuropsychological testing data

9    provided to you that you believed was Dr. Hutchinson's test

10   data, correct, the 2005?

11   A       Can you direct me to the page that you're looking at,

12   please?

13   Q       I can.  Just give me two seconds.  On page 25 of 34 you

14   do begin the review of the 2005 MMPI-2 administered by Dr.

15   Hutchinson.  That's your kind of chapter heading, correct?

16   A       Right.  But the 2005 MMPI I believe we have decided to

17   call it.

18   Q       Okay.  Now, you know after October 13th of 2016 that

19   was actually Dr. Willing that did that, not Dr. Hutchinson; is

20   that correct?

21   A       Yes.

22   Q       As you start the analysis of Dr. Hutchinson's, now

23   we'll say Dr. Willing's 2005 MMPI --

24   A       I'm sorry.  This is paragraph 55 you're referring to?

25   Q       You start on paragraph 55 of page 25 of 34.

1    A       Thank you.

2    Q       That's where you begin your analysis in your

3    declaration?

4    A       Yes.

5    Q       The first 25 pages are laying out your background, your

6    history, and some general ideas of what the MMPI is and how to

7    interpret it, correct?

8    A       You might say that paragraph 54 was the start but I

9    won't quibble.

10   Q       Page 25?

11   A       Yes.

12   Q       From page 25 to page 31 you analyze the 2005 MMPI,

13   correct?

14   A       Yes.

15   Q       And then on page 31 for the first time of your 34-page

16   declaration you discuss the 2007 MMPI which was performed by

17   Dr. Martell, correct?

18   A       I'm sorry.  What page?

19   Q       Page 31 of 34, paragraph 67.

20   A       Yes.

21   Q       So in your 34-page declaration there's slightly less

22   than four pages of that declaration dedicated to the analysis

23   of Dr. Martell's forensic neuropsychological report, correct?

24   A       Yes.

25   Q       It's fair to say that you were provided with Dr.

1   Martell's neuropsychological report?

2   A      Yes.

3   Q      You were obviously able to read it?

4   A      Yes.

5   Q      Did you ever call Dr. Martell and ask him about the

6   work that he did in this case?

7   A      I did not, and I don't know that I could have but --

8   Q      I mean, his phone number was on page 1, the opening

9   page of his report, correct?  Is that a yes?

10  A      His letterhead?  Yeah.

11  Q      Which was page 1 of his report.  On his letterhead his

12  phone number was on it?

13  A      I did not call him.

14  Q      Okay.  But what I'm saying is his phone number was

15  available as was his email address, correct?

16  A      I would have to look, but I'll take your word for it.

17  Q      I'll represent to you that both of those are on the

18  letterhead that was provided in the report you reviewed.  Would

19  you disagree with me?

20  A      No.

21  Q      In your declaration in paragraph 51 on page 23 you

22  indicate in that section that many of the conclusions you would

23  draw in your declaration are necessarily, in your words,

24  hypotheses, correct?

25  A      Correct.

1    Q       And the reason for that was you said you were missing

2    the full range of data that would be available to someone who

3    themselves conducted an interview, correct?

4    A       Correct.

5    Q       Which you did not do in this case?

6    A       Correct.

7    Q       All right.  So scientifically the term "hypothesis,"

8    which has always been represented to me to mean an educated

9    guess or educated idea of what you think might be happening,

10   correct?

11   A       It's a statement put forth to be tested, not an

12   educated guess.

13   Q       Okay.  I don't want to use my words but you used with

14   counsel during your direct examination the word often of

15   possibility, correct?

16   A       Yes.

17   Q       Okay.  Possibility that needed to be further tested and

18   the rigors of the clinical interview or more testing, correct?

19   A       Corroboration or just confirmation through a variety of

20   other methods and sources.

21   Q       Okay.  None of those things you did beyond looking at

22   the data provided to you, correct?

23   A       Well, I did look at the PAI page that did indicate that

24   the defendant had experienced or scored high on a trauma scale

25   and also produced a valid PAI profile; but because I was asked

1    to focus on the MMPI, stayed focused on the MMPI.

2    Q      Okay.  So you focused on the MMPI knowing -- and

3    clearly from Dr. Martell's he did a number of tests beyond the

4    MMPI, correct?

5    A      Correct.

6    Q      And Dr. Martell did a clinical interview that would be

7    important to you, correct?

8    A      Right.  I'd have to go back to look and see how much of

9    the clinical interview was an observation versus a clinical

10   interview, but yes.

11   Q      You were also given the 2005 MMPI for analysis,

12   correct?

13   A      Uh-huh.

14   Q      And were you given the name or phone number of Dr.

15   Hutchinson to call to consult with her or Dr. Willing about the

16   conclusions that they drew?

17   A      I don't believe so.

18   Q      Okay.  Were you provided Dr. Kuncel's testing -- even

19   though we'll all admit that she didn't do it in an ideal way,

20   were you provided the psychometric testing that Dr. Kuncel

21   produced in this case?

22   A      I saw nothing to do with the MMPI.

23   Q      But you did see other things from Dr. Kuncel?

24   A      There was some other tests from Dr. Kuncel.

25   Q      Did you see that Dr. Kuncel administered the Structured

1    Inventory of Malingering Scales?

2    A      I did see that Dr. Kuncel administered that.  I did not

3    look at that test.  It's outside of my expertise.

4    Q      For purposes of the record, you are aware that is a

5    malingering psychometric test?

6    A      Yes.

7    Q      Also referred to as SIMS.  And were you aware that test

8    concluded -- or had a number with an impression of malingering

9    in it?

10   A      No.

11          MS. HENRY:  Your Honor, I'm going to object that Dr.

12   Sanislow has testified that test is outside his area of

13   expertise.

14          THE COURT:  Overruled.

15   Q      (By Mr. Valenti)  Dr. Sanislow, you indicated in order

16   for hypotheses to best be tested, they would need to be done

17   through more testing and/or more interviews, correct?

18   A      Correct.

19   Q      You are aware that, one, Dr. Martell is a board

20   certified forensic neuropsychologist, correct?

21   A      Correct.

22   Q      You could tell that from the report you were given.

23   You knew that he did a psychological or neuropsychological

24   psychometric testing in this case, correct?

25   A      Correct.

1452

1    Q      You knew that he did the interview that you did not,

2    correct?

3    A      Correct.

4    Q      You knew that he was provided the 2005 MMPI from Dr.

5    Hutchinson's, slash, Willing?

6    A      I'm sorry.  Could you repeat that?

7    Q      You knew that he was provided the 2005 MMPI results

8    from Dr. Hutchinson/Willing team, correct?

9    A      Yes.

10   Q      You may or may not have known, but I'll represent to

11   you, that he was provided Dr. Kuncel's psychometric testing,

12   okay?  You're nodding but we need for purposes of the record a

13   yes or no.

14   A      Repeat the question.

15   Q      You knew or I'll represent to you now at least that Dr.

16   Martell was provided Dr. Kuncel's results of her psychometric

17   testing and raw data?

18   A      Yes.

19   Q      You also -- I don't know if you know this.  I don't

20   know.  Did you know that Dr. Martell observed Ms. Montgomery in

21   person while she was examined over a period of three days by

22   Dr. Park Dietz?

23   A      I do.  I was not sure if that was three or five days,

24   but I do know.

25   Q      Did you watch those videotapes of those interviews?

1   A      I did not.

2   Q      All right.  So Dr. Martell has done many of the things

3   you say in your declaration need to be done to test the

4   hypotheses, correct?

5   A      Correct.

6   Q      Because I believe your ultimate opinion, if I'm not

7   mistaken, about Dr. Martell is you believe that he concluded

8   that Ms. Montgomery was malingering to the exclusion of other

9   possibilities; is that a fair statement of your conclusion?

10  A      No, it's not.

11  Q      Okay.  Tell the Court what your conclusion about Dr.

12  Martell is.

13  A      My conclusion about Dr. Martell was in his report he

14  included only one statement about the MMPI that had to do with

15  malingering and did not explain in his report the other

16  possibilities and his decision process for reviewing and ruling

17  those in or out.

18  Q      So a little bit like a math teacher who would chastise

19  a student for not showing their work, you don't see how he

20  showed his work, correct?

21  A      I would not make that comparison.  I would say that in

22  the interest of providing -- I would say that it's important to

23  provide the clinical data in the final report on which

24  conclusions were based on.

25  Q      Would you agree with me that Dr. Martell did everything

1    you say should be done in order to come up with a valid

2    conclusion in testing the various hypotheses but you don't

3    agree with his ultimate answer; is that correct?

4    A      I don't -- no.  I don't agree with the fact that Dr.

5    Martell did not represent that in his clinical report, because

6    the clinical report is the final standard report for which

7    another clinician or others would draw conclusions.

8    Q      Would you agree with me, however, that Dr. Martell is a

9    forensic psychologist and he's writing a forensic report for

10   the Courts and the lawyers; he's not writing a clinical report

11   for you?

12   A      I would agree with that.

13          MR. VALENTI:  That's all I have, Your Honor.

14          MS. HENRY:  Just very briefly.

15   REDIRECT EXAMINATION BY MS. HENRY:

16   Q      Dr. Sanislow, you mentioned that you had looked at the

17   PAI?

18   A      Yes, I did.

19   Q      I'm showing you Movant's Exhibit 153.  Is that the PAI

20   that Dr. Martell administered that you reviewed?

21   A      Yes.

22   Q      And did the PAI that you reviewed from Dr. Martell show

23   Mrs. Montgomery's score in the PTSD as in the 99th percentile?

24   A      That sounds right.  I would have to find it.  It was

25   over 90 PAI, I do recall that.

1   Q       So ARD-T on page 3, traumatic stress, 99?

2   A       It's focusing.

3   Q       Okay.

4   A       Yes.

5           MS. HENRY:  Your Honor, I would move for admission

6   of Movant's 153.

7           MR. VALENTI:  No objection.

8           THE COURT:  Received.

9           MS. HENRY:  Nothing further.

10  RECROSS-EXAMINATION BY MR. VALENTI:

11  Q       Dr. Sanislow, Dr. Martell did conclude that she

12  suffered from both depression and PTSD, didn't he?

13  A       Yes.

14  Q       Okay.  And he indicated that though he had symptom

15  exaggeration on the MMPI-2 and the MCMI-III, he did conclude

16  that she had a valid PAI profile?

17  A       That's correct.

18  Q       And that was when he concluded then and said -- he

19  didn't conclude then and said, but he concluded then that she

20  was a sufferer from both diagnoses of PTSD and depression?

21  A       Yes.

22          MR. VALENTI:  That's all I have, Your Honor.

23          THE COURT:  All right.  Thank you, Dr. Sanislow.

24  You're excused.

25          THE WITNESS:  Thank you, Your Honor.

```
 1                    (Witness excused.)

 2              THE COURT:  I think we'll go ahead and take a break

 3      for lunch now.  Do you have a short witness you want to get

 4      done?

 5              MS. HARWELL:  She's rather lengthy, Your Honor.

 6              THE COURT:  You what?

 7              MS. HARWELL:  Our next witness is rather lengthy.

 8              THE COURT:  We'll take a lunch break, then.  I'll be

 9      back at five minutes after one.

10              MR. VALENTI:  Quickly, I haven't had an occasion

11      before to look at the Purkey case in any particular depth, but

12      I think it's important to note that when you look at the Purkey

13      case that though Dr. Dietz testified in this case and in

14      Purkey, in this case he testified in the guilt phase as a

15      response to the insanity defense put on in the case; and,

16      therefore, the examination of Dr. Dietz would have been ruled

17      by the rules of impeachment under Federal Rule 609, 608 and

18      also Rule 403 on relevancy.  Whereas, in Purkey when he

19      testified, he only testified in the penalty phase --

20              THE COURT:  You can go ahead, Doctor.  You don't

21      have to listen to this.

22              MR. VALENTI:  And the benchmark for admissibility is

23      simply reliability under 18 U.S.C. 3591 et al.  Therefore, the

24      standard of impeachment would similarly be less than it would

25      have been in the guilt phase analysis of his testimony.  I
```

1457

1   thought the distinction was important.

2         THE COURT:  I don't think the Purkey case is

3   instructive here, but that, you know, doesn't necessarily mean

4   it rules out testimony about whether this Attorney Parnham,

5   whatever his name was, instigated the proceeding.  You know, my

6   guess is that at best that may be a matter of personal

7   perspective or opinion about what is instigating and what isn't

8   and who did what and that does seem to be extremely collateral,

9   because we're not talking about whether Dr. Dietz testified or

10  not.

11        MS. HENRY:  Your Honor, if Dr. Dietz hadn't

12  volunteered that testimony, I would agree that it would be

13  collateral; but if he did volunteer that, which he did in the

14  transcript here, the fact that he volunteered testimony which

15  is not true means that would be relevant to impeaching and

16  credibility.

17        THE COURT:  Well, I think I'm -- you know, really,

18  quite frankly, out of an abundance of caution, I would let you

19  do that, but my fear is that it's just going to get into a

20  swearing match.  I don't know a swearing match, but a question

21  of what Dr. Dietz' perception is of how all of that happened

22  and what Mr. Parnham, whatever his name is, whatever the

23  attorney -- however he believes that all took place and

24  unfolded -- Parnham.  But, at any rate, I'll let you know for

25  sure one way or another when I come back after lunch.  Thanks.

1            (The noon recess was taken at 12:10 p.m. until 1:05

2    p.m.)

3                          AFTERNOON SESSION

4            THE COURT:  Well, back on this Parnham situation,

5    tell me again what it is that you anticipate that Mr. Parnham

6    will testify to.

7            MS. HENRY:  Your Honor, I anticipate that Mr.

8    Parnham will testify that he was not the instigator of the

9    grand jury investigation of Dr. Dietz.

10           THE COURT:  Where did Dietz testify that he was?

11           MS. HENRY:  In this court.

12           THE COURT:  In this case?

13           MS. HENRY:  Yes, sir.

14           THE COURT:  What was his testimony?

15           MS. HENRY:  His testimony was that he was asked a

16   question, he gave a narrative response where he described that

17   the investigation was by a runaway grand jury that had kicked

18   out the prosecutor, invited in George Parnham, and George

19   Parnham got them to investigate Dr. Dietz, among others.  That

20   was a nonresponsive answer on cross-examination.

21           THE COURT:  Well, I didn't look at Dr. Dietz'

22   testimony in this case, but I did look at the grand jury

23   testimony and thought it was rather unusual that the grand

24   jurors seemed to be asking all the questions.  I didn't know

25   because I didn't look at the whole thing, but was the

                                  1459

1   prosecutor asked to leave by the grand jury?

2           MS. HENRY:  There were several questions actually,

3   Your Honor, by the grand jury -- by the prosecutor.  There was

4   present the -- a member of the Texas Attorney General's Office

5   who did the original examination, then there was a member of

6   the Harris County District Attorney's Office who did further,

7   and then the grand jurors did ask a lot of questions.

8           THE COURT:  Okay.  I want to look at what Dietz'

9   testimony was in this case.  When I do that, then I'll answer

10  this for you.

11          MS. HENRY:  I'm pretty sure I have a pinpoint site

12  to the transcript, and I'll give that to you on the break.

13          THE COURT:  All right.  Thanks.

14          Ready?

15          MS. HARWELL:  Yes, Your Honor.  The movant would

16  call Jan Vogelsang.

17          THE COURT:  Good afternoon.  Would you come on up to

18  the witness stand for us, please.

19  JANET VOGELSANG, being sworn by the courtroom deputy,

20  testified:

21  DIRECT EXAMINATION BY MS. HARWELL:

22  Q       Please state your name for the Court and spell your

23  last name for the court reporter, please.

24  A       Janet Vogelsang, V, as in Victor, o-g-e-l-s-a-n-g.

25  Q       Ms. Vogelsang, where do you work?

1    A       I have a private practice in Greenville, South

2    Carolina.

3    Q       And what does your private practice entail?

4    A       The mental, emotional, and behavioral diagnoses.  I

5    also conduct biopsychosocial assessments for my private

6    practice and for the courts and I give educational

7    presentations.

8    Q       What degrees do you hold that allows you to do this

9    work?

10   A       I have a master's degree in social work from the

11   University of South Carolina, and I have a bachelor's degree in

12   psychology from Pepperdine University.

13   Q       What is the clinical social worker?

14   A       A clinical social worker is a mental health

15   professional that is trained to diagnose and treat mental

16   disorders.  They can be found in a number of settings; in

17   psychiatric settings, private practice, in business, and in the

18   military and a number of other settings.  The statistics are

19   that they provide 60 percent of the mental health treatment in

20   the United States.

21   Q       Are you licensed and board certified?

22   A       I am.  I'm licensed by the South Carolina Board of

23   Social Work Examiners and by the American Board of Examiners in

24   Clinical Social Work.

25   Q       And are you published?

1    A       I am.  I have written a book called Witness Stand, and

2    it is basically a guide for social workers on some of the most

3    basic issues in going to court.

4    Q       Have you held any appointments?

5    A       Several.  One was the appointment by the Governor of

6    South Carolina to the Crime Victims Advisory Board.

7    Q       And what was that?

8    A       This is a board that was set up by the governor to

9    address the needs of crime victims, and in that capacity I

10   served with the police chief from Charleston, South Carolina,

11   and an attorney from South Carolina to determine compensation

12   for crime victims for things such as lost wages, expenses,

13   mental health counseling, and other costs that occur to victims

14   of crime.  We also lobby -- presented legislation, lobbied for

15   that legislation on behalf of victims of crime.

16   Q       And you said the governor appointed you to that board?

17   A       Yes.  I served on that board for about eight years.

18   Q       Are you licensed to diagnose and treat mental

19   disorders?

20   A       Yes.

21   Q       And were you asked to do so in this case?

22   A       No, I was not.

23   Q       Could you generally and briefly describe your work

24   experience?

25   A       After I completed my schooling and my internships at

1    the Greenville Mental Health Center, the Veterans

2    Administration Hospital in Salisbury, North Carolina, and

3    William Hall Institute, my first job was in Los Angeles at the

4    Los Angeles Department of Social Services, and in that capacity

5    I worked in the neighborhoods of Watts and Compton and was

6    immediately thrown in the courtroom to testify about my cases

7    in terms of child abuse, domestic violence, termination of

8    parental rights, those kind of things.

9            And also I helped to start a program at that time

10   for teenage boys who were prostituting in Los Angeles who had

11   been sexually molested as children.

12           When I came back to South Carolina, which is my

13   home, my first job was at Baptist Medical Center as trauma

14   social worker in the emergency room for the hospital; and then

15   when I returned to Greenville, which is where I grew up, my job

16   there was as program director of the domestic violence program.

17           In 1986 I went into private practice and along with

18   three other social workers brought in psychiatrists and

19   psychologists and our practice was the diagnosis and treatment

20   of mental disorders.

21           Throughout this entire time I have testified in

22   court in different types of cases starting out in family court

23   and then eventually having some criminal court cases.

24           In 1992 I got some additional training under Dr.

25   Edna Copeland in the area of neurological problems that affect

1    learning in children and adults and added that to my practice.

2    I started a solo practice and I've been doing that ever since.

3    Q     What relevant professional organizations do you belong

4    to?

5    A     I'm past president of the South Carolina chapter of the

6    National Association of Social Workers and past president of

7    South Carolina Society for Clinical Social Workers, and I've

8    served as a board member on the American Board of Examiners for

9    Clinical Social Work.

10   Q     Have you received any awards or recognition in the

11   field?

12   A     Social worker of the Year for the state of South

13   Carolina; Alumnus of the Year for the College of Social Work at

14   the University of South Carolina; a motion by the South

15   Carolina House and a resolution by the South Carolina Senate

16   for recognition for leadership in the field of social work.

17   The same with the South Carolina Society for Clinical Social

18   Work, and I've received recognition from the 13th Circuit

19   Solicitor's Office in Greenville for services to that office

20   and to victims.

21   Q     You stated that you conduct biopsychosocial evaluations

22   in your private practice and for the courts.  What is a

23   biopsychosocial evaluation?

24   A     It's a social work method of gathering and reviewing

25   volumes of information gathered on a person, an individual and

1    their life, not only them but also their extended family as

2    well.  It consists of clinical interviews.  It consists of

3    review of any documents that have been generated or created on

4    them and their family members.  It includes consultation with

5    other experts or reading their reports, visits to the community

6    to see what programs and services are available, and to get an

7    idea of how that person has lived and where they've lived,

8    their environment, and then the creation of visual aids, which

9    I do both in my private practice when I'm planning treatment

10   and looking at resources for clients, and then also visual aids

11   that are created for the Court to help in the disposition of a

12   case.

13   Q     You've schooled me that the name itself is sort of

14   indicative of what it means.  Let's sort of break it apart.

15   What does the bio refer to in biopsychosocial?

16   A     Well, it's a way of distinguishing the social worker

17   from the medical community except for the fact that we work in

18   a multidisciplinary approach.  It doesn't mean we have medical

19   training or medical degrees or licenses.  We certainly don't

20   prescribe medications, but we do work closely with doctors,

21   neurologists, geneticists, and others who are trained in those

22   fields and we share information.

23   Q     And to what does the psycho part refer?

24   A     Well, basically the same thing in the multidisciplinary

25   approach.  We work with psychologists to have an actual layer

1   of training in high-level testing and so we share our

2   information with them.  We refer our clients to them for

3   testing.  We factor that -- those testing results into our own

4   assessment.

5   Q      And to what does the social part refer?

6   A      That refers to a person's life experiences, to their

7   environment, to the things that have shaped and impacted them

8   in terms of family, non-family, and it looks at areas such as

9   education, socioeconomic level, gender, culture, and all the

10  many other things that affect a person and help shape them when

11  they're developing.

12  Q      You said these biopsychosocials are used in a variety

13  of contexts.  What's the purpose of conducting this assessment?

14  A      Well, it's not the purpose of the assessment to make

15  excuses for human behavior.  It's simply a way to examine a

16  person's life and to try to shed some light on what has

17  happened to them and to explain how they have come to their

18  current circumstances.

19  Q      In conducting a biopsychosocial evaluation, you review

20  a lot of records.  Why do you do that?

21  A      We try to have more than one source for the information

22  whenever possible, to have at least two or more, and

23  contemporary document -- contemporaneous documents and records

24  are particularly helpful because they usually were created

25  during a time when the current case was not at issue, and so

1   the opinions and the notes of people who have had some relation

2   to the person you're assessing at another period in time can be

3   very enlightening in terms of that part of that person's life.

4   Q       Do you review research and literature from your field

5   in conducting a biopsychosocial evaluation?

6   A       Yes.

7   Q       And why is that?

8   A       Again, it's another layer of information.  When you're

9   conducting the assessment, you want to be aware of what the

10  current thinking is, what some of the historic thinking is

11  about some of the patterns that you see emerging in that

12  person's life.  It helps to form a theoretical base for your

13  conclusions and your opinions.

14  Q       You mentioned that a biopsychosocial was

15  intergenerational.  Why is that?

16  A       Because we are -- we don't grow up in a vacuum.  We're

17  shaped by the experiences of others and by the people that

18  we're exposed to growing up; and just as a doctor's interested

19  who in your family have had heart attacks or strokes or other

20  medical problems, we do the same thing in mental health.  We

21  look at the different behaviors and signs and symptoms and know

22  that some of those are literally passed down through the

23  generations from family member to family member.

24  Q       I know that you give particular scrutiny to a subject's

25  parents.  Why is that?

1    A      Well, parents are typically the primary caretakers,

2    parents and stepparents, so the kind of experience that they've

3    had in their own childhoods, the way in which they were

4    parented, the environment they lived in and how it shaped them

5    has a significant and critical impact on the way they look at

6    and raise their own children.

7    Q      Earlier you mentioned the creation of visual aids.  Why

8    do you do that?

9    A      Because the investigation covers volumes of information

10   typically, hundreds, many times thousands of pages; and if I

11   were to bring in everything I saw, every piece of paper, if I

12   were to go through and detail every single interview that I

13   did, I would be up here for days, maybe weeks.  So you have to

14   at some point have a way to condense the information.

15   Q      Did you create a visual aid in conjunction with this

16   case?

17   A      Yes.

18   Q      That's the PowerPoint we'll be presenting shortly?

19   A      Yes.

20   Q      Did you also bring with you your source documents?

21   A      Yes.

22   Q      And I believe -- I'll note for your convenience they're

23   behind you if you need to refer to any of them.

24   A      Yes.

25   Q      Do psychiatrists or psychologists rely on clinical

1   social workers to provide them with this type of information

2   and assessment?

3   A       They do.

4   Q       Have you been qualified in State and federal courts to

5   do this kind of history and give your opinions?

6   A       I have.

7   Q       In which states?

8   A       In South Carolina, Georgia, Florida, North Carolina,

9   Virginia, Tennessee, Alabama, Louisiana, Mississippi, Texas,

10  Missouri, and California and Alaska.

11  Q       What other -- you mentioned earlier that you testified

12  in family courts some when you were just beginning.  Do you

13  still do that sort of work?

14  A       I do.

15  Q       And what is the range of kind of cases you've testified

16  in?

17  A       In family court it may be child abuse, it may be

18  neglect, it may be custody cases, termination of parental

19  rights.  I've testified in divorce cases.  I think the most

20  recent one was a child battering case in which the State was

21  trying to remove the child from the mother, adoptions, just the

22  typical kind of cases that go to family court.

23  Q       And I'm sorry.  I neglected to ask you earlier.  Have

24  you ever been offered as an expert in a court and not had your

25  expertise accepted?

1    A       No.

2    Q       Are clinical social workers trained to assess both

3    victims and people who commit crimes?

4    A       Yes.

5    Q       Why do they do both?

6    A       It's part of the history of the social worker fashion

7    going back to as early as 1895 that social workers worked very

8    closely with attorneys, especially in the area of victimization

9    and the area of corrections, and so part of our training is to

10   understand the dynamics and be able to work with both.

11   Q       Do you ever turn those cases down when somebody

12   approaches you to do a biopsychosocial evaluation?

13   A       Yes.

14   Q       Why do you do that?

15   A       They are very time-consuming, especially in a capital

16   case.  They cannot be done quickly.  By the time I get on a

17   case that I've accepted, I ask for at least eight months to a

18   year, and usually the people I work with have been noting their

19   own case way longer than that.  It's not unusual frequently to

20   get calls from attorneys whose trial is two weeks out or their

21   trial is two months out or even six months and, you know, I

22   just don't think I can do my part in that amount of time.

23   Q       I neglected to ask you, Ms. Vogelsang, have you been

24   qualified as an expert in federal courts?

25   A       Yes.

1    Q      Do you know which districts?

2    A      I can tell you the states.  South Carolina -- South

3    Carolina and Virginia, Louisiana, and one other one.  Missouri.

4    Q      And Tennessee?

5    A      And Tennessee.

6    Q      Were you asked to conduct a biopsychosocial evaluation

7    on Lisa Montgomery in this case?

8    A      Yes.

9    Q      I'm going to show you what's been marked as Exhibit 2

10   and ask if this is a copy of your -- that's not going to work.

11   Ask if this is your CV?

12   A      Yes.

13   Q      Does that accurately reflect your qualifications that

14   you've testified to here today?

15   A      Yes.

16          MS. HARWELL:  Your Honor, I would ask Ms. Vogelsang

17   be qualified as an expert in clinical social work with her

18   expertise being in the conducting of biopsychosocial

19   assessments and be allowed to give her opinions based on her

20   findings.

21          THE COURT:  You want to speak to that?

22          MR. KETCHMARK:  No objection to the Court

23   considering her testimony.

24          THE COURT:  I will consider her testimony.

25          MS. HARWELL:  Thank you, Your Honor.

1    Q      (By Ms. Harwell)   Ms. Vogelsang, let's talk about how

2    you organized your information in this case in order to begin

3    to give the Court some context to Ms. Montgomery's family.  Did

4    you create a visual that shows the overall roadmap of the

5    family?

6    A      The -- I don't think I created a visual for that, but I

7    can explain the overall roadmap for the family.  As I said

8    earlier, there are volumes of information.  There has to be a

9    way at some point to condense it and pull it together, and so

10   for this case I created visual aids; and, again, it's an

11   efficient way of bringing out the most important points that

12   you found when you were conducting the assessment.

13   Q      Did you create what I was trying to refer to and did it

14   poorly as a family tree or genogram of this family?

15   A      Yes.

16   Q      If we could move to that.  Is this the genogram you

17   created?

18   A      Yes, it is.

19   Q      And what's the purpose of a genogram or family tree in

20   terms of a biopsychosocial assessment?

21   A      Well, it helps us to -- it helps us to identify who is

22   who in the family and to look at their relationships and be

23   able to identify any patterns we found that emerged from this.

24   Q      Could you begin to orient the Court to what information

25   is contained in this genogram, who's who here?

1  A      Yes.  There is a black band across my screen.  Is that
2  going to have to stay there?
3  Q      I don't know.
4           THE COURT:  Terri, do you want to have a look?
5           THE COURTROOM DEPUTY:  Yes.
6           THE WITNESS:  I can work around it for this visual.
7           THE COURT:  I can move this -- well, maybe I can't.
8  If you want to go over to the screen, on the large screen there
9  or work from where you are; but if you need to see something
10  more clearly, you can just go over to the large diagram.
11  A      I think for just this one I'll go over to the screen.
12           MS. HARWELL:  Your Honor, I have a printed copy that
13  I was going to introduce.  I can hand the printed copy to Ms.
14  Vogelsang and she might be able to see better than the screen.
15  A      That would be better.  There is a shadow.  That would
16  be a big help.  Thank you.
17           Of course, I'm not going to point out everyone on
18  this, but just so that our eyes are adjusted and accustomed to
19  this family tree, you see Lisa Marie and Hedberg is colored a
20  purple color and she's in the middle.  So what I'm going to
21  describe are the people who are important in her history and
22  point out where they are.
23           Above her and to the left is her father, John Joseph
24  Patterson, and to the right you see her mother, Judy Karen
25  Rignell.  If you go straight up from her mother, you will see

1473

1    her grandmother, Nelma, and you will see her great-grandmother,

2    Maude Alfreda Berry.  And to the right of Judy are her brother

3    and her sisters.

4              Going back over to the left of Lisa, and we'll

5    distinguish this more clearly later, but going up from her

6    father, you see her grandfather, Robert Patterson; her paternal

7    grandmother, Marie Miller, and then Marie's parents are above

8    her.

9              Between Lisa and Carl Boman you see Lisa's four

10   children, and dropping down from those four children, you see

11   her grandchildren.  And I think for the purposes of this, that

12   kind of points out --

13   Q       (By Ms. Harwell)  As you began to look through the

14   information that was amassed for you and by you, did you begin

15   to see patterns emerge that you documented with other

16   genograms?

17   A       I did.

18   Q       And did you have the family tree colored to show your

19   findings?

20   A       Yes.

21   Q       If you would refer, then, to Visual No. 3, which I will

22   hand you, and explain to the judge what he's seeing here.

23   A       So everyone on this family tree who's colored in green

24   was found either through documents or interviews to have some

25   sort of mental, emotional, or behavioral dysregulation, and so

1    that was a rather large pattern in Lisa's family on both sides.

2    Q       Going back at least two generations from Ms.

3    Montgomery?

4    A       Yes.

5             MS. HARWELL:   If we might have the next slide.

6    Q       (By Ms. Harwell)   Can you see it well around the

7    strange box there and tell the Court what this genogram

8    represents?

9    A       This family -- the colors -- the pattern that emerges

10   on this family tree is called a family pattern of custodial

11   interference, and what that means is that this pattern

12   demonstrates people who were involved in the taking of children

13   or threatening to take children either with or without the

14   benefit of the law, and this is a very unusual pattern to

15   emerge, and I don't recall ever seeing one emerge like this

16   before.   Sometimes in foster care where a child's been taken

17   from place to place, but this is actually family members

18   involving themselves in decisions about where children should

19   be without necessarily going through the court.

20   Q       And I'll ask you later in your testimony, Ms.

21   Vogelsang, to review some of the data that helped you compile

22   that chart, but if in the meantime we can turn to the next

23   slide and tell the judge what other pattern you noted for the

24   Court.

25   A       In this one, this family pattern emerged in terms of

1    substance abuse, mostly alcohol, occasionally drugs, but mostly

2    alcohol.  The only reason I included this is it had an unusual

3    cluster just around the immediate family, and it appeared to me

4    that the use of alcohol in this family was partially due to a

5    lack of professional care for the mental health problems.  So

6    you see people using alcohol to self-medicate or to deal with

7    their behavioral problems.

8    Q      So let's break this large family constellation apart a

9    little bit and focus for a moment, if we could, on the paternal

10   side of the family.  Is that what's represented by this slide

11   highlighted of paternal side?

12   A      Yes.  This just distinguishes just the paternal side

13   from the maternal side.

14   Q      Could you tell the judge sort of a brief and succinct

15   overview of the history of the paternal side of Lisa's family?

16   A      Well, and, again, thinking in terms of the behavioral

17   issues, Lisa has a paternal grandmother whose life partially

18   reflects this pattern that emerged in the family.  She was

19   raised in Washington state and was known throughout her life to

20   have these bouts of temper, of rage, of outburst, and

21   uncontrollable emotions; and so while Lisa did not grow up

22   around her, this was one of the significant parts of her

23   family, members of her family that had some of these behaviors

24   that became significant later on.

25   Q      Did you prepare a slide that documented the paternal

1   family history of impairments?

2   A       Yes.

3   Q       And is that the slide?

4   A       This is the slide.  And I'm not going to read these, of

5   course, but on Lisa's paternal side of the family there was a

6   significant number of family members who suffered from

7   depression and anxiety; and so her father, her paternal aunt,

8   her half sister, her paternal uncle, two of her -- three of her

9   cousins.  And just as a footnote, I received word yesterday,

10  I've not had time to confirm it, but that Daniel Hedberg, one

11  of her cousins, has committed suicide in the last week or two.

12  So this pattern of depression and anxiety was pervasive in her

13  family.

14  Q       And just to highlight for the Court, Ms. Vogelsang,

15  like you said, we're not going to read every slide, but did you

16  attempt to note the source documents or information you had on

17  the slides for the Court's ease?

18  A       Yes.

19  Q       Were there any other notable paternal family history

20  that came out of your investigation?

21  A       There were.  And this slide just reflects some of the

22  medical problems.  I thought it was important to list her

23  great-grandmother and grandmother both having lupus, and lupus

24  is significant in that the accompanying mental health problems

25  are things like depression and anxiety, which may have had an

1    impact on them.

2              Marie's -- her grandmother's behavior was such that

3    she would black out from her angry outburst and have no memory

4    later of what she had done, and then her Aunt Mary Lee had

5    grand mal seizures and AVM.  I am not sophisticated enough to

6    explain that in detail but it is in her medical record, but it

7    does affect the frontal part of the brain.

8    Q      Did you also prepare information on Ms. Montgomery's

9    maternal family?

10   A      Yes.

11   Q      And is that who is highlighted here?

12   A      Yes.  And that, again, just to distinguish it from the

13   paternal side of the family.

14   Q      If you would, again, just give a very succinct account

15   of the history that you found relevant to your study of Ms.

16   Montgomery based on her maternal side.

17   A      Well, the maternal side of Lisa's family had an even

18   greater pattern of mental and emotional problems going back to

19   her great-grandmother, Maude Berry, who ran away at 13, started

20   having children at 13 and 14 and had six children and then just

21   took the baby and ran off leaving the other five behind, and so

22   we see this pattern of behavior.

23             When Maude returned to the family, who are Kansas

24   farmers and known as being western types, just one step above

25   the Amish, she settled down with Emory Springer and they had

1    three children, and one of those children was Lisa's

2    grandmother, Nelma Rignell.

3             Nelma had a brother Samuel who was known for his odd

4    behavior.  Samuel was eventually found dead on the railroad

5    tracks from a mysterious death, and Nelma was raised with a

6    mother who was ill and she had very little care during that

7    time; and so basically when you're looking at that side of

8    the family, the attention goes to great-grandmother Maude.

9    There are some indications there was actually a

10   great-great-grandmother who died in an insane asylum in

11   Indiana.  And then, of course, Nelma was the mother of Judy who

12   was Lisa's mother.

13   Q    Did the maternal side of the family have mental health

14   problems that you reviewed?

15   A    Yes.

16   Q    And did we prepare slides that reflect the mental

17   health problems you found on the maternal side of the family?

18   A    Yes.

19   Q    What mental health problem is reflected in this slide?

20   A    This is Lisa's first cousin, Wendy Treibs, who I was

21   able to meet and interview, and this young woman has had a long

22   history of psychiatric hospitalizations; and for this

23   particular hospitalization the hospital noted that she had had

24   the word "evil" -- she had inscribed it on her abdomen with a

25   razor blade, and it was part of her major depressive disorder.

1479

1    And this is just one of many examples and many, many pages of

2    psychiatric documents on her first cousin.

3    Q       If you might note there on the screen, I believe

4    Slide 11 reflects that Wendy received electric shock therapy,

5    for instance?

6    A       Yes.  She received it eight times.  She had

7    self-inflicted stab wounds of the vagina.  Again, had inscribed

8    the word "evil" on her stomach, and it's noted that she had a

9    scissors injury of the vagina, also self-inflicted.  So that

10   part was listing a little bit of her history.  She'd been

11   committed more than nine times and medicated with Desipramine,

12   which is missing a letter, Stelazine, and Cogentin.

13   Q       And what was the significance of those medications to

14   you?

15   A       Well, these are medicines that are prescribed for

16   serious mental disorders.

17   Q       I believe we have one more slide, a slide reflecting

18   Ms. Treibs' axis -- her diagnoses.  What do you -- what are Ms.

19   Treibs' diagnoses?  Can you see around the black box or do I

20   need to hand it to you?

21   A       Yeah.

22   Q       Did she have an Axis I diagnosis?

23   A       She was diagnosed with major depressive disorder,

24   recurrent with mood congruent psychotic features, and mixed

25   personality disorders.  Then under Axis III, those

1    self-inflicted wounds are discussed again or recorded again.

2    Her psychosocial stressors, I would note, alleged sexual

3    assault, abuse, family, social, and interpersonal.

4    Q    And that is Ms. Montgomery's maternal first cousin?

5    A    Yes.

6    Q    Is that correct?

7         Did you receive information regarding another

8    maternal first cousin, Kenny Alexander?

9    A    Yes.  This is Wendy's brother, and this family lives in

10   San Antonio, Texas, and you can see the number of -- these are

11   just examples of some of his hospitalizations, but delusional

12   prior competency exam found him legally insane.  He's been

13   diagnosed with bipolar disorder, with psychosis not otherwise

14   specified, and I think what's covered up on my screen is that

15   he's been treated with Zyprexa and --

16   Q    And Geodon.

17   A    -- Geodon, which are prescribed for psychosis.

18   Q    Did you track mental illness through Wendy and Kenny's

19   children as well?

20   A    Yes.

21   Q    And what did you learn?  Did it seem to continue to

22   that side of the family?

23   A    Kenny has a daughter who was committed to a psychiatric

24   hospital after running over her boyfriend, and Wendy's

25   daughter, who was a very bright young woman headed for college,

1481

1   looking as though she would be just as successful as her mother

2   before she was struck with mental illness, has also been

3   committed for psychiatric care and diagnosed with a bipolar

4   disorder, and the rest of it just describes her behavior.

5   Q     Did you investigate Ms. Montgomery's siblings in terms

6   of their mental health presentation?

7   A     These are not as clearly documented because Teddy and

8   Tommy both have spent time in jail and in prison and so some of

9   our information comes from those sources, but her half brother,

10  Teddy, says that he has been diagnosed and treated with

11  psychotropic drugs, and the records shows Geodon and Zyprexa

12  which are -- they are prescribed for major mental disorders.

13  Q     What about her half brother, Tommy?

14  A     Tommy also reports that he has been on Paxil,

15  Trazadone, and Lithium; that he has had treatment for anger

16  management.  And actually I think it was Teddy who has been

17  treated at the Salvation -- it's the Salvation Army program for

18  young men, and both of them have been treated for addiction.

19  Q     What other notable maternal family history did you

20  indicate for the Court?

21  A     Well, I would just note that this being true in most of

22  our families that when you start going back several

23  generations, people do not always have access to mental health

24  care and they did not always run to a psychiatrist or a social

25  worker, but many of these behaviors and descriptives could be

1482

1   applied to Lisa's mother and some of her behaviors.  I don't

2   have any indication that she ever received care, and there are

3   other family members who have -- follow along a spectrum of

4   some of these disorders.

5   Q      As you're talking about Lisa's mother, did you

6   investigate her mother's well-being and history as well?

7   A      Yes.

8   Q      And do you have a picture of Lisa's mother, Judy?

9   A      Yes.  So this is her mother.  I'm not sure which

10  grandchild this is with her, but that is Lisa's mother.

11  Q      What did you learn about Lisa's mother's childhood and

12  adolescent history without going into too much detail?

13  A      Judy had been brought up in a very harsh and

14  poverty-stricken environment in Kansas, and she was the second

15  youngest of seven children.  Her father was physically abusive

16  to her mother who was bedridden with what sounds like something

17  like polio, and Judy has always claimed that she was sexually

18  molested by her father.  She also believed that her sister was

19  sexually abused by her father and that her sister is actually

20  her mother.

21         Family members describe Judy early on as being very

22  different from the rest of them; that she had intense mood

23  swings; that she was wild and very difficult to control.  She

24  had a lot of problems in school.  She didn't graduate and was

25  not able later to get a GED.  Judy was known to be very

1   irritable, very aggressive, and hypersexual.  Sexual

2   relationships with men, many different men became a significant

3   pattern in her life.

4           Judy took to drinking very early.  She hung around

5   in bars and she became what is known as a bar girl at that time

6   at the Fort Riley base, military base.  She had a baby at 18

7   and the baby was born dead, and she -- it was buried in a plot

8   for people who do not have money to bury their children.

9           In all, Judy had six children.  She had seven

10  marriages, one being a repeat, and she had 13 stepchildren.

11  Q       Did you prepare a slide to show the sources of some of

12  your information on Judy?

13  A       Yes.

14  Q       And I think you went through a lot of this information,

15  but just to be clear, the information about her being sexually

16  assaulted by her father was information from her to Ms.

17  Montgomery's trial counsel, David Owen; is that correct?

18  A       Yes.

19  Q       And the information that she believed herself to be the

20  product of incest was also from her?

21  A       Yes.

22  Q       Who was Leo Barabash?

23  A       Leo Barabash was Judy's first husband.

24  Q       And what did you find significant about the information

25  provided by Mr. Barabash?

```
 1    A      I thought that his information about Judy was prophetic

 2   in that he forecast that he hoped based on his marriage to her

 3   that she never had children because she would be a terrible

 4   mother.

 5    Q      Did Mr. Barabash also reflect -- I don't know if you

 6   can even see on your screen -- that Judy was a prostitute?

 7    A      Yes.

 8    Q      Did he provide any other descriptions about Judy that

 9   you are aware of?

10    A      He just talked about how terrible their time together

11   was; that she would throw things; that she had these violent

12   mood swings; that you never knew what was going to set her off.

13   She could be fine one minute and just completely go off and be

14   cussing you out and throwing things the next minute and that

15   she would just go off for no reason at all.

16    Q      Did you prepare a chart reflecting Judy's marriages and

17   her children?

18    A      I did.

19    Q      And does this reflect that Mr. Barabash married her --

20   well, married Judy in 1966 and divorced her in 1967?

21    A      Yes.

22    Q      And then when did she marry again?

23    A      Her next marriage was to Lisa's father, John Hedberg.

24   And the reason it's listed as Hedberg is that his mother

25   remarried; and, again, I don't think it was ever done legally
```

1    but he took his stepfather's name.  So it's really John

2    Patterson when you're looking at the family tree.

3    Q      But for many of his documents he actually used the name

4    Hedberg; is that right?

5    A      Yes.

6    Q      And fair to say that Lisa's parents married in 1967

7    shortly after Mr. Barabash and Ms. Rignell divorced and stayed

8    married until only 1971?

9    A      Yes.

10   Q      And we will cover the rest of those marriages in more

11   detail in a moment, but did you also bring a photograph of

12   Lisa's father, John Patterson?

13   A      Yes.

14   Q      And just, again, briefly what did you learn about John

15   Patterson's history?

16   A      We don't know a lot about John's father who would be

17   Lisa's paternal grandfather except that he grew up in North

18   Carolina around the Cherokee/Robbinsville area, and that that

19   side of the family was from German descent and they ended up in

20   the state of Washington.

21            John's life was very difficult in that his father

22   and mother literally despised each other.  They fought all the

23   time.  Robert was a drinker and he was unfaithful to Marie and

24   their marriage was a catastrophe.  So John kind of grew up in

25   this sort of environment the first three or four years of his

1   life.  He just left one day after the birth of John's sister,

2   Mary Lee.

3   Q      When you say "he"?

4   A      Robert.

5   Q      Robert.

6   A      His father just walked out one day and was gone and was

7   only heard again later when he kidnapped John.

8   Q      And kidnapped John, tell us about that.

9   A      When John was four years old, he was playing in the

10  backyard, and Robert Patterson walked into the backyard.  John

11  did not recognize him or know who he was.  Robert picked John

12  up, took him out of the backyard, put him in his car, and drove

13  off, and Lisa's father was not seen or heard from again for a

14  year.

15  Q      What did you learn about the effect of that kidnapping

16  on John Patterson?

17  A      Well, of course, he was four years old.  He does not

18  remember a lot about that year except that it was -- he was in

19  a big cold house and he was hungry and that it was drafty and

20  lonely.  But when his grandparents, Robert Patterson's parents,

21  returned him, he was not in very good shape.  He had a number

22  of losses, and possibly these could have been developmental

23  losses from whatever was going on during that year.

24  Q      Did the interviews of the family reflect the effects on

25  John Patterson of that kidnap?

1    A        Yes.   He was described as a basket case.   He's now five

2    years old.   His language and speech patterns are

3    unintelligible.   He sounds like he has an accent.   He can't

4    sleep at night.   He has terrible nightmares.   When Marie tries

5    to bathe him, he screams, and he also seems to have developed a

6    number of fears, and some of these just sound like classic

7    trauma symptoms based on this kidnapping.

8    Q        What information was available about John preceding

9    from that point about his teenage years?

10   A        His teenage years were just dating.   He was growing up

11   with a mother who was very hostile.   He tried to stay away from

12   the house a lot.   She seemed to blame John for being kidnapped,

13   for being the son of his father, and she treated Mary Lee the

14   same way.   And so there were woods near his house and as much

15   as he could, he stayed in the woods.

16          He did not like school but in school he did meet a

17   girl.   He got her pregnant and they had a baby.   Her parents

18   sent her away to California, and she later told him that it was

19   a boy, but that pretty much covered -- he did graduate, but

20   that pretty much got him through his teenage years and to high

21   school.

22   Q        What did John do after high school?

23   A        He enlisted in the Army.   John really wanted to escape.

24   He wanted to get away from his family and so he joined the U.S.

25   Army.

1    Q       How did he do in the military?

2    A       John actually did very well in the military for the

3    most part.  He received numerous awards.  He served in Vietnam

4    twice.  He served in Korea.  And after basic training, it was

5    discovered that he had some skills in accounting.  So the

6    military sent him for some additional training in accounting

7    and were able to use him successfully in a number of his

8    assignments using those accounting skills.

9            One of the things that happened to John in the

10   military is he discovered himself that he had not been taught

11   proper hygiene growing up, and so he became very concerned when

12   his own commanding officer spoke to him about cleanliness, and

13   the records do indicate that he had trouble maintaining oral

14   hygiene as well, and he said that this was a real learning

15   experience.  He realized how neglected he had been because he

16   did not know things that other soldiers seemed to know.

17   Q       What else did you learn about John's military awards

18   besides the Bronze Star?

19   A       He also -- if we can go to the next one.  He

20   received -- mine's covered up -- the Republic of Vietnam

21   Campaign Medal, National Defense Service Medal, the Good

22   Conduct Medal, the Bronze Star, the Vietnam Service Medal with

23   one Silver and one Bronze Service Star, the Expert Rifle

24   certificate, and the Armed Forces Expeditionary Medal for his

25   service in Korea.

1489

1    Q        Why was it so significant to you that John was

2    successful in the military?

3              MR. KETCHMARK:  Your Honor, if I might, it's not

4    really an objection.  It's more of a -- we did stipulate to her

5    original report and supplement.  I would note the original

6    report is 184 pages.  The PowerPoint is also -- there's no

7    objection to a stipulation of the PowerPoint.  We're not

8    contesting the information that she was able to compile and put

9    together in the biosocialpsych history here.  I don't know that

10   we need to go through ad nauseam the PowerPoint because it's

11   all sourced back, and I think they did an excellent job of

12   providing the Court with a roadmap of the information in the

13   184 pages and then digesting it down with these source

14   attachments here, and so I just think this is cumulative of

15   stuff that we haven't objected to coming in, and I just don't

16   know that we need to do this and go through the 200-page

17   PowerPoint in this fashion.

18             THE COURT:  Ms. Harwell, how are you approaching

19   this?

20             MS. HARWELL:  Your Honor, obviously one of the

21   determinations the Court has to make in light of our

22   ineffective assistance of trial counsel claim is to determine

23   the prejudice not only of trial counsel's failure to

24   investigate and amass the information that's contained in Ms.

25   Vogelsang's report but also in their failure to present it

1    compellingly in court.

2              While Ms. Vogelsang's not testified to everything

3    she would if she were called at trial, and I would drop a

4    footnote that, yes, there are a lot of slides, a lot of them

5    are address slides that we will flip through very quickly just

6    to show the Court where all Ms. Montgomery lived, almost in an

7    animated fashion to get those in very quickly.

8              But it's important for the Court to be able to

9    assess the impact of this kind of compelling testimony and how

10   that would have affected at least one juror.

11             THE COURT:  Well, how long do you think this

12   testimony is going to take?

13             MS. HARWELL:  It will take two or three hours.

14             THE COURT:  Well, I mean, I can read the reports and

15   I can get a sampling of how Ms. Vogelsang presents, and why

16   isn't that enough for me to understand, I guess, basically what

17   you say is what could have been done?

18             MS. HARWELL:  Well, because Ms. Vogelsang is

19   bringing to the Court and offering to the Court her expertise

20   in terms of not only what the information is but the

21   connections in that information and how the family patterns

22   linked together.

23             THE COURT:  You know, I'm not going to cut you off,

24   but I just don't see the point of a three-hour presentation

25   when you've got it all of record and you can give me a flavor

1    of what the presentation could have been, then in my mind

2    that's certainly sufficient.

3              MS. HARWELL:  Part of the point, Your Honor, is that

4    there is a world of information here that the jury needed to

5    hear in order to make a reliable and accurate determination.

6              THE COURT:  That's all reflected in the material

7    that she has, correct?

8              MS. HARWELL:  I believe that the information is

9    reflected, and we certainly don't intend to go through every

10   source document.  That's why we so carefully prepared the

11   slides.

12             THE COURT:  Okay.  Three hours is way too long for

13   this.

14             MS. HARWELL:  I will work to cut it down.

15             THE COURT:  Well, it's just a little after two

16   o'clock now so let's go until three o'clock with your

17   presentation of giving me a good understanding of, in summary

18   fashion, how Ms. Vogelsang would have presented all of the

19   information contained in her report and the slides that you

20   have.

21             MS. HARWELL:  I understand the Court's position,

22   but, of course, the Court will understand that I object under

23   the Fifth, Sixth, Eighth, and Fourteenth Amendments to our

24   proof being curtailed in this manner.

25             THE COURT:  Your objection is noted.

```
 1              MS. HARWELL:  Thank you.
 2              THE COURT:  Do it in an hour.
 3    Q      (By Ms. Harwell)  Ms. Vogelsang, isn't it true that
 4    Lisa's father had multiple marriages and children -- and
 5    relationships that produced children?
 6    A      Yes.
 7    Q      Was he married to someone before he met Lisa's mother?
 8    A      Yes.  He met a young woman named Joyce Hammer and he
 9    had a child with her, but he was not in the country when that
10    child was born, and that child was with Joyce Hammer for only
11    18 months before she was removed by social services.
12    Q      And that child would be Lisa's sister, Diane; is that
13    correct?
14    A      Yes.
15    Q      And Diane ultimately came to live with John and Lisa's
16    mother, Judy; is that right?
17    A      Yes.
18    Q      And how was Diane treated when she was with John and
19    Judy?
20    A      Judy, who had no parenting skills to speak of at all,
21    was very, very rough on Diane.  She was physically abusive
22    toward her.  She recognized, you know, that Diane was a very
23    vulnerable child.  She had been abandoned.  She had come out of
24    an abusive first 18 months of life, and so Judy used that
25    information to try and control Diane and to, you know, get her
```

1   to behave exactly the way she wanted to.  She had very little

2   interest in her and so John's mother, Marie, did a lot of

3   caretaking of Diane early on.

4   Q       And I'm sorry.  I skipped an important step.  How did

5   John and Judy meet, again, succinctly?

6   A       John and Judy met at an off-base club at Fort Riley in

7   Kansas, and at that time Judy was what was known as a bar girl.

8   She sat in the club along with a lot of other young women, and

9   their job was to encourage the young soldiers to drink.

10  Q       That's how she met Lisa's father?

11  A       That's how she met her father.

12          MS. HARWELL:  If we could go to Slide 31.

13  Q       (By Ms. Harwell)  I think this is the slide you

14  prepared based on the declaration of John Patterson regarding

15  Judy, then Patterson's, drinking during her pregnancy.  What's

16  reflected in this slide?

17  A       Oh, it -- these were times when a mother drinking was

18  not frowned on the way it is now.  There was a lot of

19  information about pregnancy that we did not know at that time.

20  So Judy drank throughout her pregnancy with Lisa and she and

21  John stayed in the bars.  They socialized.  They partied.  And

22  so before John was going to be reassigned and ship out again,

23  he wanted to show her a good time, and he talked about this bar

24  they went to where the waitress or the bartender made a joke

25  out of asking the baby for its I.D.  And, of course, that would

1   have been Lisa.  She was pregnant with Lisa.

2   Q     Ms. Vogelsang, Lisa's sister, Diane, is here to testify

3   about the abuse she suffered as a child.  Was she Lisa

4   Montgomery -- Lisa's primary caregiver when Lisa was small?

5   A     She was.  This is a photograph of Diane and she was

6   four and a half years old when Lisa was born, and she loved

7   Lisa from the minute she was brought home; and along with the

8   grandmother, Marie, she was able to learn how to rock Lisa, how

9   to do some diapering and feeding, and over time really became

10  Lisa's primary caretaker.  So you have a child who had been

11  traumatized taking care of this brand new baby most of the

12  time.

13  Q     You talked about Judy's mistreatment of the children.

14  Did John Patterson also reflect his mistreatment of his

15  children?

16  A     Well, he did.  He admitted to going along with Judy and

17  her punishment mistreatment.  Some examples are that Judy knew

18  that Diane's greatest treasure was Baby Lisa and so she used

19  that to keep Diane in line and she would threaten to send Diane

20  away from the home.  She would strip her naked.  She would make

21  her pack her bag and make her sit out on the porch and wait for

22  these nonexistent people who were coming to take her away; and

23  so when John came home, he joined in that punishment much to

24  his shame, and also joined in with spanking the girls, in

25  restricting their movements and suppressing noise, and later

1495

1    was able to say that they were just little girls.  They are

2    making noises that little girls make when they play, but he

3    went along with Judy in almost all cases.

4    Q       Again, Diane, now Mattingly, is here to testify later

5    today.  Did you receive information that Judy allowed her

6    sexual partners to molest Diane?

7    A       Yes.  When John was away, Judy was having men in and

8    out of the home, whatever residence.  I know we're skipping

9    along a little bit.  So she's actually in different places when

10   some of these things are happening, but she would allow men to

11   come in and out of the home, and at some point a man came into

12   Diane's bedroom and started molesting her regularly and Lisa,

13   although still probably around six months old to a year old,

14   was sleeping in the bed with Diane.  They shared a room.  And

15   so from the time Lisa came into the world, whether she had any

16   idea as a baby what this meant, it was something she continued

17   to be exposed to over time.

18   Q       Did John Patterson continue the family history of

19   kidnapping children?

20   A       Yes.

21   Q       And were there -- is there a consistent family

22   narrative on how that happened?

23   A       Well, there is.  When John realized that, in spite of

24   his best efforts, that Judy was not going to stay in the

25   relationship with him, one of his last times at home when he

1  had been rejected by her for the last time -- and I would

2  mention that John was getting in trouble with the military for

3  his efforts to keep the marriage together.  In his frustration

4  picked up Diane and Patty -- I'm sorry -- and Lisa and took

5  them to the Fort Carson barracks and there was some empty

6  barracks there and he kept them.  So instead of calling a

7  lawyer, going to court, going through legal means, he just

8  walked off with the children.

9           This story is told two different ways.  According to

10  Judy, he took the children, gave them to a family he knew and

11  that they were gone for two or three weeks while she searched

12  for them.

13  Q     And is this an example of your attempt to be fair to

14  both versions by presenting them?

15  A     Yes.

16  Q     Was -- did Judy have another child?

17  A     Judy did.  She had a child, I believe it was in 1970,

18  and this child was named Patty, and she was born when she and

19  John were still together.

20  Q     I know that, Ms. Vogelsang, you have difficulty with

21  the language that Judy, then Patterson, used to describe her

22  child, but fair to say this slide reflects the language used

23  recounted by all the family that that's how Judy described her

24  child?

25  A     Yes, it is.  She had this baby while John was out of

1497

1   the country; and when he did finally get home, he along with

2   other family members denied that he could possibly be the

3   father and this was because of her coloring and other things,

4   and so the family members really had no problems with calling

5   her nigger baby, and that's how Patty was known not only as an

6   infant but for years to come.  The neighborhoods they lived in,

7   the places they went to school, this spread to other kids and

8   so this became Patty's nickname.

9   Q     Let's take a break for a moment from sort of the

10  history and do a little bit about geography.  When the Court

11  examines all of our slides, the Court will see various maps.

12  If you would explain to the Court what those maps represent.

13  A     These were created -- and this is just the beginning,

14  as Ms. Harwell said, to show that Lisa Marie, for example, was

15  born in the state of Washington, and over the next 34 years she

16  would live in 61 locations.  I think I'm being blocked.  Okay.

17  Here it comes.  It's coming up.

18  Q     I don't at all mean for you to read to the Court each

19  of the different addresses.  If we could just flip through

20  those slides, please, and get us to 1973.

21  A     What is going to happen here is that these slides, as

22  they come through in the testimony, will just show the many

23  moves that Lisa lived through from the time she was born until

24  she was in her 30s.  These are multiple moves within the

25  Topeka, Kansas, area.

1     MS. HARWELL:  If we could get to Slide 42, please.

2     Q     (By Ms. Harwell)  Did Lisa grow up with her sister,

3     Diane, in the family?

4     A     And you said Slide 42?

5     Q     Yes.

6     A     I'm sorry.  Did she grow -- yes.  Yes.

7     Q     Or did at some point Diane leave the family is, I

8     guess, what I'm trying to get us to?

9     A     When John left the family for the last time because he

10    could not keep the marriage together, Judy was going to keep

11    Diane as long as she could keep benefits, but the military was

12    unwilling to continue benefits for her.  She went to human

13    resources and they did not find her to be eligible for money

14    for Diane, and so she asked them to please license her as a

15    boarding home, and they said that they did not think she could

16    meet the standards that they would require for a boarding home,

17    and so she first gave Diane to this same family.

18    Q     Well, to just not belabor Diane's history, at some

19    point Judy gave her over to the State.  Is that what the

20    records reflect?

21    A     Yes.

22    Q     Again, Diane will be here to testify.  But does her

23    declaration reveal Judy told her it was her fault that she was

24    being returned to the State?

25    A     Yes.  She told her -- the social workers were

1    interested in trying to place Diane with Marie, but Judy told

2    them and told Diane that Marie was dying, which was not true,

3    and then Marie couldn't take her; and so, yes, she told her she

4    was to blame and that it was her fault.

5    Q       Diane reflected that she knew deep down that if she

6    were taken, she knew that the sexual abuse she'd been

7    experiencing would continue to be inflicted on Lisa.  What

8    effect did Diane's removal have on Lisa?

9    A       Well, Diane was Lisa's protector and it was a very

10   powerful thing to see Diane so easily dispensed with, and she

11   no longer had her there to watch after her and to help provide

12   for her safety.

13   Q       What does it do to a child to see a sibling essentially

14   thrown away?

15   A       Well, especially in this case as close as she was to

16   Diane, it tells that child that they have no control; that they

17   have no power; that there's nothing they can do to stop these

18   traumatic losses, and especially in this case that her mother

19   is omnipotent.

20   Q       Did these experiences shape Lisa's personality?

21   A       They helped to shape her personality.

22           MS. HARWELL:  If we could get to Slide 47.

23   Q       (By Ms. Harwell)  Did you see various and sundry

24   descriptions of Lisa throughout the interviews of family

25   members and others who knew her that you found to be consistent

1    with this sort of traumatic environment?

2    A     Yes.  This is the way Lisa not only was described at

3    this age as a little girl but these descriptions followed her

4    throughout her childhood and her teenage years until she

5    reached young adulthood, and so they're consistent across the

6    board that she was a very timid, shy, quiet, passive little

7    girl.  She never rocked the boat.  She was afraid to speak up.

8    She was always polite.  She wasn't a child who caused trouble

9    even when she got into school, and it's the first time we start

10   seeing it noted how much she was in her own little world.

11   Q     Ms. Vogelsang, I want to move us, if we can, toward the

12   Kleiner family years.  I think we know that Judy, then

13   Patterson, once divorced from John Patterson, did not stay

14   single but ultimately married a man named Jack Kleiner?

15   A     Yes.

16   Q     What descriptions, again briefly, did you find to

17   describe who Jack Kleiner was?

18   A     Well, he was described as a mean drunk.  He drank from

19   morning to night.  He worked in an auto salvage yard and his

20   employer, as you can see up here, described him as a fruitcake,

21   is temperamental, irritable, that other people were scared of

22   him and afraid of him.  That he was a mean man and he had

23   already had one family, and the children in that family also

24   had these same descriptions of him and that he could be very

25   violent.

1    Q      I asked that you help prepare a representation of the

2    people in and out of the Kleiner household.  If we could orient

3    the Court who was in Lisa's life when her mother was married to

4    Jack Kleiner.  I believe that's Visual 50.  And who do we see

5    represented here?  Do you need the one without the box?

6    A      This is fine.

7           And so what this shows is that Judy and John are

8    over to the right and they have the two children, Lisa and

9    Patty.  And then the middle section shows the children that

10   Judy had with Jack Kleiner.  And then on the left side Jack's

11   family was Willadean Jamsom.

12   Q      And Willadean was Jack's former wife and he had five

13   children with her?

14   A      Yes.

15   Q      Did your investigation reveal that all of these people,

16   maybe not Willadean, but the rest were in and out of the

17   Kleiner family home?

18   A      Yes.

19   Q      What did you learn about the family's economic

20   circumstances when Judy was married to Jack Kleiner?

21   A      Well, this family was considered among the poorest of

22   the poor.  Judy claimed to have worked but her records show

23   that there were several years when she was unemployed.  Jack

24   worked in an auto salvage and had a couple of expensive habits,

25   including intoxication.

1          So it was the perception of the others and the

2    children in the family that they had very few resources, their

3    clothes were very ragged and poor, were often hand-me-downs or

4    secondhand clothes and their shoes duct-taped.  So their

5    economic situation was very bad.

6    Q     I just want to orient for the Court that Jack Kleiner

7    was in Lisa's life until the time she was four or five up

8    through her 16th birthday or a little bit longer than her 16th

9    birthday, right?

10   A     Yes.

11   Q     And fair to say those are very formative years?

12   A     Yes.

13         MS. HARWELL:  If we could have Visual 54.

14   Q     (By Ms. Harwell)  How was life in the Kleiner household

15   described?

16   A     If you'd give me just a moment to catch up.

17   Q     Sure.

18         THE COURT:  I've read that slide if you want to --

19         MS. HARWELL:  I was just waiting for Mr. Vogelsang.

20   Q     (By Ms. Harwell)  Is it fair to say that the language

21   on the slide reflects that the Kleiner household was not a

22   happy and supportive environment?

23   A     It was extremely chaotic.  There was a lot of physical

24   abuse, of domestic violence.  It was described with Jack

25   breaking Judy's jaw, knocking out her teeth, and the

1    punishments that he inflicted particularly on Lisa and Patty

2    were among the worst where he would make them go into the

3    bathroom, take their pants down and bend over the tub, and then

4    they had to stay that way for an unknown amount of time, and

5    then he would come in and beat them.  And that was one of many

6    of the extreme and bizarre punishments that he inflicted on

7    them.

8                   MS. HARWELL:  If we could go to Slide 56.

9    Q      (By Ms. Harwell)  Was Judy a supportive parent or was

10   she more like Jack?

11   A      She was much more like Jack.  Judy had intense mood

12   swings.  She became angry very easily.  She would strap the

13   children.  She would put Lisa in a highchair and leave her for

14   hours.  Lisa would have to stand in a corner and wasn't allowed

15   to touch the walls, and Lisa came to know that she was always

16   being watched, and so these punishments, again, certainly fall

17   under the umbrella of coercive control.

18   Q      Isn't it true that not just these children but millions

19   of children are exposed to abusive parents?

20   A      Yes.

21   Q      Do children respond differently to abuse?

22   A      They do.  It is an area of interest for me, for people

23   in mental health to try to understand why different children in

24   the same family and the same environment will react

25   differently.  And one of the reasons it's been found is that

1  children come into the world with different degrees of
2  resilience or there may be things in their environment that
3  cause them to be more resilient.
4  Q      And you provided for the Court a slide that reflects
5  some scholarship on factors that create resilience?
6  A      Yes.  This the work of Dr. Edith Grotberg and she has
7  studied and led many educational presentations on the
8  development of resilience in childhood, and this particular
9  slide shows the factors that need to be present in a home that
10  allow for the development of resilience.
11  Q      And, Ms. Vogelsang, as you were assessing the Kleiner
12  family home, were any of these factors present?
13  A      On this particular slide I did not find any of these
14  elements present.
15  Q      I'd like us to move forward in time, if we could, to
16  Visual 59 around the time that Lisa is 11 years old.  I believe
17  at that point the family was living in San Antonio.  What did
18  you learn about that time period in Lisa's life?
19  A      On a whim Jack had moved the family.  They had been in
20  Oklahoma for some time.  They had lived with his mother.  And
21  he -- they were doing so badly economically that he bought a
22  large Suburban and hitched a trailer to it and they drove to
23  Modesto, California, and they were there for a very brief time
24  which was one of the rare better times in Lisa's life.
25              She was made to ride with Jack and the boys and the

1   family going out there; and then when things failed, when Jack

2   wasn't making any money, they got into the trailer and went on

3   to San Antonio, Texas, to stay with Judy's sister, Darlene, and

4   her husband.  And they stayed there briefly until they could

5   get a house in San Antonio.

6          They left Lisa with her Aunt Darlene and her cousin,

7   Wendy, who was her very favorite person in the world, and in

8   spite of all that was going on there, Lisa was very happy to be

9   there with her cousin.

10         But it was during this time that Jack, who had left

11  her with Darlene because he wanted her to go to a white school,

12  he began fondling her on the weekends when he would pick her up

13  to and from Darlene's house, and it was also during this time

14  that her cousin, Kenny, the one I talked about earlier, began

15  to molest Lisa and talked about traumatizing her because he may

16  have taken her out in the fields alone in the middle of nowhere

17  and trying to have sex with her.  And, again, this is a

18  12-year-old girl, and Kenny made it clear that he thought it

19  was consensual, but he said that he thought of himself as a

20  little man, very young.

21   Q     Once the family moved back from Texas, back, I think,

22  to -- well, I'm lost in time now.  Once the family moved back

23  to the Midwest to Oklahoma, were observations made by

24  professionals of effects of this sort of trauma on Lisa's

25  functioning in school?

1506

1    A       Yes.  One of the school administration had concerns

2    because when Lisa returned, they tested her and, of course, she

3    had had a very good school history; and when they tested her,

4    they found that her scores were dramatically changed, and she

5    commented this usually was because a lot of absences from

6    school are because of traumatic and emotional distress.

7    Q       If we could turn, then, to a little bit more of our

8    chaos map taking Lisa from 1971 where we left her before

9    through until when the family arrived in Sperry, which I

10   believe encompasses their trip to Modesto, California, their

11   address in San Antonio, an address in Tulsa, and then

12   ultimately both a house and a farm in Sperry, Oklahoma, in 1981

13   and 1982.  What did you learn about -- actually, let me ask you

14   a different question.

15           While we're getting caught up with our chaos map, if

16   you could very briefly, and, again, Your Honor will read the

17   slide and strategies of coercive control but if you could

18   explain what that concept is to the Court.

19   A       I think it's a concept that has been very clear when

20   it's been discussed as it regards war, prisoners of war, cults,

21   brothels, any situation of captivity where someone is not free

22   and independent and is under the control of another person who

23   is dominating them; and what had been discovered through

24   studies, for example, of communist regimes, of the situation of

25   U.S. soldiers in Korea, that a set of strategies had been used

1    to bring them into compliance so that they would do whatever

2    their captors wanted.

3             In the last several years in mental health

4    researchers have applied this concept of coercive control to

5    domestic violence, because they have found that children who

6    are captive in a home where there is total control, there is no

7    opportunity for independence and where the children are exposed

8    to behaviors by the parents that actually can and do border at

9    times on torture, that these children will start to demonstrate

10   the same kinds of behaviors, the same kinds of results that we

11   see with soldiers.

12            Dr. James Garbarino has actually written on children

13   of war in his book, No Place to Be a Child, and Evan Stark, Dr.

14   Pearman, Kathy Whelan, a number of psychologists, social

15   workers, and psychiatrists have really developed the

16   application of the experiences at war and in these situations

17   to the perceptions of small children in a home where this kind

18   of control is being exercised by a powerful and omnipotent

19   adult.

20   Q    And I know, Ms. Vogelsang, we probably will not finish

21   in our hour allotted all of your slides, but fair to say

22   throughout your presentation you have attempted to point to

23   different strategies of coercive control that were exercised

24   against Ms. Montgomery at different points in her life; is that

25   correct?

1   A      Yes.

2   Q      Was one of them when Ms. Montgomery and her sister were

3   forced to fight each other?

4   A      One of the ways in which Judy and Jack dealt,

5   especially with Patty and Lisa -- and it's not just them.  I

6   mean, these things happened to other children but they were

7   especially hard on Patty and Lisa, was to give them boards and

8   force them to beat each other, and they were not allowed to

9   stop until they had drawn blood.  That's just one of many

10  examples of the kind of control they exercised over --

11  especially over Lisa's time.

12  Q      I know, Ms. Vogelsang, that you have several slides

13  that set forth information about the environment in Sperry,

14  Oklahoma, setting forth some of your research and investigation

15  of what kind of area that was.  If we could skip over Sperry in

16  general and talk about the Kleiner homestead, please.

17          I believe you prepared a slide that reflected that

18  the family was very poor even relative to Sperry, Oklahoma, in

19  general which community members reflected was already a pretty

20  depressed area; is that correct?

21  A      Yes.

22  Q      Did you prepare a slide about -- it shows the area

23  where the Kleiner family moved out in the country and orient

24  the Court with the use of a map?

25  A      Jack Kleiner bought a trailer outside of Sperry and it

1   was sitting on four acres.  It was considered to be an isolated

2   area, and the star on the map indicates approximately where the

3   trailer was sitting.

4   Q       Did neighbors describe that area for you with their

5   declarations?

6           MS. HARWELL:  If we might have the next slide.

7   A       Linda Baker, who was actually an acquaintance of

8   Judy's, someone that she knew within that area, wrote that --

9   I'm sorry.  It's covered.

10  Q       (By Ms. Harwell)  How about I read it and you see if it

11  agrees with what you thought it says.  "Jack had them out in

12  the country kind of in his own little kingdom.  They were

13  isolated.  They could have screamed and the neighbors probably

14  wouldn't have heard them."

15  A       Yes.

16  Q       Did you receive other information from community

17  members regarding Jack Kleiner's behavior out on his own little

18  kingdom in Sperry?

19  A       There was another family that lived out that way, and

20  Wesley Gann was a preacher and had the opportunity to observe

21  Jack on many occasions, starting with an argument they had when

22  Mr. Gann had laid down some gas lines or water lines that he

23  thought would be helpful to Jack and caused Jack to completely

24  become enraged.

25          But he talked at length about incidents that

1  happened of Jack making fun of him for going to church on
2  Sunday and coming out to the road and falling on his knees and
3  having a stick of wood in his hand and pretending like he was
4  worshipping the stick of wood just to make fun of Mr. Gann, how
5  he would masturbate as Mr. Gann went by with his young daughter
6  and how disgusting that was to Mr. Gann, but yet made him feel
7  afraid and intimidated for his child, and just story after
8  story of this bizarre behavior that Kleiner engaged in.
9    Q     I know the Court is aware because of some of the
10  testimony that was presented at trial that at some point Mr.
11  Kleiner progressed from molesting Lisa Montgomery to raping
12  her?
13    A     Yes.  By the time she was 13, the fondling that he had
14  been doing -- actually she had already been isolated before
15  that at one of their addresses and was made to sleep in a
16  laundry room and he had been molesting her at that time, but by
17  the time she was 13 he had built a room on the back of the
18  trailer in Sperry, and this room didn't have access from inside
19  the trailer.  A couple family members recall if you went to the
20  closet, there was a window that you could look into the room,
21  but Lisa started staying in that room and he would come into
22  that room to molest her, and her saving grace was that Judy was
23  storing wine that she made in that room and Lisa -- this is how
24  Lisa started drinking.
25    Q     Did you learn that the family had another secret

1   besides Mr. Kleiner's rape of Lisa?

2   A      Yes.

3   Q      And what was the family secret?

4   A      Judy was engaging, in my opinion, including with Jack

5   regarding the molestation of Lisa, and this form of collusion

6   is well known in studies on child abuse where the mother does

7   nothing to prevent the abuse from happening and in fact goes

8   about it almost as though it's not happening and the child

9   becomes the surrogate for the mother, and in Lisa's case not

10  only sexually but in Judy's other responsibilities as well.

11         She had servicemen come to the trailer.  Her son,

12  Teddy, recalls that there were three or four that would come

13  and all the children would be sent outside and that only Lisa

14  and Judy would remain in the house, and so these were -- this

15  was a plumber, an electrician, and I believe someone who

16  delivered propane gas, but Judy was trading Lisa for those

17  services.

18  Q      Did Lisa disclose this abuse to anyone?

19  A      No, she never did, until recently.

20  Q      Back when she was a child, did she tell her cousin,

21  David Kidwell?

22  A      Her cousin, David Kidwell, who was in law enforcement

23  visited the home and became very concerned about Lisa's

24  demeanor.  He felt that she was distressed, and he made the

25  effort to get with her later and she did open up to him and

1    tell him about these men and about them coming to the home and

2    that they were molesting her, that they urinated on her like

3    she was trash and were allowed to do pretty much anything.

4    Q      And just to clarify, Ms. Vogelsang, when you say

5    molested her, Mr. Kidwell's report is that there were anal,

6    oral, and vaginal rapes; is that right?

7    A      Yes.

8    Q      And that the men were allowed to beat and slap Lisa?

9    A      Yes.

10   Q      Did Mr. Kidwell reflect what behaviors he saw while

11   Lisa was disclosing this to him?

12   A      I'm sorry.  Could you repeat that?  You know, even

13   though he knew about this, he wanted to report it, she told him

14   not to.  She was very worried about what would happen to Patty

15   if anyone found out, and much to his chagrin years later he did

16   not report it or help her.

17   Q      To be clear, Ms. Vogelsang, we're talking about a young

18   teenage girl?

19   A      Yes.

20   Q      So she was not in control of a deputy?

21   A      Right.

22   Q      Did Mr. Kidwell reflect that then young Lisa, who went

23   by Kleiner even though she wasn't Mr. Kleiner's child, was

24   crying and shaking while she told him this story?

25   A      Yes.

1    Q        I believe you mentioned earlier that Teddy Kleiner, her

2    brother, talked about times that these men would come to the

3    home and that the other children didn't necessarily understand

4    exactly what was going on and that it was only as an adult that

5    he was able to contextualize what must have been happening?

6    A        Yes.

7    Q        He provided a declaration that you reviewed.

8             Did Ms. Montgomery, who wasn't Ms. Montgomery at

9    that point, tell anyone else back contemporaneously or shortly

10   after this abuse?

11   A        She told Carl Boman.

12   Q        And who was Carl Boman?

13   A        Judy, when she left Jack Kleiner, married Richard Boman

14   who was also a person with a law enforcement background, and he

15   had a son named Carl; and through various manipulations of

16   Lisa, Carl and Lisa were thrown together and eventually became

17   engaged and ultimately married.  So Carl was both her

18   stepbrother and her husband.

19   Q        And Mr. Boman this summer admitted that he had guarded

20   the secret for Lisa for years, that it wasn't just Jack Kleiner

21   who raped her but other men as well?

22   A        Yes.

23   Q        And the statement he made regarding disclosures to him

24   about Lisa Montgomery when she was 16 or 17 was consistent with

25   the things that David Kidwell said?

1    A       Yes.

2    Q       What other -- is it fair to say you look for

3    corroborating data or consistency in these kinds of reports?

4    A       Yes.

5    Q       And what other kind of details did you find to be

6    telling in this part of the Lisa Montgomery biopsychosocial in

7    terms of other pieces of information that corroborated what

8    Lisa told her cousin back when she was a young girl?

9            MS. HARWELL:  If we could have the next slide.

10   A       In the Kleiner divorce between Judy and Jack there were

11   interrogatories and one of the questions was about any other

12   men that Judy had been associated with and she named these

13   two -- two of these men, Gerald Shipley and Harold Allee.

14   Q       (By Ms. Harwell)  And those were names Ms. Montgomery

15   provided just this year as being people who attacked her back

16   when she was young?

17   A       Yes.

18   Q       Was there any other consistency that you found notable

19   in terms of Ms. Montgomery's description of the men who used to

20   rape and beat her when she was a young girl?

21   A       When Mr. Shipley died, it was noted in his obituary

22   that his nickname was Shorty, and Lisa had remembered a man

23   named Shorty leaving money on the dresser when he would leave

24   the trailer.

25   Q       And she wouldn't have any way of knowing that we would

1    go and look for his obituary?

2    A       Right.

3    Q       At some point did Judy, then Kleiner, discover that her

4    husband was raping her 15-year-old daughter?

5    A       She did.  She walked in when Jack had Lisa down on the

6    floor and he was raping her, and she got a gun -- and, again,

7    there are two stories, that she got a gun and held it to Jack's

8    head and threatened to kill him, and Lisa's memory is that she

9    held a gun to her head as well.

10   Q       Fair to say the presence of a firearm in such an

11   emotionally loaded situation would be very traumatic?

12   A       Yes.

13   Q       Did you prepare a slide with Ms. then Kleiner's

14   description of what her husband was doing to her 15-year-old

15   daughter from when she testified at her divorce proceeding?

16   A       Yes.

17   Q       And is that this slide?

18   A       Yes.  When she was testifying, they asked her

19   specifically what Jack was doing and she replied, "He was in

20   her.  He was pumping her."

21   Q       Did Ms. Kleiner, then Ms. Kleiner, do anything to

22   protect her daughter from Mr. Kleiner when she made that

23   discovery?

24   A       Aside from pulling out the gun and that whole incident,

25   she allowed him to come back to the trailer after two days; and

1   so in spite of this incident, he was allowed to live there with

2   them from February until May of 1985.

3   Q      If the transcript here reflects that it's May of 1984

4   was when -- is that right?

5   A      Yes, May of '84.

6   Q      Does this transcript reflect when it was that -- or why

7   it was that Ms. Kleiner finally left Mr. Kleiner?  Was it

8   because of him raping Lisa?

9   A      No.  It was because while he was staying with them at

10  the trailer, he got in an argument with Patty and he slapped

11  her and that's when she separated from him.

12  Q      So raping one daughter is not reason to separate but

13  slapping the other one is?

14  A      That's correct.

15  Q      In your experience, treating two children so

16  differently, does that also cause trauma to the children

17  involved?

18  A      Well, it does, and it's not an uncommon occurrence that

19  in abusive homes children are set against each other.  Children

20  see what's happening to the other one and they become scared

21  and so they seek approval from the parent -- the abusive parent

22  so it won't happen to them.  They develop a dislike for the

23  abused child, like Lisa, and work against that child in order

24  to protect themselves.  So this was not an unusual occurrence.

25  Q      Did Ms. Kleiner, and then Boman, get help for her

1   daughter, Lisa, after she found her husband raping her?

2   A      Well, she didn't get help but her attorney made a

3   referral and got a counselor involved.

4   Q      I believe you received the counseling records from the

5   counseling done by Nancy Walentiny; is that correct?

6   A      Yes.

7   Q      Fair to say that those notes reflected that the

8   counselor noted that the mother appeared to have a lack of

9   empathy for her daughter, Lisa?

10  A      Yes.

11  Q      And just also to move quickly through those, that the

12  counselor also noted that Lisa was uncomfortable verbalizing

13  feelings and that she was recently engaged to C and then the

14  name is whited out?

15  A      Yes.

16  Q      And that is just in February of '85; is that right?

17  A      Yes.

18  Q      Fair to say that Ms. Walentiny also noted from an

19  interview from Lisa's brother, Teddy, that Teddy reported that

20  his father had broken a broom on Lisa?

21  A      Yes.

22  Q      And that the counselor noted that the mother verbally

23  overwhelms Lisa?

24  A      And could you just go back to that one?

25  Q      Sure.

1   A       Because it also said that the father would throw him
2   around also blank and Lisa, and then also that his father broke
3   a broom on Lisa, and both of those were very common abuses to
4   throw them against walls, especially Lisa.
5   Q       Once Judy Kleiner gained custody of her children, did
6   she continue taking Lisa to therapy?
7   A       No.  She stopped the therapy as soon as that procedure
8   was over.
9   Q       Did the Court in the Kleiner v. Kleiner divorce
10  proceedings make findings regarding Judy, then Kleiner's
11  behavior?
12  A       Yes.  The judge had a couple of opinions about her
13  behavior.  One, that her failure to report was inexcusable, and
14  also that she appeared to him to be emotionless; but further
15  that judge also went on to say that it was very difficult for
16  him to not report what he had heard to the juvenile court, and
17  he was not comfortable with his decision not to do it.  But
18  that between the doctor not reporting and Judy not reporting
19  it, it just seemed that it had gone way too far without there
20  being some sort of an intervention.
21  Q       And you ultimately learned that the defense counsel did
22  make a referral to DCS?
23  A       Yes.
24  Q       Fair to say that in that court proceeding Lisa did
25  not -- or it was not disclosed the entirety of the abuse,

1  rather the court proceeding only dealt with Jack Kleiner's

2  rapes of Lisa; is that right?

3  A       Yes.

4  Q       And in your field of social work do you have some

5  concepts that would help us understand why Lisa did not bring

6  all of the sexual trauma to light?

7  A       Well, nondisclosure is a common and typical behavior in

8  abuse cases.  She was, I think, now more afraid of her mother

9  and her mother, you know, had this power.  She had this

10 omnipotence.  Lisa was intimidated by her, and even more so

11 maybe than in other cases you'd see; and because this one is so

12 extreme, Lisa was not about to talk about the things that her

13 mother had done in terms of the family secrets and these

14 servicemen coming to the house.

15            That is not only common in abuse but going back to

16 strategies for coercive control, again, these are behaviors

17 we've seen among, for example, U.S. soldiers in Korea who

18 cooperated, went along, not because they agreed with their

19 captors but because they had to survive.

20 Q       Was there ramification to Lisa -- did Judy do anything

21 to Lisa to punish her for this disclosure of Jack raping her?

22 A       She cut her hair off and she told her that only good

23 girls had long hair.

24 Q       Were there people around Lisa at that time who were

25 noticing symptoms that were consistent with this kind of

1   trauma?

2   A      I think that just about everyone who was around Lisa

3   had come to recognize her as a target and as the person that

4   was receiving the most virulent types of abuse from Judy.

5   Q      I know that lay people don't provide you information

6   with clear labels.  They don't say, Ms. Vogelsang, we saw

7   someone dissociating, but do they provide you descriptors that

8   allow you to know that there might be mental health symptoms in

9   place that you need to note?

10  A      They do.  And in Lisa's case from the time she was

11  small and first able to read a book -- in fact, going even

12  farther back.  I think many of these descriptions of Lisa as

13  quiet, timid, shy, withdrawn were possibly early coping

14  strategies that she had; and then once she started school,

15  started reading books, people started to notice that she could

16  lose herself in a book, that this was her escape.  So much so

17  that Judy commented that the house could burn down around her,

18  and from that point on you hear all of these phrases over and

19  over from her about her all the way through and into adulthood

20  "not emotionally present," "in her own world," "spaced out at

21  times," "in a world of her own."  Her daughters recalled, which

22  they sort of thought was funny, but that Lisa would even read a

23  book when she was driving the car with all of them in the car.

24         So her strategies to cope and to survive and escape

25  things that she had no skills to deal with make up a very long

1   list of behaviors that, in my opinion, would be related to

2   someone who was dissociating.

3   Q      I'd like to flip over to Slide 105 and talk some more

4   about the strategies of coercive control that you brought up

5   earlier.  You noted, I think in Lisa's history and in the

6   family history of the Kleiner family, some other fairly bizarre

7   and extreme examples of the way the children were kept in line

8   through these strategies of coercive control.  If you would

9   tell the Court what you saw in the declaration of Teddy Kleiner

10  and the description of how his mother killed his dog.

11  A      Well, this stood out to me because one of the ways to

12  strike fear in children and to control them is to kill an

13  animal or to kill one of their animals, and this is the second

14  incident of Judy doing this.  Teddy was getting off the school

15  bus one day and he saw his mother and her drinking buddy out in

16  the yard near the house and he saw that she had his dog in her

17  arm; and when he got over there, she took the shovel and hit

18  the dog over the head, and Teddy watched as the dog fell and

19  lost its balance and died and remembered the dog's brains

20  spilling out, and this was because the dog had killed one of

21  Judy's chickens.

22  Q      Were there other incidents that happened to Lisa?  I'm

23  referring actually -- I'll just direct you.  Do you remember

24  about Judy destroying some of Lisa's treasured things or

25  getting rid of them?

1    A       Well, one example, aside from getting rid of Diane,

2    which was certainly a treasure for Lisa, but Lisa loved music

3    and she was able to play the violin and according to her high

4    school boyfriend, played quite beautifully, and Judy needed

5    money and she took it away from her and sold it.

6    Q       Did you prepare a slide reflecting the language of

7    Teddy Kleiner to describe his mother's power over the children

8    in the household?

9    A       Yes.  Can you point to me where --

10   Q       It's right in the block there on the screen.

11   A       I see it.  I think I can actually read this.  "She's

12   destroyed or taken everything I've ever loved and she holds so

13   much power that I know she is capable of anything."  And it

14   brings to mind a story Teddy told me when I met him that he has

15   such bad nightmares about Judy, even today, and that he had

16   just had one where he was being chased by a huge dog like a

17   Doberman and that he jumped up on a wall and he was about to

18   fall off the wall and he kept reaching over the other side for

19   his mother's hand hoping she would pull him over so that the

20   dog couldn't get to him, and in his dream she would not put her

21   hand out, and he said this describes for me the way she saw us

22   and the kind of power she had.

23   Q       Did Lisa ever manage to escape her mother's control?

24   A       Well, she -- no, she did not.  She managed to leave

25   home but she did not escape Judy.

```
1    Q      What efforts did she make to leave that environment

2    entirely?  I direct your attention to her -- wait a minute.

3    The slide regarding -- 102 regarding her attempts to go to the

4    Air Force.

5    A      Even before Judy married Carl Boman, she had during her

6    senior year had a couple of major successes being selected for

7    the Upward Bound Program which she was able to attend in the

8    10th grade and 11th grade and loved it, at Rogers State

9    Community College.  This was a very special thing in her life,

10   and she kind of got a glimpse of what maybe life could be like.

11   She knew she wasn't going to be able to afford to go to college

12   so she enlisted in the Air Force and got an enlistment date for

13   right after she graduated.

14   Q      But what happened?

15   A      When Judy met Richard Boman, she wanted to spend as

16   much time as possible with him, so Lisa was left at home with

17   her younger brothers and sisters.  She was going to school.

18   She was cooking.  She was cleaning.  She was getting the kids

19   off to school.

20          When Richard's son, Carl, came home from the Army,

21   the two of them found a way to be together without all the

22   children around, and they pushed Carl and Lisa together to care

23   for these children and actually made it seem like it was cute

24   or romantic, Look at the two of you together just like husband

25   and wife.
```

1       Lisa was able to break away from that briefly.  She

2   lived with Carl for just a little while.  She moved back and

3   continued taking care of the children, and finally called Carl

4   and said she couldn't take it anymore.  She moved back in with

5   him and they got pregnant, and that was really the end of

6   Lisa's dreams.

7           MS. HARWELL:  If we could go to Slide 108.

8   Q       (By Ms. Harwell)  Is this a photograph of what happened

9   to Lisa's dreams?

10  A       Yes.  This is a photograph of her marriage to Carl.

11  Q       And Carl Boman was how much older than Lisa?

12  A       He was six years older than her.  She was 16 and he was

13  22 when they met.

14  Q       Can you describe briefly what Lisa's marriage to Carl

15  Boman was like?

16  A       Let me just begin by saying one more thing about that

17  marriage.  He was an adult and she was a minor.  And given what

18  Lisa had been through, it's worthy to comment, to say that Judy

19  saw no problem with that relationship.  This child had been

20  through this court testimony.  She had been through years of

21  rape.  She had been through her mother's trading her.  She had

22  been through all these many things and still there doesn't seem

23  to be any recognition at all that she is still a minor.

24          As far as their marriage, this, in my opinion, is

25  when the initial decline of Lisa began, not that the things

1  that had happened to her before were not about as low as it can

2  get for a child, but this decline now from the age of 16, 17,

3  18.  She's pregnant.  She has four children in succession, four

4  in less than five years, and she and Carl are living together

5  in Hominy, Oklahoma; and instead of this being a good time for

6  Lisa, again, being married, one would hope independent, Lisa

7  had no skills at all for stepping out into the adult world, and

8  so she is having one child right after the other.

9          By the time she finishes having those children, she

10  is unable to cope in the little house she and Carl have.  He is

11  working.  He turns out to be very controlling, very sexually

12  aggressive toward her.  He has control of the car.  He does the

13  grocery shopping.  He controls the money.  He controls what she

14  wears.  And so we begin to see Lisa decline even further.

15  Q      What is the --

16          THE COURT:  Ms. Harwell, I'll give you five minutes

17  to wrap up this presentation.

18  Q      (By Ms. Harwell)  Did you track Lisa and Carl's

19  progress or Lisa's progress around the country up to the time

20  she married Carl and then on from there?  And does that --

21  those patterns of moves reflect her early life and the pattern

22  of moving constantly that she learned as a child?

23  A      I'm sorry.  Reflects her what life?

24  Q      Does it reflect her early life and what she learned

25  from her mother in terms of chaotic?

1    A      You know, there is repetitiveness that occurs in the

2    lives of abused children, and so everywhere Lisa went no matter

3    who she was involved with, it could have been strangers or it

4    might be Carl and Kevin, her husbands, you still see these same

5    patterns of power and control where in her mind she certainly

6    does not believe she has any independence and can control the

7    things that are happening to her.

8    Q      A moment ago you talked about how Lisa's marriage to

9    Carl, in your opinion, began the decline, and the Court has

10   indicated that he's going to cut us off, so I would just like

11   you to, if you can, summarize what you mean by decline.  A

12   decline in Lisa's functioning?  And maybe highlight just a

13   couple of examples of how you saw that decline manifested over

14   the next few years of Lisa's life.

15   A      With Lisa it manifested with sexuality, with having

16   affairs with many different men, with drinking.  Her personal

17   appearance declined.  Her hygiene declined.  And to such an

18   extreme degree that people could not be around her.  The odor,

19   her appearance.  It started to affect the way she parented the

20   children so that neighbors noticed and reported her, and this

21   continued -- actually on three occasions.  You see this happen

22   again when she moves to Deming, New Mexico.  You see this same

23   pattern.  And it just becomes worse and worse and worse to the

24   point that her children commented that for five years she had

25   lice and was as completely unaware of the lice as though she

1    didn't have them at all; whereas, it was driving the children

2    crazy, not only to have them themselves but to see their mother

3    with this condition and be oblivious to it.

4           Then she had a brief bounce-back, very brief when

5    she met Kevin; but as soon as they bought the farm in Kansas,

6    she was unable to make her dreams come true to have a farm, to

7    have a garden, to have farm animals.  One of her favorite

8    stories was Little House on the Prairie so she had this Laura

9    Ingalls dream that she was going to create this for herself and

10   her children and she was very earnest.

11          In the end Lisa ended up staying in her room with

12   the children bringing her food to her, staying on the computer

13   for hours, reading, and then she really more or less removed

14   herself from the family; and when it became apparent that her

15   children were going to be moving out, moving away --

16   Q     Fair to say, Ms. Vogelsang, that if you were to give

17   the entirety of your testimony, it would reflect that you

18   received a lot of information that was contrary to that

19   presented at trial that Lisa was a good and adequate mother;

20   that, rather, the information you had from Oklahoma Department

21   of Children's Services as well as from your interviews with her

22   children reflects that her functioning declined such that they

23   were living in intolerable conditions and she was not able to

24   care for the children?

25   A     Two of her daughters had to buy a tent and move outside

1    the house the conditions were so poor.

2    Q      Also fair to say that your investigation, and if you

3    were to testify fully, would reveal that you looked at records

4    from a counselor who saw Lisa in, I believe, 2002 who marked in

5    her notes the decline in Lisa's functioning from one year to

6    the next and that that was consistent with your opinions based

7    on the sociological data you were getting that Lisa was on a

8    downhill spiral for the last years before her arrest; is that

9    correct?

10   A      That's correct.

11   Q      Also fair to say that if you were to testify in full,

12   you would continue and give the Court more information about

13   the pattern of child abduction in this family, including the

14   slides that just passed -- flashed through documenting all of

15   the people in the family who treated children essentially as

16   objects and moved them from one family member to another?

17   A      Yes.

18          MS. HARWELL:  And I think, Your Honor, with the

19   limitations you've placed on us, that might be the best I can

20   do.

21          THE COURT:  All right.  Thank you.

22          Ms. Henry.

23          MS. HENRY:  Your Honor, the pinpoint cites for the

24   Dietz testimony for the Court to review are 2526 through 28 and

25   2665.  And those are found in Volume 12 of the criminal court

1    transcript.

2              Your Honor, during this last presentation there's

3    been a matter that Mr. Valenti and I have been corresponding

4    about that we would like to have a few minutes for us to

5    discuss a potential dispute regarding materials from Mr.

6    Duchardt where he's requested a subpoena duces tecum and

7    discuss this to see if we can come up with some sort of

8    agreement.  So we would request perhaps the Court give us an

9    extra five minutes for us to discuss that.

10             THE COURT:  Okay.  We'll be in recess until 3:30.

11             MS. HARWELL:  Before we do that, may I make Ms.

12   Vogelsang's PowerPoint an exhibit, Your Honor?

13             THE COURT:  Sure.

14             MS. HARWELL:  I believe it's been marked as 154, and

15   I would move for its admission at this time.

16             MR. KETCHMARK:  No objection.

17             THE COURT:  It's received.

18             (Recess taken.)

19             THE COURT:  Did you get the business you had to take

20   care of squared away?

21             MR. KETCHMARK:  We did, Your Honor.

22             THE COURT:  Mr. Ketchmark, do you have any

23   cross-examination?

24             MR. KETCHMARK:  I do, Your Honor, briefly.

25   JANET VOGELSANG resumed the stand and testified:

1    CROSS-EXAMINATION BY MR. KETCHMARK:

2    Q       Good afternoon, ma'am.

3    A       Hi.

4    Q       Do you know when you were first brought into this

5    particular matter, when you were retained?

6    A       It was in 2013.

7    Q       Do you have notes or something that might help you

8    reflect?

9    A       My first interviews were in February of 2013 so I may

10   have been contacted before then.

11   Q       Okay.  In your original declaration that you filed,

12   ma'am, you have on page 7 a footnote that you dropped down

13   talking about preparing the biosocial history under extreme

14   time constraints for circumstances over which Lisa and her

15   counsel have no control.  Do you recall typing that footnote

16   into your original declaration?

17   A       Could I see it?

18   Q       Sure.  That particular footnote I'm talking about,

19   ma'am.

20   A       I don't recall what the situation was.

21   Q       That was my question.  Just so we're clear, you recall

22   writing this but you don't recall specifically what the time

23   constraints were and what caused you to drop that footnote in

24   as you sit here today?

25   A       Yes.

1    Q      I think you also testified, ma'am, on direct

2  examination that your preference to get into a case is that you

3  have at least eight months to a year because of the amount of

4  work that goes into what it takes to put together one of those.

5  Is that a fair recollection of what your testimony was?

6    A      Yes.

7    Q      Would you agree with me, ma'am, that the more time you

8  have, obviously the better because that allows you to amass

9  more records, do more interviews, and do a deeper dive into

10  somebody's particular background?

11    A      Yes.

12    Q      In fact, in this particular matter your original

13  declaration, I believe, is dated March 17th of 2013.  Does that

14  sound correct to you?

15    A      Yes.

16    Q      And then you filed a supplemental declaration that was

17  filed on August 5th of 2016, just this year, because there was

18  additional information learned from your original declaration

19  until the declaration that was filed as the supplement on

20  August 5th of this year; is that correct?

21    A      Yes.

22    Q      And you're aware, ma'am, are you not, that even after

23  August 5th when you filed your supplemental, there was

24  additional work that was being done in terms of interviews and

25  records being amassed?  In fact, I think in your direct

1   testimony you referenced several of the declarations.  Would

2   you agree with me that Linda Baker's declaration that you

3   talked about would have been dated August 18th of this year?

4   Do you have any reason to disagree with that?

5   A       No.

6   Q       Similarly, you talked about the Reverend Wesley Gann

7   and the declaration he provided, and you have no reason to

8   dispute with me, would you, ma'am, that that declaration was

9   September 7th of this year as well?

10  A       Yes.

11  Q       So with respect to this process and the more time -- as

12  you get more information with more time, you obviously can go

13  deeper; and if there's more information, you're going to always

14  be able to add to what was done before?

15  A       Not necessarily.  In other words, the additional

16  information may just be consistent with what you already had.

17  It's only if it were to be significant and changing that you

18  would then be concerned.

19  Q       So let me see if I can characterize -- and, again, if

20  I'm incorrect, let me know.  But what I think you're saying is

21  that some of the stuff that you find might be cumulative or

22  confirming of what you already knew; is that correct?

23  A       Yes.

24  Q       And some of it might be wholly different and entirely

25  new and it could basically open up other avenues that you want

1    to learn?

2     A       It could.

3     Q       Additionally, ma'am, when you got into this case, am I

4    correct in my assumption that there was a significant amount of

5    work that was collected before you came in and kind of brought

6    this all together?

7     A       Yes.

8     Q       A lot of records that were obtained by prior defense

9    teams?

10    A       Yes.

11    Q       And a lot of interviews that were conducted with

12   witnesses by prior investigators or attorneys?

13    A       Yes.

14            MR. KETCHMARK:  One moment, Your Honor.

15            That's all I have, Judge.

16            MS. HARWELL:  Very, very briefly, Your Honor.

17   REDIRECT EXAMINATION BY MS. HARWELL:

18    Q       Ms. Vogelsang, you were not retained on the Lisa

19   Montgomery matter before the Office of the Federal Public

20   Defender began to represent Ms. Montgomery in August of 2012;

21   is that right?

22    A       Yes.

23    Q       And so fair to say from August of 2012 until your

24   declaration filed in March, that's about five months?  I mean,

25   from October to March is about five months?

1    A      Yes.

2    Q      You did not work on this case meaningfully after the

3    filing of your first declaration before this court granted us a

4    hearing, then, in December of last year; is that right?

5    A      Yes.

6    Q      And so fair to say from the Court's granting of a

7    hearing in December of last year until now -- or until you

8    filed your supplemental declaration in August is, again, eight

9    or nine months?

10   A      Yes.

11            MS. HARWELL:  No further questions.

12   RECROSS-EXAMINATION BY MR. KETCHMARK:

13   Q      And just so I'm clear, then, ma'am, if the Court

14   wouldn't have granted the hearing, the additional information

15   you found in your supplemental would have never come to light,

16   correct, by you?

17   A      That's correct.

18            MR. KETCHMARK:  That's all I have, Judge.

19            THE COURT:  Thank you, Ms. Vogelsang.  You're

20   excused.

21            (Witness excused.)

22            THE COURT:  Revisiting the Parnham matter, I have

23   reviewed Dr. Dietz' testimony at trial where he said, "And

24   we got the runaway grand jury investigate the District

25   Attorney's" -- "and he got the runaway grand jury to

1    investigate the District Attorney's office and me."  And so

2    how does that impeach with the proceeding before the grand

3    jury, Ms. Henry?

4         MS. HENRY:  If, Your Honor, I can pull up the

5    transcripts.

6         THE COURT:  Okay.  I didn't read the whole thing,

7    quite frankly.  I looked at some of the references of Dietz

8    about Parnham, and I didn't see where Dietz said one way or

9    another about Parnham instigating the proceeding against him.

10        MS. HENRY:  So here's exactly what I was referring

11   to, Your Honor, page 2665 beginning with line 6.  "Well, to be

12   accurate there was a runaway grand jury that kicked out the

13   prosecution."  So we have that grand jury transcript which

14   shows the prosecution wasn't kicked out.  So that's A.  "Was

15   investigating the Houston crime lab" --

16        THE COURT:  Wait a minute.  I don't see the page

17   number.  The copy's obliterated, the page number.  So I'm

18   trying to look at the grand jury transcript.  But tell me

19   again, what did you just read?

20        MS. HENRY:  This is from the criminal court

21   transcripts.

22        THE COURT:  Oh, the criminal court transcript?

23        MS. HENRY:  Yes, sir.

24        THE COURT:  Okay.

25        MS. HENRY:  Volume 12, page 2665.  And, again, three

1    things for Parnham.  One is that because -- in normal

2    circumstances grand jury testimony, as the Court knows, would

3    be secret.  So you couldn't blame trial counsel for not getting

4    grand jury transcripts which should be secret.  So Mr. Parnham

5    could establish that.  That grand jury transcript was not

6    secret and was available and he would have given it to Mr.

7    Duchardt.  So that's A.

8           And, again, I'm with the government that if this

9    answer hadn't been given nonresponsively, none of this would

10   have been relevant; but since it was, we're entitled to impeach

11   a witness' truthfulness.  "There was a runaway grand jury that

12   had kicked out the prosecution, was investigating Houston crime

13   lab invited, comma, well, they consulted a member of the

14   defense bar who it's my understanding invited George Parnham,

15   Andrea Yates' lawyer, and the one who changed his story about

16   whether it was an honest mistake or he was accusing me as a

17   liar, of lying, invited him to come before the grand jury

18   without an official there" -- Mr. Parnham would say that's not

19   what happened -- "to give his theory.  And he got the runaway

20   grand jury to investigate the District Attorney's office and

21   me."  Mr. Parnham would say that's not true.  "The outcome of

22   that was that they returned no indictment and found no

23   wrongdoing.  But it did generate a lot of press with it."

24   That's the answer that is subject -- and I would also point the

25   Court to the declaration already in evidence from Jim Brooks

1    who was the grand jury foreperson of the grand jury that

2    investigated Dr. Dietz.

3              I would further note that that grand jury did not

4    make a finding that there was no wrongdoing.  They simply made

5    a no true bill.  So Mr. Parnham can provide -- he didn't get

6    them to investigate anybody.  Prosecutors weren't --

7              THE COURT:  I'll let you bring him up.

8              MS. HENRY:  Thank you.

9              THE COURT:  Ms. Harwell, do you have the next

10   witness?

11             MS. HARWELL:  I do, Your Honor.  The movant would

12   call Diane Mattingly.

13             THE COURT:  Ma'am, would you come up to the witness

14   stand for us, please.

15   DIANE MATTINGLY, being sworn by the courtroom, testified:

16   DIRECT EXAMINATION BY MR. HARWELL:

17   Q      Get situated there.  And pull the microphone over close

18   to you.  I know you have a soft voice.  If you'll state your

19   name for the Court and spell your last name for our court

20   reporter, please.

21   A      Diane Mattingly, M-a-t-t-i-n-g-l-y.

22   Q      And, Ms. Mattingly, you are Lisa Montgomery's half

23   sister; is that right?

24   A      Yes.

25   Q      You and Ms. Montgomery had the same father?

1    A       Yes.

2    Q       You testified at Ms. Montgomery's trial I think in this

3    exact same courtroom in front of Judge Fenner back in 2007; am

4    I right?

5    A       Yes.

6    Q       Can you tell the Court and the record in a very general

7    way what that experience was like for you?

8    A       It was extremely overwhelming.  I was terrified.

9    Q       Why were you terrified?  Was it your first time being

10   in court?

11   A       I've never been in court before, didn't know what to

12   expect.

13   Q       And so when you got here, how did you feel?

14   A       I felt anxious.  I felt terrified.

15   Q       Well, let's talk about before you came to court.

16   Before you got to court to do your testimony, did you have

17   contact with Ms. Montgomery's legal team?

18   A       Their investigators.

19   Q       Let's talk about that.  More than a year before the

20   trial you got a phone call from someone you didn't know; is

21   that fair to say?

22   A       Yeah.

23   Q       And that someone you know now to be Dani Waller?

24   A       Yes.

25   Q       Was that phone call kind of -- did it kind of take you

1    aback?

2    A       I had been married for a month.  I just so happened to

3    come home early that day.  The phone rang and it changed my

4    world.

5    Q       Tell us about that.  How did it change your world?

6    A       I completely lost my family at age nine, and then all

7    of a sudden somebody's telling me my sister -- and that was 30

8    years ago that I had last seen her, and it was like, Oh, my

9    God, all of a sudden my family's back.  It just really changed

10   everything for me.

11   Q       It sounds like that's separate and apart from having to

12   come to court was sort of an emotional experience for you?

13   A       Extremely.

14   Q       Did the person who you talked to on the phone later,

15   who you later found out was Ms. Waller, did she come to talk to

16   you in Kentucky at your home?

17   A       Her and Ron.

18   Q       And what was that like?

19   A       It was extremely difficult because I usually keep my

20   past just really locked up and they laid it all out.  And it's

21   the first time my new husband had heard everything.

22   Q       Fair to say that some of the things you talked about

23   with Ms. Waller and Mr. Ron Ninemire who was present for some

24   of those things were really hard to talk about?

25   A       Extremely.

```
1    Q      Very personal --

2    A      Very personal.

3    Q      -- traumatic memories?

4    A      Very.

5    Q      At some point did they tell you they were going to want

6    you to come to court and testify?

7    A      Yes.

8    Q      Did you have sort of mixed feelings about that?

9    A      I did.

10   Q      Why?

11   A      Because I didn't want to face it.  Two, my husband was

12   upset because I was hurting and I was afraid I was going to

13   hurt him.  I was just scared.

14   Q      When you say your husband was upset, I think I know

15   from our conversations that he felt really protective of you?

16   A      Extremely protective of me.

17   Q      He saw that these conversations were really difficult

18   and emotional and he didn't really want you to have to go

19   through it?

20   A      Right.

21   Q      And you all were kind of newly married?

22   A      Yeah.  We had just been married a month when this all

23   started.

24   Q      So fair to say at that point you were worried about

25   pleasing him and his feelings about the whole thing?
```

1    A       Yes.

2    Q       But you did come --

3    A       Yes.

4    Q       -- right, to testify?  You came to Kansas City?

5    A       Yes.

6    Q       Once you got here, did you meet with any of the lawyers

7    from the case?

8    A       I met with one that I now know his name is Fred.

9    Q       Where did you meet with him?

10   A       It was at the hotel lobby.

11   Q       Was that at the Westin at the Crown Plaza?

12   A       Yeah.

13   Q       Were you staying there or did Dani bring you there?

14   A       No, Dani brought me there.

15   Q       Who else was there?

16   A       John, our biological father, and Kevin, Lisa's husband.

17   Q       Let's talk about that meeting, if we could, for just a

18   minute.  You have previously met John Patterson before that

19   night.  I think I know.

20   A       Uh-huh.

21   Q       How many times?

22   A       Once.

23   Q       And had you ever met Kevin Montgomery?

24   A       No.

25   Q       So on the night that you go talk to the lawyer, you're

1    confronting your biological father?

2    A        Correct.

3    Q        Who you don't really have much of a relationship with?

4    A        No.

5    Q        And then your sister's husband who you never met?

6    A        Never met.

7    Q        Is that the only time before you got on the witness

8    stand that you talked with Mr. Duchardt?

9    A        That was the only time.

10   Q        Well, let's talk about that conversation.  Did Mr.

11   Duchardt tell you what he was going to ask you on the witness

12   stand?

13   A        Not that I recall.

14   Q        Did he talk to you about the kind of things I've talked

15   with you about, about your sexual abuse history?

16   A        No.

17   Q        Did Mr. Duchardt tell you what to expect?

18   A        No.

19   Q        Do we need to stop and get you some water?

20   A        No.  I'm good.

21   Q        Are you sure?

22   A        (Witness nodded head.)

23   Q        Okay.  I'm sure somebody could get some.  Let me know

24   if you want some.

25            Let me ask it this way:  Who was doing the talking?

1    A       He was.  He was.  I barely -- I just sat there and just

2    kind of listened.

3    Q       So he wasn't getting information from you.  He was just

4    talking to you and John Patterson and Kevin Montgomery?

5    A       Correct.

6    Q       Did you ask questions?

7    A       No.  I didn't know what to ask.  I thought he knew

8    that I had been told the whole story.  I thought he knew so I

9    didn't feel like I had to ask anything.

10   Q       Did you request from the lawyers to see your sister

11   before court?

12   A       Yes.

13   Q       What happened with that?

14   A       They said there wasn't enough time.

15   Q       Okay.  So when you came in those doors at the trial to

16   come testify, was that the first time you had seen your sister

17   since you were eight?

18   A       Yes.

19   Q       Clearly it's emotional even remembering it, and I'd

20   like the record to reflect the witness is crying.  Fair to say

21   it affected you even more back then?

22   A       Yes.

23   Q       Was it hard to see Lisa under those circumstances?

24   A       It was hard because I hadn't seen her in over 30 years,

25   and for this to be the first time to see her was so traumatic.

1    Q       So I think I know from the record that when you got to
2    the witness stand, you began to cry; is that fair?
3    A       That's fair.
4    Q       Did they take a break to let you compose yourself?
5    A       Not that I remember.
6    Q       So when you started testifying, let's talk about how
7    that went.  The lawyer asked you about what it was like growing
8    up in Judy's household.  I think you told him it was like
9    walking on eggshells?
10   A       It was.
11   Q       Is that --
12   A       That's how it was.
13   Q       It's accurate?
14   A       Yes.
15   Q       Do you wish that you had given more description?
16   A       That wasn't even the smallest part of what living in
17   the house was.  There's so much more.
18   Q       What's more?
19   A       Judy had a way of finding things that would hurt you
20   and she would use them against you.  Like she knew that I had
21   this deep desire to have a family.  I mean, not only did I lose
22   my mom, I lost my grandmother.  I was living in the home with
23   her.  I didn't have my father.  It was just her.  And every
24   time she would pull me in and tell me that she loved me, then
25   she would send me away, then she'd pull me in and tell me that

1   she loved me.  And then I would live with a family two weeks

2   here, then I would live with a family for nine months there.  I

3   never had stability with her.

4   Q      You said that you had already lost your father because

5   he was away?

6   A      Correct.

7   Q      You also said you already lost your grandmother.  Do

8   you mean John Patterson's mother?

9   A      Yeah.

10  Q      What did Judy tell you about John Patterson's mother?

11  A      That she was sick and dying.

12  Q      Did you later find out that wasn't true?

13  A      Yeah.  She didn't die until 2008.

14  Q      So there was this person in your life that was

15  significant to you in your family that Judy kept from you?

16  A      Yes.

17  Q      When you describe Judy pulling you in and pushing you

18  away -- I think you previously provided a declaration in this

19  matter.  I'm going to show you the first page and see if you

20  recognize it.  Does that look like something we had you sign?

21  A      Yes.

22  Q      Let me show you the last page and see if you recognize

23  the signature.  Is that your signature there at the bottom?

24  A      Yes.

25  Q      In your declaration you describe in more detail some of

1  the things that Judy did to you.  Let's talk about when she

2  would put you outside.  Can you tell the Court what that was

3  like?

4  A     Just one second.

5  Q     Sure.  Take the time you need.

6  A     When she would put me out, she would take all my

7  clothes off because I wasn't to take anything that she

8  provided, and she would open up the door, shove me outside, and

9  shut the door.

10 Q     And this was before you were eight years old?

11 A     Yes.

12 Q     Do you know how long she left you outside?

13 A     For a while.  I can't tell you if it was five minutes,

14 if it was ten minutes, if it was 30 minutes.  I don't know.  I

15 was out there and I was scared.

16 Q     And you were naked?

17 A     And I was naked.

18 Q     How has that treatment affected you as you grew up and

19 as an adult?

20 A     I don't trust people that tell me that they love me.

21 My husband even said to me one time, he goes, You don't believe

22 that I really love you, do you?  In my head I do but in my

23 heart I always think, okay, when's the shoe going to drop?

24 When am I going to mess up and they're not going to love me

25 anymore?

1    Q        And that's what you experienced as a child living with

2    Judy?

3    A        Yes.

4    Q        Did Judy use food to harm you?

5    A        Yeah.

6    Q        How did she do that?

7    A        She knew that I hated onions so she would hand me raw

8    onions and I would have to eat them up, and I'd have to eat --

9    they would be big -- and I would have to eat the whole thing.

10   Q        Or what?  Did you even know what the threat was?

11   A        No.  I just knew I had to eat it.

12   Q        And would it make you gag?

13   A        It would make me sick.  I can't eat onions today.  If

14   you cook them up and chop them up real fine and I can't see

15   them, I can eat them, but if there's aroma there, I will

16   literally physically get sick.

17   Q        Did Judy hurt you in ways that -- we're talking sort of

18   right now about emotional things that scarred you, but did she

19   hurt your body as well?

20   A        Oh, yeah, whatever is in her hand.  I was at that time

21   the blunt of her anger.  If she had a broom in her hand, she

22   would smack me with it.  If she had anything in her hand, it

23   didn't matter.  If she didn't have anything in her hand, it

24   would be her finger in my chest pounding it.

25   Q        And I'm going to ask an indelicate question because no

1    child deserves to ever be treated like that, but was it always

2    punishment or was it sometimes --

3    A       No.  No.  That's what I think threw me off last time

4    because the question to me was, How does she punish you?  Well,

5    you got whippings.  You got hit.  That was punishment.  But

6    Judy was more than that.  If she was in a foul mood, whoever

7    was in front of her got it, either hit or thrown outside with

8    no clothes on.  It just was whatever at that moment she thought

9    of.

10   Q       At trial you talked about being Lisa and Patty's

11   protector.  I want to talk about that awhile now.  As you're

12   sitting here today a little bit calmer, do you think that

13   testimony was true?

14   A       Yes.

15   Q       Were you Lisa's and Patty's protector?

16   A       I was.

17   Q       Though you said that at trial, there wasn't a lot of

18   explanation given about what you were protecting them from.

19   I'm going to have to ask you, what were you protecting Lisa and

20   Patty from?

21   A       Judy would have a lot of men over, and I don't think I

22   can think of any time when there wasn't a man there.  It would

23   always be different men.  And they would get into fights and I

24   would always have to take both Lisa and Patty and either run

25   them into their room and keep them quiet.

1       But one time in particular there was a really bad

2   fight, and me and the girls, we were in the living room and

3   Judy and this man -- I don't know who he was -- were fighting

4   and doors were -- she was trying to push the door and trying to

5   push him out and he was trying to come in, and we were probably

6   about as far away from this fight as I'm probably me to you,

7   and I have Patty behind me in a corner -- I mean, not Patty but

8   Lisa behind me in the corner and Patty is on my hip, and I was

9   just trying -- because we couldn't get past.  We were stuck

10  there in this fight, and I'm trying to keep them calm because I

11  didn't want them to become -- to engage it even more so.  Yeah,

12  that's a memory that's really ingrained in my brain.

13  Q       There was also other abuse that you did not testify

14  about regarding the sexual abuse that happened to you when you

15  were at Judy's home.  Ms. Mattingly, I'm going to ask you about

16  the man who would come in and see you there.  Let's start with

17  what you remember about where your sister was when the things

18  happened to you.

19  A       Lisa and I shared a bedroom and when you walk in the

20  door, the wall where the door was was Lisa's bed, then the

21  opposite door was my bed.

22  Q       Was this a big room?

23  A       Huh-uh.

24  Q       And so were your beds close together?

25  A       Yeah.  If we reached out our hands, we could touch.

1    Q      And we're talking about a time leading up to you being

2    eight years old and Lisa being four or five years old; is that

3    right?

4    A      Yeah.

5    Q      And so when this man would come into the room, Lisa was

6    close enough to you that you could touch her?

7    A      Yes.

8    Q      I'm not going to make you tell the details of what he

9    did to you, but is it fair to say that he raped you?

10   A      Yes.

11   Q      I'd like the record to reflect that she indicated in

12   the affirmative.

13          Take your time, Ms. Mattingly.

14   A      I'm sorry.

15   Q      No, don't be sorry.

16          Let's talk about sort of one more big topic when

17   Judy sent you away.  You said a few minutes ago that sometimes

18   she would give you to one family and then you'd come back, then

19   another family.  I want to talk about the time you were

20   ultimately sent away.

21          Did you ever feel that you had a home there with

22   Judy that was stable --

23   A      No.

24   Q      -- or certain?

25   A      No.

1    Q       Did she make threats to send you away often?

2    A       Yes.

3    Q       Did you -- was there a cause and effect?  Was it like

4    you misbehaved in some way and she'll say, I'll send you away

5    if you do that again, or was it random?

6    A       It was random.

7    Q       When the Department of Children's Services ultimately

8    showed up, I think the records show it was on Valentine's Day

9    when you were eight years old.

10   A       That really sucks.

11   Q       Did you know why they were there?

12   A       Yeah.  Judy told me they were coming to get me.

13   Q       And what did she say about why they were coming to get

14   you?

15   A       That it was my fault.

16   Q       What did you think that meant?

17   A       That I did something bad.

18   Q       And you've never known why you were sent away?

19   A       I don't know.

20   Q       You've told me in the past that when the social workers

21   put you in the car, you became physically sick?

22   A       I threw up all the way from Ogden to Salina.  They

23   would have to stop several times.

24   Q       And why was that?

25   A       Because I wasn't there to protect them anymore.

```
 1   Q       And by "them," you mean Lisa and Patty?

 2   A       Yes.

 3   Q       Ms. Mattingly, if someone had talked to you before

 4   trial the way you and I met and got this information from

 5   you -- I know you told the investigators.

 6   A       I did.

 7   Q       But if a lawyer had talked to you and helped you plan

 8   to testify the way you did today, would you have been willing?

 9   A       I would have.  I would have told the whole thing.  I

10   just didn't know what to say.  I didn't know what to say.

11           MS. HARWELL:  I don't have any further questions.

12           MR. VALENTI:  No questions, Your Honor.

13           THE COURT:  All right.  Thank you, Ms. Mattingly,

14   and I'm sorry that you had to come down and testify again.

15           THE WITNESS:  That's okay.

16           (Witness excused.)

17           MS. HARWELL:  Your Honor, may I step out for one

18   moment?  We're going to call Ms. Waller.

19           THE COURT:  All right.

20           Over here.

21   DANIELLE WALLER, being sworn by the courtroom deputy,

22   testified:

23   DIRECT EXAMINATION BY MS. HARWELL

24   Q       Good afternoon.  If you'll state your name for the

25   Court and spell both parts of your name, please, for the court
```

1    reporter.

2    A       Danielle Waller, D-a-n-i-e-l-l-e, W-a-l-l-e-r.

3    Q       And, Ms. Waller, what is your profession?

4    A       I am a mitigation specialist.

5    Q       Let's talk about your history with the Lisa Montgomery

6    case.

7    A       Okay.

8    Q       Who hired you to be on the Lisa Montgomery case?

9    A       David Owen hired me.

10   Q       How did that come to happen?  How did you meet Mr.

11   Owen?

12   A       I was in Chicago working at a death penalty conference

13   and he came to Chicago and met with me.

14   Q       Did he have his investigator, Ron Ninemire, with him?

15   A       Yes.

16   Q       Did you all have sort of an interview at that point?

17   A       Somewhat informally, but yes.

18   Q       And ultimately you did a contract to perform services

19   for them; is that right?

20   A       Yes.

21           MS. HARWELL:  If I could have Exhibit 129.

22   Q       (By Ms. Harwell)  I'll ask you while we're getting

23   that --

24           MS. HARWELL:  And I'm sorry, Your Honor, I don't

25   have it in my hand.

```
 1    Q       (By Ms. Harwell)  Did you prepare the description --

 2    you've looked at Exhibit 129 in the past.  I'll show it to you

 3    again.  Did you prepare the description of your job description

 4    in that contract or did Mr. Owen?

 5    A       I did.

 6    Q       I'll show you Exhibit 129 and see if you recognize

 7    that.  Does that look like the contract you signed?

 8    A       Yes.

 9    Q       Okay.  Fair to say that when you signed that contract

10    in June 2006, you thought you knew what mitigation

11    investigation was; is that right?

12    A       Yes.

13    Q       And you filled out a description based on your

14    experience of being a mitigation investigator?

15    A       Yes.

16    Q       Is that what happened in this case?

17    A       No.

18    Q       How was your experience of working the mitigation part

19    of the case different from the description you provided in your

20    job contract?

21    A       My role was very truncated.  So instead of it being a

22    comprehensive, global type of investigation and holistic, it

23    was task oriented with few specific things that needed to be

24    done.

25    Q       And who made that designation?  Who told you what your
```

1    job was to be?

2    A        David did.

3    Q        And by "David," you mean Mr. Owen?

4    A        Yes, Mr. Owen, David Owen.

5    Q        How did he explain that to you?  Did he give you a task

6    list?

7    A        Yes.

8    Q        He did?

9    A        He had a task list and at times would just tell me this

10   is what we're doing, this is what we need to do.

11   Q        Okay.  So when you came on the case, were you expecting

12   to do a chronological history of Ms. Montgomery, look for red

13   flags in documents, those sorts of things?

14   A        Yes.

15   Q        And did you end up doing those tasks?

16   A        No.

17   Q        What concretely -- I understand it was truncated, but

18   concretely what were the tasks you were given to do?

19   A        They had a list of people that had already been

20   interviewed and I was to go to those people and see if what

21   they had said before was still true and if they were willing to

22   testify to it.

23   Q        Were you also to find any remaining witnesses?

24   A        Yes.  There were other witnesses that they wanted

25   interviewed for some peripheral issues.

1    Q       Did they identify who those witnesses were or did you?

2    A       Both.

3    Q       I believe you told me in the past that Mr. Owen had a

4    list of witnesses color coded by region?

5    A       Yes.

6    Q       As to when you were to see whom?

7    A       Yes, with their schedule, because they went with me.

8    At least one of them was always with me and so it was according

9    to their schedules.  So they had a, you know, spreadsheet

10   thing.

11   Q       At the time you signed on to the case, the trial date

12   was set for April of 2007; is that right?

13   A       Yes.

14   Q       So you understood you were going to have less than a

15   year of work on this case?

16   A       Yes.

17   Q       Were you told that a lot of work had already been done?

18   A       I was told that work had been done in terms of -- I

19   knew they had records, which can be an exhaustive,

20   time-consuming task, so I knew that piece -- that the records

21   were there to read and analyze and so --

22   Q       What were you told about the process of evaluating Ms.

23   Montgomery's mental health?

24   A       That was not necessary, that for what I was doing

25   they'd already had her evaluated and for our part there was

1   nothing there.

2   Q       When you came on the team, did you come to understand

3   there were more lawyers involved than just Mr. Owen?

4   A       Yes.

5   Q       Did you meet Mr. Duchardt?

6   A       Yes, I did.

7   Q       Tell us about that.  What was that like?

8   A       It was, I think, my first trip to Kansas City, and then

9   he -- we went to a restaurant and he was coming to meet me, and

10  they told me to not be offended by him if he was rude to me

11  because he doesn't believe in mitigation specialists, and they

12  just don't want me to be offended.

13  Q       When you say "they," who told you that?

14  A       Ron Ninemire and David Owen.

15  Q       Was Mr. Duchardt in any way offensive?

16  A       No.  He was fine.  But I was, you know, I was kind of

17  anxious because they just said he was going to be rude to me

18  but he wasn't.

19  Q       Did Mr. Duchardt -- did you have much contact with Mr.

20  Duchardt from that point on?

21  A       Not a lot.  I had some but not a lot.  I mean, I

22  primarily worked with David Owen.

23  Q       Who did you understand to be the lawyer that was going

24  to be presenting the information you were attempting to gather?

25  A       David Owen.

1    Q      Did Mr. Duchardt assign you tasks at all?

2    A      No.

3    Q      And that wasn't surprising to you since you thought Mr.

4    Owen was in charge of mitigation; is that fair?

5    A      Yes, and he hired me and told me David -- or Fred

6    didn't use mitigation specialists so --

7    Q      Did you meet John O'Connor?

8    A      I did.

9    Q      When do you think you met him relative to the ultimate

10   trial date?

11   A      You know, I don't remember when I met him, but I don't

12   remember a lot about him, honestly.

13   Q      Did you see him very many times before trial?

14   A      No.  A couple at most.

15   Q      Let's talk about the process of diving into this case.

16   What was the first task David Owen assigned to you when you

17   first came to Kansas City to kind of dig at it?

18   A      The first thing he wanted to do was drive around

19   Skidmore, I think take a road trip.

20   Q      And you went to Skidmore?

21   A      Yes.  I think so.

22   Q      Who was it that went?

23   A      Ron Ninemire and David Owen and I don't remember if

24   Stephanie went or not.

25   Q      Did you understand the purpose of that in terms of your

1   work?

2   A      Not really.  I mean, we had a short period of time, and

3   it was -- it might have been two days it took up.  I don't

4   remember.  But, no, it was just them driving around.

5   Q      As you dug into the file, did you begin to see the

6   names of other mitigation people you knew that had worked on

7   the case?

8   A      Yes, I did.

9   Q      Whose name did you see?

10  A      Lisa Rickert.

11  Q      Did you know Ms. Rickert?

12  A      Yes.

13  Q      How did that make you feel to find out she had worked

14  on the case before you?

15  A      I felt like a sick feeling in my stomach, like --

16  Q      Why is that?

17  A      Because I respect Lisa Rickert's work, and I saw her

18  name and I said, Was Lisa Rickert on this case?  And somebody

19  told me, Ron or David, I think it was David said, Yeah, she was

20  fired.  And I thought what in the world would you fire Lisa

21  Rickert for?  What could Lisa have done?  Then I was told she

22  was fired because of an interview she did with Lisa's

23  ex-husband went south and they didn't like the way it worked

24  out and she was fired.  And so, yeah, I was very anxious from

25  then on.

```
 1   Q      Aside from that sort of unsettled anxiety that you're
 2   describing, how was it working with the Federal Public
 3   Defender, with Ron Ninemire, for instance?
 4   A      I liked Ron Ninemire.  I mean, he's very -- he was very
 5   nice and, you know, we became friends.  I liked working with
 6   Ron.
 7   Q      Did Ron have any problems with Mr. Owen?
 8   A      Yes, he did.
 9   Q      And how were those expressed to you?
10   A      Well, eventually Ron -- I mean, after we worked
11   together a while because he was always with me, he opened up
12   more and more, but at first I could tell -- I could just tell
13   there was something going on, and Ron didn't want to speak.  It
14   was -- you could just tell there was a lot of tension and
15   drama; and then as we worked together more, he would say, I'm
16   not going to speak up if David's there.  David gets mad.  And
17   David would get mad if I was with Ron and not him.  It was just
18   clear something had happened.
19   Q      You said that Mr. Ninemire would say, I'm not going to
20   speak up.  I'm not going to -- essentially not going to speak
21   up to Mr. Owen.  Is that what you're saying?
22   A      Yeah.  He would even leave the area.
23   Q      Did that influence your feelings about working with Mr.
24   Owen?
25   A      Yes.
```

```
 1    Q       How so?
 2    A       Well, I mean, you can't -- I mean, it was very clear
 3    you can't speak up, right?  If you have a differing opinion, if
 4    you're not on task according to how he sets the task, it
 5    doesn't go over well.
 6    Q       Let's talk a little more about working with David Owen.
 7    You said he went on some witness interviews with you?
 8    A       Right.
 9    Q       How did those go?
10    A       Not well.  I still to this day don't know why he went.
11    Q       What do you remember specifically about -- I think you
12    at some point told me there was a woman named Bonnie Taylor?
13    A       Right.  So Bonnie Taylor was a lady who was very poor
14    and her -- you know, her home was not the cleanest and she
15    didn't have a lot of furnishings.  It was a really dirty house.
16    And we went in.  And he was clearly disgusted by her and did
17    not want to be there and was offensive, and I was embarrassed
18    for her and I was embarrassed by his behavior.  So I suggested
19    we go to a cafe or some restaurant in town to talk; and, of
20    course, Bonnie, she didn't have, you know, a way out there so I
21    said, Bonnie, just ride with us.  And then he was angry later
22    because -- I don't remember if he had a Mercedes or what car he
23    drove, but he had a very expensive car and he wasn't happy that
24    she was in the back seat.
25    Q       And, Ms. Waller, the Court's already heard quite a bit
```

1  of testimony last week about the kind of work mitigation

2  specialists have to do to do trauma interviews and to really be

3  present with someone.  So fair to say that when you're

4  interviewing someone and trying to get at family secrets and

5  things they know that they're not anxious to reveal, expressing

6  disdain for them is counterproductive?

7  A      Right.

8  Q      Did that also happen with Lisa's stepsister, Penny

9  Craig?

10  A      Yes.  In a different way, though.  With Penny Craig

11  he -- in the middle of talking to Penny he took a newspaper, a

12  full newspaper, and opened it and started reading it.  So I was

13  distracted because I'm watching him and I'm watching her trying

14  to figure out if she's offended by this.  Does she realize what

15  he's doing?  But, yeah, it was a mess.

16  Q      And is it fair to say that you found that sort of

17  behavior in the midst of your attempts to interview these

18  mitigation witnesses to be disruptive?

19  A      Yes.

20  Q      Did you speak up to Mr. Owen?

21  A      No.

22  Q      And why not?

23  A      I think part of it -- I'm sorry.  I think part of it

24  was I didn't want to rock the boat.

25  Q      You had already heard that Ms. Rickert had been fired?

1    A      And I just started my private practice and I didn't

2    want to be fired.

3    Q      And, I'm sorry, Ms. Waller, but I'm going to ask the

4    record reflect Ms. Waller is crying.  Is it fair to say that

5    you're crying because that's embarrassing to admit now?

6    A      Yeah.  I mean, I feel really bad about it because I

7    should have, you know, said something.

8    Q      Was there a point at which Mr. Owen sort of stepped

9    back and became less involved in the case?

10   A      Yeah.  When he was -- he was demoted at some point and

11   he became less involved, but in a way it honestly got worse in

12   the fact that he was never less -- he was always in his office

13   with the door shut and Stephanie in there and then he wanted me

14   in there.  So that almost made it harder in a way because if I

15   wasn't in there, he was mad.  But, you know, a lot of times

16   they were just in there talking.  It wasn't even --

17   Q      But he would want you to just hang out in his office?

18   A      Yeah.  Honestly, I don't know why, but maybe I think he

19   was kind of lonely, right, and there was a lot of -- boy, at

20   that point you walked in that office you could feel the tension

21   in the public defender's office.  It was really rough.

22   Q      You said that you didn't do a lot of work that you

23   would normally do in terms of making chronologies, looking for

24   red flags.  Did you attempt to highlight some things for the

25   team in terms of pitfalls that they should avoid?  I'm thinking

1   specifically about Lisa's children.

2   A       Yeah.  I was worried about the children because, I

3   mean, you know, their truth is their truth and their experience

4   is their story; and, at best, I think Lisa was going to look

5   like a mean mother.  At worst, she was going to look abusive.

6   Q       Let me show you Movant's Exhibit 130.  Does this appear

7   to be a memo you wrote in this case?

8   A       Yeah.  Yes.

9   Q       Let me show you here over on, I believe it's page 3,

10  directing your attention to Strategies, slash, Points to

11  Consider.  If you would just read those first couple of

12  sentences.

13  A       If I can read it.  "It's going to come out that Lisa

14  was mean to these kids at certain points.  Chelsea felt Lisa

15  was mean to them all, but especially to her."

16  Q       So this was a memo you presented to the defense team;

17  is that correct?

18  A       Yes.

19  Q       And was that you attempting to sort of flag for the

20  lawyers information that you learned that they should consider

21  in their strategy?

22  A       Yes.

23  Q       That's why it's labeled Strategies/Points to Consider?

24  A       And I talked to them about it too a little bit, but

25  they didn't really -- you know, they didn't want to hear that.

1    Q      I want to talk for a moment about some work on the case

2    of which I know you were a little bit proud.  You were the

3    investigator who insisted on finding Diane Mattingly; is that

4    right?

5    A      Yes.

6    Q      And I phrased it that way "insisted on finding."  Why

7    had the team not found Ms. Mattingly before you were involved?

8    A      Because Ron Ninemire adopted a child and he -- the

9    idea of somebody coming in years later and interviewing her

10   about a past family really upset him, and he didn't want to

11   interrupt -- I mean, at that point we had no idea what her life

12   was like.  He didn't want to interrupt her life

13   Q      So Mr. Ninemire was more concerned about this person he

14   didn't know, hadn't met than he was about his client, Ms.

15   Montgomery?

16   A      I think he felt paternal towards her, you know, he was

17   projecting because of his own daughter and all those things.

18   Q      You've described several instances where you feel

19   ashamed that you didn't speak up.  Why is it you were able to

20   speak up in that instance and insist that Ms. Mattingly be

21   located?

22   A      I had a different relationship with Ron.  Ron and I

23   were friendly, and I didn't feel that Ron was going to -- Ron

24   didn't have the ability to fire me either; but, you know, Ron

25   wasn't disrespectful to me when he disagreed with me.

```
1   Q      Let me stop you there.  Were the lawyers disrespectful
2   to you when they disagreed?
3   A      I mean, I felt they were.  I mean, I felt it was pretty
4   clear I wasn't -- if I wasn't on board, it wasn't welcomed.  My
5   input just wasn't welcomed.
6   Q      So if you said something that wasn't what they already
7   thought, they weren't interested?
8   A      No.
9          THE COURT:  Are you talking about David Owen or all
10  the lawyers?
11         THE WITNESS:  You know, I'm talking more about
12  David, but there were a few times that Fred made it pretty
13  clear he wasn't interested in what I thought or was doing.
14  Q      (By Ms. Harwell)  And we'll talk about a couple of
15  those instances in just a moment.  I do want to ask you a
16  little bit more about Ms. Mattingly before we get to that.  You
17  traveled to Kentucky with Mr. Ninemire and met with Ms.
18  Mattingly at her home?
19  A      Yes.
20  Q      I believe she -- in fact, she just testified she'd only
21  been married for a month?
22  A      Yes.
23  Q      And her new husband was sitting there.  She just
24  testified that she had never told anyone all the things she
25  told you and Mr. Ninemire.  Was that an emotional interview;
```

1   fair to say?

2   A      Yes.

3   Q      Did you feel like one of -- that Ms. Mattingly needed

4   to be visited by the team again before she came and testified?

5   A      Yes, definitely.

6   Q      Did you make that assessment known to the team?

7   A      Yes, I did.

8   Q      Who specifically did you let know?

9   A      You know, for some reason I was thinking it came down

10  to Fred, because I remember at some point Fred and I were going

11  to go there and talk to her together.

12  Q      If at one point you were planning a trip with Mr.

13  Duchardt to Kentucky in September before the October trial,

14  does that coincide with your memory?

15  A      Yes.

16  Q      Did that trip happen?

17  A      No.  I think he -- I think he said, like, he had it

18  under control and if he needed me, he'd let me know.

19  Q      Do you remember whether you were present for Mr.

20  Duchardt's -- immediately before Ms. Mattingly testified, prep

21  of her testimony?

22  A      I don't remember a lot about it.

23  Q      I'm going to show you Exhibit 1-283.  I believe that

24  reflects an interview you had with a man named David Kidwell in

25  March of '07; is that fair?

1    A        Yes.

2    Q        Do you remember this interview?

3    A        Some of it, yes.

4    Q        Do you remember whether you would have shared this

5    interview memo with the team?

6    A        Yes, I did.

7    Q        I'm going to turn to the second page.  And I will ask

8    you if you see here on -- in the second paragraph that Mr.

9    Kidwell told you that, "Lisa told him that sometimes Jack would

10   come home drunk with his friends and make her perform

11   sexually"?

12   A        Yes.

13   Q        After you sent that memo to the defense team, what

14   follow-up did they request you to do with Mr. Kidwell?

15   A        None.

16   Q        What follow-up did you do with Mr. Kidwell?

17   A        None.

18   Q        Ms. Waller, you served a subpoena on Mr. Kidwell in the

19   summer of 2007.  Do you recall doing that?

20   A        Yes, slightly.  I don't have real clear memories, but I

21   think that was a task that was assigned me.

22   Q        Did -- do you remember him coming to court and

23   testifying?

24   A        I wasn't -- yeah.  I mean, he was there but I don't

25   remember it specifically.

1    Q      Did you provide all of your confidential memos of your
2    investigation to the trial team?
3    A      Yes.
4    Q      Let's talk about the instances you referred to with the
5    Court when the Court asked you about Mr. Duchardt's treatment
6    of you.  Did you and Mr. Duchardt attend any team meetings
7    together?
8    A      Yes.  We were at a few team meetings.  He was there.
9    Q      What about Mr. O'Connor?
10   A      I don't remember him being there very much, maybe once,
11   I think, maybe.
12   Q      Do you recall any notable interaction with Mr.
13   O'Connor?
14   A      I remember one time I made a genogram, which you do in
15   every case.
16   Q      Is that with Mr. O'Connor?  I'm asking --
17   A      I'm sorry.  What was the question?
18   Q      I'm asking you if you had any significant interaction
19   with Mr. O'Connor.
20   A      Mr. O'Connor.  Okay.  I do remember walking up to him
21   to ask him something and he said to me something like, I don't
22   think you should wear that shirt.  It's cut too low.
23   Q      Is that the only significant memory you have of
24   interacting with John O'Connor?
25   A      That's the only memory I have.

1    Q       Let's talk about Mr. Duchardt.  What do you remember

2    about interacting with Mr. Duchardt?

3    A       The things that stick out in my mind are, like I said,

4    I made this genogram, which generally you do, and it shows

5    sequential damage, and I had it in the office and I just showed

6    it to him and he looked at it and pushed it aside and said, I

7    can't make heads or tails out of this and walked away, but it

8    was -- he was annoyed by me.  That was my sense of it.

9    Q       Was this another instance where you felt dismissed and

10   did not go forward?

11   A       Well, yeah, I mean, that was not what was wanted.

12   Q       Was there anytime where you sought Mr. Duchardt out for

13   advice or to talk about the case?

14   A       Yeah.  We were -- yes.  We were at a conference.  We

15   were going to be at the same conference together and I started

16   getting a little panicky and I pulled him aside --

17   Q       Let me stop you right there.  You and I went back and

18   looked through that you were at a conference in Dallas in March

19   of 2007.  Does that seem like the right conference?

20   A       Right.

21   Q       So that would be shortly before the April trial date's

22   approaching.  And you said you were starting to get panicky.

23   Tell the Court why.  What do you mean?

24   A       Well, I always had this low-level anxiety happening but

25   I was -- like that sick feeling in your stomach that you are on

1571

1   a sinking ship and there is no way to get off this, and I just

2   thought I needed to say something to somebody, and so I pulled

3   him aside and asked him if I could talk to him.

4   Q       And how did that go?  What did you say?

5   A       I mean, he was polite.  I just said that I was

6   concerned that it wasn't going well and --

7   Q       When you say "it wasn't going well," what wasn't going

8   well?

9   A       David Owen's preparation for sentencing -- sentencing

10  in general.  I just -- I didn't feel like it was together and

11  it was going well, and I didn't feel like David knew what he

12  was doing, and I was worried about how it was all going to go.

13  Q       And is that what you expressed to Fred?

14  A       Yes.

15  Q       And what was Mr. Duchardt's response?

16  A       He told me not to worry about it and that he would take

17  care of it and that was it.

18  Q       Let's talk about your role, then, at the trial.  The

19  case got continued from that April setting to October of 2007.

20  Is it fair to say that for most of the trial your role was sort

21  of transporting witnesses, making sure people were here to go

22  on the stand when they were supposed to be?

23  A       Yes.

24  Q       Did you get to watch much of the testimony?

25  A       I don't recall watching much of it.

1    Q      Did you notice that there was anyone at the defense

2    counsel table that you did not know?

3    A      Fred's -- I later was told it was Fred's wife and I

4    can't remember her name.

5    Q      But there was someone you didn't recognize?

6    A      Right.

7    Q      Had you ever seen that person before you came to court?

8    A      No.

9    Q      She'd not been at team meetings or anything?

10   A      No.

11   Q      And you learned ultimately that it was Mr. Duchardt's

12   wife?

13   A      Right.

14   Q      What were you told about why she was at counsel table?

15   A      Well, I was told that she had been working with Lisa

16   and that she was a therapist who had been working with Lisa and

17   had a relationship with Lisa.

18   Q      And then as the trial was progressing, did you actually

19   talk with her?

20   A      Yes.  I talked to her in some small room somewhere at

21   some point making small conversation with her.

22   Q      Like when a jury was out or something like that?

23   A      Yeah.  We were standing there so I started talking to

24   her.

25   Q      And what did you ask her about?

```
1    A       I asked about being a therapist, where she went to

2    school, how long she had been a therapist, and just making

3    small talk.  She said, I'm not a therapist.

4    Q       And did that kind of take you aback?

5    A       I said, Oh, I'm sorry.  I don't know what I said.  Oh,

6    I'm sorry, I thought you were a therapist, and I asked her I

7    don't know why I would think that.  She said what I do is I

8    work with horses and I put impaired children -- I don't know

9    the details but something about impaired children and horses.

10   Q       In your role as the sort of witness transportation

11   going in and out of the courtroom, did you have a chance to

12   observe Ms. Montgomery's mother, Judy Shaughnessy, sitting in

13   the hallway?

14   A       Yes, I did.

15   Q       What did you see Ms. Shaughnessy doing in the hallway?

16   A       She was saying -- she was saying things to witnesses

17   that were going to testify.

18   Q       Like?

19   A       I specifically remember it was Becky Perkey.  There was

20   one of Jack's -- I think Becky Perkey, and she said something

21   about -- it was a threat, you know, something like, We all have

22   secrets or you don't -- I don't remember.  Something about

23   you've got plenty to hide too or something trying to get this

24   woman from not testifying to whatever she was afraid she was

25   going to testify to.
```

```
 1    Q       I assume that was somewhat alarming to you?

 2    A       Yes.

 3    Q       Did you make the lawyers aware of that?

 4    A       I actually told Ron.  I said something to Ron Ninemire

 5    and he said something to the lawyers, or he said he said

 6    something to the lawyers.

 7    Q       After the trial was over, I assume you spent some time

 8    with the team at least briefly?

 9    A       Very briefly, yes.

10    Q       And did you have a chance to observe the lawyers'

11    attitudes about how Ms. Montgomery's children's testimony had

12    gone?

13    A       They were angry and they felt betrayed.

14    Q       And when you say "they," does that include Mr.

15    Duchardt?

16    A       Yes.  It was the general consensus is my recollection

17    of it is they felt betrayed by the children's testimony.

18    Q       Ms. Waller, a moment ago when I showed you

19    Exhibit 1-283, the interview you did of Mr. Kidwell, you began

20    to weep.  Why are you so emotional about your failure to follow

21    up on this interview?

22    A       You know, because that's what -- that's what a

23    mitigation specialist should do.  There is important

24    information that would impact the trajectory of somebody's life

25    and be significant in their functioning and it requires
```

1     follow-up and rapport building.  It requires so much more that

2     it didn't get.

3      Q      And yet you passed the information you did receive to

4     trial counsel?

5      A      Yes.

6      Q      And at that point your work was being directed and

7     guided by a lawyer?

8      A      Yes.

9             MS. HARWELL:  If I could have one moment, Your

10    Honor.

11            I don't have any further questions.

12            MR. KETCHMARK:  No questions, Your Honor.

13            THE COURT:  All right.  Thank you, Ms. Waller.

14            THE WITNESS:  Thank you.

15            (Witness excused.)

16            THE COURT:  Do you have another witness?

17            MS. HENRY:  We do.  She'll be quite lengthy.  Could

18    we start with her today and finish her tomorrow?

19            THE COURT:  Sure.

20            MS. HENRY:  Your Honor, movant calls Dr. Kate

21    Porterfield.  Could I have a moment to set up the PowerPoint?

22            THE COURT:  All right.

23            THE WITNESS:  Your Honor, I forgot my glasses.

24    Could I go retrieve them?

25            THE COURT:  Sure.  Go ahead.

```
 1                THE WITNESS:  Sorry about that.
 2                THE COURT:  That's all right.
 3    KATHERINE PORTERFIELD, being sworn by the courtroom deputy,
 4    testified:
 5    DIRECT EXAMINATION BY MS. HENRY:
 6    Q      Good afternoon, Dr. Porterfield.  If you could state
 7    your name for the record and spell your last name for the court
 8    reporter, please.
 9    A      Katherine Porterfield, P-o-r-t-e-r-f-i-e-l-d.
10    Q      And, Dr. Porterfield, how are you employed?
11    A      I'm a psychologist at Bellevue Hospital and NYU School
12    of Medicine.
13    Q      And how long have you been a psychologist?
14    A      I've been a psychologist since 1998.
15    Q      Where did you receive your education?
16    A      I did my undergraduate at Georgetown University, and
17    then I did my master's degree in clinical psychology at the
18    University of Michigan, then my doctorate in clinical
19    psychology also at University of Michigan.
20    Q      And are you licensed as a psychologist?
21    A      Yes, licensed psychologist.
22    Q      Can you tell us about -- let me ask you this:  You
23    testified that you were at Bellevue, because I spaced out?
24    A       Yes.  I'm employed at Bellevue Hospital and the NYU
25    School of Medicine, but I didn't say the name of the clinic,
```

1    which is the Bellevue NYU Program for Survivors of Torture.

2    Q      What is the Survivors of Torture program?

3    A      So it's a clinic at Bellevue Hospital and NYU School of

4    Medicine where we treat individuals who have come from

5    situations of either refugee, trauma, war, or situations of

6    frank torture.  So we serve individuals coming from all over

7    the world from various war zones and places in which there are

8    human rights abuses such as torture.

9              Our clinic is multidisciplinary.  That means we

10   provide medical, mental health, and social services care to our

11   clients, and I'm one of the staff psychologists, supervisors,

12   and just staff members there.

13   Q      How do you get your patients?  How do they come to you?

14   A      Our patients at the Bellevue NYU program come from a

15   variety of sources.  Some are referred to us by attorneys.

16   Some hear of us by word of mouth.  We see folks from over 70

17   different countries.  So sometimes someone might hear about us

18   through another person from their community.  So they might

19   meet another person from Guinea or from Congo or from Kosovo

20   and they'd say, Oh, you should go to Bellevue.  They provide

21   help.

22   Q      Have you worked with sex trafficking victims?

23   A      I have worked with survivors of sexual violence, gang

24   rape, and forced prostitution, so yes.

25   Q      And have you also worked with crime victims, victims of

1    rape, helping them to prepare their testimony for court or just

2    to be able to testify for court?

3    A      I've worked with individuals who because of their --

4    some kind of abuse or violence against them were going to be

5    needed to testify about it in a court.  It wasn't always --

6    it's not a criminal case.  It could be a human rights case.

7    So, for instance, a war crime trial or also in the context of

8    someone I treated who might be applying for political asylum

9    and they may be getting ready to testify regarding that.  So

10   I've worked with people doing that kind of work as well.

11   Q      Can you give the Court the best description of the type

12   of psychology that you practice?

13   A      Yes.  I'm a clinical psychologist.  I was trained in

14   general clinical psychology as well as child and adolescent

15   psychology.  I did my internship at a child and family clinic

16   at the University of Michigan.  That's an APA-approved

17   internship.  And I -- as well as a child inpatient unit at the

18   University of Michigan.

19            I also did a postdoctoral training, fellowship at a

20   clinic in New York City for children and adolescents.  So my

21   training is both broad clinical psychology as well as child,

22   adolescent, and family work, and my current specialty of the

23   last 15 -- actually probably now 17 years is working with

24   survivors of trauma.

25   Q      Can you give us an example -- well, do you do work with

1   NGF (ph) International Association?

2   A       I do at times.  I've been asked to give trainings to

3   organizations that go out into the field and have to conduct

4   interviews with survivors of rape and other mass kinds of

5   violence.

6            I also consult with organizations who deal with

7   journalists who have been traumatized in the field, so

8   organizations, for instance, that are trying to provide those

9   journalists with help and they will call me in.  I'll do a

10  consultation or in some cases treatment with a traumatized

11  journalist.

12  Q       Like a journalist who's been kidnapped in another

13  country and held --

14  A       Correct.

15  Q       -- tortured and comes back to the United States?

16           You're somebody they're going to reach out to?

17  A       Yes.  I have done several consultations on that.

18  Q       Can you give us an example of -- you mentioned some

19  international work.  Have you recently done some work with The

20  Hague?

21  A       Yes.  I recently was part of a training for the

22  prosecutor team at The Hague working on a particular case, and

23  I was part of the faculty who prepared them to examine

24  witnesses in a war crime trial.

25  Q       And what is The Hague?

1    A       Oh, sorry.  Technically it's the international criminal

2    court and it's in The Hague, often referred to as The Hague.

3    It's an international criminal court that was put together by

4    several -- by the United Nations and parties that sign treaties

5    to participate in order to bring to justice situations of human

6    rights violations, genocide, crimes against humanity that could

7    not be put into jurisdictions elsewhere.

8    Q       Have you -- do you have any ad hoc editorial positions?

9    A       Yes.  I periodically review articles for a variety of

10   journals that, you know, will ask -- because the article might

11   be something in my expertise so I'll be asked to review the

12   article, give my recommendations for acceptance or revision.

13   Q       Can you describe your teaching experience for the

14   Court, please?

15   A       Well, since I've been at Bellevue NYU, I'm considered a

16   clinical instructor so I do a lot of supervising of trainees.

17   I supervise interns, externs, psychiatric residents.  I've

18   taught different courses to the residents and interns as well

19   as do a fair amount of guest lecturing.

20            I also conduct a lot of public -- presentations at

21   law schools or psychological organizations, hospitals, clinics,

22   things like that.  I do a lot of teaching that's presentation

23   based as well as at Bellevue NYU as an instructor.

24   Q       Do you instruct students in appropriate methods or

25   methodologies in interviewing survivors of trauma?

1    A        Sure.  I've done that plenty of time, but if I'm asked

2    to do a course on, you know, how -- conducting interviews with

3    trauma survivors, that might be a particular workshop or course

4    that I would do, either do a lecture on or lead the course.

5    Q        And is there a specialty involved with interviewing

6    survivors of trauma?

7    A        Well, certainly I think the field of psychology has

8    developed a very deep body now of knowledge about how survivors

9    of trauma have a particular vulnerability in accounting trauma

10   because of what trauma actually does to one physically, and so

11   the process, then, of interviewing someone is a very sensitive

12   process that one needs to know how to do in the best way

13   possible; and by best way possible, I mean you're trying to

14   reduce harm, but you're also trying to get accurate information

15   and then perhaps use that information for whatever context

16   you're in, whether that's a clinician trying to do treatment or

17   someone making recommendations for treatment, or in a human

18   rights trial where you need to have information in front of a

19   Court or in like this, a criminal matter.

20   Q        Have you published in your field of study?

21   A        I have published some articles regarding treatment,

22   evaluation, and care of torture survivors.

23   Q        And have you given many public presentations?

24   A        I have.  I've given a fair number of talks.  As I said,

25   workshops, trainings, you know, sometimes it's an hour around

1    the hospital.  Sometimes it's a day-long program, just depends

2    on the request.

3                MR. KETCHMARK:  Again, Your Honor, her CV is an

4    exhibit that's been preoffered and admitted.  I'm not

5    challenging her qualifications or her background or experience.

6                MS. HENRY:  I was just moving from the CV.

7                THE COURT:  All right.

8    Q     (By Ms. Henry)  Dr. Porterfield, well, showing you --

9    because I've switched off the Elmo -- Movant's Exhibit No. 9,

10   does that appear to be your curriculum vitae?

11   A     Yes.

12   Q     And is that the most up-to-date version of your

13   curriculum vitae?

14   A     I believe so, yes.

15   Q     Thank you.

16                MS. HENRY:  Your Honor, given government's

17   stipulation, we would move that Dr. Porterfield be accepted as

18   an expert in clinical psychology with a specialty in trauma.

19                THE COURT:  All right.  I will accept her opinions.

20                MS. HENRY:  Thank you, Your Honor.

21   Q     (By Ms. Henry)  Dr. Porterfield, it's fair to say you

22   were retained by my office earlier this year; is that correct?

23   A     That's correct.

24   Q     And I asked you to perform an evaluation of Lisa

25   Montgomery and help us in assisting her trauma history; is that

1    correct?

2    A      That's correct.

3    Q      And in order to do that, I gave you a number of

4    documents and exhibits; is that fair to say?

5    A      Yes, that is.

6    Q      Including the biopsychosocial history of Ms. Jan

7    Vogelsang; is that correct?

8    A      That's correct.

9    Q      You have not had an opportunity to review the

10   PowerPoint presentation that has been admitted into evidence in

11   this case, have you, that Ms. Vogelsang --

12   A      Correct.  I have not.

13   Q      But you were present in the courtroom to hear Ms.

14   Vogelsang's testimony; is that correct?

15   A      Yes.

16   Q      And you were also present in the courtroom to hear the

17   testimony of Ms. Montgomery's biological half sister, Diane

18   Mattingly; is that also correct?

19   A      That's correct.

20   Q      And you had not met Ms. Mattingly prior to testifying

21   here?

22   A      I have not.

23   Q      In addition to reviewing the numerous records -- and

24   we'll get into that probably a little bit more tomorrow.  But

25   in addition to reviewing the records, did I ask you to conduct

1   some in-person interviews?

2   A      Yes.  So I was asked to evaluate Mrs. Montgomery, so

3   those were in-person interviews, and I was also -- well, I

4   actually asked to interview a witness, Mr. Kidwell, when he

5   came forward with some information that I was interested in

6   hearing firsthand.

7   Q      And so after you interviewed Mr. Kidwell, did you then

8   go and visit with Mrs. Montgomery again?

9   A      I did.

10  Q      And the Court has heard a little bit about Mr. Kidwell,

11  and we'll get back to him when we get into the symptomatology

12  that you observed and his descriptions of Mrs. Montgomery, but

13  for today's purposes, is it fair to say that your clinical

14  observations of Mrs. Montgomery as well as the descriptions of

15  Mrs. Montgomery's behavior by Mr. Kidwell were confirmatory of

16  your opinions in your original report?

17  A      That's correct.

18  Q      And, Dr. Porterfield, did you prepare two reports in

19  this case?

20  A      I did.

21  Q      Did you prepare one report dated April 22nd, 2016?

22  A      Yes.

23  Q      And I'm going to show you what's previously been

24  admitted into evidence as Movant's Exhibit No. 7, and I'll ask

25  you to take a look at that and tell us if that is in fact the

1    report that you prepared?

2    A       It is.

3    Q       And, I'm sorry, I should have grabbed the other one.

4    Dr. Porterfield, showing you Movant's Exhibit No. 8, what is

5    that document?

6    A       This is the letter that I sent as an addendum to my

7    previous report dated October 10th.

8    Q       Thank you.

9    A       May I keep a copy for questions or no?

10   Q       Yes.

11   A       Of both.  Thank you.

12   Q       And, Dr. Porterfield, was the purpose of that addendum

13   to summarize the additional information that you had received

14   after reviewing Ms. Vogelsang's supplemental declaration as

15   well as your interview of Mrs. Montgomery, your interview of

16   Mr. Kidwell, and your review of additional documents that had

17   been coming in through the investigation of the case?

18   A       Yes.

19   Q       And did you list in your supplemental addendum all of

20   the documents that were relevant to you in summarizing your

21   opinions?

22   A       I did.

23   Q       And specifically, Dr. Porterfield, was the referral

24   question that we presented to you whether or not -- or did we

25   ask you to assess and describe the impact of physical

1    maltreatment, sexual and emotional abuse and neglect that Ms.

2    Montgomery survived as a child and adolescent on her later

3    psychological and emotional functioning?

4    A       Yes, that was the referral question.

5    Q       And we asked you to do that in your capacity as a

6    clinical psychologist; is that fair to say?

7    A       Correct.

8    Q       You're not a forensic psychologist; is that fair?

9    A       That's correct.

10   Q       And you were aware that your report was going to be

11   considered by other members of the multidisciplinary team of

12   experts that will be testifying on behalf of Mrs. Montgomery;

13   is that correct?

14   A       Yes.

15   Q       And so we did not ask you to reach an opinion as to

16   competency; is that true?

17   A       Correct.

18   Q       We just asked you to use your expertise in trauma and

19   tell us how that affected Lisa?

20   A       Yes.

21   Q       In doing so, Dr. Porterfield, did you also review the

22   testimony of Dr. Martell and Dr. Park Dietz in the underlying

23   criminal case?

24   A       Yes, testimony and reports.

25   Q       And was there something in particular about those --

1  their testimony that stood out to you as you were -- that you

2  kept in the back of your mind when you were evaluating Lisa

3  Montgomery?

4   A     Well, I mean, there's -- there was a particular

5  construct that both of the gentlemen used that I felt was

6  really important to understand in terms of both my evaluation

7  of Ms. Montgomery as well as understanding the opinions that

8  they reached and that was the concept about the sexual abuse

9  she suffered as a child.

10  Q     And specifically did you read where Dr. Martell

11  testified that it was his understanding -- testified in front

12  of the jury that it was his understanding that Lisa Montgomery

13  was a willing participant in the sexual abuse that she

14  experienced from the ages of 14 to 15 years old?

15  A     You said Dr. Martell, correct?

16  Q     Yes.

17  A     Yes.  That's right.

18  Q     And did you also read that Dr. Dietz testified that

19  there was a question in his mind as to whether or not Lisa

20  Montgomery had consented to the sexual abuse that had been

21  perpetrated upon her by her much older 52-year-old stepfather

22  when she was a young teenager?

23  A     My memory of that was in the report, Dr. Dietz' report.

24  I actually don't recall at this moment if it was in the

25  testimony.

1    Q      Okay.  But if it's there, you wouldn't quibble with it?

2    A      Correct.

3    Q      And why was that important to you to consider?

4    A      Well, I was asked to examine Ms. Montgomery's child and

5    adolescent development and history in the context of

6    experiences of trauma, maltreatment, sexual abuse, emotional

7    abuse, and neglect; and, as I do that, I am going to be looking

8    at not just Ms. Montgomery's history and what occurred in her

9    life, what happened to her, what people describe about what

10   happened to her, but I'm also going to be looking at Ms.

11   Montgomery herself, how she acts presently and also how people

12   describe her in the past.  So you're looking at sort of this

13   tapestry of data that is historical as well as current, and

14   then what you're doing is analyzing that data in the context of

15   your expertise and what you know about children's development

16   and trauma.

17           So when I find in the course of extensive data,

18   extensive witness reports and Ms. Montgomery's own report that

19   she at age 14 was raped repeatedly over the course of two

20   years, that having been preceded, by the way, of at least two

21   years of what we would call grooming, sexual fondling and

22   building towards the rape, that's very important to me in then

23   understanding Ms. Montgomery's development afterwards, her

24   development as an adolescent girl going into those later teen

25   years and going into her young adulthood; and the reason is

1    that traumatic event of rape, repeated rape by a father would

2    have devastating consequences on a young girl's development,

3    which I'm happy to talk about it.  If I could go now to your

4    question.

5    Q      Sure.

6    A      Sorry.  When I saw the two mental health experts had

7    examined Ms. Montgomery, had heard the story of her being

8    repeatedly raped for several years both from her and from

9    others and determined that that was consensual, it led me to

10   have great concerns about the conclusions that were reached by

11   those two mental health experts, because in my mind if you are

12   looking at a 14-year-old child who's been repeatedly raped and

13   you're calling it consensual, then I'm not sure how a mental

14   health expert could view that -- the functioning then of that

15   person through a proper and appropriate and scientifically

16   based lens, which is that a child that had been raped is

17   deeply, deeply damaging to kids.

18            So those constructs of consent were very important

19   to me in understanding the previous mental health examination

20   of Ms. Montgomery vis-à-vis then my own evaluation and own

21   belief how she was affected.

22   Q      Thank you.

23            MS. HENRY:  Your Honor, I believe it's about 5 p.m.

24   and this would be a good place for us to break with Dr.

25   Porterfield.

1          THE COURT:  We'll do that.  Thank you, Doctor.  See

2     you in the morning.

3          THE WITNESS:  Okay.

4          THE COURT:  Anything we need to talk about before we

5     go?

6          MR. VALENTI:  I don't think so, Your Honor, no.

7          THE COURT:  All right.  Nine o'clock tomorrow

8     morning.  Thank you.

9          (Court adjourned at 5 p.m. until 9 a.m. Tuesday,

10    November 8, 2016.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25