# Ex. 5

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI


LISA M. MONTGOMERY,             )
                                      )
                 Movant,       )
                                        )
       vs.                   )   Case No.
                                        )   12-CV-08001-GAF
UNITED STATES OF AMERICA,     )
                                        )
              Respondent.   )


TRANSCRIPT OF PROCEEDINGS - VOLUME VII
BEFORE THE HONORABLE GARY A. FENNER
UNITED STATES DISTRICT JUDGE
NOVEMBER 8, 2016
KANSAS CITY, MISSOURI


FOR THE MOVANT:
    MS. KELLEY J. HENRY
    MS. AMY D. HARWELL
    Office of the Federal Public Defender
    810 Broadway Street, Suite 200
    Nashville, Tennessee 37203

    MS. LISA G. NOURI
    526 Holmes
    Kansas City, Missouri 64108




    Proceedings recorded by mechanical stenography, transcript
produced by computer




KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106

APPEARANCES
(continued)

FOR THE RESPONDENT:
        MR. JEFFREY E. VALENTI
        MR. DAVID M. KETCHMARK
        United States Attorney's Office
        400 East Ninth Street, Suite 5510
        Kansas City, Missouri 64106

I N D E X                          Page

OCTOBER 31, 2016

VOLUME I

MOVANT'S EVIDENCE

RUSSELL STETLER
      Direct examination by Ms. Harwell. . . . . . . . .   55
      Cross-examination by Mr. Valenti . . . . . . . . .  135
      Redirect examination by Ms. Harwell. . . . . . . .  156
      Recross-examination by Mr. Valenti . . . . . . . .  157

MARC BOOKMAN
      Direct examination by Ms. Henry. . . . . . . . . .  159
      Cross-examination by Mr. Valenti . . . . . . . . .  215

I N D E X                                           Page
(continued)

NOVEMBER 1, 2016

VOLUME II

RONALD E. WURTZ
     Direct examination by Ms. Henry. . . . . . . . . . .   276

BRET DILLINGHAM
     Direct examination by Ms. Henry. . . . . . . . . . .   288
     Cross-examination by Mr. Valenti . . . . . . . . . .   308
     Redirect examination by Ms. Henry. . . . . . . . . .   312

ANITA BURNS
     Direct examination by Ms. Nouri. . . . . . . . . . .   313

STEPHANIE ELLIOTT
     Direct examination by Ms. Nouri. . . . . . . . . . .   330

TROY SCHNACK
     Direct examination by Ms. Nouri. . . . . . . . . . .   361
     Cross-examination by Mr. Valenti . . . . . . . . . .   383

SUSAN HUNT
     Direct examination by Ms. Nouri. . . . . . . . . . .   386
     Cross-examination by Mr. Valenti . . . . . . . . . .   423

LISA RICKERT
     Direct examination by Ms. Harwell. . . . . . . . . .   428
     Cross-examination by Mr. Ketchmark . . . . . . . . .   453

KURT LIPANOVICH
     Direct examination by Ms. Harwell. . . . . . . . . .   460
     Cross-examination by Mr. Valenti . . . . . . . . . .   470

I N D E X                                        Page
(continued)

NOVEMBER 2, 2016

VOLUME III

RICHARD BURR
     Direct examination by Ms. Henry. . . . . . . . . .   523
     Cross-examination by Mr. Ketchmark . . . . . . . .   594
     Redirect examination by Ms. Henry. . . . . . . . .   607
     Recross-examination by Mr. Ketchmark . . . . . . .   611

JUDY CLARKE
     Direct examination by Ms. Henry. . . . . . . . . .   612

LAINE CARDARELLA
     Direct examination by Ms. Nouri. . . . . . . . . .   683

HOLLY JACKSON
     Direct examination by Ms. Harwell. . . . . . . . .   693

DEBRA GARVEY
     Direct examination by Ms. Henry. . . . . . . . . .   719
     Cross-examination by Mr. Valenti . . . . . . . . .   761

I N D E X                                                       Page
(continued)

NOVEMBER 3, 2016

VOLUME IV

DAVID FREEDMAN
        Direct examination by Ms. Henry. . . . . . . . . .   811
        Cross-examination by Mr. Ketchmark . . . . . . . .   855

ROBERT PETER FUCETOLA
        Direct examination by Ms. Henry. . . . . . . . . .   862
        Cross-examination by Mr. Valenti . . . . . . . . .   885

ERIN GARMAN
        Direct examination by Ms. Henry. . . . . . . . . .   897
        Cross-examination by Mr. Ketchmark . . . . . . . .   908

CHRIS ARMSTRONG
        Direct examination by Ms. Henry. . . . . . . . . .   911

WILLIAM LOGAN
        Direct examination by Ms. Henry. . . . . . . . . .   920
        Cross-examination by Mr. Valenti . . . . . . . . .   971

MARILYN ANN HUTCHINSON
        Direct examination by Ms. Henry. . . . . . . . . .   982
        Cross-examination by Mr. Valenti . . . . . . . . .  1060

I N D E X                                    Page
(continued)

NOVEMBER 4, 2016

VOLUME V

CHRISTOS DAVATZIKOS
     Direct examination by Ms. Henry. . . . . . . . . . .  1120
     Cross-examination by Mr. Valenti . . . . . . . . . .  1165
     Redirect examination by Ms. Henry. . . . . . . . . .  1179

ANDREW NEWBERG
     Direct examination by Ms. Henry. . . . . . . . . . .  1182
     Cross-examination by Mr. Valenti . . . . . . . . . .  1236

CAMILLE ELIZABETH KEMPKE
     Direct examination by Ms. Henry. . . . . . . . . . .  1245
     Cross-examination by Mr. Valenti . . . . . . . . . .  1254

RUTH BOUTIN KUNCEL
     Direct examination by Ms. Henry. . . . . . . . . . .  1255
     Cross-examination by Mr. Valenti . . . . . . . . . .  1290
     Redirect examination by Ms. Henry. . . . . . . . . .  1302

I N D E X                                    Page
(continued)

NOVEMBER 7, 2016

VOLUME VI

CHARLES N. SANISLOW
     Direct examination by Ms. Henry. . . . . . . . . .  1363
     Cross-examination by Mr. Valenti . . . . . . . . .  1441
     Redirect examination by Ms. Henry. . . . . . . . .  1455
     Recross-examination by Mr. Valenti . . . . . . . .  1456

JANET VOGELSANG
     Direct examination by Ms. Harwell. . . . . . . . .  1460
     Cross-examination by Mr. Ketchmark . . . . . . . .  1531
     Redirect examination by Ms. Harwell. . . . . . . .  1534
     Recross-examination by Mr. Ketchmark . . . . . . .  1535

DIANE MATTINGLY
     Direct examination by Ms. Harwell. . . . . . . . .  1538

DANIELLE WALLER
     Direct examination by Ms. Harwell. . . . . . . . .  1553

KATHERINE PORTERFIELD
     Direct examination by Ms. Henry. . . . . . . . . .  1577

```
                I N D E X                         Page
                (continued)

             NOVEMBER 8, 2016

                VOLUME VII
```

KATHERINE PORTERFIELD (resumed)
      Direct examination by Ms. Henry (cont'd.). . . . . . 1636
      Cross-examination by Mr. Ketchmark . . . . . . . . . 1706
      Redirect examination by Ms. Henry. . . . . . . . . . 1709

SIDDHARTHA NADKARNI
      Direct examination by Ms. Harwell. . . . . . . . . . 1711
      Cross-examination by Mr. Valenti . . . . . . . . . . 1740
      Redirect examination by Ms. Harwell. . . . . . . . . 1744

GEORGE WASHINGTON WOODS, JR.
      Direct examination by Ms. Harwell. . . . . . . . . . 1746
      Cross-examination by Mr. Valenti . . . . . . . . . . 1847
      Redirect examination by Ms. Harwell. . . . . . . . . 1861

JOHN O'CONNOR
      Direct examination by Ms. Henry. . . . . . . . . . . 1864

I N D E X                              Page
(continued)

NOVEMBER 9, 2016

VOLUME VIII

JOHN O'CONNOR (resumed)
      Direct examination by Ms. Henry (cont'd.). . . . . .  1951
      Cross-examination by Mr. Valenti . . . . . . . . .  1994
      Redirect examination by Ms. Henry. . . . . . . . .  2022
      Recross-examination by Mr. Valenti . . . . . . . .  2025

RUBEN GUR
      Direct examination by Ms. Henry. . . . . . . . . .  2028
      Cross-examination by Mr. Valenti . . . . . . . . .  2098
      Redirect examination by Ms. Henry. . . . . . . . .  2127
      Recross-examination by Mr. Valenti . . . . . . . .  2129

GEORGE PARNHAM
      Direct examination by Ms. Henry. . . . . . . . . .  2131

DAVID OWEN
      Direct examination by Ms. Henry. . . . . . . . . .  2136
      Cross-examination by Mr. Valenti . . . . . . . . .  2153
      Redirect examination by Ms. Henry. . . . . . . . .  2177
      Recross-examination by Mr. Valenti . . . . . . . .  2186

FRED DUCHARDT
      Direct examination by Ms. Harwell. . . . . . . . .  2189

                            I N D E X                        Page
                           (continued)

                       NOVEMBER 10, 2016

                         VOLUME IX

FRED DUCHARDT
      Direct examination by Ms. Harwell (cont'd.). . . . .  2263
      Cross-examination by Mr. Ketchmark . . . . . . . . .  2273

BEN LEONARD
      Direct examination by Ms. Henry. . . . . . . . . . .  2324
      Cross-examination by Mr. Valenti . . . . . . . . . .  2327

Movant's closing argument . . . . . . . . . . . . . . . .  2331

Respondent's closing argument . . . . . . . . . . . . . .  2359

Movant's rebuttal closing argument. . . . . . . . . . . .  2374

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | Declaration and supplemental declaration of Janet Vogelsang | 52 | 52 |
| 1-1 | Declaration of Thomas Allen Hedberg | 52 | 52 |
| 1-2 | Declaration of Lisa Rickert with interviews | 52 | 52 |
| 1-3 | Birth certificate of Marie Josephine Miller | 52 | 52 |
| 1-4 | Death certificate of Marie Josephine Miller | 52 | 52 |
| 1-5 | Declaration of Mary Lee Coleman | 52 | 52 |
| 1-6 | Declaration of John Joseph Patterson | 52 | 52 |
| 1-7 | Military records of John Joseph Patterson | 52 | 52 |
| 1-8 | Declaration of Christina Juarez Patterson | 52 | 52 |
| 1-9 | Declaration of Diane Rae Mattingly | 52 | 52 |
| 1-10 | Medical records of Mary Lee Coleman | 52 | 52 |
| 1-11 | Declaration of Heath Hedberg | 52 | 52 |
| 1-12 | Declaration of Lon Mac Hedberg Yates | 52 | 52 |
| 1-13 | Mary Lee Hedberg Coleman Gray Junior High | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-14 | School records of Desiree Boman | 52 | 52 |
| 1-15 | Marriage certificate of Robert Lee Patterson and Marie Miller | 52 | 52 |
| 1-16 | Birth certificate of Robert Lee Patterson | 52 | 52 |
| 1-17 | Draft card of Robert Lee Patterson | 52 | 52 |
| 1-18 | Declaration of Grace A. Figg Baum | 52 | 52 |
| 1-19 | Declaration of Wendy Alexander Treibs | 52 | 52 |
| 1-20 | Death certificate of Robert Patterson | 52 | 52 |
| 1-21 | Declaration of Ronald J. Figg | 52 | 52 |
| 1-22 | Enlistment records of Gordon Hedberg | 52 | 52 |
| 1-23 | Marriage license of John Hedberg/Joyce Hammer | 52 | 52 |
| 1-24 | Welfare report on Diane Hedberg | 52 | 52 |
| 1-25 | Riley County records on Diane Hedberg | 52 | 52 |
| 1-26 | Letter from Kings County on Diane Hedberg | 52 | 52 |
| 1-27 | Home Study on Hope Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-28 | Birth certificate of Judy Rignell | 52 | 52 |
| 1-29 | Testimony of Desiree Boman | 52 | 52 |
| 1-30 | Interview of Ron Gieck | 52 | 52 |
| 1-31 | Declaration of Teddy Kleiner | 52 | 52 |
| 1-32 | SSA earnings of Judy Shaughnessy | 52 | 52 |
| 1-33 | Certificate of still birth | 52 | 52 |
| 1-34 | Divorce decree of Leo Barabash/Judy Rignell | 52 | 52 |
| 1-35 | Divorce decree of John Hedberg/Judy Hedberg | 52 | 52 |
| 1-36 | Certificate of live birth of Lisa Marie Hedberg | 52 | 52 |
| 1-37 | Interview of Patty Hedberg | 52 | 52 |
| 1-38 | Marriage certificate of Jack Kleiner/Judy Hedberg | 52 | 52 |
| 1-39 | Divorce transcript of Kleiner v. Kleiner | 52 | 52 |
| 1-40 | Interview of Jerri Jo Kleiner Leonard | 52 | 52 |
| 1-41 | Second declaration of Tommy Lee Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-42 | Marriage license of Judy Boman/Hector Ochoa | 52 | 52 |
| 1-43 | Petition for divorce in Ochoa v. Ochoa | 52 | 52 |
| 1-44 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-45 | Declaration of Dani Waller | 52 | 52 |
| 1-46 | Declaration of Jessica Marie Robinson Thompson Brown | 52 | 52 |
| 1-47 | Mental health report of Diane Hedberg | 52 | 52 |
| 1-48 | Interview of Diane Rae Hedberg Mattingly | 52 | 52 |
| 1-49 | Death certificate of Jack Kleiner | 52 | 52 |
| 1-50 | Obituary information of Jack Kleiner | 52 | 52 |
| 1-51 | Records on Penny Craig | 52 | 52 |
| 1-52 | Divorce of Willadean Kleiner/Jack Kleiner | 52 | 52 |
| 1-53 | Telephone call summary of Josie Kleiner | 52 | 52 |
| 1-54 | Interview of Teddy Kleiner | 52 | 52 |
| 1-55 | Interview with Penny Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-56 | Interview with Tommy Kleiner | 52 | 52 |
| 1-57 | Declaration of Holly Jackson | 52 | 52 |
| 1-58 | Mental health exam of Teddy Kleiner | 52 | 52 |
| 1-59 | Vacation Bible School certificate | 52 | 52 |
| 1-60 | School records for Lisa Montgomery | 52 | 52 |
| 1-61 | School records for Lisa Montgomery | 52 | 52 |
| 1-62 | Declaration of John Francisco | 52 | 52 |
| 1-63 | Art certificate for Lisa Montgomery | 52 | 52 |
| 1-64 | Reading certificate for Lisa Montgomery | 52 | 52 |
| 1-65 | Medical records for Lisa Montgomery | 52 | 52 |
| 1-66 | Spelling award for Lisa Montgomery | 52 | 52 |
| 1-67 | Good citizenship award for Lisa Montgomery | 52 | 52 |
| 1-68 | Lisa Montgomery report to parents | 52 | 52 |
| 1-69 | Declaration of Eunice Copeland | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-70 | Declaration of Kenneth Alexander | 52 | 52 |
| 1-71 | Medical records for Kenneth Alexander | 52 | 52 |
| 1-72 | Kenneth Alexander Florida State Hospital | 52 | 52 |
| 1-73 | SSDI records for Kenneth Alexander | 52 | 52 |
| 1-74 | Kenneth Alexander Snowy Range Consulting | 52 | 52 |
| 1-75 | Kenneth Alexander Wyoming Behavioral | 52 | 52 |
| 1-76 | Kenneth Alexander Wyoming State Hospital | 52 | 52 |
| 1-77 | Kenneth Alexander admission note | 52 | 52 |
| 1-78 | School transcript for Lisa Montgomery | 52 | 52 |
| 1-79 | Declaration of Chelsea Boman Veal | 52 | 52 |
| 1-80 | Declaration of Jonathan Caleb Thompson | 52 | 52 |
| 1-81 | Declaration of Marvin Alexander | 52 | 52 |
| 1-82 | Declaration of Becky Purkey | 52 | 52 |
| 1-83 | Declaration of Jacqueline Moffett | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-84 | Declaration of Jeff Batson | 52 | 52 |
| 1-85 | Declaration of Penny Craig | 52 | 52 |
| 1-86 | Declaration of David L. Owen, Jr. | 52 | 52 |
| 1-87 | Declaration of Alice Mae Derry | 52 | 52 |
| 1-88 | Declaration of Mary Osborn Hodges | 52 | 52 |
| 1-89 | Declaration of Janet McNickle Eastman | 52 | 52 |
| 1-90 | Declaration of Rachael Bowman Johnson | 52 | 52 |
| 1-91 | Declaration of Brenda Cox | 52 | 52 |
| 1-92 | Interview with Lewis Priest | 52 | 52 |
| 1-93 | Tarrant County records of Jeff Batson | 52 | 52 |
| 1-94 | Interview of Allen Baldwin | 52 | 52 |
| 1-95 | Death certificate of Nils Rignell | 52 | 52 |
| 1-96 | Interview of Susan Barrow-Swartz | 52 | 52 |
| 1-97 | Declaration of Susan Barrow-Swartz | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-98 | Declaration of Nita Milburn Montgomery | 52 | 52 |
| 1-99 | Lisa Montgomery, Project Upward Bound | 52 | 52 |
| 1-100 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-101 | Interview of Patty Baldwin | 52 | 52 |
| 1-102 | Counseling records of Lisa Montgomery | 52 | 52 |
| 1-103 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-104 | Divorce file of Boman v. Boman | 52 | 52 |
| 1-105 | Declaration of Carl James Boman | 52 | 52 |
| 1-106 | Declaration of Richard Leroy Boman | 52 | 52 |
| 1-107 | School transcript of Lisa Montgomery | 52 | 52 |
| 1-108 | Enlistment records of Lisa Montgomery | 52 | 52 |
| 1-109 | School records of Michael Boman | 52 | 52 |
| 1-110 | School records of Michael Boman | 52 | 52 |
| 1-111 | State of Kansas v. Carl Boman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-112 | Declaration of Ann Walker-King | 52 | 52 |
| 1-113 | Michael Boman Mar Vista High School | 52 | 52 |
| 1-114 | Declaration of David J. Stadler | 52 | 52 |
| 1-115 | Marriage certificate of Carl Boman/Lisa Hedberg | 52 | 52 |
| 1-116 | Birth certificate of Desiree Boman | 52 | 52 |
| 1-117 | Declaration of Darlene Alexander | 52 | 52 |
| 1-118 | C.J. Boman Deming School records | 52 | 52 |
| 1-119 | Birth certificate of C.J. Boman | 52 | 52 |
| 1-120 | SS statement of Lisa Montgomery | 52 | 52 |
| 1-121 | 1988 datebook | 52 | 52 |
| 1-122 | Birth records of C.J. Boman Jane Phillips | 52 | 52 |
| 1-123 | Competency exam of Kenneth Alexander | 52 | 52 |
| 1-124 | Jane Phillips - early labor for C.J. | 52 | 52 |
| 1-125 | 1989 datebook | 52 | 52 |
| 1-126 | Scripps Memorial Hospital Operative Report | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-127 | Medical records of Carl Boman | 52 | 52 |
| 1-128 | Carl Boman - C.B. Pettigrew, D.O. | 52 | 52 |
| 1-129 | Declaration of Gerald Upshaw | 52 | 52 |
| 1-130 | Birth records of Kayla Boman | 52 | 52 |
| 1-131 | Post-birth records of Kayla Boman | 52 | 52 |
| 1-132 | Kayla Boman Children's Hospital San Diego | 52 | 52 |
| 1-133 | C.J. Boman admitting physical exam | 52 | 52 |
| 1-134 | Desiree Boman, H&P exam | 52 | 52 |
| 1-135 | Children's Hospital San Diego | 52 | 52 |
| 1-136 | C.J. Boman Children's Hospital San Diego | 52 | 52 |
| 1-137 | Chelsea Boman, Scripps Memorial Hospital | 52 | 52 |
| 1-138 | Children's Hospital San Diego concussion | 52 | 52 |
| 1-139 | Discharge summary for Desiree Boman | 52 | 52 |
| 1-140 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-141 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-142 | Lisa Montgomery, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-143 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-144 | School records of Desiree Boman | 52 | 52 |
| 1-145 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-146 | C.J. Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-147 | Declaration of Eithol Marie Boman Towery | 52 | 52 |
| 1-148 | Order Author. Disc of Records under protective order | 52 | 52 |
| 1-149 | Telephone interview of Brett Owens | 52 | 52 |
| 1-150 | Lisa Montgomery statement to Dr. Brian Shane | 52 | 52 |
| 1-151 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-152 | Divorce file in Boman v. Boman | 52 | 52 |
| 1-153 | Divorce decree of Kenneth Alexander/ Kimberly Alexander | 52 | 52 |
| 1-154 | Radiology report of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-155 | School records of Desiree Boman | 52 | 52 |
| 1-156 | Lisa Montgomery Tulsa Community College | 52 | 52 |
| 1-157 | School records of Desiree Boman | 52 | 52 |
| 1-158 | School records of Chelsea Boman | 52 | 52 |
| 1-159 | School records of Desiree Boman | 52 | 52 |
| 1-160 | Interview of Carl Boman | 52 | 52 |
| 1-161 | Interview of Roberta and James Upshaw | 52 | 52 |
| 1-162 | Medical records of Lisa Montgomery | 52 | 52 |
| 1-163 | School records of Chelsea Boman | 52 | 52 |
| 1-164 | School records of Kayla Boman | 52 | 52 |
| 1-165 | School records of Desiree Boman | 52 | 52 |
| 1-166 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-167 | Declaration of Kayla Deanne Boman | 52 | 52 |
| 1-168 | Declaration of Carl James Boman II | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-169 | Tommy Kleiner, Case No. 99-CR-3250 | 52 | 52 |
| 1-170 | C.J. Boman, Stormont Vail Regional Health | 52 | 52 |
| 1-171 | Lisa Montgomery, St. Francis records | 52 | 52 |
| 1-172 | Kevin Montgomery, St. Francis records | 52 | 52 |
| 1-173 | Montgomery v. Montgomery No. 97D-192 | 52 | 52 |
| 1-174 | Declaration of Kevin Montgomery | 52 | 52 |
| 1-175 | School records of Desiree Boman | 52 | 52 |
| 1-176 | School records of Chelsea Boman | 52 | 52 |
| 1-177 | School records of C.J. Boman | 52 | 52 |
| 1-178 | School records of Kayla Boman | 52 | 52 |
| 1-179 | Medical records of Kayla Boman | 52 | 52 |
| 1-180 | Workers' Comp claim of Lisa Montgomery | 52 | 52 |
| 1-181 | Interview of Teddy Kleiner | 52 | 52 |
| 1-182 | Medical records of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-183 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-184 | Motion to temporarily stay child support | 52 | 52 |
| 1-185 | SS statement of Kevin Montgomery | 52 | 52 |
| 1-186 | C.J. Boman, St. Francis Hospital | 52 | 52 |
| 1-187 | Chelsea Boman, St. Francis Hospital | 52 | 52 |
| 1-188 | Desiree Boman, St. Francis Hospital | 52 | 52 |
| 1-189 | Lisa Montgomery, Lawrence Memorial Hos. | 52 | 52 |
| 1-190 | Kevin Montgomery, St. Francis Hospital | 52 | 52 |
| 1-191 | Alias citation in contempt | 52 | 52 |
| 1-192 | Medical records of Desiree Boman | 52 | 52 |
| 1-193 | USA v. Montgomery No. 05-06-002 | 52 | 52 |
| 1-194 | Lisa Montgomery, St. Francis Hospital | 52 | 52 |
| 1-195 | School transcript of Desiree Boman | 52 | 52 |
| 1-196 | Kayla Boman, Carroll High School | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-197 | Declaration of Vanita June Boman | 52 | 52 |
| 1-198 | Declaration of Cheryl Fine | 52 | 52 |
| 1-199 | Notes of Dr. Sallye Wilkinson | 52 | 52 |
| 1-200 | Physical exam of Kayla Boman | 52 | 52 |
| 1-201 | Physical exam of C.J. Boman | 52 | 52 |
| 1-202 | Physical exam of Chelsea Boman | 52 | 52 |
| 1-203 | Chelsea Boman, Newman Memorial Co. Hospital | 52 | 52 |
| 1-204 | Sports physical of Kayla Boman | 52 | 52 |
| 1-205 | School records of Chelsea Boman | 52 | 52 |
| 1-206 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-207 | Justin Kleiner, The Farm History | 52 | 52 |
| 1-208 | Bonnie Jean Taylor and Teddy Kleiner Power of Attorney | 52 | 52 |
| 1-209 | Hospital records of C.J. Boman | 52 | 52 |
| 1-210 | Teddy Kleiner, intake and social history | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-211 | The Farm Court Report on Justin Kleiner | 52 | 52 |
| 1-212 | Interview of Lori Colwell | 52 | 52 |
| 1-213 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-214 | Interstate Compact on placement of children | 52 | 52 |
| 1-215 | Bonding out of Tommy Kleiner | 52 | 52 |
| 1-216 | Tommy Kleiner, Frankin County | 52 | 52 |
| 1-217 | Shaughnessy home study | 52 | 52 |
| 1-218 | Screening records of Justin Kleiner | 52 | 52 |
| 1-219 | Justin Kleiner, case log for monthly family contact | 52 | 52 |
| 1-220 | Hospital records for Chelsea Boman | 52 | 52 |
| 1-221 | Employment records of Lisa Montgomery | 52 | 52 |
| 1-222 | Cotton O'Neal Clinic | 52 | 52 |
| 1-223 | Kansas v. Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-224 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-225 | Kansas v. Tommy Kleiner, No. 98-CR-1335 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-226 | Interview of Kevin Montgomery | 52 | 52 |
| 1-227 | Death certificate of Lori Diane Blalock | 52 | 52 |
| 1-228 | Declaration of Jenny Hays | 52 | 52 |
| 1-229 | Request for leave form | 52 | 52 |
| 1-230 | State of OK v. Teddy Kleiner, No. CM-1999-3081 | 52 | 52 |
| 1-231 | Mental health and class report on Teddy Kleiner | 52 | 52 |
| 1-232 | Letter to Kevin from Lisa | 52 | 52 |
| 1-233 | Coffey Health Systems v. Montgomery, No. 2004-LM-0108 | 52 | 52 |
| 1-234 | James McMurray, DDS account history rpt. | 52 | 52 |
| 1-235 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-236 | Montgomery v. Shaughnessy, No. 2004-DM-23 | 52 | 52 |
| 1-237 | Patient discharge sheet of Chelsea Boman | 52 | 52 |
| 1-238 | Chelsea Boman, Waverly Medical Clinic | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-239 | School transcript of C.J. Boman | 52 | 52 |
| 1-240 | Medical records of Desiree Boman | 52 | 52 |
| 1-241 | Discharge from duty for Chelsea Boman | 52 | 52 |
| 1-242 | Discharge from duty for Kayla Boman | 52 | 52 |
| 1-243 | Tommy Kleiner v. Nina Green, No. 05-DM-226 | 52 | 52 |
| 1-244 | Interview of Cheryl Fine | 52 | 52 |
| 1-245 | Interview of Lisa Green | 52 | 52 |
| 1-246 | Kansas v. Tommy Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-247 | Interview of Katheryn Dewey | 52 | 52 |
| 1-248 | School transcript of Kayla Boman | 52 | 52 |
| 1-249 | Interview of Kayla Boman | 52 | 52 |
| 1-250 | Interview of Mona Marcotte | 52 | 52 |
| 1-251 | Physical evidence glove box 1B15(18) | 52 | 52 |
| 1-252 | Evidence retrieved from house | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-253 | School records of Desiree Boman | 52 | 52 |
| 1-254 | Hospital records of Mary Lee Coleman | 52 | 52 |
| 1-255 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-256 | Interview of Lisa Green | 52 | 52 |
| 1-257 | Home study of Judy Shaughnessy | 52 | 52 |
| 1-258 | Diane Rae Hedberg adoption registry | 52 | 52 |
| 1-259 | Central Assembly of God church, promotion beginner to primary | 52 | 52 |
| 1-260 | Central Assembly of God church, promotion primary to junior dept. | 52 | 52 |
| 1-261 | Pease Middle School records | 52 | 52 |
| 1-262 | Medical records for Wendy Treibs | 52 | 52 |
| 1-263 | Email from Lisa Montgomery to Lori Colwell | 52 | 52 |
| 1-264 | Home study on Judy and Danny Shaughnessy | 52 | 52 |
| 1-265 | Shield of Service discharge summary for Teddy Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-266 | Montgomery v. Kleiner No. 03-DM-198 | 52 | 52 |
| 1-267 | Motion for modification of child support | 52 | 52 |
| 1-268 | History and physical of Carl Boman | 52 | 52 |
| 1-269 | Waiver of parental rights for Justin Kleiner | 52 | 52 |
| 1-270 | Case activity log for monthly family contact for Justin Kleiner | 52 | 52 |
| 1-271 | Psychiatric evaluation for Lisa Montgomery | 52 | 52 |
| 1-272 | Department of Human Services report | 52 | 52 |
| 1-272-1 | Neuropsychological evaluation of Lisa Montgomery | 52 | 52 |
| 1-273 | Jim Dale Eastom sex offender registry | 52 | 52 |
| 1-274 | Declaration of Dylan Montgomery | 52 | 52 |
| 1-275 | Residences chart of Lisa Montgomery | 52 | 52 |
| 1-276 | Declaration of Dustin Montgomery | 52 | 52 |
| 1-277 | Child abuse-neglect referral form | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-278 | Report to the district attorney | 52 | 52 |
| 1-279 | Child abuse-neglect referral form | 52 | 52 |
| 1-280 | Photograph | 52 | 52 |
| 1-281 | Declaration of Ben Leonard | 52 | 52 |
| 1-282 | 1999 Oklahoma DHS records | 52 | 52 |
| 1-283 | Interview of David Kidwell, Sr. | 52 | 52 |
| 1-284 | Declaration of Carl Boman | 52 | 52 |
| 1-285 | Declaration of Leon Michael Barabash | 52 | 52 |
| 1-286 | Declaration of James N. Miller | 52 | 52 |
| 1-287 | Declaration of Michael Harlow | 52 | 52 |
| 1-288 | Declaration of Sang Ye Seiffert | 52 | 52 |
| 1-289 | Declaration of Dr. Sallye Wilkinson | 52 | 52 |
| 1-291 | Declaration of Bret Dillingham | 52 | 52 |
| 1-292 | Declaration of Desiree Boman Offutt | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-293 | Chronology of disruption of child custody | 52 | 52 |
| 2 | Curriculum vitae of Janet Vogelsang | 52 | 52 |
| 3 | Residential map of Lisa Montgomery | 52 | 52 |
| 4 | Genogram | 52 | 52 |
| 5 | Chart of mental health symptoms | 52 | 52 |
| 6 | Chart of traumatic events | 52 | 52 |
| 7 | Report of Katherine Porterfield | 52 | 52 |
| 8 | Addendum to report of Katherine Porterfield | 52 | 52 |
| 9 | Curriculum vitae of Katherine Porterfield | 52 | 52 |
| 10 | Declaration of David Kidwell | 52 | 52 |
| 11 | Declaration of Ben Leonard re: David Kidwell | 52 | 52 |
| 12 | Declaration of Wesley Gann | 52 | 52 |
| 13 | Declaration of Carl Boman | 52 | 52 |
| 14 | Declaration of Linda Baker | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 15 | Declaration of Ben Leonard re: Linda Baker | 52 | 52 |
| 16 | Lisa Montgomery handwritten note | 52 | 52 |
| 17 | Kleiner v. Kleiner divorce proceedings | 52 | 52 |
| 18 | Obituary of Gerald "Shorty" Shipley | 52 | 52 |
| 19 | Declaration of Carl McClain | 52 | 52 |
| 20 | Report of George Woods | 52 | 52 |
| 21 | Addendum to report of George Woods | 52 | 52 |
| 22 | Curriculum vitae of George Woods | 52 | 52 |
| 23 | Report of Siddhartha Nadkarni | 52 | 52 |
| 24 | Declaration of Diane Bradford | 52 | 52 |
| 25 | Curriculum vitae of DiAnne Bradford | 52 | 52 |
| 26 | Declaration of Charles Sanislow | 52 | 52 |
| 27 | Curriculum vitae of Charles Sanislow | 52 | 52 |
| 28 | Reports of Ruben Gur | 52 | 52 |
| 29 | 2016 addendum to report of Ruben Gur | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 30 | Curriculum vitae of Ruben Gur | 52 | 52 |
| 31 | Curriculum vitae of Andrew Newberg | 52 | 52 |
| 32 | Testimony of Helen Mayberg | 52 | 52 |
| 33 | Testimony of Alan Evans | 52 | 52 |
| 34 | Report of Helen Mayberg and Alan Evans | 52 | 52 |
| 35 | Curriculum vitae of Christos Davatzikos | 52 | 52 |
| 36 | Deposition of V.S. Ramachandran | 52 | 52 |
| 37 | March 2005 letter of Marilyn Hutchinson | 52 | 52 |
| 38 | Curriculum vitae of Marilyn Hutchinson | 52 | 52 |
| 39 | 3/7/05 report of William Logan | 52 | 52 |
| 40 | 5/15/07 report of William Logan | 52 | 52 |
| 41 | Declaration of William Logan | 52 | 52 |
| 42 | Curriculum vitae of William Logan | 52 | 52 |
| 43 | Report of Ruth Kuncel | 52 | 52 |
| 44 | Curriculum vitae of Ruth Kuncel | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 45 | Report of Robert Fucetola | 52 | 52 |
| 46 | Curriculum vitae of Robert Fucetola | 52 | 52 |
| 47 | Declaration of Russell Stetler | 52 | 52 |
| 48 | Supplemental declaration of Russell Stetler | 52 | 52 |
| 49 | Curriculum vitae of Russell Stetler | 52 | 52 |
| 50 | Declaration of Denise Leboeuf | 52 | 52 |
| 51 | Curriculum vitae of Marc Bookman | 52 | 52 |
| 52 | Report of Lawrence Fox | 52 | 52 |
| 53 | Curriculum vitae of Lawrence Fox | 52 | 52 |
| 54 | Lisa Rickert resignation letter | 52 | 52 |
| 55 | Email from David Owen to Holly Jackson | 52 | 52 |
| 56 | Holly Jackson mitigation themes chart | 52 | 52 |
| 57 | To-do list of Deb Garvey | 52 | 52 |
| 58 | 4/3/07 transcript of proceedings | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59 | 4/5/07 transcript of proceedings | 52 | 52 |
| 60 | Declaration of Susan Hunt | 52 | 52 |
| 61 | Declaration of Phil Thompson | 52 | 52 |
| 62 | Affidavit of David Owen | 52 | 52 |
| 63 | Declaration of Judy Clarke | 52 | 52 |
| 64 | Declaration of Deb Garvey | 52 | 52 |
| 65 | 4/30/06 letter from Susan Hunt to Richard Burr | 52 | 52 |
| 66 | 4/21/06 transcript of proceedings | 52 | 52 |
| 67 | 4/25/06 transcript of proceedings | 52 | 52 |
| 68 | 5/3/06 transcript of proceedings | 52 | 52 |
| 69 | Order banning Judy Clarke from CCA | 52 | 52 |
| 70 | Order regarding Judy Clarke's telephone number | 52 | 52 |
| 71 | Letter from Lisa Montgomery to Judge Fenner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 72 | Deposition of Ray Conrad | 52 | 52 |
| 73 | Declaration of Linda McCandless | 52 | 52 |
| 74 | Declaration of Ben Leonard re: Linda McCandless | 52 | 52 |
| 75 | Declaration of Charles Dedmon | 52 | 52 |
| 76 | Declaration of Melody Brannon | 52 | 52 |
| 77 | 4/5/07 transcript of In Chambers hearing | 52 | 52 |
| 78 | Stipulation regarding Denise Baker | 52 | 52 |
| 79 | Stipulation regarding Hugh Rineer | 52 | 52 |
| 80 | Declaration of James Brooks | 52 | 52 |
| 81 | Grand jury testimony of Park Dietz | 52 | 52 |
| 82 | Billing records of Fred Duchardt | 52 | 52 |
| 83 | Declaration of Chris Armstrong | 52 | 52 |
| 84 | Billing records of John O'Connor | 52 | 52 |
| 85 | CCA visitation records | 52 | 52 |
| 86 | ABA Guidelines 1989 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 87 | Supplementary Guidelines 2008 | 52 | 52 |
| 88 | Guide to Judiciary Policy 2016 | 52 | 52 |
| 89 | Summary of deleted history | 52 | 52 |
| 90 | Amended plan for implementing the Criminal Justice Act | 52 | 52 |
| 91 | Order appointing Federal Public Defender | 52 | 52 |
| 92 | Motion to withdraw | 52 | 52 |
| 93 | Order appointing additional counsel | 52 | 52 |
| 94 | Motion to withdraw | 52 | 52 |
| 95 | 1/27/05 letter from Susan Hunt to CCA Warden | 52 | 52 |
| 96 | Mitigation Investigation: A Duty that Demands Expert Help but Can't Be Delegated | 52 | 52 |
| 97 | Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment | 52 | 52 |
| 98 | Curriculum vitae of David Freedman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 99 | Letter to Susan Hunt from Reuben Camper Cahn | 52 | 52 |
| 100 | The Mystery of Mitigation | 52 | 52 |
| 101 | Records requested chart | 52 | 52 |
| 102 | Witnesses interviewed chart | 52 | 52 |
| 103 | ABA Guidelines 2003 | 52 | 52 |
| 104 | The Defense Team in Capital Cases 2003 | 52 | 52 |
| 105 | A New Profession for an Old Need 2003 | 52 | 52 |
| 106 | Mitigation Evidence in Death Penalty cases | 52 | 52 |
| 107 | Mental Disabilities and Mitigation | 52 | 52 |
| 108 | Commentary on Counsel's Duty to Seek and Negotiate a Disposition | 52 | 52 |
| 109 | Unknown Story of a Motherless Child | 52 | 52 |
| 110 | The ABA Guidelines and Norms | 52 | 52 |
| 111 | Mental Health Evidence and the Capital Defense Function | 52 | 52 |
| 112 | The ABA Guidelines: A Historical Perspective | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 113 | New Strategies for the Defense of Capital Cases | 52 | 52 |
| 114 | The Trial for Life | 52 | 52 |
| 115 | The Penalty Phase Trial | 52 | 52 |
| 116 | The Nelson Case | 52 | 52 |
| 117 | Using the Mitigation Specialist and the Team Approach | 52 | 52 |
| 118 | The Mental Health Evaluation in Capital Cases: Standards of Practice | 52 | 52 |
| 119 | Mitigation Investigation | 52 | 52 |
| 120 | Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation | 52 | 52 |
| 121 | Cultural Competency in Capital Mitigation | 52 | 52 |
| 122 | Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases | 52 | 52 |
| 123 | Why Capital Cases Require Mitigation Specialists | 52 | 52 |
| 124 | Memo from Stephanie Elliott to defense team | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 125 | Curriculum vitae of Siddhartha Nadkarni | 52 | 52 |
| 126 | Affidavit of Lisa Rickert | 52 | 52 |
| 127 | 1/6/05 letter from Lisa Rickert to Ron Ninemire | 52 | 52 |
| 128 | Hallmarks of bipolar disorder | 52 | 52 |
| 129 | Contract of Dani Waller | 52 | 52 |
| 130 | 9/12/06 memo from Dani Waller to team | 52 | 52 |
| 131 | Chart of similar cases | 52 | 52 |
| 132 | 3/5/05 letter from Susan Hunt to Isaac Johnson | 52 | 52 |
| 133 | Attorney timeline | 52 | 52 |
| 134 | Letter from John David Luton | 52 | 52 |
| 135 | The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert/Lay Testimony | 52 | 52 |
| 136 | U.S.D.C. Docket sheet | 52 | 52 |
| 137 | Notes by Roseann Ketchmark | 52 & 1954 | 52 & 1954 |
| 138 | Notes by Roseann Ketchmark | 52 & 1962 | 52 & 1962 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 139 | Fred Duchardt's email to Department of Justice | 52 | 52 |
| 140 | Dillingham billing statement | 295 | 296 |
| 141 | Dillingham billing statement | 297 | 297 |
| 142 | Deposition of Tommy Kleiner | 475 | 476 |
| 143 | Report of Robert Fucetola | 876 | 876 |
| 144 | Chart | 885 | 885 |
| 145 | Contact notes | 905 | 905 |
| 146 | MMPI-2 report | 1070 | 1070 |
| 147 | Raw data | 1070 | 1070 |
| 148 | Printout from MIMneuro | 1232 | 1233 |
| 152 | Robert Fucetola's MMPI report | 1421 | 1421 |
| 153 | PAI report | 1456 | 1456 |
| 154 | Janet Vogelsang's Biopsychosocial History report | 1530 | 1530 |
| 155 | Katherine Porterfield's report | 1705 | 1705 |
| 157 | Memo of Fred Duchardt | 1988 | 1988 |
| 158 | Leona Hayes file | 1965 | 1965 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 159 | Dr. Woods PowerPoint | 2216 | 2216 |
| 160 | 2/12/07 fax memo from Fred Duchardt | 2323 | 2324 |
| 161 | Declaration of Torres | 2327 | 2327 |
| 162 | Torres jury questionnaire | 2326 | 2326 |

FOR THE RESPONDENT:

| | | | |
|---|---|---|---|
| 41 | Statement of John O'Connor | 2022 | 2022 |
| 42 | Statement of Fred Duchardt | 2277 | 2277 |
| 44 | 2014 truncated transcript | 2329 | 2330 |
| 45 | Judge Gaitan's order on Nelson 2255 | 2329 | 2330 |

1       NOVEMBER 8, 2016

2       MORNING SESSION

3       (Court in session at 9 a.m.)

4       THE COURT:  Good morning.

5       Ready, Ms. Henry?

6       MS. HENRY:  Yes, Your Honor.

7       THE COURT:  All right.

8       MS. HENRY:  Movant recalls Dr. Kate Porterfield.

9       THE COURT:  Doctor, I'll have you sworn again since

10  it's a new day.

11  KATHERINE PORTERFIELD, being sworn by the courtroom deputy,

12  testified:

13  DIRECT EXAMINATION (continued) BY MS. HENRY:

14  Q     Dr. Porterfield, yesterday afternoon I was asking you

15  about the difference between clinical work and forensic work,

16  and I'd like to revisit that because I forgot to ask you one

17  question there and that is with respect to the nature of

18  clinical work.  Do clinical psychologists only treat patients?

19  A     No.  Clinical psychologists can perform a range of

20  tasks and functions based on their training, but treatment,

21  caring for people, providing therapy is one of the tasks, one

22  of the skills that you receive training, but it's not the only

23  context in which you're trained as a psychologist.

24  Q     In fact, you testified yesterday about your work in

25  immigration courts.  What are those evaluations that you

1    conduct?

2     A       So, for instance, another aspect of the training of

3    becoming a clinical psychologist is you learn to perform

4    assessments, evaluation of mental disorders.  You learn to

5    perform treatment, therapy, and you are able to formulate

6    diagnoses and treatment plans.

7              So for my work at the Bellevue NYU program,

8    Survivors of Torture, I spoke about yesterday, much of our work

9    is -- much of my work is evaluation.  So I will evaluate a

10   potential new client of the program.  I will assess their

11   history, determine if the individual meets criteria to be

12   accepted into our program.  That has nothing to do with

13   providing treatment.

14             Additionally, for many of my clients who I do end up

15   treating, I will sometimes perform an evaluation, then testify

16   in immigration court about their mental disorder coming out of

17   torture.

18    Q       And, in fact, most of your testimony -- in fact, almost

19   all of the testimonial work that you've done in courts has been

20   in the context of immigration; is that correct?

21    A       The bulk of it, yes.

22    Q       You testified it's really -- it's two or three times in

23   criminal cases before today?

24    A       That would be -- this is the third.

25    Q       And one of the times that you testified, was that for

1    the prosecution in a child murder case?

2    A      Correct.

3    Q      Thank you.  I appreciate you helping me go back through

4    that.

5    A      Excuse me.  This is the fourth.

6    Q      Okay.  So two times with defense and once with the

7    prosecution in the child murder case?

8    A      Correct.

9    Q      Now, Dr. Porterfield, you spoke yesterday about the

10   fact that you conducted an evaluation of Mrs. Montgomery for

11   the referral question, which we won't go back and repeat

12   because that's already in the record.  Did you prepare a

13   PowerPoint slide that would help us get through your testimony

14   as quickly as possible?

15   A      I did.

16   Q      And would it assist the Court and the parties in

17   understanding your conclusions for us to go through those

18   slides?

19   A      I believe so, yes.

20   Q      And the first of those slides is up on the screen

21   today, and we're not going to read verbatim everything on the

22   slides, but could you begin with a summary of your conclusions

23   with respect to Lisa Montgomery?

24   A      Sure.  My conclusions essentially as they appear there

25   is that Ms. Montgomery, that her childhood and adolescent

1    experiences of trauma, victimization, and neglect had a

2    massively deleterious effect on her development and her

3    functioning and capacities, and that these impairments are well

4    studied and well researched in the literature as impairments

5    that come from developmental alterations that happen to abused

6    children.

7         I then summarized, as you see on the slide, that her

8    difficulties fall in the realm of what we call chronic or

9    complex posttraumatic stress from ongoing trauma as well as

10   bipolar disorder and very severe dissociative symptomatology.

11   Q    And, Dr. Porterfield, is there a methodology that you

12   follow which is generally accepted in your field?

13   A    Yes.  So the --

14   Q    Can you describe that methodology?

15   A    Yes.  So the methodology involves how you collect data

16   and what data you collect when you are trying to make

17   conclusions about an individual's mental functioning, and so

18   for -- the standard is to conduct a clinical interview and as

19   much record review and what you would think of as sort of

20   collateral information as possible.

21        For this case that was really my two sort of prongs

22   of data.  The first prong would be information regarding Ms.

23   Montgomery's history of her life and her development, and that

24   came from everything from records to witnesses to her life,

25   whether those be professional people who encountered her or

1    family members or other people who knew her.  Of course, Ms.

2    Montgomery's history of her own life, so her own report as well

3    as any other expert testimony that had been done around her and

4    her life.  And then I also interviewed another witness, Mr.

5    Kidwell, regarding her history.

6          That second prong, then, is the clinical condition

7    and any data that will -- so that first is history.  The second

8    is what about her functioning?  What was she like?  How did she

9    act?  How does she act now?  And that data you get from that

10   clinical interview that I mentioned.  You also get it from any

11   records that describe her functioning.  How was she?  What did

12   she act like as a young person?  As well as witnesses'

13   testimony about what was Ms. Montgomery like.  So that's sort

14   of the two prongs I'm looking at.

15   Q     Is there a scientific basis for that methodology?

16   A     Absolutely.  When you conduct an evaluation, you have

17   the data; but as a medical professional, you need to interpret

18   that data and analyze it, and you want to do that through

19   literature and the foundation scientifically in your field that

20   undergirds what you're looking at.  So for me that's a set of

21   data that comes out of, first of all, normal childhood

22   development.  Very important to understand what is a normal,

23   good enough childhood.  How do you develop in that?

24          I looked at some data, which I can briefly

25   summarize, from something call the ACE Study, the Adverse

1   Childhood Experiences Study.  The neurobiological research that

2   underpins our understanding of what happens to kids who get

3   abused was very important to me in understanding Ms.

4   Montgomery's functioning, my own clinical knowledge from

5   working for the past 18 years with traumatized people, and, of

6   course, the clinical literature about the diagnoses such as

7   posttraumatic stress, complex trauma; in other words, the

8   literature that talks about what do people who have abuse

9   backgrounds struggle with then.

10   Q      Is it generally accepted in your field to use these

11   sources of science in order to interpret the data you discussed

12   in the slide previously?

13   A      Yes.  You need to take that data you've amassed and

14   understand it through a lens of the field, you know, my field

15   being psychology.

16   Q      And is it important for the Court to understand what a

17   normal childhood development, what you called good enough child

18   development is in order to understand your interpretations of

19   Ms. Montgomery?

20   A      I believe there's a few points that are important to

21   understanding about how a child grows that then will be

22   illustrative of what happens when a child's development is

23   derailed by science.

24   Q      So what is the primary task of normal childhood

25   development?

1    A       Well, so when I think about a growing child, one of the

2    things that's very basic, and our field has really demonstrated

3    this, is that child infancy, from being a baby up until growing

4    into adulthood, has this sort of overwhelming task as an

5    organism, a human organism.  We call that biopsychosocial

6    regulation.

7            I can be fairly brief on this.  But what the idea of

8    biopsychosocial regulation is that baby from infancy to adult

9    is learning to control and recognize his or her self, his body

10   functions, her senses, her perceptions of the world, her

11   feelings, her interactions, meaning the child is growing to

12   learn how to manage being an organism in the world.

13           So a quick example would be an infant lying in a

14   crib who experiences discomfort from a wet diaper.  That child

15   at four or five months old has no other capacity except one,

16   which is to cry, right?  So what that child does is they exert

17   the one regulatory process they can do, vocalization, to

18   express body doesn't feel good.  What you hope in normal

19   childhood, again, good enough childhood is that environment

20   will respond to that child.  So that baby's going to lie there

21   and a warm face is going to appear that picks the baby up,

22   holds the baby, comforts the baby and says, Oh, we've got to

23   change that diaper, and changes that diaper.

24           All of that description I just gave is just one

25   little moment, right, in the life of that organism that's

1    growing to learn how to regulate himself or herself, and that

2    is the foundation of what are these actually literally

3    trillions, trillions of neurochemical connections that start to

4    get made for that child about what it means to cry, what it

5    means to be lying there feeling cold.

6              And so -- and I can wrap this up, but what you're

7    learning about when you learn about the regulation capacities

8    of children is the way the child's own needs of their body

9    interact with the environment, and does that environment teach

10   them cry equals comfort or cry equals a number of bad things

11   that can happen to abused children; fear, violence, hurt.

12   That's what regulation is.

13             The reason I said there's trillions of moments

14   because there's actually in the neurochemical wiring of the

15   baby's brain this incredible opportunity that happens over the

16   course of the child's life to make connections, and each of

17   those connections happens as the child interacts with the

18   environment.

19   Q     And I know we're going to talk a little bit more about

20   the neurobiological aspects of trauma, but is that experience

21   that you described, the baby in the crib seeing the warm face,

22   we know that's relevant to Lisa Montgomery because that warm

23   face just wasn't there?

24   A     Correct.

25   Q     But is that seeing the warm face, is that what helps to

1    create what -- I think you've taught me are called mirror

2    neurons?

3    A       Are called what?

4    Q       Is that the mirror neurons?

5    A       Well, I think we talked about just mirroring, right?

6    So this idea that a baby, their first development comes from

7    being seen.  So as they see a face and then they are seeing

8    back, they begin that process of the neurochemical connections

9    that have to do with interpersonal connectivity.

10   Q       And there's a scientific basis for this?

11   A       Oh, absolutely, yes.

12   Q       That science was available in 2007?

13   A       Yes.  I included in your references, as needed, but I

14   do have a bibliography in both my report and in this slide show

15   just about the kind of basis of this scientific work.

16   Q       And so what does the science tell us, then, about how

17   the child learns to regulate?

18   A       I will say -- I'll be brief here.  Just simply that the

19   child regulates the body through the interaction of the

20   environment.  It's not just that it naturally happens that we

21   learn to control ourself.

22           Another quick example, a child grabs -- a

23   three-year-old child grabs a toy from their brother or sister,

24   the environment needs to respond to that.  Again, a good enough

25   response is, Oh, no, we don't grab toys.  Take this back and

1    you go sit.  You grabbed a toy from your brother.  That wasn't

2    nice.  Good enough, right?  A response with the environment

3    says, This is a limit on you, and that teaches the child.

4    Again, another moment of regulation.  I can't grab.  I can't

5    hit.  When I do these things, the environment will respond.

6    That's why it's an interaction and why each thing the child

7    learns from that environment will shape not only the child's

8    behavior but what we now know, it will shape the child's brain

9    development.

10   Q       So now relevant to Lisa Montgomery's case.  What

11   happens to the child when their environment isn't that good

12   enough environment?

13   A       So my clinical evaluation of Ms. Montgomery really

14   yielded a conclusion that her environment was throughout her

15   childhood one of coercion, violence, humiliation, degradation,

16   exploitation.  I mean, it was a very horrible childhood.

17   That's going to lead to an adaptation that children make that

18   is often called in our field survival coping, and it's kind of

19   what it sounds like.  Survival coping -- if you'd like me to

20   continue?

21   Q       Please.

22   A       It's basically a description that the child is going to

23   adapt.  That's the thing about the human organism.  We adapt.

24   So when a child's environment is frightening, the child will

25   adapt to managing fear by having physiological fear protection

1    mechanisms that take place.  Let me give an example.

2    Q      What do you mean by that?

3    A      Yes.  Sorry.  So survival -- I'm going to actually use

4    an example because Ms. Montgomery did one inadvertently, I

5    think, in our interview which is that she was describing at one

6    point being a little girl and having spoken and her mother

7    saying, You don't speak to me, or some way that her mother was

8    angry she had spoken so the mother duct-taped her mouth and

9    made her stand.

10          Frankly, Ms. Montgomery was describing this very

11   offhandedly, and she talked about what I learned.  It's funny.

12   You learn you better not cry too hard because when you cry real

13   hard with duct tape, you can start to get your nose stuffed up,

14   and so I had to learn don't cry too hard because I don't want

15   that nose to get stuffed and I won't be able to breathe.

16          That's an unbelievably disturbing formulation for a

17   child to have to make, right, about how to not suffocate

18   oneself with duct tape?

19          In fact, when she said it, the offhanded thing she

20   then said was, Well, I will just daydream during that.  That is

21   clinically a very important phrase "daydream."

22   Q      Why so?

23   A      Because Ms. Montgomery was not daydreaming at that

24   point.  Daydreaming is the kid sitting in math class and he

25   puts his pencil down and starts looking outside and thinking

1    they want to go play.  What Ms. Montgomery was describing was

2    the beginning of what I'm going to talk about which is of a

3    dissociative style of dealing with stress, fear, and pain,

4    meaning she detached and disconnected.

5            Again, something we now know about scientifically

6    she detached from the fear, from the overwhelming experience.

7    So what she calls daydreams is, in my opinion, the beginning of

8    her learning to dissociate.

9    Q    And how does this survival coping affect the brain?

10   Does it cause brain changes?

11   A    Yes.  This has been really an exploding part of our

12   field for the last 30 years which is that the things that

13   children do under traumatic stress have been shown now to be

14   adaptations that make lasting, permanent changes in the brain.

15           There's three -- I'm really not going to do a big

16   deep dig on the science here but if I could just briefly sort

17   of frame.  There's three major areas the research has looked at

18   what we call the neurochemical aspect of brain development.

19   That's the brain messengers that send signals to us.  The

20   neuroendocrine system, which is the hormonal system which

21   regulates much of the bodily functioning, including response to

22   stress; and the neuroanatomical, meaning simply that brain

23   structure, that actual mass that is the brain.

24           Again, I'm not going to summarize them all here, but

25   I did provide a very lengthy bibliography.  There's extensive

 1   literature on what those changes have been shown to be in

 2   maltreated children.

 3   Q      Let me ask you for just a moment about that.  Was this

 4   information, this science available to clinicians such as

 5   yourself in 2007 when Mrs. Montgomery's case was tried?

 6   A      It was.

 7   Q      Can you just explain, again, briefly.  I know you

 8   prepared a slide about the neurotransmitters and the like.  Can

 9   you briefly summarize --

10   A      Sure.

11   Q      -- these brain changes?

12   A      Again, I'll do it by the categories.  So

13   neurotransmitters are the brain chemicals that connect the

14   synapses of our neurons, those little spaces between the nerves

15   and our brain.  The reason it's interesting -- I said trillion

16   before.  We believe that children have trillions of synapse

17   connectivity moments, meaning moments when things are firing as

18   they are developing, which is kind of an incredible idea, and

19   those -- what we've shown is that the chemicals that go across

20   the synapses that create the connectivity between our nerves

21   and our brains have shown alteration, if you study stressed,

22   traumatized kids, and the alterations are that they have

23   overactivation of some.

24          It depends -- now, I'm not going to break down all

25   these neurotransmitters.  There's overactivation of some of

1    them, there's underactivation of others.  You see impairments,

2    frankly, in the quantity of the chemicals that are in the

3    child's brain and how they're interacting.

4            Sorry.  Do you want me to just say about the

5    neuroendocrine system?

6    Q    Yes.  Sorry.  You're the scientist.  I'm not.  So can

7    you tell us about the neuroendocrine system?

8    A    I can do this quickly.  The neuroendocrine system is

9    our hormonal system that manages stress, the part of our body

10   that handles -- sorry -- the system in our body that handles

11   digestion, alertness, appetite, and it is a deeply sensitive

12   system because it has to handle all of the ways we are as a

13   person.

14           When children are put under severe stress and strain

15   and fear, their neuroendocrine system has now been shown

16   scientifically to have alteration.  I'll give one quick

17   example.  There's something called cortisol that gets released

18   in the body after you've been through something very, very

19   stressful.  So if I were hit by a car and then they took me to

20   the hospital and I was awake, very frightened and then

21   afterwards they quickly took a sample of my saliva, what they'd

22   probably find is that the cortisol in my saliva would be at a

23   very high rate, and that's because that cortisol is what goes

24   kind of pouring into the human body to calm it down after a

25   trauma; and so what we see in traumatized children is they have

1    excessive and under -- they have too much and too little

2    cortisol, depending on -- it's a deeper analysis than I'll do

3    here, but the point is their stress response system is not

4    activating itself in a normal way.  It's activating itself in

5    an overly stressed way.  That's an example of a neuroendocrine.

6    Q      And that can actually affect the changes in the brain

7    as a child?

8    A      Absolutely, yes.  The cortisol particularly has been

9    shown -- there is a direct link between the function -- the

10   structure of the brain, which is the next part of the slide,

11   which is something called the corpus callosum -- and I have one

12   thing for a moment, if I could, because it does relate to

13   findings of Ms. Montgomery.

14          Corpus callosum is an anatomical part of the brain.

15   It's literally down the middle and it connects the right and

16   left hemispheres.  What we have found recently in robust

17   studies is that too much of that cortisol stress response

18   shrinks that corpus callosum, which is kind of incredible

19   because what we're now seeing is that abused children as they

20   grow have a smaller corpus callosum which means they have less

21   connectivity between left and right parts of their brain, and

22   that connectivity is everything for people.  That's how we put

23   things into words because our left hemisphere is language

24   broadly, connects with our right, which has to do with our

25   perceptions.

1       So to have that proof that abused children have less

2   connectivity, I'm thinking now about Ms. Montgomery's IQ test

3   that shows this very large discrepancy between her verbal

4   capacity and performance capacity.  That is a really important

5   finding now about what happens to children under stress.

6   Q      And does it matter at what point in the child's

7   development that they experience this chronic severe stress?

8   A      Yeah.  I mean, one of the things that's really amazing

9   about the brain also is how much of it develops what we call

10  postnatally.  You're not born with a functioning brain that we

11  now have as adults.  It develops over the course of the child's

12  life.

13      There are critical periods in children's lives where

14  there's real explosions of brain development.  One of them at

15  adolescence.  Another one tends to be in that preschool area,

16  sort of three to -- sorry -- two to four, and one of those

17  things that sometimes gets used in my field is what fires

18  together wires together.

19      The idea there is if a child's brain is required to

20  be in a certain state, let's say, a state of fear and threat

21  detection, I have to protect myself, I'm under threat, the

22  parts of the brain that handle fear and threat detection are

23  firing, right?  That's trillions of connections.  And then they

24  become wired.  They become permanently connected.  So that

25  child's brain is now what we think of as a survival brain.

1   It's a brain ready for fear.  It's ready for threat.  It's not
2   a brain really ready to do sort of the normal things that kids
3   have to do.  That's how it becomes problematic.
4          There's also functional parts of the brain, the
5   frontal lobe up here and the limbic system, which handles
6   our emotions that are not even formed until really late
7   adolescence -- not completely formed until late adolescence.
8   Q     So how is the frontal lobe impacted -- let me ask you
9   this question:  When Mrs. Montgomery -- there's been testimony
10  about the fact that really she experienced physical trauma from
11  birth on and it was constant throughout childhood, and then the
12  sexual trauma began probably around eight or nine and continued
13  on and continued to get worse and worse and worse.  So when
14  you're experiencing this physical, emotional, sexual trauma
15  throughout the course of her development from birth to --
16  A     Yes.
17  Q     -- 18, is it -- do we know something about the way the
18  frontal lobe and the limbic system would be affected?
19  A     Well, what's sad about it, frankly, in this case is
20  that the critical periods of development for, let's say, the
21  limbic system.  That limbic system, by the way, again is the
22  emotional responses of the child.  One of the critical
23  developmental periods of the limbic development is early
24  childhood.
25          So what we found is that if children are abused,

1  maltreated, frightened during their younger years, sometimes

2  they're going to demonstrate later what we call affective

3  problems, problems with their feelings, handling them, what we

4  call emotional dysregulation.  So we've got Mrs. Montgomery

5  certainly experienced in early childhood -- while that limbic

6  system was formulating itself and growing, she experienced

7  great abuse, fear, abandonment, neglect.

8        I was going to say the frontal lobe gets shaped much

9  more in those and really solidified in the adolescence and

10 later adolescence.  What we find with teenagers who are abused

11 is that they suffer more of those cognitive impairments that

12 come from frontal lobe damage.  So trouble planning, trouble

13 thinking things through, trouble with their reasoning capacity

14 and handling emotion and reasoning together, you know.  Making

15 a good decision, essentially.

16       So then we've got Ms. Montgomery abused severely as

17 an adolescent, and we see in Mrs. Montgomery's clinical

18 condition the detrimental effect of that, which is terrible,

19 terrible functioning in planning, impulse control, and

20 reasoning.

21       So sadly you see the critical periods for her

22 because the abuse took place across her childhood, in her

23 adolescence many of the critical periods where times she was

24 under severe traumatic stress and, therefore, her functioning

25 became impaired.

1    Q       And so we've gotten into the next slide a little bit,

2    let's move on to -- is there a scientific basis or studies and

3    research about the way that these brain changes affect

4    functioning?

5    A       Yes.  So, again, if I just quickly frame that we are

6    talking about -- we've talked about normal child development,

7    then we've talked about, well, what about the brain changes

8    that come when the child is under stress, fear, pain?  Well,

9    how do we know that does anything to kids?  How do we know

10   these brain changes do anything?

11           Well, what's been, again, very, very powerful and

12   exciting in our field is that we have studied the effects of

13   childhood stress through a lot of studies.  I'm just going to,

14   again, briefly focus on this one that's quite important, which

15   is called the Adverse Childhood Experiences Study.

16   Q       Before you describe the Adverse Childhood Experiences

17   Study, let me ask you, was the data from the Adverse Child

18   Experiences Study available to trial counsel in this case in

19   2007?

20   A       It was.

21   Q       And what was the ACE Study?

22   A       So just broadly what the ACE Study did was examine,

23   well, what about when people have bad life events, hard life

24   events?  So what do we know about that?  How do they turn out?

25   And what the study did -- it was an HMO study, believe it or

 1   not, so meaning it came out of a large healthcare plan, and

 2   they looked at 17,337 people, which is an astonishingly large

 3   sample for my field.  We don't usually have such large samples.

 4   What that does is it gives you the ability to really have

 5   robust conclusions because you have such a large sample.

 6   Q       And what did they conclude?

 7   A       So what they did was they looked at people in this HMO

 8   and asked them, Did you have these experiences in your life?

 9   This is a childhood retrospective study.  They asked about ten

10   things, as you can see there on the slide.  They asked about

11   abuse.  They asked about household function as defined by a

12   number of things; parental, mentally ill parent, substance

13   abuse parent, mother treated violently, family member in

14   prison, and then parental separation or divorce.  Then they

15   about asked neglect.  Importantly, they looked at emotional

16   abuse, physical abuse, sexual abuse separately and they also

17   looked at neglect, physical and emotional.  They took these ten

18   variables and they said, Did you have these occur in your

19   childhood?

20   Q       And what was the outcome of that study?

21   A       Well, what was remarkable is that they found that

22   the -- there was a graded effect, a dose-related effect of

23   trauma and traumatic stress, and that was the more adversity

24   that a person had in their childhood, the worse off they were

25   doing, the more poorly they were functioning; and by poorly

1    functioning, I mean on a number of measures; medical health,

2    sort of physical health, psychological health, anxiety,

3    depression, substance abuse, interpersonal health, you know,

4    marriages, divorces.  They looked at how are people doing.

5    What they found is the more adversity, the worse off people

6    were doing.

7           And what's really fascinating about the ACE Study is

8    that much of the literature talks about a person with four ACE

9    events you are going to have a massively increased likelihood

10   of suicide.  A person with four ACE events has a massively

11   increased likelihood of alcoholism.  So they really looked at

12   those ACE events and even at the rates of three and four ACE

13   events, they found very, very poor outcomes.

14   Q    And you're aware, Dr. Porterfield, are you not, that at

15   the trial of this case on cross-examination Dr. Kuncel was

16   asked the question about, and I don't remember the number, but

17   something to the fact that studies show that, you know,

18   hundreds of thousands of children in a year experience some

19   sort of abuse?  Is this finding from the ACE Study about the

20   dose response to stressors relevant to answering some of those

21   questions about why sometimes children with maybe a single

22   instance of abuse differ in their capacity to function versus

23   those people who have a number of these stressors?

24   A     Absolutely.  Because what it shows is that the dose

25   matters.  If you are talking about multiple, six, seven, eight

```
 1   adverse childhood events, again, we're not even talking about
 2   looking at the length of these events in the child's life; but
 3   if you are talking at that level of adversity, you're going to
 4   be looking at worse and worse functioning afterwards.
 5              And so with Ms. Montgomery, for instance, if we just
 6   do a broad-base look at her as a subject of the ACE evaluation,
 7   you see that she has nine out of ten ACE events in her
 8   childhood.  That is an astonishing load of adversity.
 9   Q     And just to briefly go through Mrs. Montgomery's
10   clinical condition, can you describe for the Court what your
11   findings were with respect to her clinical condition?
12   A     Yes.  So I think to do that it would be helpful if I
13   could talk about posttraumatic stress disorder for a few
14   minutes and describe how that happens to people.
15   Q     First of all, let me ask you, did you give Mrs.
16   Montgomery -- did you believe that posttraumatic stress
17   disorder is part of her overall --
18   A     Yes.  Mrs. Montgomery has posttraumatic stress
19   disorder.  In fact, she has what I would call complex
20   posttraumatic stress disorder which has to do with pervasive,
21   long-standing traumatic events as opposed to sort of one or two
22   exposures.
23   Q     So we're going to break that down.  In order to
24   understand complex trauma and complex PTSD, we first need to
25   understand PTSD.  So could you explain PTSD to the Court?
```

1    A      Sure.  I mean, just to use this slide as a frame, what

2    you're talking about when you're talking about posttraumatic

3    stress disorder is the human response to fear and the human

4    response to terror.

5           What's amazing about posttraumatic stress actually

6    is that we used to sort of think of it as an anxiety disorder,

7    people are scared, they're nervous after they've had something

8    bad happen.  But what we've actually learned in the last 30

9    years or so is that really posttraumatic stress disorder is a

10   disorder coming out of our memory functioning in the brain and

11   our arousal system or what I will call our fear network, and

12   what we find is that people who have posttraumatic stress has a

13   dysfunctional linkage between their memory of the event and

14   their fear reaction in their body and that makes people really

15   suffer, because what they do is that fear -- let me describe

16   the fear network for a moment.

17          Fear network is the part of our body that activates

18   when we're in danger.  Sometimes it's called fight or flight,

19   and it is a physiological human response that is nonverbal and

20   involuntary.  Again, if a car were coming towards me, I would

21   not think, Do I jump out of the way?  I would dive out of the

22   way.  Because my body would have activated a set of

23   physiological responses to fear.  Those physiological responses

24   are incredibly useful in that moment.  When a child is being

25   hurt, the physiological fear response is helpful to them

1   because it helps the child either get away, fight the person

2   off, or what we later see is shut down and freeze.  So that

3   fear response is useful.

4            However, after the trauma is over, it's not so

5   useful to have the fear response continuing to fire, and people

6   who have posttraumatic stress have that.  The way we understand

7   it is that when the trauma occurs, the brain is laying down a

8   memory of what happened, okay?  As that brain is laying down

9   that memory, let's say, again, the car is coming and I'm going

10  to remember this moment of this car coming towards me.  As

11  that's happening, I'm in a state of fear, and the dysfunction

12  of PTSD is that we understand now that the part of the brain

13  that encodes memory is the hippocampus, the larger system than

14  that but the hippocampus is the main structure.  If laying down

15  that memory as the amygdala, the part of the brain we talked

16  about the limbic system, is sending fear.

17           So later the memory of the trauma activates the

18  fear, and so the terrible thing about posttraumatic stress is

19  that for people who have been traumatized, remembering is

20  actually being afraid.  In other words, when they remember,

21  they feel fear in their body, and my patients and many people

22  I've worked with describe this.  It's not, Oh, it's a bad

23  memory, it makes me upset.  That's, of course, true.  It's that

24  if you make me remember, I am going to feel those physiological

25  feelings of fear again.

1    And that's why that little circle I have there has

2  to do with if you start with the perception, so the moment of

3  the trauma.  So for a rape survivor, right, as you're being

4  raped, those perceptions, your sensory reaction to being raped

5  is being laid down in your body while you are unbelievably

6  frightened.  In Ms. Montgomery's case that would be as a child.

7  Then you follow that circle later, that network of reactions

8  can get triggered again and just all of a sudden and then that

9  person has extreme discomfort because they're afraid again.

10 Q    Let me ask you a question, Dr. Porterfield.  So what

11 you're describing about that re-experiencing of the trauma when

12 an individual remembers what happened to them is one of the

13 reasons why it's very difficult for individuals such as Mrs.

14 Montgomery to be able to access the memory of her trauma and

15 express it in an interview with a mental health professional?

16 A    Absolutely.  I mean, all survivors of trauma,

17 especially if they haven't been treated, I mean received mental

18 health treatment or medical treatment, they have great

19 difficulty returning to the traumatic memory.  That's kind of

20 the classic characteristic problem of a posttraumatic

21 experience is if I return to that memory, I'm going to feel

22 unbelievably afraid.  Soldiers tell us this.  Firemen tell us

23 this.  Kidnapped survivors tell us this.  And Mrs. Montgomery's

24 history is certainly a story of this.  Because what happens is

25 the individual does everything they can to not have that state

1660

1    return.  They will really, really try to stop it from coming,

2    and that means they will try to push away reminders.  They will

3    try to push away anything that takes them to that place.  With

4    Mrs. Montgomery --

5    Q     Is that what you call avoidance?

6    A     It is called avoidance, yes.  Mrs. Montgomery became so

7    pathological as a child that it turned to what I mentioned

8    earlier dissociation, which is a severe form of avoidance.

9    Q     And so we have the DSM criteria for PTSD up here on the

10   slide and you described some of those.  Very quickly could you

11   tell us the criteria?

12   A     Just very briefly, yes.  So this is the criteria for

13   the diagnosis of posttraumatic stress.  The first criteria is

14   that you have to have the stressor, an exposure of some kind.

15   It could be that they heard about something, suffered it

16   yourself, witnessed it.

17              Criterion B is what is called that intrusive

18   re-experiencing, which means the memories and feelings of the

19   trauma come back to you and, again, it's called re-experiencing

20   for a reason.  It's not just remembering.  The body feels that

21   fear again, and that's what our survivors tell us.  And it's

22   intrusive because it comes out of the blue sometimes or it can

23   come from a trigger and the person feels the feelings again of

24   fear and of the trauma.  Sometimes they might picture things.

25   They might smell things.

1   Criterion C is what we call avoidance, and that is

2   people work very hard to not go back to that memory.  They'll

3   try to put it out of their mind, say, Please don't talk to me

4   about it.  They'll avoid things that remind them, and that's

5   very often a conscious process of avoiding.

6   And then Criterion D is sort of a complex set of

7   symptoms that I can also talk about a little later, in fact,

8   when I talk about complex posttraumatic stress.  Negative

9   changes in thought or mood.  That's just what it sounds like.

10  The survivor of violence, the survivor of trauma often

11  struggles afterwards with what we call sometimes meaning

12  making.  Who am I in this world if this happened to me?  Who

13  are people if this happened to me?  These negative changes are

14  very powerful for survivors.  And when the trauma is what we

15  call manmade, so human trauma as opposed to, you know,

16  hurricane, a car accident, you know, some other difficult

17  environmental trauma, when the trauma comes from people,

18  especially loved ones or people who should protect, then you

19  see really, really severe Criterion D problems.  Those negative

20  changes become much more impairing in terms of sense of self,

21  sense of the world, and I can talk a little more about that

22  later.

23  Finally, that last criterion is alterations in

24  arousal/reactivity.  That is when I talked about that fear

25  reaction, that posttraumatic patient who suddenly has a heart

1    racing, suddenly feels their stomach is contracting, like they

2    have a nervous stomach.  Suddenly they feel startled, a phrase

3    called exaggerated startle response, which is the person jumps.

4    You know, a door slams, they come out of their skin.  So those

5    alterations in arousal is the final set of criteria for

6    posttraumatic stress.

7    Q     And when you reviewed the records in this case, the

8    data as well as your clinical interview of Mrs. Montgomery and

9    your interview of David Kidwell, which we'll get to a little

10   bit later, but as a summary, did you -- were you able to

11   document each of these criteria with respect to Mrs.

12   Montgomery?

13   A     Yes.  My evaluation of Mrs. Montgomery demonstrated

14   many of these symptoms in the present and there was also a

15   retrospective reporting of them and observation of them of

16   others who had seen them in her, so, yes, they were consistent.

17   Q     So now let's get into what happens when the trauma is,

18   I think as we say, ongoing, pervasive, and inescapable.  What

19   is that called?

20   A     Well, what our field has learned is that someone who

21   experiences trauma in a circumscribed manner, one trauma, two,

22   couple different events in their life, they really struggle

23   often with PTSD.  It can be severe.

24         So there's a different sort of presentation and set

25   of problems that emerges in people who have had to have a

1    lifelong or chronic condition of fear, trauma, and being

2    overwhelmed; and the sort of model of that is called complex

3    posttraumatic stress, and that -- we've learned this through

4    war survivors, kids growing up in war zones, kidnap survivors,

5    children who have been chronically abused.  These are the

6    populations who have a posttraumatic condition, but we look at

7    it as having more impairments, more pervasive problems in the

8    functioning, and it's sort of best understood, I think, as a

9    captivity condition, meaning the person's trauma came out of a

10   situation they could not get out of, sometimes called learned

11   helplessness, meaning -- excuse me -- the captivity sometimes

12   is described as leading to learned helplessness which is a

13   condition in which the person realizes there is nothing they

14   can do to escape.  I've seen that in several kidnap survivors.

15   Q      Let's discuss this concept of learned helplessness a

16   little bit because you're aware that at the trial in this case,

17   as we suggested -- as we talked about yesterday, there was a

18   question as to whether or not Mrs. Montgomery's complex PTSD

19   was not diagnosed, and there was a question about whether or

20   not Ms. Montgomery's PTSD was simply from the crime itself, and

21   there were also many questions raised as to whether or not Mrs.

22   Montgomery was a, quote, willing participant in the sexual

23   trauma that they knew about at least at the time of the trial.

24   Can you describe this concept of learned helplessness, because

25   I think it's very important to understand that?

1    A       Well, absolutely.  The idea that a child would be

2    living in a home in which the main -- one of two caregivers is

3    going to have complete access to her in a room that he has

4    built off the side of the house, that entire structure is a

5    structure that I would say is a recipe for learned

6    helplessness.  What I mean by that is an experience in the

7    human body and human mind that this stress I'm under, this

8    threat that's attacking me, I can't get away no matter what I

9    do.  So the individual begins to enact an almost passive and

10   what we call immobile response because there's nothing I can

11   do.

12           The research on this came out of dogs, actually, and

13   sort of disturbing which was that they shocked dogs over and

14   over again and created a condition where the cage door was open

15   for the dogs to actually get out of the shock and the dog

16   stopped trying, and it was really a horrible metaphor about the

17   mammalian, meaning mammal, response to too much harm and fear,

18   which is that you start to believe physiologically and mentally

19   that there's nothing you can do, and I do believe that's quite

20   relevant to Mrs. Montgomery's childhood in that this was

21   happening in the home.  She was the victim of caregivers, her

22   stepfather and what was shown to be true is her mother as well

23   colluding.  And so this experience for her was not escapable.

24   Q       And you mentioned this mammalian study.  Is the limbic

25   system often referred to as the mammalian brain?

1    A      Yes.  That's that part of the brain that carries our

2    fear, and one of the reasons people think about is mammals.

3    You do think of animals, right, you think of that monkey

4    responding to something by grabbing onto the momma monkey or

5    you think about a dog, you know, running away from something

6    frightening; that that flight-or-fight mechanism comes through

7    the limbic system, and the limbic system is where we process

8    fear and negative emotion.

9    Q      So how is it that multiple traumatized children develop

10   complex PTSD?

11   A      Well, I mean, essentially the thing you need to

12   understand about complex posttraumatic stress is that it's just

13   not that fear that I'm going to talk about for a few minutes.

14   This child is having a prolonged state of fear.  And what's

15   really critical is that prolonged state of fear is coming at

16   the hands of someone they trust or supposed to trust.  It's

17   coming at the hands of people who are supposed to protect them.

18            So that's the sort of critical piece that you have

19   to understand about a chronic child sexual abuse survivor is

20   that they not only get that disordered arousal system that we

21   talked about, right, their fear and threat detection is quite

22   off-kilter, but they also develop a disordered sense of self

23   and a disordered sense of other people and detachment, and

24   that's from the perpetrator being trusted adults or people who

25   are supposed to trust them.  It's really critical to

1    understanding the difficulties that Mrs. Montgomery had.

2    Q      So can you explain to the Court what are the symptoms

3    of complex posttraumatic stress?

4    A      Right.  We don't need to review the first because we've

5    already talked about those symptoms of posttraumatic stress,

6    the re-experiencing, avoidance, and overwhelming sense of

7    threat.

8           Where complex traumatized children develop problems

9    are in these very broad-based areas of functioning, and I can

10   do this -- I'll try to do this kind of quickly and clearly.

11   The first is what we call affective dysregulation.  That's just

12   big words that has to do with how the child learns to handle

13   themself, handle their feelings.  If you remember going all the

14   way back to the beginning of my conversation today,

15   biopsychosocial regulation.  Affective dysregulation is that

16   child does not learn to deal with their body, control their

17   feelings, understand their body.  Second --

18   Q      Can you also talk to us about the negative

19   self-concept?

20   A      Yes.  So the second component, that part of complex

21   posttraumatic stress is what we call negative self-concept.

22   That's pretty straightforward.  People who are chronically

23   abused over a long period of time, especially by caregivers,

24   develop deeply disturbed senses of their self in the world;

25   damaged, destroyed, as throwaway, garbage.  This is the kind of

1  language people will use who have been badly abused, and I can

2  talk later about Mrs. Montgomery in this regard.

3   Q      And what about interpersonal disturbances?  What do you

4  mean by that?

5   A      Again, it's pretty straightforward, but people who are

6  chronically abused in a situation in which they couldn't escape

7  develop great difficulty managing interpersonal relationships,

8  dealing with other people.  When you think about it, of course,

9  it makes sense, right?  The child is growing and learning what

10 are people.  If the child grows and learns that what people are

11 is they are a source of physical pain, they're a source of

12 terror, they're a source of I will be getting raped, then their

13 capacity to deal with people gets impaired because people are

14 sources of pain and danger.

15  Q      And so while this is common sense to some extent it's

16 also based on substantial clinical or scientific and empirical

17 research?

18  A      Oh, absolutely.  The research on child abuse, child

19 maltreatment can be poor outcomes that I've laid out as well as

20 the complex problems is a very, very well-studied aspect of our

21 field.

22  Q      And so in Lisa Montgomery's case, turning to your

23 evaluation of Lisa Montgomery based on the scientific,

24 empirical research, and your experience, did you identify risk

25 factors in Lisa's childhood that confirmed your diagnosis of

1   complex posttraumatic stress?

2    A      Yes.  So if we think back again to those risk factors

3   we talked about with the ACE Study and there's been other --

4   ACE is not the only study to look at risk factors.  In fact,

5   the Department of Justice looked at risk factors in children

6   and says that if kids have these problems, they're going to go

7   on to have trouble with delinquent and -- delinquent behavior.

8            The risk factors I'm identifying here you see on the

9   slide are basic things that Lisa experienced in her childhood;

10  and, frankly, they are over a long period of time that I

11  believe are critical to understanding her very poor outcome as

12  an adult.

13   Q      So it's important for us to talk about all of these

14  risk factors.  We talked a lot about sexual abuse.  That's been

15  a lot of the focus over the last week and a day, but the sexual

16  abuse is there but there's also other types of abuse; is that

17  correct?

18   A      Yes.  So Ms. Montgomery's --

19   Q      Let's start first with the sexual abuse and move

20  through that quickly, then we'll get into the risk factors.

21   A      I mean, so just broadly there is just such extensive

22  sexual abuse in this woman's childhood that is well documented,

23  well reported, including reported before the events of the

24  crime and documented by experts and professionals, not simply

25  family members.  There is her -- actually, I realize I do not

 1   have up there that she was sexually assaulted by a relative,

 2   Kenny, I believe his name is.

 3   Q      Her cousin, Kenny Alexander, when she was a small

 4   child?

 5   A      Yes.  But then really the first two points --

 6   Q      The gang rapes and the trafficking, you're aware that

 7   that's something that the jury didn't know about; is that fair

 8   to say?

 9   A      Did not know about?

10   Q      Right.

11   A      Correct.

12   Q      That was new information that you learned from your

13   interview of David Kidwell and your interview of Lisa

14   Montgomery?

15   A      Correct.  So I was just pausing because Diane's rape I

16   have there with Lisa Montgomery present predates the other

17   events because Lisa was herself a small child at that point.  I

18   believe Ms. Mattingly estimates Lisa was about three or four

19   when she was lying in bed while Diane, seven or eight, was

20   being raped by an adult male.  So we're going to start with

21   that -- a starting point of sexual abuse because for a

22   four-year-old child to be lying in that situation would be

23   unbelievably frightening and would be a condition of sexual

24   abuse.

25                Sorry.  To then return to your question.  Lisa

1  Montgomery's experience of being groomed by Jack Kleiner

2  starting at approximately age 11, if not earlier, with

3  fondling, nudity, physical punishment being coupled with the

4  nudity, being forced to bend over a bathtub with her bare

5  bottom exposed and growing into at age 13 an experience of

6  frank rape by him is just an astonishing amount of abuse for a

7  child to absorb.  It is very, very severe.

8          When you then add that what has emerged is that she

9  also was trafficked by her mother, other caretaker, who is

10 supposed to protect, traffics to other adult men who multiply

11 raped her, beat her, and urinated on her, it is almost

12 incomprehensible the kind of stress this child's body and mind

13 suffered; and, frankly, her disordered behavior shows the cost

14 in terms of how severely disturbed she is.

15 Q     So we've talked about the sexual abuse.  What about the

16 physical abuse?

17 A      Again, these are well documented, multiple witnesses

18 talking about just an extensive and very just sadistic sort of

19 tone in this child's home by her mother and stepfather in terms

20 of being, you know, put in a shower when she had wet her bed,

21 in a cold shower, just cruel physical treatment.  Being whipped

22 with multiple objects; belts, cords, wire hangers.

23          A story told by someone else of Judy hitting Lisa

24 with a hairbrush over the head, having a broom broken over her

25 back by her adult stepfather and also being hit and beaten

1    during the rape to the point where she said she would have

2    bruises sometimes on her legs after the rape by these men.

3    When you talk about dose, we're talking about just an enormous

4    dose of physical violence in this child.

5    Q      And did Mrs. Montgomery tell you that sometimes she

6    would have to wear long dresses in order to cover up the

7    beatings on her legs?

8    A      Yes, she did.

9    Q      And told you that the beatings were allowed?

10   A      Yes.

11   Q      During the gang rapes?

12   A      That's correct.

13   Q      Did Mrs. Montgomery also tell you that some of these

14   men would leave her money because they knew that Judy wasn't

15   sharing all the proceeds with her?

16   A      Yes.  She talked about a man who would open the drawer

17   of her dresser and sort of slip this money in; which, again, if

18   you try to think about a child developing in the world and

19   conceiving of what people are and what adults are, it's so

20   perverse to think of a child having just been raped by an adult

21   male as he slips money into her dresser and the mother is in

22   the other room.

23   Q      Let's talk about the next factor, emotional abuse, and

24   I know there is a lot of emotional abuse when we get back to

25   talk about that dose of stress.  What were some of the

1    instances of emotional abuse that you were able to document in

2    the records?

3    A      Again, there is a staggering amount of abuse enacted on

4    Lisa Montgomery as a child and adolescent that I would call

5    emotional.  By emotional abuse, that is cruelty towards her,

6    verbal, psychological manipulation, things designed to really

7    make her feel terrible.

8           You know, there is just a tone across this family of

9    disparagement and sort of vicious language being used towards

10   children.  There is -- the experience of Ms. Mattingly as a

11   child being told, You are going to be removed from the home

12   because you're bad, you're not ours.  Again, this is now --

13   that's an emotionally abusive situation for Ms. Montgomery as

14   well because she's a little child watching her big sister,

15   beloved, being threatened with abandonment.  This is so

16   frightening for children.  Watching Diane Mattingly being put

17   on the porch naked.  This is emotionally abusive to Lisa

18   Montgomery, of course, as well as to Ms. Mattingly.

19   Q      What about Jack's threats?

20   A      Well, you know, Mr. Kleiner by all accounts was just an

21   unbelievably frightening man, and he threatened Lisa that he

22   would rape her sister if she told.  So Lisa now has the double

23   bind, I have to submit to the rape because if I don't, my

24   sister gets it.  He also threatened, though, to kill the family

25   if she told.  This was a very important point to me because it

1   led to a real feeling of, I believe, learned helplessness that

2   I talked about earlier in Lisa.  He's saying, I will kill your

3   family.

4           If you want to sort of think about part of my

5   questioning was evaluating her, what was the believability of

6   that threat?  What I found in the records was that Judy Kleiner

7   herself in her divorce proceeding says, Part of why I didn't

8   want to leave or kick him out, rather, was I believed he was

9   going to kill us.  So there you've got a grown woman saying

10  this man is capable of hurting, slash, killing his family.  So

11  when a little child, 11, 12, 13, 14 feels it, that to me is

12  quite credible.

13          Other abuse --

14  Q     And what abuse, emotional abuse did you see, for

15  example, with Judy with respect to Lisa?

16  A     Well, again, I believe Mrs. Kleiner was very mentally

17  ill because her -- the things she was capable of doing to her

18  children are really astonishing in their cruelty.  Cutting

19  Lisa's hair as a symbol of you're bad and dirty.  That's a very

20  disturbing concept for a child that you are physically now

21  going to be changed by me into less attractive -- whatever the

22  meaning of the short hair is -- because you're bad and dirty.

23  That's a very, very disturbing message for a child.

24          It really leads to the most powerful emotional abuse

25  that I believe happened to Lisa Montgomery by her mother, which

1    was that after this extensive years of sexual abuse was

2    discovered, Mrs. Kleiner blamed Lisa for the abuse, said that

3    she had done it, she had stolen her husband, said she had

4    broken up the family.  She said she had made it so we don't

5    have money now.  It's very difficult to try to capture how

6    damaging that message is to a child who suffered sexual abuse.

7            When kids suffer sexual abuse, one of the biggest

8    predictors of improvement in their functioning, helping them is

9    does the system respond in a way to protect them, to prosecute

10   the perpetrator and do they get loving family support from

11   those who care for them.

12   Q     And what you have just described, would that have been

13   relevant to rebut the prosecution's argument at trial that

14   hundreds of thousands of children are sexually abused but their

15   outcomes are fine?

16   A     Oh, absolutely, because the variables that matter are

17   all in the details, right?  What was the extent of the abuse

18   and what happened after?  What are those protective factors?  I

19   can talk about that later, if you like.  But this idea of Mrs.

20   Kleiner saying to Lisa, This is your fault, is really just a

21   staggering kind of damage to do to a child.

22   Q     And the other instances that you have here on this

23   slide, such as allowing Jack back into the home, sending Lisa

24   away, and publicly humiliating Lisa, are those all examples of

25   Mrs. Kleiner doing what to Lisa?

1    A      Well, again, not to be too fine of a point on it but

2    it's not simply Mrs. Kleiner says, It's your fault, you did

3    this, you stole my husband, you chose this, she also then tells

4    people this publicly, and there's multiple witnesses who say

5    she said that all the time.  So now you've got this other layer

6    for this child.  It's not just, Hey, this is your fault, coming

7    from the mother -- who, by the way, knew about it clearly and

8    was bringing it about herself -- it's that she's telling

9    people.  So when you think of an adolescent, this is a time of

10   deep sort of self-consciousness and awareness of who am I in

11   the world, how do people think of me, and you have this woman

12   saying to people all around, This child did this on purpose,

13   she brought it on herself, she was having sex with my husband,

14   that is deeply, deeply disturbed behavior by Kleiner -- Mrs.

15   Kleiner and very damaging as you see in Lisa, or as I saw,

16   frankly, in my evaluation.

17   Q      And you are aware that at trial, the government's

18   experts, Dr. Dietz and Dr. Martell, relied on Judy Kleiner's

19   reports that Lisa had brought the sex on herself when they were

20   making conclusions about Lisa being a willing participant or

21   consenting to the sexual abuse?

22   A      Yes.  I'm aware that Dr. Martell and Dr. Dietz both

23   raised the specter of Lisa as, quote, a willing participant and

24   someone who possibly consented to sexual abuse when she was

25   starting at 11 years old.

1    Q       And there also have been instances of Judy actually

2    killing the family dog in front of the children; is that

3    correct?

4    A       Yes.  So this is just further emotional abuse.  I mean,

5    again, this is not the child being physically hurt but imagine

6    the child watching your mother kill a beloved, treasured pet,

7    the coercion and the control that's part of that.

8            Other examples of abuse would be forcing the kids to

9    fight one another, something that's strangely and bizarrely

10   Mrs. Kleiner chose to do having her children have to hit each

11   other with wooden boards.

12   Q       In fact, told them that they had to go out and hit each

13   other with two-by-fours and don't come back until someone's

14   bleeding?

15   A       Correct.

16   Q       And that was confirmed by multiple sources?

17   A       That's right.

18   Q       And then she would also continue to leave Lisa at home?

19   A       Well, in fact, the leaving Lisa alone at home sounds

20   almost passive and, in fact, what emerged is that Mrs. Kleiner

21   appeared to actively participate in the handing over, what we

22   call trafficking, frankly, of Lisa to adult men for sex.

23   Q       Beyond those instances of abuse, which we can all agree

24   is quite disturbing, there was also emotional and physical

25   neglect, another one of these ACE factors that adds to the

1   dose?

2   A       Yes.  The neglect, emotional and physical -- I mean,

3   again, I think as lay people, we probably have a conception of

4   these two concepts, but the emotional neglect has to do with

5   the lack of love, nurturing, tenderness that's essential to a

6   growing child.

7            Physical neglect is more the absence of needed

8   environmental sources of, you know, of health for the child.

9   So dirty home, poor home, child not getting enough food,

10  nutrition, clothing, leaving the child.  No toys has actually

11  been identified as a source of -- as a variable of neglect, not

12  letting that child grow and have something to play with.  So

13  those are both two different factors, again, present in Lisa

14  Montgomery's life.

15  Q       And what about the risk factor with respect to parental

16  loss?

17  A       Parental loss and abandonment is shown as a severe risk

18  factor for many, many years in the literature, and we know Lisa

19  Montgomery, it's quite clear her father both takes her away

20  from the mother for this sort of bizarre period of time that's

21  unclear what that was but appears to abscond with her, but then

22  he really just disappears and abandons her, and that's a risk

23  factor for kids to lose a parent.

24  Q       And that's scientifically known?

25  A       Yes.  Again, when I say risk, I apologize because --

1    what I'm saying is risk factors are events in one's life that

2    increase the likelihood that you're going to have problems,

3    psychological, emotional outcomes.

4    Q      And the violence in the home?

5    A      Well, again, this is a very, very robustly and

6    rigorously studied aspect of child development, which is are

7    they suffering violence in the home and/or witnessing domestic

8    violence?  Huge factor that predicts problems in kids to

9    witness violence in their home, and we have this in spades

10   during Lisa Montgomery's childhood.

11   Q      You saw that in the records and you have them listed

12   here some of the instances of violence you were able to glean

13   from reliable documents and data in your review?

14   A      Absolutely.  I mean, stories of -- as we heard, Diane

15   Mattingly protecting Lisa from witnessing a massive fight

16   between adults in the middle of her living room.  Mr.

17   Patterson, the first -- sorry -- Lisa's father and Judy were

18   flagrantly violent with each other and fought.

19          Mr. Kleiner was apparently brutal towards Judy.

20   She had a broken nose, black eyes, physical, you know,

21   manifestations of the amount of violence and severity of

22   violence.

23          There were a number of people coming in and out of the

24   house.  These supposed boyfriends or men who were coming to see

25   Judy, and there would be violence with them at times.

1    Q      Then, of course, we have evidence from, for example,

2    James Miller, a cousin of Lisa, who came to live with them that

3    described Jack's assaulting of Lisa and the children and

4    multiple witnesses talking about Jack's physical abuse?

5    A      Yes, extensive.

6    Q      And the risk factors regarding substance abuse in the

7    home?

8    A      Just simply there's a high correlation of children who

9    grow up in homes with substance-abusing adults as having their

10   own risk to not just substance abuse but other mental disorders

11   and other problems.  We see this extensively in the history of

12   Lisa Montgomery in terms of those adults who on that side

13   reported to be substance abusing.

14   Q      These risk factors seem to be quite astonishing and

15   unique in Lisa Montgomery's history with respect to child

16   objectification, abduction, and abandonment.  Why is that

17   important and relevant to you in your analysis of Lisa

18   Montgomery?

19   A      Well, I called this risk factor.  It's not in the ACE

20   Study, of course, because it is so -- frankly, I think it's

21   sort of rare the amount of child objectification that is

22   present in this family multigenerationally, but I have flagged

23   it because it is so pronounced in terms of a pattern that

24   existed in this family of seeing children as objects to be used

25   in battles with one another, literally people take threatening

1    to get rid of kids, getting rid of kids, threatening to steal

2    kids; and you see I've listed it here, but from Lisa's

3    childhood she saw this disturbing pattern that children were

4    objects and it, I believe, was absorbed into her very disturbed

5    sense of self.

6    Q      And then the risk factor of her mentally unstable

7    parents.  What evidence did you see in Lisa's history that her

8    parents were mentally unstable?

9    A      Again, there's robust and rigorous literature on this.

10   When kids have a mentally ill parent, especially untreated,

11   that the children have much greater likelihood of mental

12   illness.

13          You've got Mr. Patterson who supposedly has

14   posttraumatic stress disorder and depression and he himself

15   didn't think he could be around his children, and Mrs. Kleiner

16   is clearly a very disturbed woman.  I don't know what her

17   diagnosis would have been, but her completely out-of-control

18   behavior, her vicious sadism, her lability, meaning the mood

19   sort of instability, and her assaultiveness suggests she was

20   very mentally ill.

21          And then Mr. Kleiner, again, just a profoundly

22   disturbed man in terms of not just his behavior in the home as

23   violent but also pronounced alcohol use and, of course, most of

24   all a predatory sexual abuser.

25   Q      What was the psychological effects of Mrs. Montgomery

1    of all of this on her childhood and adolescence?

2    A     As I said, there's just massive, pervasive, severe,

3    negative impact on Mrs. Montgomery in almost all aspects of her

4    functioning due to this traumatic stress and this highly

5    disturbed childhood.

6    Q     Let's break that down a little bit, if we can.  Let's

7    talk first about the effects of Mrs. Montgomery with respect to

8    her emotional dysregulation.

9    A     So if you just think back a minute to -- we talked

10   about complex posttraumatic stress and that category falls

11   under there.  It is, again, emotional dysregulation, inability

12   to recognize, deal with, handle one's feelings and experiences.

13           Okay.  So there is extensive evidence that Mrs.

14   Montgomery was a profoundly dysregulated young woman.  So

15   starting -- I think, it really, really began to emerge in her

16   teen years when she was being raped and then going into her

17   very disturbed adulthood.  This would be -- you know, examples

18   of this are her incredible volatility, her inability to handle

19   emotions, retreating in her bed for days, sort of losing it on

20   her kids, I think mistreating her children, excessively

21   drinking, being engaged in promiscuous behavior.  These are all

22   signs of a person who is not able to manage or regulate the

23   emotions and the experiences that are going on in their body.

24   Q     I'd like to stop you right there for second.  You're

25   aware of the fact at the trial of this case trial counsel

1    attempted to portray Mrs. Montgomery as a, quote-unquote, good

2    mother and good wife and didn't really deal with the plain fact

3    that Mrs. Montgomery had, in fact, abused her children and had

4    these bouts of emotional volatility, anger --

5    A       Yes.

6    Q       -- those sorts of things?

7             If you had been or someone like you had been

8    contacted by trial counsel, would you have been able to put

9    that behavior within the context of this emotional

10   dysregulation that came out of Mrs. Montgomery's complex

11   posttraumatic stress?

12   A       You would have looked at the data.  I mean, what do we

13   do when we do an analysis and an evaluation?  You look at the

14   data, then you analyze the data, and the data is everywhere

15   that Mrs. Montgomery was an incredibly dysfunctional parent and

16   who could not run a home much less raise children.

17   Q       Now, with respect to this distorted -- well, let me ask

18   you this:  Did you -- because it's important to look at

19   pre-crime descriptors of Mrs. Montgomery.  When you talked to

20   Mr. Kidwell, did he describe for you his personal observations

21   that you found consistent with emotional dysregulation?

22   A       Yes.  He talked about Ms. Montgomery both as a

23   teenager, which for me was really important because it was

24   contemporaneous with the abuse.  Now, of course, it's the

25   retrospective report because Mr. Kidwell looking back, but he's

1   talking about Lisa Montgomery as a teenager as he's seeing her,

2   and he's talked about her being retreated into herself, looking

3   incredibly frightened, shaking, trembling, showing a startled

4   response.  These are the signs of a traumatized child, and he's

5   seeing them in his teenage years -- sorry -- in her teenage

6   years.

7           He then also says that as she grew, she became this

8   strange member of the family who everyone says she's impossible

9   to deal with.  She flies off the handle.  She's irritable.  You

10  never know what she's going to do.  So then you watch that

11  dysregulation now at a different point in time and it's morphed

12  into more of what we see as this chronically undercontrolled

13  woman due to who used to be that frightened, withdrawn

14  teenager.

15  Q      Now, with respect to distorted damage to self, I know

16  that's going to become very important as we discuss

17  dissociation and psychosis.  Could you please describe for the

18  Court what it is that you mean here with respect to distorted

19  damaged sense of self?

20  A      Yes.  Ms. Montgomery has such an unbelievably troubled

21  split and damaged sense of herself.  Again, consistent with

22  what has happened to her and what her childhood was but it is

23  so pronounced, and what I mean by that is her ability to be

24  herself is almost not -- she's almost incapable of feeling a

25  sense of self; and what I mean by that is when she feels a

1   sense of self, she's confused by that.  When she has a feeling,

2   she doesn't really know if the feeling is coming from within

3   her or outside of her.  That's very, very disturbing.

4          When she does describe herself, she talks about

5   herself as being damaged, broken, only good as a body to create

6   babies, brought about by Jack's abuse.  She has these very

7   denigrating conceptions of herself.  But what's even more

8   disturbed is that there isn't really for her a sense of self

9   that is steady or consistent, and it's almost like quicksand,

10  her sense of herself in the world.

11  Q      Now, up here on the slide you mentioned, "Must have

12  wanted it if I wanted a room."  Do you recall in your clinical

13  interview of Mrs. Montgomery when you began to ask her about

14  the abuse by all of these other men, her telling you about what

15  her mother's -- her mother blaming her?  What did her mother

16  say?

17  A      Well, her mother said, first of all, Hey, you wanted a

18  room so we need to pay for those renovations.  I'm putting it

19  in quotes.  And, therefore, sort of like if you wanted this

20  room, you have to take it.  And also she herself internalized

21  it.  That's where we're getting into sense of self.  She said,

22  I must have wanted it if I wanted to have a room, right?  She

23  asked that of me almost as if it was possibly true.

24  Q      Do children do this when they're subjected to abuse?

25  A      Absolutely.

1    Q      Do you see in your research and science that they start

2    to try to -- that they take on this sort of strange almost

3    weird justification for their parents' actions?

4    A      Yes.  That is why complex posttraumatic stress is a

5    little different than posttraumatic stress because that sense

6    of self and interpersonal distortion, they are so pronounced

7    and so difficult to -- well, frankly, they're very hard to

8    treat if the child doesn't get really good treatment, because

9    when a child's being abused, they have to make sense of it,

10   okay?  They have to make sense of what's happening.  What we

11   know clinically if that child is being abused by a loved

12   figure; mom, dad, a beloved person in their life, they then

13   have to make sense why is this happening.  It must be that I'm

14   making it happen.  I am bringing this on.  That then leads to

15   an entire cascade of beliefs about oneself as dirty,

16   disgusting, you know, warped, did it to myself, and that's

17   where that really toxic self-blame happens in sexual abuse

18   survivors, and Mrs. Montgomery is deeply disturbed with that.

19   Q      What about Mrs. Montgomery's body confusion?

20   A      Yes.  So we're going to talk about dissociation a

21   little later, but, you know, Mrs. Montgomery's perception of

22   herself is not just her internal feelings and thoughts.  It's

23   also her physical body.  She has a very -- in my clinical

24   opinion, a very split, fragmented, and troubled relationship to

25   her own body.  She literally does not perceive her body

1    accurately in some cases and has trouble remembering, for

2    instance, states of her body with any accuracy.

3            So pregnancy has been discussed with her many times,

4    sex, her body during sex, what was happening to it.  These are

5    perceptions that for her are split.  They're fragmented.  I can

6    talk about dissociation but it might be easier later but I will

7    explain that.

8    Q       Sure.  We'll wait.  We're going to get there very, very

9    quickly.  What about her distorted perception in her

10   interpersonal relationships?

11   A       This is that third piece of the complex posttraumatic

12   stress.  We've got that emotional dysregulation.  We've got

13   that sense of self being distorted.  Then we have a very, very

14   troubled part of Mrs. Montgomery which is her perception of

15   other people; and what I mean by this -- and this happens to

16   severe abuse survivors -- Mrs. Montgomery grew in a context of

17   experiencing people as a source of physical pain, emotional

18   pain and neglect.  She then internalized that that is what

19   human interaction is.  People are going to hurt you.  They're

20   going to violate you.  And what emerged as she grew into an

21   adult was a difficulty perceiving people as anything except a

22   threat or an object, because people to her were the source of

23   such deep, disturbing violence as a kid.

24           So for her people were not like you or I might

25   experience, you know, a full person with a range of

1    capabilities and relationships.  You know, to me maybe you're a

2    lawyer, I'm an expert here on the stand.  We have a whole set

3    of meanings about that.  Lisa Montgomery when she sees people,

4    she experiences people as highly frightening and threatening

5    and sources of destruction, basically.

6    Q      And now we're going to move into a discussion of

7    dissociation, which is such an important finding with Mrs.

8    Montgomery.  Can you explain to the Court why children

9    dissociate?

10   A      Yes.  So this is really, I think, a very, very

11   important aspect of Mrs. Montgomery's mental disturbance.  She

12   is a very, very severe example of a person who uses

13   dissociation; and what I mean by dissociation, just for a

14   minute take it back to kids, if a child is experiencing

15   something that is physically hurting them or just horrifying

16   them, it's overwhelming them, one of the things that happens

17   physiologically is that the brain actually releases into the

18   body chemicals that are -- we call them endogenous opioids.

19   It's just like it sounds.  Endogenous from within, coming from

20   within us.  Opioids like you might think of with -- that you

21   need during surgery or during, you know, pain relief people

22   take opiates.

23          We have a set of those in our body that get released

24   during physical pain and they're incredibly protective.  I

25   mean, if a soldier -- and we hear these stories all the time

1    from veterans.  If a soldier hits an IED and his leg is wounded

2    severely and he's lying there talking to his buddy saying,

3    Okay, radio this and do that, you know, move this way, and the

4    buddy is thinking, How is he talking to me?  How is he

5    functioning?  His leg is very, very injured.  What's happening

6    is his system has kicked into opiate secretions that are

7    decreasing and detaching the pain.

8    Q      How does that work with children in a sexual abuse

9    case?

10   A      So a child who is being raped, the child -- let's say,

11   if we're going to use Mrs. Montgomery, that's obviously why

12   we're here, a young child 13, physically not developed, who's

13   being raped by an adult male is going to have a whole cascade

14   of physical discomfort, pain, and horror from that.  So they're

15   going to have smells and sounds of an adult male having sex.

16   They're going to have the physical pain in their genital area

17   of an adult male penetrating them, and all of that is going to

18   lead that body to need to, as we talked earlier, survive, cope.

19   What's going to happen is the body releases chemicals that will

20   anesthetize.  That decreases the pain the child feels.  It

21   decreases the sensory experiences, I'm not really feeling it.

22   It decreases the consciousness.  Rape survivors will tell you

23   it was like I left my body and looking down and so -- sorry.

24   Q      No.  That's a really, really important point with

25   respect to Lisa Montgomery and that consciousness issue in the

1    looking down.  What examples do you have from Lisa Montgomery?

2     A      So one of the things, again, sort of came out

3    organically in a description she was giving, she was talking

4    about Jack Kleiner's fondling her and what, again, I'm calling

5    grooming, preparing the child to be the object of my sexual

6    abuse.  She was talking about what he would do, taking off her

7    clothes and starting to touch her body and she just offhandedly

8    said, Things were still real then.  And I said, Well, what does

9    that mean?  And we began to talk about her memories, and what

10   was clear was that her memories were -- are different as she

11   gets older because they are more fragmented, and what I'm

12   positing is that they are memories that have been degraded and

13   fragmented by her dissociation.  Sorry.  That's a long

14   explanation.  But if I could have just another minute on it.

15          Those endogenous opiates I talked about, those

16   things that make you not feel the pain, the good thing is they

17   make you not feel the pain, but the other side of it is they

18   also disconnect us then as that memory of the event is being

19   laid down.  That's why after a trauma we often don't have great

20   fragmented -- sorry -- great linear memories.  We have

21   fragmented memories.  So as that opiate is decreasing pain and

22   decreasing consciousness, it's also decreasing memory and

23   connection.

24          So when Lisa Montgomery says to me, Things were

25   still real then, what she was saying is she has a memory of

1   that that is different from the memory of the later rapes,

2   because when the rapes started happening, when the multiple men

3   were raping her, she says it is much less able to be accessed

4   as a memory.  It's a much foggier fragmented image in her

5   memory.

6   Q      And is that consistent with what you see in rape

7   survivors?

8   A      Yes, because what dissociation -- I've seen

9   dissociation in survivors of severe sexual assault quite a bit,

10  and what you're talking about is they have an altered

11  consciousness.  They have -- if you see this slide, the kind of

12  technical word for dissociation is a disruption of what we call

13  our normally integrated functions.

14         Integrated functions are that I'm sitting here in

15  this courtroom and I'm perceiving it.  I know I'm in a

16  courtroom.  My thoughts are matching what my senses are telling

17  me and also matching my feelings, which I'm on the stand

18  talking.  That's an integrated experience.

19         People who dissociate, they're not integrated.  So

20  their thoughts are cut off.  Their memories -- sorry -- their

21  emotions are disconnected.  Their memory of what happened to

22  them is often choppy, fragmented, or nonexistent.  Sometimes

23  they would call it dissociate amnesia.  Their perceptions,

24  their senses are not always in tune and their sense of self is

25  often cut off from their experience.  That is the classic

1    clinical presentation of a severely dissociated person, and

2    Mrs. Montgomery has a very severe dissociative symptomatology.

3    Q      And you've used the word "severe," and we know that you

4    have, because of your work at Bellevue with Survivors of

5    Torture and your work with journalists who have been kidnapped

6    in third world countries and tortured, you've seen a lot of

7    people who have been traumatized.  Where would you place Mrs.

8    Montgomery's level of dissociation in the population of

9    individuals that you have treated which is quite unique?

10   A      Oh, it is one of the most severe cases of dissociation

11   I've ever seen.  What I mean by that is it's so pervasively

12   part of who she is.  I've seen survivors of very severe rape

13   and torture who had an okay enough childhood that, yes, they

14   have severe dissociation.  When you start reminding them about

15   the kidnapping, for instance, they dissociate.  They

16   disconnect.  I'm not feeling myself anymore.  I can't do this.

17   I'm not in my body.  The world's not real but they have a

18   fundamental sense of self that is intact.

19          Mrs. Montgomery doesn't have that.  Mrs.

20   Montgomery's entire development took place in a context of

21   stress, humiliation, degradation, and so her dissociation is

22   woven deeply into her personality.  There is no ground for her

23   to stand on.  So her dissociation is not the sort of episodic

24   blips.  Her dissociation is a completely pervasive part of who

25   she is.  She lives in a dissociated state much of the time.

1    Q      And so that makes it particularly difficult, then, for

2    someone who doesn't consult with someone of your experience and

3    expertise -- and you're not the only one with this experience

4    and expertise; is that fair to say?

5    A      Absolutely.  Psychologists learn what posttraumatic

6    stress is and what complex posttraumatic stress is and what

7    dissociation is.  These are not -- you know, these are not

8    esoteric concepts in psychology.

9    Q      And it was known in 2007?

10   A      Absolutely.

11   Q      And a lawyer could have consulted with you to learn

12   about how to interview Mrs. Montgomery and what to do with

13   information that she provides?

14   A      Me or many other qualified people.

15   Q      And you describe the situation of altered consciousness

16   and how when these folks are not -- who experience trauma

17   they're not integrated and sometimes they feel outside their

18   bodies?

19   A      Yes.

20   Q      Is that often reported to you as saying, I feel like

21   there's someone else there or I feel like I was in this other

22   place looking down in the situation?

23   A      There's two really important concepts I can explain

24   fairly briefly.  Depersonalization and derealization and these

25   are the real challenges of a dissociated person because what

 1    depersonalization means is I don't feel like a person.  I'm not

 2    in my body.  I'm not real.  And derealization is the world is

 3    not real.  The world feels like a movie or a fog or a dream,

 4    and it's really incredible because people who dissociate, they

 5    talk about this as just a very frightening, disturbing

 6    experience to feel that way.

 7              Mrs. Montgomery has very severe derealization and

 8    depersonalization, and that means she is very vulnerable to not

 9    knowing if she's real, if her environment's real, if the

10    interaction is real.  It all, like I said, becomes sort of like

11    quicksand for her, and I believe that is because her

12    neurobiological response to early stress was such a heavy load

13    of anesthetizing, altering neurochemicals that she now just

14    daily functionally lives in that kind of -- in that kind of

15    operating stance, which is the world does not feel real to her.

16    Q     And so we talked, I think --

17    A     I think we talked about that.

18    Q     We talked about this.  We'll go past that.  And we've

19    talked a good deal about --

20    A     Yes.

21    Q     -- Dr. Martell and Dr. Dietz so we don't need to go

22    back there.  But you did -- there is one important point about

23    the way that a mental health professional approaches Mrs.

24    Montgomery's history and experience because is it fair to say

25    that if you -- if your construct of Mrs. Montgomery is that she

1   is perhaps as she was described at trial as almost as though

2   she brought this sexual abuse on herself, does that impact the

3   way in which you're going to review the data and skew your

4   ultimate results?

5    A     Well, absolutely.  I mean, just to speak about it a

6   little more scientifically.  If you take a factor that's

7   incredibly toxic and what I call disease inducing, which is

8   child rape, that is a very disease-inducing process for a

9   child, they're going to have multiple impairments coming out of

10  being raped.  If you take that and say, Well, I'm going to take

11  that out, I'm going to take it out as a factor, I'm going to

12  say, No, that was not rape, that was a choice made by a child,

13  well, then, what you're doing is you're essentially taking out

14  the toxic factor and saying, I don't need to weigh that

15  anymore.  Now let's look at the functioning.  It makes no

16  sense.  It's spurious.  It's not a way to examine to take out

17  one of the most important factors in their development and say,

18  We're going to say that doesn't matter.

19   Q     I want to ask you now, Dr. Porterfield, about some

20  examples of specific physiological responses that you

21  observed -- I'm sorry.  I need to talk about protective factors

22  first.  I got ahead of myself.

23        Again, we talked about how at trial there was this

24  discussion from the prosecution about hundreds of thousands of

25  kids being abused every year.  There is a concept in psychology

1   that looks at protective factors and what makes certain

2   children resilient and others not; is that fair to say?

3   A      Correct.  Those are the factors that can mitigate the

4   effect of adversity.  So we say if a kid has a rough situation,

5   what distinguishes the kids to do okay coming up with those

6   variables of adversity versus the kids who don't?  We're able

7   to break that down in the field into what we call protective

8   factors.

9   Q      And is this scientifically based and research based?

10  A      Yes.  A lot of research on what we call risk --

11  Q      And this information regarding the protective factors

12  was the science and literature available in 2007?

13  A      Absolutely.

14  Q      So can you describe for the Court some of the

15  protective factors that can assist --

16  A      Sure.

17  Q      -- a child and whether those were present for Mrs.

18  Montgomery?

19  A      This is not an exhaustive list but one of the biggest

20  protective factors is what we call social support.  I'm taking

21  that a little farther here and calling it a nurturing, loving

22  response to the traumatic event in a child's life, because one

23  of the things we know is that social support is greatly

24  important; friends, a good school system, adults, parents who

25  care about you, take care of you.  But what we also know

1    clinically is that a traumatized child also needs nurturing.

2    They need a response that's therapeutic from loved ones as well

3    as from therapeutic providers.  All of that is a protective

4    factor for an abused child.  It will help the child do better

5    after being sexually abused.

6    Q     So instead of having these protective factors, did Mrs.

7    Montgomery actually have the opposite?

8    A     Absolutely.  Mrs. Montgomery not only did not have a

9    nurturing, loving response from her family, she had the exact

10   opposite, which she was directly and patently blamed for what

11   was done to her.  So incredibly disturbing to do to a child.

12         She also did not have the support of any other adult

13   around her as her mother went around telling people it was her

14   fault.  For instance, could an aunt or uncle or neighbor have

15   said, you know, you wonder, Well, gosh, it wasn't her fault.

16   Let me help Lisa.  No one.  She tells Mr. Kidwell, an older

17   cousin at the time, a law enforcement representative --

18   Q     Let's pause there for just a moment.  Mr. Kidwell was

19   in fact in law enforcement when Lisa Montgomery --

20   A     I believe so, yes.

21   Q     And one of the things Lisa Montgomery told you when

22   you -- in fact, wasn't the first words out of her mouth when

23   you started to ask her about the gang rapes and later we

24   learned about the trafficking, was the first word out of her

25   mouth, Whenever I told, nobody did anything?

1   A      Yes.  I found that to be a really poignant and

2   important point, Whenever I told, no one did anything, because

3   what you're thinking about is, What's 360 degrees around the

4   child?  The child's been abused.  When they turn around, what

5   do they see in 360 degrees?  No matter where Ms. Montgomery

6   turned, there was no one who responded appropriately with

7   therapeutic or legal systemic responses to having been a rape

8   survivor.

9          There were a few sessions of therapy with a

10  therapist who recognized that she was a rape survivor but

11  astonishingly does not inform child protective services.  That

12  makes no sense.  There is Mr. Kidwell, a relative who is a law

13  enforcement agent, who does not inform other law enforcement or

14  child protection this child's being raped.  There are --

15  there's divorce court in which the rape is described, and there

16  is not any legal or therapeutic mandate afterwards that this

17  child be assisted.

18         So when I say 360, wherever this child turned, there

19  was not a response that said, You were hurt.  The environment

20  is going to respond to you.  And that is a deeply important

21  part of Mrs. Montgomery's disturbance is that the world around

22  her is a world that she experiences as threatening,

23  frightening, and not seeing her as a valuable human.

24  Q      Now, with respect to Nancy Walentiny, the counselor,

25  you're aware of the fact that the way that Mrs. Montgomery got

1    into counseling was because it was Judy Shaughnessy's lawyer

2    who reported --

3    A       Yes.

4    Q       -- to the CPS and got her some counseling, but those

5    counseling sessions were in fact quite brief and they were not

6    court mandated.  Is that what you meant?

7    A       Yes.

8    Q       And did you know something specific about Mrs.

9    Shaughnessy -- well, first of all, did you notice that Dr.

10   Walentiny actually shared the content of Lisa Montgomery's

11   counseling sessions with Judy Shaughnessy?

12   A       Correct.  Which is a very tricky and sort of

13   complicated issue whether you would share information with a

14   sexual abuse survivor who is under age with a parent.

15   Q       And did, in fact, Judy Shaughnessy tell Lisa

16   Montgomery, I'll know everything you tell her so watch what

17   you say?

18   A       Yes.  She told Lisa that, I will know the content of

19   what you say.  She also directed her to not tell about the men

20   who were coming to the home.  She directly said, Don't tell

21   that because I'll get in trouble.

22   Q       And did Nancy Walentiny actually make observations

23   about Judy Shaughnessy in the records themselves that you found

24   to be important?

25   A       There were two points that I thought were really

1    salient from Mrs. Walentiny.  First was describing Judy as

2    unempathic towards Lisa; and, again, the quick example is I

3    believe Ms. Kleiner is in the room with Lisa, her daughter, who

4    has now been exposed to having been a survivor of at least four

5    years of sexual assault and Mrs. Kleiner begins to say to the

6    therapist, Oh, they're always asking for money.  They don't

7    appreciate me.  Ms. Kleiner, in other words, in a therapy

8    session for her sexually abused child begins to explain about

9    the child, and Ms. Walentiny rightly identifies this as sort of

10   a shocking level of nonempathy for her abused child.

11           The second observation Ms. Walentiny makes that is

12   quite relevant is that Judy, quote, talked over Lisa.  That's a

13   really important dynamic in that room because literally she's

14   talking over her.  What we also, I think, know is that she was

15   controlling Lisa's ability to actually share the truth in that

16   therapy session, and essentially Lisa didn't go to any more

17   therapy, right?  It was stopped.  That was also just a hugely

18   problematic decision on the part of Judy.

19   Q     So now that we've talked a little bit about the therapy

20   sessions, I want to close out our time here this morning

21   talking with you a little bit about the importance of someone

22   who is skilled in trauma, conducting an appropriate interview

23   with a trauma survivor in order to help them disclose the

24   extent of their trauma.

25           We've heard a little bit, again, about this

1    distinction between clinical and forensic; but in terms of

2    asking questions in order to get to the truth of the trauma, it

3    doesn't really matter whether it's a clinical setting or a

4    forensic setting; is that fair to say?

5    A      Sure.  You can conduct a competent and effective trauma

6    interview in a number of contexts.  It doesn't have to be

7    clinical or forensic.

8    Q      But can there be barriers in that environment that you

9    can't control, in fact, it's happening in a jail cell?

10   A      Sure.

11   Q      You have to work around that.  But are there other

12   barriers that are avoidable that could be employed in order to

13   assist the client in being able to be -- to be able to

14   disclose?

15   A      First of all, whenever you're conducting an interview

16   as a psychologist, whatever the context, you need to be aware

17   of the barriers that exist, whether those are barriers because

18   of the client's potential mental state.  Maybe they're

19   psychotic.  Maybe they're paranoid.  Or barriers -- and/or

20   barriers of the environment.  You're in a prison.  You're in a

21   room where the patient knows they're being watched, whatever.

22   You need to be aware of those barriers and be factoring them

23   into how you conduct your interview and how you observe the

24   patient.

25              With trauma that's a particular set of things you

1    need to think about.  What is this person's trauma history that

2    I do know about?  Is there any, you know, sort of verifiable

3    aspect to it?  And also what's happening to them as I begin to

4    examine them regarding the trauma?  You want to be doing that

5    in a particular way to be careful but also to be getting

6    effective information, and so you need to be thinking about a

7    lot of variables around you in the environment including your

8    style of interviewing in order to get effective information.

9    Q    So I'm going to ask you about a couple of different

10   situations and ask you to comment on them.  I don't think that

11   you know this but there's been testimony from Dr. Kuncel who

12   was the person who the trial team picked to present testimony

13   about Lisa Montgomery's trauma, testimony from her when she was

14   interviewing Lisa in Philadelphia at CCA, she was placed in a

15   room with a glass wall --

16   A    Uh-huh.

17   Q    -- where there were 50 to 60 people outside the room

18   waiting to go into visitation who could look in and observe --

19   A    Yes.

20   Q    -- that clinical interview.  Would that be a situation

21   which would impede an individual from being --

22   A    It, of course, would not be optimal, especially with a

23   vulnerable person that they're being watched and that there's

24   people going back and forth.  I would try to prevent that.

25   Q    And also does the gender of the interviewer, can that

1    make a difference?

2     A      It can.  It's important to consider it.

3     Q      And does it matter if you have an individual such as

4    Mrs. Montgomery who talks about having a difficult time with

5    more than one man in the room, would that be a barrier to

6    disclosure?

7     A      Sure.  I think that's where gender becomes an issue.  I

8    don't think gender is a black-and-white issue.  You can never

9    have a male interview a female or never have a female interview

10   a male.  That's not realistic.  I think where gender becomes an

11   issue is where a person's sexual abuse is at the hands of

12   multiple men and the individual maybe signals that way, I'm

13   uncomfortable, I'm getting uncomfortable, I'm feeling -- you

14   know, I'm having reactions, but then the interviewer needs to

15   be adjusting to that, needs to be dealing with that.  Would

16   that have better been done by women?  Possibly.  Even if done

17   by men, it needs to be done in a clinically sensitive way so

18   you don't what's called decompensate the patient, meaning

19   dissolve them into their symptoms, which can happen.

20    Q      When you interviewed -- let me ask you this:  Because

21   individuals who have been serially raped and trafficked, they

22   often have shame and blame themselves and so it's embarrassing,

23   is humiliating, would that be fair to say, to share those

24   details?

25    A      Very much so.

1    Q      And so would having a video camera trained on you and

2    microphone clipped to your lapel so that you are constantly

3    aware of the fact that everything you say is being recorded and

4    will be played back to people you don't even know who, would

5    that also be a barrier --

6    A      I think that would be very obstructive to a person

7    handling an interview well.

8    Q      And, Dr. Porterfield, getting back to your clinical

9    interview of Mrs. Montgomery, you have seen her a total of

10   three times; is that right?

11   A      Yes.  That's correct.

12   Q      Two days in March of 2016 and once in September?

13   A      Yes.  Correct.

14   Q      And those were both lengthy visits.  Did you -- do you

15   know about how long you spent with Mrs. Montgomery?

16   A      Yeah.  I think I spent about 11 hours, you know, about

17   18 hours, 19 hours.

18   Q      During the time that you spent with Mrs. Montgomery,

19   did you observe physical, involuntary physiological reactions

20   from her when you were discussing --

21   A      Absolutely.

22   Q      Can you describe those?

23   A      Sure.  Ms. Montgomery became very anxious and agitated

24   at times, shifting in her seat, crying, getting hot, and having

25   to sort of, you know, shake her clothing to release air.  She

1    became -- she gagged several times, literally had sort of a

2    physical gag reflex when talking about sexual abuse.  I think

3    that's most of what I remember.

4    Q       If I could have just one moment, please.

5            Thank you, Dr. Porterfield, that's all I have.  The

6    government may have some questions.

7            THE COURT:  We'll take a break now.  I'll be back at

8    five minutes till eleven.

9            (Recess taken at 10:40 a.m.)

10           MS. HENRY:  I forgot one thing, Your Honor.  May it

11   please the Court.  I apologize.

12           THE COURT:  Okay.

13           MS. HENRY:  Thank you.  I had forgotten to move into

14   evidence Movant's Exhibit No. 155, which is a hard copy of Dr.

15   Porterfield's PowerPoint which was displayed in court today.  A

16   copy has been provided to opposing counsel.  We would move that

17   it be accepted into evidence.

18           MR. KETCHMARK:  And I have no objection to that,

19   Your Honor.

20           THE COURT:  Received.

21           MS. HENRY:  Thank you, Your Honor.  No further

22   questions.

23           THE COURT:  All right.  Mr. Ketchmark.

24           MR. KETCHMARK:  Thank you, Your Honor.

25   KATHERINE PORTERFIELD resumed the stand and testified:

1   CROSS-EXAMINATION BY MR. KETCHMARK:

2   Q       Good morning, ma'am.

3   A       Good morning.

4   Q       How are you?

5   A       I'm good.  Thank you.

6   Q       Dr. Porterfield, if I understand correctly, there are

7   two reports, obviously in addition to the PowerPoint, there's

8   your original report, which has been marked as Movant's Exhibit

9   No. 7.  I believe that's dated April 22nd of 2016.  Is that

10  your original report?

11  A       Yes.

12  Q       And then you have a supplemental report, I believe,

13  ma'am, that is Movant's Exhibit No. 8, and I believe that is a

14  supplemental report that was dated October 10th of 2016; is

15  that correct?

16  A       Correct.

17  Q       I'm curious, ma'am, you talk about meeting with Ms.

18  Montgomery and the meetings occurred in March of this year and

19  I think that was for a total of 11 hours?

20  A       That's right.

21  Q       Do you remember when you were first approached by this

22  defense team and retained as an expert in this matter?

23  A       I believe it was February of this year.

24  Q       So it would have been sometime in 2016?

25  A       I believe so.  There is a chance it was late '15, but I

1    believe it was January or February of this year.

2    Q       Would it be accurate to state, though, ma'am, that the

3    majority of your work, regardless of when you would have been

4    retained, would have been basically in 2016?

5    A       Correct.

6    Q       And just so the Court is clear, and the Court obviously

7    will have copies of the reports, but the difference between

8    what's contained in your supplemental report and what's

9    contained in the original report is additional information and

10   investigation of interviews that you did with David Kidwell as

11   well as Ms. Montgomery with respect to additional abuse that

12   she might have suffered at the hands of multiple men; is that

13   correct?

14   A       That's correct.

15   Q       So, ma'am, is it a fair characterization that was not

16   information that you had either explored or fully developed

17   because had you done that prior to your initial report, that

18   would have been included in the initial report and there would

19   have been no need for a supplemental?

20   A       Correct.

21   Q       With respect to this concept, ma'am, that you testified

22   to about complex PTSD, you recall that line of testimony which

23   was extensive?

24   A       Yes.

25   Q       And you would agree with me, would you not -- I'm

1    calling you ma'am.  I apologize -- Doctor, that the concept of

2    PTSD is something that's been recognized in the DSM and has

3    been recognized for quite some time since the 1980s; is that a

4    fair statement?

5    A    Yes.

6    Q    The concept of complex PTSD is a concept that has been

7    proposed but it's recognized in the DSM as it stands today in

8    the current version of the DSM; is that correct?

9    A    Correct.

10   Q    In fact, it's been proposed several times but it hasn't

11   been adopted; is that a fair statement?

12   A    Well, I don't think it's accurate to say several times,

13   but there was a conversation about including it a few years ago

14   and a further study was ordered on it, so it was not put in

15   when the recent restructuring occurred that was called DSM-5.

16   Q    And you're aware and you reviewed obviously the

17   testimony of the -- and the reports of the various experts here

18   with respect to the concept that Ms. Montgomery suffers from

19   PTSD and that wasn't disputed in the trial.  Would you agree

20   with that characterization?

21   A    Correct.

22   Q    So the concept of complex PTSD is a concept that talks

23   about chronic or exposures to PTSD over an extended period of

24   time chronically that results in this concept of complex PTSD

25   that you're talking about?

1    A        Well, sorry.  I just want to break that down a little

2    bit.  So it's not exposure to PTSD.  It's an exposure to

3    traumatic stressors over the extended period of time that

4    results in a clinical presentation that is widely known in the

5    clinical literature as well as in the ICD-11 that's coming as

6    complex posttraumatic stress disorder.

7              MR. KETCHMARK:  One moment, Your Honor.

8              That's all I have.

9    REDIRECT EXAMINATION BY MS. HENRY:

10   Q        Dr. Porterfield, you are aware that though the

11   diagnosis of posttraumatic stress disorder was given at trial,

12   there was a dispute at trial as to whether or not Mrs.

13   Montgomery's posttraumatic stress disorder was as a result of

14   the crime alone or as a result of the crime as well as the

15   extended sexual abuse; is that correct?

16   A        Yes.

17   Q        And part of that dispute was because of Dr. Dietz and

18   Dr. Martell saying they didn't have enough information and that

19   perhaps Mrs. Montgomery had been a willing consensual

20   participant in the sexual abuse and rapes that she suffered at

21   the hands of her stepfather for a period of years?

22   A        Yes, because the diagnosis of posttraumatic stress is

23   necessarily linked to what the stressors were; and so if you

24   diagnose it and are not properly identifying, recognizing, and

25   elaborating the stressors, you're going to really misunderstand

1    the clinical presentation that comes from posttraumatic stress.

2    Q      And, of course, if Dr. Dietz and Dr. Martell had been

3    provided the extensive biopsychosocial history that you have

4    been provided, perhaps they wouldn't have had those questions;

5    fair to say?

6    A      I don't necessarily agree with that because they were

7    provided that she was extensively raped for two years and they

8    said it was consensual.  So I don't know what further

9    information might have shifted them to not see a 14-year-old

10   having sex with their stepfather as rape.

11   Q      Good point.

12          The concept of complex posttraumatic stress disorder

13   has been around since about 1993 or even earlier than that; is

14   that correct?

15   A      Oh, yes.

16   Q      And, in fact, I'm holding in front of me a book,

17   Treating Complex Traumatic Stress Disorder by a --

18   A      Dr. Courtois and Julian Ford, two leaders in the field

19   of traumatology.

20   Q      And, as you say, the concept of posttraumatic stress

21   disorder will be in the ICD-11.  What is the ICD?

22   A      The ICD is the International Classification of Diseases

23   11th edition, which is coming out.  It is the internationally

24   recognized diagnostic formula, framework rather, that is used

25   in the United States for all medical disorders and almost all

1    insurance, and it is actually -- sorry to drill down for a

2    moment, but the complex posttraumatic stress disorder is

3    present in ICD-10, the current formulation.  It's called

4    enduring personality change due to catastrophic stress.  The

5    coming edition has simplified and classified it as complex

6    posttraumatic stress disorder.  So it is in existence.

7    Q      And, in fact, the concept of complex posttraumatic

8    stress disorder was a generally accepted clinical diagnosis at

9    the time of Mrs. Montgomery's trial?

10   A      Widely used.

11   Q      Thank you.

12          MS. HENRY:  No further questions.

13          MR. KETCHMARK:  No additional questions.

14          THE COURT:  All right.  Thank you, Dr. Porterfield.

15          THE WITNESS:  Thank you.

16          THE COURT:  You're excused.

17          (Witness excused.)

18          MS. HARWELL:  Good morning, Your Honor.  Movant

19   would call Siddhartha Nadkarni.

20          THE COURT:  Right up here, please.

21   SIDDHARTHA NADKARNI, being sworn by the courtroom deputy,

22   testified:

23   DIRECT EXAMINATION BY MS. HARWELL:

24   Q      Dr. Nadkarni, if you will state your full name and

25   spell it for our court reporter, please.

1    A        My name is Siddhartha Nadkarni.  The first name is

2    spelled S, as in Sam, i-d, as in dog, d, as in dog,

3    h-a-r-t-h-a, and my last name is spelled N, as in Nancy, a-d,

4    as in dog, k-a-r-n-i.

5    Q        And, Dr. Nadkarni, what is your employment?

6    A        I work at NYU Medical Center.

7    Q        In what field?

8    A        I do neurology and psychiatry and I work in the

9    epilepsy division there.

10   Q        If we could review briefly what your qualifications are

11   for that position.

12   A        Sure.  So I went to medical school at the University of

13   Miami and then matriculated into a combined neurology and

14   psychiatry residency program.  That was six years in duration

15   at NYU Medical Center.

16            After that, I did a fellowship in neurophysiology

17   specializing in epilepsy.  That was one year in duration.

18            Then I've been board certified in multiple boards

19   including neurology, psychiatry, behavioral neurology,

20   epilepsy, and clinical neurophysiology.

21   Q        That's five separate board certifications?

22   A        Right.

23   Q        If I might show you what's been marked as Exhibit 125.

24   Do you recognize this document?

25   A        Sure.  This is my CV.

1   Q       Make sure it accurately reflects your qualifications.

2   A       Yes.

3   Q       Dr. Nadkarni, you said that you work with epilepsy.

4   Can you explain sort of in laymen's terms that I might

5   understand exactly what your clinical practice is like?

6   A       Sure.  So my days are divided between seeing patients.

7   The patients that I see have seizure disorders or other

8   neurobehavioral or neuropsychiatric illnesses.  So I would say

9   it's a mix of neuropsychiatry and epilepsy, people who have

10  seizures coming from different parts of their brain.

11          And then a lot of what I do is also administrative,

12  so I'm a program director for multiple residencies and

13  fellowships.  So one of them is the epilepsy research

14  fellowship at NYU, another one in the combined residency in

15  neurology and psychiatry, and then I've been also the program

16  director of the clinical neurophysiology fellowship and the

17  regular epilepsy fellowship, and I'm the training director for

18  the neuroscience curriculum for the psychiatry residency

19  training program.

20  Q       It was perhaps implied in your answer to that question

21  but you teach as part of your duties?

22  A       Correct.

23  Q       To med students?

24  A       From medical students to residents to fellows, all the

25  way across the board.

1    Q       Have you been published, Dr. Nadkarni?

2    A       I have.

3    Q       Can you tell us about your publications?

4    A       My publications are generally in the areas of epilepsy

5    and psychiatry and also in the area of brain injury as well.

6    Q       Are those peer-reviewed articles, book chapters?  Just

7    give the Court a feel.

8    A       Correct.  So there are peer-reviewed articles in there.

9    There's book chapters in different book publications.  One

10   recent book chapter is a chapter in the book of Traumatic Brain

11   Injury where it's a chapter talking about epilepsy and

12   psychiatric illness and epilepsy and traumatic brain injury.

13   Q       And those publications are reflected in the CV; is that

14   correct?

15   A       Yes, they are.

16   Q       Have you testified as an expert witness before?

17   A       I have.

18   Q       Do you know whether it was a State or a federal case?

19   A       I've done both.

20   Q       And your expertise was accepted in that time?

21   A       Yes.

22           MS. HARWELL:  I would ask the Court to declare Dr.

23   Nadkarni an expert in the field of epilepsy, neurology, and

24   neuropsychiatry and traumatic brain injury while I'm at it.

25           MR. VALENTI:  No objection.

1       THE COURT:  I will consider his opinions.

2   Q      (By Ms. Harwell)  Dr. Nadkarni, when you became

3   involved in the case of Ms. Montgomery, what did we ask you to

4   do in this case?

5   A      You asked me to evaluate her neurologically.

6   Q      And in very general terms -- we're going to go through

7   and talk about all of your findings specifically, but as a

8   general overview, what did you find?

9   A      So it involved taking a history from her and performing

10  a neurological examination of her as well as record review.  I

11  found she has deficits that came out in her neurological

12  examination that lead me to think that she has both epilepsy

13  and a significant frontal lobe syndrome, as well as parietal

14  lobe and temporal lobe dysfunction.

15  Q      Okay.  Well, let's start with your methodology.  You

16  said that you reviewed records, took some history.  If you'd

17  tell us, just sort of walk us through, when you as a clinician

18  do an evaluation, what all is involved in that?

19  A      It involves taking a history of the patient, which is

20  an interview of the patient where the patient gives you

21  information regarding the history of the present illness, what

22  is currently bothering the patient, what is the history of that

23  complaint in all sort of dimensions.

24          That includes following -- that includes a past

25  medical history, a developmental and social history, a past

1  psychiatric history, past surgical history, medication, allergy

2  history, and what medications the patient's been taking and

3  then a neurological examination.

4  Q      Just with regard to the history, you asked those

5  questions of Ms. Montgomery but her team also provided you with

6  a fair amount of documentation --

7  A      Correct.

8  Q      -- and records; is that right?

9  A      That's correct.

10  Q      And those are listed in your report, which we've marked

11  as Exhibit 23?

12  A      Yes.

13  Q      And you have that in front of you, I think?

14  A      Yes.

15  Q      So you reviewed not only what Ms. Montgomery related

16  about her medical history but also documentation from

17  hospitalizations and medical records; is that fair to say?

18  A      Correct.

19  Q      Then you were going to talk about what else you do in

20  your assessment.

21  A      Right.  So it usually involves the examination, the

22  neurological examination, which looks at different parts of the

23  nervous system as they manifest in somebody's comportment and

24  neurological exam, how they function sensory-wise,

25  coordination-wise, mental status wise, all of those things.

1    Q       When you say a "neurological examination," is that

2    something that someone sitting there watching, like me, would

3    realize this is a doctor examining a patient?

4    A       Yes.  It involves touching the patient and having them

5    do things and assessing how they do them.

6    Q       And are those the sorts of clinical evaluations you do

7    in your practice all the time?

8    A       Yes, exactly.

9    Q       So what you did in our case for Ms. Montgomery is what

10   you do at NYU on a regular basis?

11   A       Right, with any patient.

12   Q       Did you also use any instruments?

13   A       I used a -- well, I use instruments to examine her,

14   including reflex hammer and tuning fork and other instruments

15   like that, but I use a cognitive assessment instrument as well.

16   Q       Okay.  Tell us about that.  What is that?

17   A       That's called the Montreal Cognitive Assessment.  It's

18   a bedside instrument that's a screening tool for cognitive

19   impairment.

20   Q       And why do you use that?

21   A       It's a good way to measure certain functions that are

22   seen in the way the brain works in terms of cognition.  So it

23   involves things like language assessment, side shifting,

24   organization, memory.  Very specific cognitive functions are

25   screened on that test.

1   Q       And I believe you wrote a report.  I think your report

2   reflects it was written in September 2013?

3   A       That's correct.  Right.

4   Q       Since that time our team provided you the data from Dr.

5   Ruben Gur; is that right?

6   A       Yes.  I did not have that before.

7   Q       It's fair to say you did not rely on Dr. Gur's data in

8   writing your report?

9   A       I didn't have that information when I wrote my report.

10  Q       But you've now been able to review it and to determine

11  whether it contradicts or confirms what you were looking at?

12  A       Right.

13  Q       And, I mean, we won't bury the lead.  What's the

14  outcome?

15  A       So, yeah, I think it confirms very nicely what I saw

16  just on my examination, history, and record review of Ms.

17  Montgomery.

18  Q       And when you say you looked at Dr. Gur's data, by that

19  you mean you looked at the PET results and the MRI results?

20  A       Correct.

21  Q       And those are the sorts of diagnostic testing you are

22  very familiar with in your work?

23  A       Yes, routinely.  So after the history and examination

24  to confirm your diagnosis, you often do testing including

25  neuroimaging testing, functional and structural neuroimaging

1    testing.

2    Q      So while you read all of Dr. Gur's synthesis of it, you

3    yourself are qualified to look at those instruments and sort of

4    know what's going on there?

5    A      Yes.  Yes.

6    Q      Did you prepare slides to help us talk about your

7    findings?

8    A      I did.

9    Q      And if we might turn to those now.  Let's talk -- you

10   said a bunch of things in the beginning in terms of your

11   summary of the findings.  I'm going to let you tell us where we

12   want to start in terms of breaking apart each of your findings.

13   A      Sure.  So we can actually start with the first slide,

14   which is sort of an overview slide of the cerebral hemispheres.

15   I think what I'll do is as I talk about the functions of these

16   structures, maybe mention how Lisa's case is impacted by these

17   parts of the brain.

18   Q      Please.

19   A      The entire colored portion of this slide has to do with

20   what we call the neocortex.  That's n-e-o-c-o-r-t-e-x.  And

21   that's the cortex that is evolved really late in human

22   development, and it is responsible for very higher-level

23   functions that human beings have basically in their daily

24   lives.

25            So in the front there in the light pistachio green

1719

1     is the frontal lobe, which we'll talk about more in Lisa's

2     case.  Right behind that is the parietal lobe, and right behind

3     that in pink is the occipital lobe.  Then in light blue or

4     purple is the temporal lobe.

5              Each of these has functions that are very basic

6     functions, and then they have functions that are much

7     higher-level functions.  So the frontal lobe is where motor

8     function is.  That's a very basic function and helps us move,

9     initiates movements, and helps us move our limbs and our

10    tongues and our bodies.

11             The parietal lobe is a lobe that takes in sensory

12    information and then sort of assesses the nature of that,

13    whether it's taste, smell, touch.  Those are all involved in

14    parietal lobe functioning.

15             Then the occipital lobe is involving vision, visual

16    assessments.  And the temporal lobe has some function in

17    auditory functioning.  These are sort of the basic functional

18    elements of some of these lobes.

19             The temporal lobe also is involved in emotional

20    regulation, short-term memory and functions along those lines,

21    and then the higher-level functions involved in these

22    structures are also important.  So the frontal lobe is

23    important for comportment, which is sort of the way people

24    assess the world and interact with the world and stimuli that

25    they get from the world involving decision-making, judgment,

1   insight, social awareness, social adaptation, self-awareness,

2   empathy.  These are all things that are involved in specific

3   circuits in the frontal lobe, and many of those areas Lisa

4   Montgomery has a lot of problems with functionally based on

5   her -- based on frontal lobe injury.

6           The parietal lobe has a big function in

7   self-awareness and awareness of the world.  Specifically in

8   terms of half of the space or left hemispace, which is right

9   hemispace, but also in terms of overall awareness of situations

10  and one's own self in those situations.

11          Then the temporal lobe houses the limbic structures,

12  a lot of limbic structures, which are called the limbic because

13  they are on the edge, on the medial, middle edge of the brain

14  and are connected in various ways between the frontal and

15  temporal lobes, and they're sort of on a limb, and they are

16  very important in emotional processing, processing of emotional

17  information, generating emotional experiences that are internal

18  emotional experiences, and those structures are also involved

19  in Lisa Montgomery's case.

20  Q      May I stop you right there.  You used a phrase

21  "internal emotional experiences," and I don't really know what

22  that is.  Can you distinguish that from an external emotional

23  experience?

24  A      Right.  So what I mean is there are representations of

25  states that other people are in and a state that you're in

1  yourself, right?  So if I see somebody that has an angry face,

2  I should be able to say, Oh, that person has an angry face and

3  let me model that in myself, let's say, What would it be like

4  if I had an angry face?  When I sort of model that in myself, I

5  can tag that angry face with feeling angry, and that's sort of

6  an emotional tag to that external representation, and that

7  internal representation lets me say, Oh, that person must be

8  feeling angry because when I internalize that and I see that, I

9  feel angry.

10          I think Lisa Montgomery can't do that.  I think she

11  can't assess other people's states and internally represent

12  them and talk about them in any significant way.  I think

13  that's the broken part of her brain.

14  Q       Where do we go from here?

15  A       Okay.  So we can go to the next.

16  Q       I think you want to talk about the parietal lobe?

17  A       We can talk about the parietal lobe.  That's next.

18  This is a scheme of the same thing.  So the parietal lobe is

19  very important in integrating experiences and stimuli from the

20  world.  So when something comes into the brain, whether it's

21  auditory or it's visual, it goes to these primary cortices like

22  the temporal lobe which we're getting just bits of data.  It's

23  almost like O's and Y's, little bits of data, binary data that

24  says, Oh, this is a sound.  And then this is a sight.  And then

25  those basic bits of data are sort of attached to each other in

1    secondary association cortex.  Primary association cortex first

2    and then secondary association cortex, which is usually within

3    the lobes that are involved.

4            The parietal lobe is a very important function in

5    taking those bits from the secondary association cortex and

6    putting them together.  So sights and sounds or smells and

7    sounds or sounds or sights with smells, and then sort of making

8    an assessment about what those things might mean and what the

9    valence is for a given person.

10   Q       Let me stop you there.  What is valence?

11   A       Valence means the importance of that given object,

12   right?  So if you see -- if somebody sees something on a table,

13   for some people a box of cigarettes or an iPad or whatever it

14   might be, there might be some valence to those objects, and the

15   parietal lobe helps you say, Oh, this is something that's

16   important to me.

17           That information that's packaged in the parietal

18   lobe then gets sent to the frontal lobe to make higher-level

19   judgments of, Should I approach that thing?  Should I walk away

20   from that thing?  How should I behave in relationship to that

21   thing?  I think this is also -- this process of synthesizing

22   information and tagging it with the appropriate valence of

23   whether it's important or not is also a problem for Lisa

24   Montgomery because of her parietal lobe dysfunction.

25   Q       You put in the slide regarding the Brodmann Map.  What

1    is the significance of the Brodmann Map?

2     A      This is just to point out that, you know, there are --

3    this is a very famous map that was made when they stimulated

4    different parts of the brain, often during epilepsy surgery

5    actually, and they saw what happened.  So they'd give

6    electrical impulses to different parts and one would make the

7    hand move and one would make somebody speak and one might make

8    somebody cry or see something.

9            So this is a map to show what different areas

10   generally -- you know, in the population basis what functions

11   they subserve, and I put this up here because, you know, like I

12   said before, there are lower-level functions of all of these

13   lobes and there are higher-level functions of all of these

14   lobes.

15           The lower-level functions are really nicely mapped

16   out in this Brodmann Map, but the higher-level functions really

17   involve networks of different parts of the brain that go

18   together and those you can't map out so easily locally

19   structurally, and the importance is that in neuropsychological

20   testing you can measure those fundamental functions that are

21   listed in the Brodmann Map, but it's very, very hard or I would

22   say it's almost impossible in neuropsychological testing as we

23   know it to map out higher-level functioning, which is a big

24   problem in Lisa's case.

25    Q      So if I understand what you're saying, you're saying

1    the Brodmann Map is part of the basis for your testimony in the

2    sense that it gives us the understanding of what different

3    parts of the brain do?

4    A       Right.

5    Q       But at the same time it is also descriptive of

6    limitations for neuropsychological testing?

7    A       Yes, very much so.

8    Q       Because there are ways in which the parts of the brain

9    work together which can't be just shown by part by part?

10   A       Correct.  Right.

11   Q       Did you also find problems with other parts of Ms.

12   Montgomery's brain?

13   A       Yes.  So I think the three main areas that are affected

14   in Ms. Montgomery are the frontal lobe, the parietal lobe, and

15   the temporal or, slash, limbic lobe, and the right hemisphere I

16   think is more affected than the left hemisphere.

17           So this picture that's up right now gives a little

18   bit of a sense of the limbic structures.  So as you see the

19   picture on the top right, it says cingulate gyrus.  And if you

20   just follow that down to the left and around the

21   parahippocampal structures in the temporal lobe below, that's

22   all part of the limbic lobe.

23           So in Ms. Montgomery's case these limbic structures,

24   parietal structures, and inferior frontal structures are all --

25   have all been shown to be abnormal with her, and actually

1    follows kind of a classic pattern, very classic pattern for

2    comportment difficulties.

3    Q      What do you mean by "classic pattern"?

4    A      So in patients who have trouble with -- comportment is

5    comprised by several things that help us enact behaviors in the

6    world, right?  So it involves insight, judgment,

7    self-awareness, social adaptation, and empathy, and it lets us

8    behave appropriately in the world we live in and assess when

9    something will have negative consequences or positive

10   consequences and helps us make judgments, basically.

11          And with Lisa I think there's a comportment --

12   there's a comportment difficulty in these structures.  So the

13   classic pattern that's seen in people who have comportment

14   problems is relatively lower metabolism in the left hemisphere

15   compared to the right hemisphere and relative atrophy in the

16   right hemisphere compared to the left hemisphere.  This is

17   neuroimaging -- this is a classic neuroimaging pattern for

18   comportment difficulties.

19   Q      And I think that's a good place for me to stop you.  I

20   sort of neglected to do it until now.  You are talking about a

21   lot of things that are undergirded by scientific research?

22   A      Yes.

23   Q      The concepts you're discussing and the knowledge about

24   the brain that you're discussing, is this brand new stuff or

25   was it around in 2007?

1    A       It was definitely around in 2007.  It's been around

2    probably for 50 or 60 years at least.  There's been an

3    explosion of neuroscience now that we've learned a lot more but

4    these concepts we've known about, these networks.

5    Q       So the things that you're describing to the Court,

6    while it sounds pretty exciting to those of us who are English

7    majors, are really pretty basic concepts, things that's been

8    known about the brain for a long time?

9    A       Right.  This is sort of a behavioral neurology 101.

10   Q       So a neurologist in 2007 could have certainly testified

11   to the things you are testifying to?

12   A       Absolutely.

13   Q       And I'm sorry.  I interrupted as you were talking about

14   systems that affect comportment.

15   A       Right.  So comportment is the way you enact behaviors

16   and behave in the world.  These systems -- you can imagine why

17   these systems would be important.  So this parietal lobe

18   function of synthesizing information, stimuli from the world,

19   and tagging it appropriately would be crucial to making a

20   decision about what's important, what's not important, what

21   would be bad for me, what would be good for me.  She has

22   significant abnormalities in that area, as well as her limbic

23   lobes.

24          So the limbic lobe is very important for generating

25   emotional -- those emotional tags and the physical experiences

1  that go along with emotional states, and that also is abnormal

2  in her imaging.

3          And last, the area of the frontal lobe.  Lots of

4  different parts of the frontal lobe are involved in

5  comportment, but the main parts are the orbital frontal cortex.

6  If you'd just go back a slide.

7  Q     Sorry.

8  A     No problem.  So the orbital frontal cortex is the -- if

9  you look at the top picture on the right, the tip of the brain,

10  that's the frontal pole.  If you'd just go down below that,

11  sort of the surface, that just rounds out the frontal lobe on

12  the bottom, that's called the orbital frontal cortex, and that

13  has connections in various ways to other parts of the brain

14  that have to do with social adaptation, social awareness,

15  making judgments about when to say something, when not to say

16  something, right?  So we all have -- I shouldn't say we all,

17  but a lot of people have had frontal lobe syndrome in their

18  lives temporarily, and it's basically like if you're drunk,

19  right?  When you're drunk, alcohol basically temporarily

20  removes your frontal cortex functioning.

21  Q     Kind of shuts it down?

22  A     Shuts it down.  Right.  Exactly.  So that, you know,

23  your judgment is off.  You might think you're funnier than you

24  are, right?  That's a classic actual frontal lobe sign.  You

25  can't assess the world correctly and you're disinhibited.  So

1    you make judgments and you say things that are inappropriate

2    and hurtful or otherwise inappropriate socially.  And that's

3    something that's very, very hard to get around people who have

4    frontal lobe syndrome.  It's very closely linked to this notion

5    of comportment and how you behave in the world.

6    Q     You've talked about what frontal lobe syndrome is.  I

7    want to back up a little bit since you're a specialist in

8    epilepsy.  What is epilepsy?

9    A     Okay.  Epilepsy is a disease where people have

10   seizures, and seizures are any kind of behavioral change or

11   experience that somebody can have that's related to abnormal

12   firing of certain parts of the brain.

13          So if you think of the brain as a peach kind of, the

14   lining is where all the neurons live, the cell bodies live, and

15   they send down on these cables, these axons that are sort of

16   the meat of the fruit, of the peach, but those neurons in that

17   cortex if they get together and start firing when they

18   shouldn't and they get enough of their neighbors involved,

19   people can have seizures.  Seizures that are pleomorphic.  It's

20   all different kinds of seizures people can have.

21   Q     You said pleomorphic?

22   A     Right.  Different presentations, different symptoms

23   that people have during seizures.

24   Q     So I think most of us have some idea what we think

25   seizures look like.  You as a specialist, tell us about the

1729

1  range of what a seizure activity can look like.

2   A     So what people conventionally think of as I'm shaking,

3  shaking, shaking, I'm making noise, I'm frothing at the mouth,

4  that's called a convulsion, a generalized convulsion.  But

5  there's a lot at the final common pathway sort of.  There's a

6  lot of seizures that happen before you end up convulsing.  And

7  they can be -- any psychic experience actually people can have

8  during a seizure.

9         So in a frontal temporal epilepsy, which is I think

10  what Lisa Montgomery suffers from, people can have -- the five

11  most common symptoms are auras, which you retain awareness but

12  you might smell something strange, and the trick is that it's

13  stereotyped.  So the smell is the same every time because the

14  same part of the brain is firing so you get the same kind of

15  sensation.  That's a very important historical point for

16  epilepsy that people have stereotyped experiences.

17         So abnormal smell, out-of-body experiences or

18  dissociative experiences in general is a common feature of

19  temporal lobe epilepsy.  People can lose time very commonly.

20  So all of a sudden they find themselves doing something and

21  they can't account for the last few minutes, five minutes, ten

22  minutes.

23         And if those symptoms progress enough, you have

24  alteration in your awareness and you might blank out, you might

25  stare, you might have what we call behavioral arrest where you

1    just stop doing what you're doing.  You might have automatic

2    movements on one side of your body, hand rubbing or rubbing

3    your face or moving your legs in certain ways; and then if that

4    progresses and involves more cortex, if those neurons get more

5    friends involved, eventually if both sides get involved, you

6    have a big convulsion, which is what people generally think of

7    as seizure.

8    Q       I hear you saying, though, that there are seizure

9    activities in the brain that doesn't involve external

10   manifestations?

11   A       Absolutely.  You would never know by looking at

12   somebody.

13   Q       Okay.  And do you have any sense of how common that is

14   or uncommon that is?

15   A       It's very common.  It's probably -- it's more common

16   than convulsions in temporal lobe epilepsy.

17   Q       How does this kind of misfiring in the brain actually

18   affect the rest of the brain activity?

19   A       So if it's very local, it won't -- so people can go

20   through their lives and do whatever they're doing.  They might

21   just have an intense deja vu or an intense smell, or something,

22   and they can just work through it and nobody else would know.

23           If it spreads more, you might have problems

24   speaking.  You might be unaware of what's going on around you.

25   You might not be able to understand what people are saying.

1   You might not be able to move as easily.  There's all these

2   things that can happen once the seizure spreads.

3   Q       Can seizure activity in the brain affect someone's

4   memory or ability to remember things?

5   A       Absolutely.  So temporal lobe seizures especially.  The

6   place where they start is usually in the structure called the

7   hippocampus, which is at the tip of the temporal lobe.  In that

8   upper right-hand picture again in the very front of the bottom

9   is the temporal lobe and that's where the hippocampus is, and

10  often seizures start in the hippocampus or right next to the

11  hippocampus in a structure called the amygdala; and once those

12  areas get involved -- the hippocampus is responsible for

13  memory.  So once it's seizing or its neighbor is seizing, it's

14  not going to be able to put down new memories.

15  Q       So the seizure activity itself can affect someone's

16  ability to remember something?

17  A       Absolutely.

18  Q       Let's talk about your findings in Ms. Montgomery's case

19  specifically.  As you were doing your neurological examination,

20  if you could tell us about the findings that led you to your

21  conclusions?

22  A       Sure.  So in the -- first of all, in the history Ms.

23  Montgomery gives a classic history for symptoms of temporal

24  lobe epilepsy over many, many, many, many years, going back to

25  even her childhood she's had experiences that go along with

1    temporal lobe epilepsy.  In fact, to such an extent that, you

2    know, that I was unable to get further EEG testing on her; but

3    even without that electroencephalogram testing to look at her

4    brain waves, her history points to a temporal lobe epilepsy in

5    a way that I would treat her just based on her history just as

6    a clinician.

7    Q     When you say "I would treat her," that implies that

8    would take some judgment?

9    A     Correct.

10   Q     Why is that?

11   A     Well, the diagnosis of temporal lobe epilepsy is made

12   by a lot of -- it is made by history, then a little bit is

13   helped by the examination, and then you can do confirmatory

14   tests.

15   Q     I guess what I'm getting at is what would be the

16   downside of treating it?

17   A     Oh, yes.  Right.  So if you -- no, these medications

18   have lots of side effects, chronic side effects and acute side

19   effects.  So it can affect your thinking.  They can give you

20   double vision and tremor and sleep problems and mood problems.

21   So it's a big deal to put somebody on seizure medicine.  So you

22   don't do it unless you're convinced that somebody has epilepsy,

23   then the benefits outweigh the risk of taking the medication.

24   Q     And just to be clear for the Court, I mean, you said

25   you're a clinician.  Do you have any ballpark figure of how

1  many people you have diagnosed with temporal lobe epilepsy in

2  your practice?

3  A      Oh, my goodness.  Probably 5-, 6,000 maybe, something

4  like that.

5  Q      Fair to say you're fairly familiar with the symptoms?

6  A      Yeah.  It happens every day just about, yeah.

7  Q      So when you say "I examined Ms. Montgomery and I saw

8  these signs and symptoms, I see it in her history," you're

9  somebody who knows?

10 A      Yes.  And typical, right?  So typical signs.  This

11 isn't like an atypical presentation of epilepsy.

12 Q      And let's break that apart a little bit.  What were the

13 typical signs you saw?

14 A      So the episodes of lost time and the episodes of -- she

15 had olfactory hallucinations but they were very stereotyped.

16 She had several episodes of lost time where she lost time even

17 if it was a few minutes long.  There's a question, you know,

18 she might have dissociation in other ways, but there were

19 discrete episodes that were brief in duration where she would

20 be doing something and all of a sudden she didn't know how she

21 was doing it.  That's very suspicious for seizures.

22         Then on the neurologic examination when I examined

23 her physically, she has weakness in her left hand, weakness in

24 coordination in her left hand.  That points to sort of brain

25 abnormalities in both the frontal lobe and temporal lobe

1    circuits.

2    Q    Let me ask you, Dr. Nadkarni, having watched you do

3    this exam, when you say "weakness in the left hand," it's not

4    something where someone has to -- they could sort of fake how

5    hard you're trying.  You were doing objective testing that

6    demonstrated to you the weakness?

7    A    Oh, yeah.  Right.  So she doesn't -- it's not like she

8    can't move her arm and anybody can see it; but if you dive in

9    and do subtle testing, the testing might be subtle but the

10   findings are sort of not subtle for somebody who knows what

11   they're looking for.

12   Q    Let's talk a little bit about the data you reviewed

13   from Dr. Gur, the MRI and the PET.  Are your findings and Dr.

14   Gur's consistent or inconsistent with each other?

15   A    They're consistent with each other.

16   Q    Is there -- do you have a slide we need to look at to

17   talk about that?

18   A    I don't think so.

19   Q    Could you tell us how they -- how they're congruent?

20   A    Right.  So my findings in the neurologic examination

21   portion of my assessment of her pointed to frontal lobe

22   dysfunction, and the PET scan and the MRI also point to those

23   areas as being abnormal along with limbic dysfunction, which is

24   temporal lobe dysfunction, which maps perfectly onto her

25   history of probable epilepsy and the seizures.

1    She also had some element of incoordination in her

2    left hand, which might just be from the weakness, but that

3    could point to like a global difficulty in her right

4    hemisphere.  The right side of the brain controls the left side

5    of the body so it's a fact that she was weak but she had some

6    incoordination that spoke to sort of a right hemisphere

7    problem.  These are all findings that came out in the

8    neuroimaging studies.

9    Q    Did you also review the neuropsychological testing

10   conducted by Dr. Fucetola?

11   A    I did.

12   Q    Were his findings consistent or inconsistent with your

13   findings?

14   A    I think they were consistent with my findings.

15   Q    I was just going to ask, did he not also give the MoCA,

16   the Montreal Cognitive Inventory?

17   A    He did a much more extensive version of the same thing.

18   Q    But I believe it's true that on one of the subscales of

19   that involving the words starting with F, you ended up with

20   almost exactly the same results?

21   A    Yeah, which is important.  So that's another finding on

22   the neurologic examination that was striking is that if I asked

23   somebody to give me as many words as they can in one minute

24   that started with the letter F, you should -- somebody who has

25   sort of a basic level of education should be able to hit, you

1    know, 15, 20, 25 words in a minute that start with letter F,

2    and Lisa could only produce 12 words for me which is shocking

3    given what her other neuropsych testing showed, like her IQ was

4    very high.  There's no explanation for why she couldn't give

5    those -- more than 12 words.

6              And really she was trying and the -- what it shows

7    is that the frontal circuits -- these same frontal circuits are

8    involved in generating thoughts and words and those frontal

9    circuits, the medial frontal circuits don't work as well with

10   her and that was a focal finding in that neuropsych testing

11   too.

12   Q    It seems to a layperson, Dr. Nadkarni, that you sort of

13   mentioned so many different parts of the brain and so many

14   different circuitries that it sounds like you're saying, you

15   know, her brain is just completely falling apart.  I think I

16   know from your conversations that you're alluding to activity

17   because of there being systems within the brain that affect

18   more than one region?

19   A    That's exactly right.  So it's not she has a tumor or a

20   stroke in one place and now she can't move her hand.  It's that

21   these are networks that have been severely damaged, I think.

22   Q    Is it fair to say that though there are a lot of

23   different names of locations that you've talked about, you're

24   actually talking about systems within the brain that work

25   together and you're saying this system has a problem and this

1    system has a problem?

2     A        Right.   Those systems absolutely -- those systems

3    absolutely work together.   And, you know, the problem is that

4    it's very hard to assess those networks when we examine

5    patients.   So if I look for somebody the way they move, that's

6    one thing or if you do neuropsych testing, all of the things

7    that you test in neuropsych testing that were on that Brodmann

8    Map, like language and attention and set shifting, each one of

9    those discretely could be okay in somebody's brain, but their

10   connections between the emotional circuitry and the salient

11   circuitry and the judgment circuitry can be completely

12   dysfunctional and you would never know from just neuropsych

13   testing or even not necessarily from neuroimaging all the time.

14   Somebody could have a normal MRI scan, which we don't have in

15   this case, and they can have severe problems in the frontal

16   lobe and comportment, comportment syndrome.

17    Q        You indicated that despite all of these subparts you've

18   named as sort of generally problems in the frontal, parietal,

19   and limbic systems?

20    A        Yes.

21    Q        Would a problem with any one of those be fairly

22   crippling to someone's functioning in the world?

23    A        Yes, absolutely.

24    Q        But here we have sort of an interplay of different

25   problems?

1    A       Right.  So this is especially disabling.  In a very

2    sort of verified kind of -- in the highest levels of human

3    interaction and functioning, this is like -- it's almost as if

4    these areas are completely nonfunctional sometimes, these

5    networks I mean.

6    Q       Is it true that an injury to one of those areas would

7    affect the functioning of other areas?

8    A       It's possible, sure.

9    Q       I think at some point when we were speaking, you said

10   it's sort of like if a bomb went off in one part of the city,

11   it might affect the sewer in another part of the city?

12   A       Exactly right.  This woman hasn't been injured but

13   she's sustained multiple head injuries; and if you bomb a city,

14   you can -- if you bomb one part, you affect another part.  If

15   you bomb multiple parts, which is what's I think happened in

16   her case, then the ramifications can be significant.

17   Q       All of the opinions that you've testified to here today

18   and your diagnosis of these problems in Ms. Montgomery's brain,

19   do you hold those opinions to a reasonable degree of medical

20   certainty?

21   A       Yes.

22           MS. HARWELL:  If I might have just one moment, Your

23   Honor?

24           THE COURT:  All right.

25           MS. HARWELL:  I don't have any more questions.  The

1739

1    government may have some more.

2              MR. VALENTI:  May it please the Court.

3              THE COURT:  Mr. Valenti.

4    CROSS-EXAMINATION BY MR. VALENTI:

5    Q      Dr. Nadkarni, is that pronounced correctly?

6    A      Yes.

7    Q      Thank you.

8              Did I understand, sir, you're a medical doctor,

9    correct?

10   A      Yes.

11   Q      And you study the neurological systems most focusing on

12   epilepsy; is that right?

13   A      Epilepsy and neuropsychiatry.

14   Q      And neuropsychiatry.  And I believe that I understood

15   this and read in your report that you believe that some of the

16   periods of dissociation that Ms. Montgomery had been attributed

17   to and other findings were, in your opinion, more likely a

18   result of postictal situations that she found herself in after

19   seizure; is that correct?

20   A      Right, ictal and postictal.

21   Q      Ictal meaning, i-c-t-a-l, kind of the scientific term

22   for in a seizure?

23   A      Right.

24   Q      And postictal meaning just that, after the seizure?

25   A      Right.

1    Q      And postictal, as I understand your report, would mean

2    that the brain having had experienced some type of traumatic

3    event has a period of recovery post-seizures, correct?

4    A      Right.

5    Q      And during that period of seizure or post-seizure,

6    during that recovery period, a person's not got their full

7    mental faculties at their disposal, correct?

8    A      Right.

9    Q      I believe you described that there were a number of

10   circumstances that can be found kind of in the -- commonly

11   aware, as most people think of, the actual physical convulsions

12   but for someone in your field, you see things like lost time,

13   inability to have attention, or something like, I think you

14   said, smells?

15   A      Abnormal smells.  Lots of symptoms that are like that

16   that go with temporal lobe epilepsy.

17   Q      The conclusions you drew about some of these periods of

18   time loss for Ms. Montgomery was a result of the neurological

19   examination you did as well as the examination of her history;

20   is that correct?

21   A      Yes.

22   Q      Okay.  We didn't really talk about it in much detail,

23   but can you talk to us about the neurological examination you

24   did conduct?  How did you go about doing that?

25   A      How did I do the neurological examination?

1    Q        Correct.

2    A        So I was sitting in the room with her and I checked her

3    cranial nerves, checked eye movements, and I checked the

4    symmetry of her facial movements, her hearing, the different

5    nerves of her head and face; and then you do a motor

6    examination which involves testing muscle tone and bulk and

7    strength, sensory examination testing basic sensory modalities,

8    coordination examination, and a cognitive assessment as well.

9    Q        I think you mentioned EEG; is that correct?

10   A        I mentioned -- in my impression I said that it would be

11   helpful to get an EEG.

12   Q        Was one done?

13   A        I don't believe so.

14   Q        Okay.  An EEG, for purposes of the record, stands for

15   electroencephalogram?

16   A        Right.

17   Q        That does what?

18   A        That shows you abnormalities of brain waves that might

19   be associated with various different illnesses.  So one being

20   epilepsy.  It can show you how active those brain waves are in

21   terms of epileptic spikes.  So you can see spikes on an EEG

22   when people aren't having seizures.  It tells you where

23   seizures can come from.  It can tell you that somebody has

24   abnormal brain functioning having had lots of seizures as well.

25   Q        For purposes of your courtroom discussion, as I'm not

1742

1   an expert in the field, is a seizure from epilepsy kind of like

2   an electrical overload in the brain?  Is that a decent analogy?

3   A      Yeah.

4   Q      Okay.  Well, with an EEG if you happen to be doing it

5   at the time of a seizure, is it fair to say you're trying to

6   track those electrical impulses and put them in graphs and you

7   can see some evidence that that's going on?

8   A      That would be ideal if you can get it during a seizure.

9   That's very rare to catch it during a seizure.

10  Q      When someone experiences a seizure, is there evidence

11  left beyond the surface?

12  A      Yeah.  So oftentimes in people who have epilepsy if

13  they have seizures for a long time, they can have changes that

14  happen in their psychiatric symptoms and cognitive functions

15  and even motor functions that are subtle but are remnants of

16  having seizures in the past.

17  Q      Anything along the lines of a hormonal or an enzyme or

18  something that you -- terrible.  I'm not an expert.

19          Can you draw blood?  Is there anything you can do

20  like that to show there's been past indications of seizure

21  activity in the brain?

22  A      No.

23  Q      So if the test was all about the modality, the

24  strengths, the grips, the symptomatology that we've discussed

25  is the best post-seizure way to determine if someone has had

1  those in the past?

2  A      And the EEG and MRI if it happens right afterwards.

3         MR. VALENTI:  Just a moment, Your Honor.

4         Nothing further.  Thank you.

5  REDIRECT EXAMINATION BY MS. HARWELL:

6  Q      Dr. Nadkarni, I believe you just testified that it

7  would be very rare to actually catch a seizure during an EEG?

8  A      Correct.  We try to make that happen.  It's very hard.

9  Q      I just want to ask you one more question.  If in Ms.

10  Montgomery's social history there was evidence that during

11  systematic and repeated and very brutal rapes that occurred

12  over several years, her head was banged into a concrete floor

13  repeatedly, could that cause the kind of injury that you have

14  been describing here today?

15  A      Right.  So I think -- I missed that.  I don't think I

16  said that.  But I think all of her -- mostly, 99 percent of her

17  problems that are involving the frontal lobe and her temporal

18  and parietal lobe are from repeated traumatic injury.  She also

19  had a prenatal toxic history also so that probably didn't help.

20         But developmentally and then postbirth, severe

21  traumatic head injuries she's had repeatedly will give you this

22  kind of a picture, and classically those patients present with

23  comportment problems, these frontal lobe syndrome kind of

24  issues.  And epilepsy -- you have posttraumatic epilepsy also,

25  which I think is what happened with her.  She had posttraumatic

1    epilepsy from that too.

2    Q      Thank you.

3           MS. HARWELL:  No further questions.

4           MR. VALENTI:  Nothing further, Your Honor.

5           THE COURT:  Thank you.  Doctor, you're excused.

6           THE WITNESS:  Thank you very much.

7           (Witness excused.)

8           MS. HARWELL:  Your Honor, movant would call Dr.

9    George Woods.

10          Your Honor, if we might have a brief recess.  The

11   government needs to review Dr. Woods' PowerPoint.

12          THE COURT:  All right.

13          MR. VALENTI:  I've not seen his PowerPoint before.

14          THE COURT:  How long do you want?

15          MR. VALENTI:  I'm told it's a hundred slides.

16          THE COURT:  A hundred slides?

17          MS. HARWELL:  It's all information that they have

18   seen before.

19          MR. VALENTI:  It's probably from his report, which

20   I've read, but I've not seen his PowerPoint.

21          THE COURT:  It's pretty early to break for lunch but

22   we could do that.

23          MR. VALENTI:  I could probably -- if we could take

24   ten minutes.  I need to see it to make sure that I'm

25   comfortable with the material in it.

1745

```
 1              THE COURT:  I'll check with you in about ten

 2    minutes.

 3              MS. HARWELL:  Thank you, Your Honor.

 4              (Recess taken at 11:53 a.m.)

 5              (The noon recess was taken at 12:05 p.m.)

 6                        AFTERNOON SESSION

 7              THE COURT:  Thank you.  You can be seated.

 8              MS. HARWELL:  Thank you, Your Honor.  I think we

 9    were in the process of calling Dr. George Woods.

10              THE COURT:  Dr. Woods, would you come up to the

11    witness stand, please.

12              THE WITNESS:  Thank you, Your Honor.

13    GEORGE WASHINGTON WOODS, JR., being sworn by the courtroom

14    deputy, testified:

15    DIRECT EXAMINATION BY MS. HARWELL:

16    Q     If you would state your name full name.

17    A     George Washington Woods, Jr.

18    Q     And are George and Woods spelled in the customary way?

19    A     Yes.

20    Q     If you would tell us about your professional

21    background.  What is your vocation?

22    A     Sure.  I'm a physician.  I specialize in psychiatry and

23    a subspecialty of neuropsychiatry.

24    Q     And where are you licensed to practice?

25    A     I'm licensed in California.
```

1    Q      And what is neuropsychiatry?

2    A      Neuropsychiatry is the -- really the evolution of

3    psychiatric practice.  It's really understanding that the brain

4    is a very, very important instrument in understanding how

5    people behave, and so neuropsychiatry is really moving from the

6    early psychiatry when we really just looked at, say,

7    medications or we looked at mental health.  We didn't really

8    have a sense of the ways in which the brain impacted behavior

9    and other medical diseases.  If I could give you a quick

10   example?

11   Q      Sure.

12   A      When we first started using psychiatric medications,

13   particularly antipsychotic medications, they were really aimed

14   at what we call positive symptoms of psychosis and positive

15   symptoms are hallucinations and delusions primarily, and to

16   some degree psychiatric medications were useful for that.

17          As time went by, though, we found out that there are

18   other types of symptoms.  There are negative symptoms;

19   withdrawal, isolation, lack of motivation.  And there are

20   cognitive symptoms.  There are symptoms that work that are

21   brain based that impact a person's ability to weigh and

22   deliberate, to sequence their behavior, to really understand

23   the big picture, and psychiatric meds are not really aimed

24   towards those cognitive symptoms.

25          So neuropsychiatrists are really -- really look at

1    those cognitive symptoms.  We certainly take into consideration

2    the positive symptoms and negative symptoms, but we want to

3    look and see the ways in which the brain doesn't work and how

4    does that translate into behavior.

5    Q     Are you also trained in psychopharmacology?

6    A     Yes.

7    Q     What is psychopharmacology?

8    A     Psychopharmacology is the relationship between

9    medications and their impact on the organism.  What I mean is

10   that medications affect not only the brain but all parts of the

11   body.  So after my psychiatric residency, I did a fellowship in

12   geriatric psychopharmacology, which was a two-year program at

13   the National Institute of Mental Health and the American

14   Psychiatric Association.

15         MS. HARWELL:  Your Honor, though that's not the

16   primary focus of Dr. Woods' testimony, I would note for the

17   Court that by agreement with the government, Dr. Woods is going

18   to be testifying to information that is included in the report

19   of Dr. DiAnne Bradford who was the psychopharmacologist

20   retained by the Montgomery team but who passed away as we were

21   preparing for this hearing.  She and Dr. Woods have worked

22   together for years, and he is both trained to recognize, to

23   understand, and discuss her findings and will be relating those

24   to the Court.

25   Q     (By Ms. Harwell)  Dr. Woods, do you have a clinical

1748

1    practice where you actually treat patients?

2    A        Yes, I do.

3    Q        And where is that?

4    A        It's in Oakland, California, 401 Grand Avenue,

5    Suite 380.

6    Q        And how much of your time do you spend treating

7    patients?

8    A        About 40 percent of my time is spent treating patients

9    and about 60 percent of my time -- say about 50 percent of my

10   time is doing consultations both civil and criminal forensic,

11   and 10 percent of my time -- I'm trying not to get over a

12   hundred, but about 10 percent of my time is spent doing

13   clinical research.

14   Q        And how -- you mentioned your forensic practice.  How

15   does your clinical practice inform your forensic practice?

16   A        When you see patients, you see the range of pathology.

17   When you see patients, you see people that may work every day,

18   may raise children, may become educated, may function and yet

19   still have cognitive and psychiatric problems.  So much

20   different perspective than only looking at forensic patients.

21   The other real advantage, in my opinion, in seeing patients is

22   that you work patients up.

23   Q        Sorry?

24   A        What we call work patients up.  So when someone comes

25   in -- for example, last Sunday, Sunday a week ago, I saw a

1    patient.  In seeing her, I developed a differential diagnosis.

2    Is this a minimal brain problem?  Is it minimal cognitive

3    impairment?  Is this early onset dementia?  Is this depression?

4    Is this her thyroid medicine?  And then you figure out what

5    testing needs to be done in order to determine exactly what's

6    going on with that person.  So that's not necessarily what

7    occurs in a forensic setting.

8    Q      I hear you making a distinction between the clinical

9    setting and the forensic setting in terms of the longitudinal

10   nature of the clinical practice?

11   A      That's correct.

12   Q      Is that what you're saying?

13   A      That's correct.

14   Q      So you develop hypotheses and then are able to sort of

15   test them out over time?

16   A      That's correct.

17   Q      And that informs your ability to what you're seeing in

18   the other contexts?

19   A      That's correct.  The clinical picture is what counts

20   even in a forensic setting.

21   Q      Why is that?  What do you mean?

22   A      Because you have to know what's wrong with the person

23   before you can answer forensic questions; and if you are

24   hamstrung in having a good understanding of what's going on

25   with the person clinically, then it hampers your ability to

1    answer the forensic question.

2              If you look at the statutes, you know, the

3    statutes -- really many of the statutes that relate to mental

4    illness or mental disorder say you have to have a mental

5    disease or defect.  Well, if you don't have a clear

6    understanding of what that mental disease or defect is -- is

7    there a mental disease or defect?  If there is one, what is it?

8    What are the range of possibilities?  You can't answer a

9    forensic question until you're clear about the clinical

10   question.

11   Q      You mentioned that you're trained forensically?

12   A      Yes.

13   Q      And I'm sorry.  We kind of skipped over some steps in

14   terms of your training.  Perhaps we can back up and do some of

15   that in terms of what are your qualifications to treat people

16   clinically and to offer forensic opinions.

17   A      Sure.  Clinically I finished a medical -- a rotating

18   medical internship in Alameda County Hospital in Oakland,

19   California.  I then did a psychiatric residency that was

20   focused on neuropsychiatry at the Pacific Medical Center in San

21   Francisco, and during that residency, we took extended

22   neurological courses as well as externships.  So we studied

23   movement disorders.  We did neurological examinations.  We

24   studied epilepsy.  We studied a number of things at Kaiser,

25   Kaiser Center in San Francisco, California.  I was chief

1   resident by the last year, and at that point I did a fellowship

2   in geriatric psychopharmacology, as I mentioned.

3            The reason why I did that particular residency is

4   because geriatric medicine, as we now know, the average person

5   over 65 is on about eight or nine different medicines.  So you

6   not only want to know the medication itself, but you want to

7   know what interactions of the medication may be.  Does this

8   medicine interact with another medicine?  In this case we'll

9   see where certain medicines would increase the blood level of

10  other medications.  So that was really my training from a

11  clinical perspective.

12           In terms of forensics, I first started teaching at

13  the University of California, Davis in their Department of

14  Forensic Psychiatry.  I taught there from about 1990 to 1994.

15  From 2000 to 2012 I taught a course for second- and third-year

16  residents -- or third- and fourth-year residents in Atlanta at

17  Morehouse School of Medicine in the Department of Psychiatry,

18  and that course is called Clinical Aspects of Forensic

19  Psychiatry.  Once again, capturing that clinical piece that is

20  really felt to be important.

21           I currently teach at the University of California

22  Berkeley at Boalt Hall in the law school.  I teach a course on

23  law and mental health.  And I also have a webinar of Westlaw

24  called Where Mental Health Meets the Law, and these are courses

25  that are really designed to put together an understanding of

1752

1    the neurobehavioral aspect of psychiatry and the law.

2            Currently I'm taking a sabbatical from Morehouse

3    School of Medicine because currently I am president of the

4    International Academy of Law and Mental Health.  So that's the

5    forensic side.

6            But on the clinical side much of my work is really

7    aimed at looking at what we call neurodevelopmental disorders;

8    fetal alcohol, Fragile X, and in that sense I'm associate

9    editor of the Journal of Policy and Practice in Intellectual

10   Disabilities.  I'm also the co-chairman of the special interest

11   research group for the International Association for the

12   Specialized Study of Intellectual and Developmental

13   Disabilities.

14           I've worked for the World Health Organization in

15   Kenya and Italy and Zanzibar, and I'm currently working in

16   Malawi where I am working with local doctors learning about

17   their knowledge and their expertise in neurology and

18   neuropsychiatry and also teaching as well.

19   Q     Have you been recognized as an expert in the field of

20   neuropsychiatry?

21   A     Yes.

22   Q     State court?  Federal court?

23   A     State and federal court.

24   Q     And military court, I think?

25   A     That's correct.

```
 1    Q       Have you seen Exhibit -- Movant's Exhibit 22, a copy of
 2    your CV?
 3    A       Yes, I have.
 4    Q       You actually provided it to us?
 5    A       Yes.
 6    Q       And does it accurately reflect your background,
 7    accomplishments, teaching appointments, and publications?
 8    A       Yes.
 9            MS. HARWELL:  Your Honor, I believe Exhibit 22 is
10    already in evidence.
11    Q       (By Ms. Harwell)  I think, Dr. Woods, you were talking
12    about how clinical practice informs forensic practice and I
13    sort of backed up to get your qualifications to do that.
14    A       Sure.
15    Q       In Ms. Montgomery's treatment, did you see any
16    interplay of sort of clinical practice and how that works with
17    forensic practice?  I'm referring to sort of the treatment, the
18    longitudinal treatment of Ms. Montgomery that you've reviewed.
19    A       Yes.  I'm sorry.  I paused there for a minute because I
20    think the difficulty was there was not an interplay that
21    perhaps you would have liked.
22    Q       Okay.
23    A       What we really see -- if I may just summarize?
24    Q       Sure.
25    A       What we really see with Ms. Montgomery is that there
```

1   was a significant period of clinical treatment where Ms.

2   Montgomery was actually diagnosed with bipolar disorder and

3   actually diagnosed with several subsets of bipolar disorder

4   that are very important.

5         She was diagnosed, for example, with a mixed phase,

6   a rapid cycling, what we call a rapid cycling of bipolar

7   disorder.  Rapid cycling bipolar disorder means that someone

8   can have both elevations and depression at the same time.

9         Rapid cycling is a type of bipolar disorder that is

10  commonly found -- more commonly found in women.  It is a type

11  of bipolar disorder that is most commonly found with the type

12  of cognitive impairments that we discussed quickly and I'll

13  talk more about this.

14        So early on she was -- the diagnosis of bipolar

15  disorder was made, and she was treated from 2005 actually until

16  today.  What we see in that ongoing treatment is, No. 1, her

17  clinicians actually treat her for mood disorder.  They treat

18  her with mood-stabilizing drugs.  They treat her with

19  antidepressant medications.  They do not treat her completely

20  because Ms. Montgomery also has a psychosis.  And -- I'm sorry.

21  Q     I was going to say, we're going to go more thoroughly

22  into your findings, but I wanted you to give sort of a brief

23  summary upfront.

24        MS. HARWELL:  Your Honor, I neglected to ask if the

25  Court would consider Dr. Woods' opinions as based on his

1    expertise in the field of neuropsychiatry.

2              MR. VALENTI:  No objection.

3              THE COURT:  I will do so.

4    Q       (By Ms. Harwell)  Dr. Woods, did we provide you

5    referral questions as you began to look at the Lisa Montgomery

6    case?

7    A       Yes.

8    Q       Did you prepare slides to help us walk quickly as

9    possible through all of the information that you reviewed and

10   considered?

11   A       Yes.

12   Q       And the slides that we're going to go through for Your

13   Honor, for the Court, would you -- are they directed towards

14   that which was important to you in your assessment of Ms.

15   Montgomery?

16   A       That's correct.

17   Q       If we could talk, then, about your referral questions.

18   I believe we gave you seven referral questions.

19   A       I believe that's correct, yes.

20   Q       And if you could just succinctly -- I mean, the judge

21   is going to see them flash up on the screen, but if you could

22   tell him what you were looking at.

23   A       Sure.  First, the capacity to appreciate the

24   wrongfulness of her conduct or to conform her conduct to the

25   requirements of law significantly impaired, regardless of

1    whether the capacity was so impaired as to constitute a defense

2    to the charge.  That was first.

3           To determine whether she was suffering under a

4    severe mental or emotional disturbance at the time of the

5    offense, and also to determine whether Ms. Montgomery's

6    neurobehavioral history was an important component of her

7    social history.

8           To review prior assessments of Ms. Montgomery by

9    both trial defense and government experts and to really look at

10   whether they accurately reflected Ms. Montgomery's

11   neurobehavioral history and also to discuss whether the

12   reliable psychiatric assessment of Ms. Montgomery should

13   include, must include consideration of her neuropsychological

14   deficits.

15          Did Ms. Montgomery's impairments and medications

16   affect her ability to rationally assist her counsel prior to

17   and during the trial?  And did her impairments and medications

18   inform her demeanor at trial?

19   Q      Did you prepare a report of your findings as to those

20   seven referral questions?

21   A      I did.

22   Q      And if I were to tell you that report has been marked

23   as Exhibit 20 -- let me hand it to you.  I'll ask you if that's

24   a copy of your report that you prepared?

25   A      Yes.

1   Q      And then did you further prepare an addendum to that

2   report earlier this year?

3   A      Yes, I did.  I think it was 2013.  I just want to look.

4   Yes.  Thank you.  Yes.

5   Q      Is that a copy of the addendum you prepared in this

6   case?

7   A      That's correct.

8   Q      And if you read into the record which exhibit number

9   that is.

10  A      The addendum is Exhibit No. 21 and the initial report

11  is Exhibit No. 20.

12  Q      Do you need those to be able to testify?

13  A      I would appreciate it.

14  Q      I will leave them with you.

15  A      Thank you.

16  Q      And do those reports, both the one filed in 2013 and

17  then the supplement filed earlier this year, accurately reflect

18  your findings?

19  A      Yes.

20         MS. HARWELL:  And, Your Honor, I believe those are

21  already in evidence.

22  Q      (By Ms. Harwell)  Dr. Woods, I would like us to talk

23  now about the methodology you used in arriving at those

24  conclusions in your report.

25  A      Yes.  The methodology that I use is really to review

1    the data as the slide shows.  I reviewed the data of the

2    biopsychosocial history.  I must start out by saying that the

3    biopsychosocial history is the most scientific component of any

4    medical examination.

5    Q       Why do you say that?

6    A       Because testing is without context.  It's important

7    that when you do neuropsychological testing, when you do

8    neuroimaging, when you do psychometric like the MMPI-2, that

9    you understand the context in which that testing was done and

10   you have a much better sense of who that person is if you have

11   some history.

12            We now know that genetics are very, very important.

13   Genetics are part of your biopsychosocial history because in

14   this case we know that family members share genetic disorders,

15   family members share mood disorders, and that's important to

16   know.  So that's really where you should start with a thorough,

17   comprehensive biopsychosocial history and your science is added

18   to that.

19   Q       Do you feel that you have a full comprehensive

20   biopsychosocial history in this matter?

21   A       Yes.  It was evolving over time, but that's certainly

22   why I wrote the addendum, but yes.

23   Q       In addition to reviewing the biopsychosocial history,

24   what else do you do in your methodology?

25   A       You really want to look at a clinical assessment.  You

1    want to be able to do a thorough enough examination, not just

2    an interview, but certainly like in this case where I did a

3    neurological examination.  I also noted that Dr. Nadkarni did a

4    neurological examination as well as a psychiatric examination.

5            You want to be able to look at documents across the

6    life span, educational records, social service records.  You

7    certainly want to take into consideration other mental health

8    evaluators.

9    Q    I want to ask you about that.  In this case did you

10   work as part of that interdisciplinary team?

11   A    Yes.

12   Q    And were you working in consultation, then, with Dr.

13   Porterfield, Dr. Nadkarni, and Ms. Vogelsang?

14   A    Yes.

15   Q    And your work informed each other; is that fair to say?

16   A    Yes.  If I can just quickly?

17   Q    Sure.

18   A    When you go see a doctor and they make certain

19   decisions, they then send you to the lab to get lab work.

20   They'll send you to get a neuroimaging or an X ray.  That's the

21   kind of interplay, collaborative work that gives you a much

22   more informed understanding of what's going on.

23           So the reports of other mental health evaluators are

24   very important.  The clinical interviews are very important.

25   The neurological, neuropsychological, and neuroimaging are very

1    important in understanding the evolution of the science of

2    trauma and neurobiology is very important.

3    Q      Can you tell the Court how you then weigh all this

4    information?  It seems like you take a lot of data from a lot

5    of different sources.  How do you begin to synthesize that

6    information?

7    A      You look for internal consistencies.  You look for

8    information that's outside of the forensic setting as well as

9    within the forensic setting.  For example, the social services

10   records from 2003 that notes that maybe delusional, bipolar

11   2003 was before the offense.

12          When you look at the medical records of Dr.

13   McCandless and Dr. Kempke, Dr. McCandless treated Ms.

14   Montgomery for years; and when you look at the consistent

15   treatment, Dr. McCandless' attempts to change medications and

16   to add medications, to really try to gain some control over

17   these symptoms, that's very, very important because it's

18   outside of the forensic setting.  It's someone that is really

19   being a treater.  Those can be very, very helpful to your

20   forensic conclusion.

21   Q      Was all of the data you reviewed equally relevant?

22   A      It's difficult to -- it's difficult to weigh.  What you

23   want to be able to do is to see if there are lines of thinking.

24   Are there lines of thought that are more important than others?

25   For example, in this case one of the lines of thought is that

1  there is a family history of mood disorders, family history of

2  bipolar disorders, so that becomes increasingly important.

3  There's a family history of psychotic disorders.  There's a

4  family history of sexual abuse.  Those become the lines you

5  want to begin to start to follow more carefully.

6  Q      Was some of the data you reviewed relevant to more than

7  one of your referral questions?

8  A      Yes.

9  Q      After weighing the data, then what sort of guides you

10  in formulating your forensic assessment?

11  A      The question is, No. 1, are these mental diseases and

12  defects?  No. 2, of what significance are they?  Are they like

13  Tom Brokaw?  Nobody knows who Tom Brokaw is.  One of the

14  television news persons that had depression but still was able

15  to get up every day and come to work.  Or are these of such

16  great significance that they actually impaired someone's

17  ability to function?

18            So once you gather the data, you look at

19  functioning.  You gather the data, you determine the

20  significance of the data, and then you turn and you look and

21  say, How did that person function?  Does this data -- is this

22  data consistent with how this person was able to function?  And

23  that's where the forensic component becomes more relevant.

24  Q      As you're talking about the data, I have to ask, was

25  the data provided to you here, including the biopsychosocial

1    history, did it give you an adequate basis to formulate

2    conclusions within a reasonable degree of medical certainty?

3    A        Yes.

4    Q        By way of summary, can you provide a preview of your

5    clinical findings first, then we'll move to the forensic

6    findings?

7    A        Yes.  First of all, Ms. Montgomery has brain impairment

8    and this impairment is lifelong.  Her brain impairment is

9    merely what we call multifocal.  It's in multiple areas.

10   Certainly it's in the back of the brain, the cerebellum.  It's

11   certainly in the right side of the brain, the right parietal

12   lobe, the right temporal -- frontal lobe, and we can talk more

13   about that.

14           There are early brain structures that are also

15   impaired, what we call the limbic system.  Now, the reason why

16   these early brain structures are important is because these are

17   the -- when a child is born, their brain is about 40 percent

18   formed.  A cat's brain is about 65 percent formed.  An ant's

19   brain is about 90 percent formed.  And it's thought that the

20   reason why a child's brain is only 40 percent formed is because

21   the environment plays such an important role in the development

22   of that child, much more so than in other species.  Those early

23   brain structures are what are there when that child is born;

24   the amygdala, the hippocampus.  These parts of the brain that

25   we call the limbic system.  Those are what a child is born

1   with, and they are tremendously impacted with those early

2   childhood experiences.  That's why we know now that those

3   experiences, if they're traumatic, can change the brain.

4   Q      Did you also see that there were behaviors present that

5   indicated brain impairment?

6   A      Yes.  Behaviors are symptoms.  It's important to keep

7   that in mind that behaviors are symptoms.

8   Q      I'm sorry.  I was going to say let's talk about Ms.

9   Montgomery's brain impairments.

10  A      Sure.  Her academic functioning made her look better

11  than she was.  She was a good student, relatively good student.

12  We sort of saw a drop-off in high school.  However, day-to-day

13  life requires more than reading and writing.  You see these

14  little clues not being able to sequence her thinking.  She

15  treated lice on her children but did not treat lice on her own

16  body.  So, consequently, her children continued to get lice.

17  She could add but she couldn't go to the store and shop.  So

18  we're talking about that transition from mathematics to

19  functional academics.  What could she do with this academic

20  information?  She could read but she had difficulty

21  remembering.  She could not help her children with homework and

22  she had difficulty making a menu.

23  Q      Did you see other behaviors that you saw as symptoms of

24  brain impairment?

25  A      Yes.  She talked about when she first got -- when she

1    finally got to prison at Carswell that it took her a month to

2    learn to make her bed that specific way that was required in

3    Carswell.

4            We know that she hit her children.  They have

5    described that in their declaration.  But at the same time when

6    she wanted to be a good mother and put her children in that

7    conflictual situation where they recognized her love but also

8    didn't know what to do with her behavior.

9            She would start a project and would be unable to

10   complete it.  And at times would actually just wipe the project

11   off.  She talked about knitting or tatting and just wipe it all

12   off.  She bought new tools each time she started a project.

13   Could I stop for a moment here?

14   Q      Sure.

15   A      Because the next point is a very important point.

16   These are sequencing issues.  These are not just someone who

17   gets frustrated and just throws things away.  These are

18   problems with the way that her brain works in terms of if I do

19   this, then I should do that and then I should do that.  When we

20   talked about making a menu, many of my clients that have

21   frontal lobe injuries cannot follow menus because menus are

22   sequencing.  You add these ingredients.  You put that on the

23   stove.  Then you add these ingredients.  Those are brain

24   problems.  And when you see someone who can't do those, your

25   first thought is what is going on with the way their brain is

1   processing this information.

2    Q      So these were clinical clues or symptoms that you saw

3   sort of in reviewing Ms. Montgomery's biopsychosocial history?

4    A      Exactly.  And that family and friends were completely

5   aware of -- as her sister said, I knew there was something

6   wrong with her but I didn't know -- I didn't think she was

7   schizophrenic.

8           These are -- these next two; bathing, changing

9   clothes, and cleaning houses are, again, the kinds of behaviors

10  one sees with people that are significantly impaired.  We are

11  comparing this to someone who theoretically has a 120 IQ; and

12  even though we know there are problems with IQ and what that

13  really means, this is someone that in a situation -- in a

14  testing situation they could do very, very well, but they can't

15  translate that, what we call ecological validity.  They

16  couldn't take it to the streets.  So she could have a 120 IQ on

17  tests, but the things that should reflect on the streets she

18  couldn't do.

19   Q      You indicated there that she had a certain obsessive

20  quality.  What do you mean by that?

21   A      People that are obsessive can be obsessive in a number

22  of interesting ways.  That show on TV, Hoarders.  Right.  And

23  hoarding is now in the DSM-5.  Hoarding has become a subset of

24  obsessiveness.  Obsessive qualities doesn't mean you're

25  obsessively neat.  What it means is you can't stop the way you

1   are because your anxiety overwhelms you, and she talks about

2   not being able to clean, not being able to bathe because of

3   this overwhelming anxiety that just kind of stopped her from

4   that kind of behavior, and that's what we're talking about.

5   Q      In addition to brain impairments, did you see clinical

6   symptoms of other disabilities?

7   A      Yes.

8   Q      If you could outline those briefly.

9   A      I think most of the prominent clinical symptoms were

10  the symptoms of her PTSD.  She had significant avoidance, and

11  this isn't an avoidance in that, I don't want to talk about

12  this or I don't want -- she was not able to talk about the

13  trauma that she had experienced to the degree that she had

14  experienced it, and that really speaks to not the Type 1 PTSD

15  that Dr. Dietz was talking about, the single act, but the

16  complex PTSD, the repetitive acts, the repetitive breaking of

17  spirit.  So it's my professional opinion, and I think Dr. Dietz

18  agreed, she had PTSD but it's much more severe PTSD.

19          Again, bipolar disorder.  Bipolar disorder is a mood

20  disorder.  It's a disorder of mood swings.  We normally think

21  of -- historically think of bipolar disorder as people that

22  have mania.  They think they're the king of England, then they

23  become depressed.  But that's not really true.

24          We know now that bipolar disorder most commonly

25  presents as irritability.  It presents as agitation.  Women sit

1    in the depressed phase of bipolar disorder much more so than

2    men.  They stay and they can't stay in that depressed phase.

3           As I mentioned earlier, bipolar disorder can be

4    mixed.  So that you have -- I don't know if you remember the

5    two masks, the laughing mask and the crying mask and bipolar

6    disorder, those two masks are mixed.  So a person may be

7    experiencing both the depression as well as the agitation or

8    irritability at the same time.  It's clearly what Dr.

9    McCandless struggled with three or four years ago.

10          It's difficult to determine to really -- and there's

11   no reason to, to determine which of these symptoms are mood

12   based, bipolar based, and which are trauma based because

13   they're comorbidly interreactive and they're bipolar and PTSD.

14   When we talk about comorbid, I'd like for you to think about

15   mixing colors.  When you talk about a comorbid disorder, we're

16   talking about disorders that mix and become something that

17   often is even greater and more severe.

18          These brain impairments don't go away when we talk

19   about comorbidity.  The traumatic experiences undermine her

20   perception of the reality consistently, even more so than the

21   bipolar disorder, and we see that in her treatment.  Her

22   sisters described her as going away, spacing out, as well as

23   other family members, other people in the community.

24          Her bipolar disorder was not clinically controlled

25   until she received antipsychotic medication, and she describes

1   this.  She describes while at CCA having some of her symptoms

2   controlled with the valproic acid and some of the symptoms

3   controlled with the other psychiatric medication, but really

4   her thought process remained impaired, and it really didn't

5   become better until she was tested with -- until she was

6   started with Risperdal.  There's a type of -- in statistics

7   there is a type of experiment that's called ipsative study.

8   Q     And what's an ipsative study?

9   A     It's i-p-s-a-t-i-v-e.  An ipsative study is a

10  one-person study where you -- we do the clinical studies often

11  where you may start someone on a medicine or start someone on a

12  mode of treatment and you then take them off of it and then you

13  start it back to see if it's really having the effect that it

14  did.

15         We see that happening with Ms. Montgomery in

16  March of 2009 when she has started for a very short time

17  on Risperdal.  She talks about being better.  I might say

18  Risperidone or Risperdal.  These are all the same medications.

19  She talks about clearing up.  She talks about her thoughts

20  being improved.  But she's taken off the medication in 2009 and

21  really struggles through the end of 2009 and 2010 until she is

22  put back on the antipsychotic.  She does very well and is on it

23  to today.

24  Q     Has Risperidone completely resolved all of Ms.

25  Montgomery's problems?

1   A       She is certainly more organized.  She is able to

2   compensate in ways that she was not able to compensate before.

3   Q       Let's talk about what ways she's able to compensate

4   now.

5   A       Sure.  She can take notes.  She can write things down

6   and follow through.  In fact, every day she writes down what

7   she wants to do for the next day.  She can use a calendar

8   effectively, and she describes these antipsychotics as making

9   her able to take advantage of these compensatory mechanisms.

10  Q       How are these clinical findings relevant for your

11  forensic conclusions?

12  A       Well, Dr. McCandless treated Ms. Montgomery pretrial,

13  during the trial, and posttrial.  The CCA records are replete

14  with symptoms of bipolar disorder, one which may -- one period

15  of time she may not -- she gets two hours of sleep in an

16  eight-hour period.  The next day she sleeps for 20 hours.

17  She's described as irritable.  She's described as confused.

18  She's described as not being able to focus.  She's described

19  with having impaired concentration.

20          And, most importantly, you see Dr. McCandless

21  for -- from 2007 through 2009 -- 2006, actually, through 2009

22  treating Ms. Montgomery with medications for bipolar disorder.

23  Now -- and changing those medicines.  Not just treating but

24  she gives her Elavil because Elavil -- because she was having

25  some pain.  So she puts in Elavil which is a tricyclic

1    antidepressant we'll talk more about later.  Ms. Montgomery has

2    significant sedation problems with that Elavil.  She cuts it

3    back.  Ms. Montgomery is a little better.  She cuts it back.

4    Ms. Montgomery is a little better.  So you see a real clinical

5    picture with Dr. McCandless during this period.

6    Q      And how does that clinical picture that you saw

7    beginning to emerge from Dr. McCandless' treatment of Ms.

8    Montgomery, which I think we're going to sort of walk through

9    here in a minute, how is that relevant, then, to the questions

10   we asked of you?

11   A      Well, they're relevant in that the clinical treatment

12   was not -- the depth of the clinical treatment was not taken

13   into consideration by many of the mental health providers both

14   on the defense side as well as on the prosecution side.

15   Q      So when you say they weren't adequately taken into

16   account, what do you mean by that?

17   A      Well, first of all, there was a limited social history

18   about the extent of mood disorders in the family.  If you knew

19   that, as we know now, that several of her brothers are on the

20   same medications that she's on; that people on both the

21   maternal side of the family as well as the paternal side of the

22   family carries diagnoses of mood disorders and specific

23   diagnoses of bipolar disorder; if you knew that there were

24   other family members that actually carry the same diagnosis, it

25   would inform your clinical opinion as to whether when in 2003

1   the social worker said, Wow, Ms. Montgomery she has a little

2   bipolar in here.  You would say, Wow, that makes sense.

3          We also know that genetically mood disorders -- the

4   incidents of mood disorders is about 4 percent of the

5   population in the United States and about 3.8 percent of the

6   population internationally.  If you have one nuclear family

7   member that has a mood disorder or a bipolar disorder, that

8   increases your potential of being bipolar twofold.  It doesn't

9   mean that you may have all the symptoms but you may have some.

10  That's exactly what we see in her situation.

11         Dr. Fucetola's testing was not followed -- although

12  he recommended it, was not followed with the neurological

13  assessment and that isn't just the neuroimaging but also a

14  neurological examination that Dr. Nadkarni and I did perform.

15  Q     I think you've already addressed the fact that the

16  clinician in the jail provided a lot of information that was

17  not really looked at in a forensic setting; is that right?

18  A     That's right.  And the clinical presentation undermined

19  her ability to rationally assist her counsel, in my opinion.

20  Q     We've heard -- his Honor's heard last week and I think

21  you've been made aware of Ms. Montgomery's statement at the end

22  of trial after the verdict had been returned and after the

23  death verdict had been returned that she would now -- what can

24  she do to help now.  Did you take that into consideration in

25  any way?

1    A       Yes.

2    Q       What did that signify to you?

3    A       It was -- it was consistent with impaired sequencing of

4    the frontal lobes.

5    Q       Can you say more of what you mean by that?

6    A       I purposefully said that more technically than I should

7    have.  One of the real things that the frontal lobes do is sort

8    of what we call executive functioning and executive functioning

9    helps you sequence.  It helps you put things in proper sequence

10   so they work.  This is too late.  She had been on trial for

11   weeks.  She had been in pretrial for years.  And so to make

12   this statement at this point, again, really reflects her

13   inability to rationally assist because of her brain impairment.

14   Q       What indicates to you that wasn't just withholding on

15   Ms. Montgomery's part?

16   A       Well, again, if you look at the clinical records,

17   you'll see that Ms. Montgomery had difficulty even before

18   that.  If you look to Dr. Kuncel's records, Patricia Kuncel,

19   she even -- Dr. Kuncel in 2007 is wondering whether Ms.

20   Montgomery can really keep it together during a trial.  She

21   sees her as delusional.  She sees her as fragile.  She's

22   concerned about her decompensating.  This is before the trial

23   even starts.

24           If you look at Dr. McCandless' records during the

25   trial, Ms. Montgomery describes having difficulty reading

1    discovery because she can't concentrate.  She's having

2    difficulty focusing.  And then you have this statement which,

3    again, is an indication of very poor sequencing.

4    Q      Is there any significance to the fact that Ms.

5    Montgomery had no reason to not help her counsel or did she

6    have a reason, in your opinion?

7    A      No.  No.  I don't think that there's any significance

8    to that.  You know, this is real.  The whole issue of

9    normalization comes up and we'll talk about that.  Our

10   tendency, particularly with people who have brain impairment,

11   is to try to normalize their behavior.  Couldn't it be this?

12   Couldn't it be that?  And if Ms. Montgomery did not have the

13   clear brain impairments that we see, certainly that could be

14   taken into consideration, but she does.

15   Q      What effect did medication have on Ms. Montgomery's

16   appearance in the courtroom around the time that she made that

17   statement?

18   A      The medications and particularly the Elavil, but the

19   others as well, impaired her presentation to the jury.  They

20   created both sedation and somnolence.  These are two different

21   phenomenon.

22   Q      And I think we're going to delve more into that

23   deeply in a little bit.  I just wanted to sort of get to your

24   answer -- a summary of your answers to the referral questions

25   before we begin walking through all the data.

1774

1   A       I'm sorry.  I apologize.

2   Q       That's okay.

3   A       My summary is that, yes, she was under severe mental

4   and emotional disturbance at the time of the offense and her

5   capacity to appreciate and the ability to conform was impaired,

6   that neurological and neuropsychological history is important.

7   It was either not considered or erroneously presented.  It was

8   incomplete and because it was incomplete, it was unreliable.

9            It's my opinion that the medications affected both

10  her demeanor and her affect and it -- later I'll describe what

11  affect is.  It masked her symptoms and their severity and, in

12  my opinion, it impaired her ability to be competent to aid and

13  assist counsel.

14  Q       And do you hold all of those opinions to a reasonable

15  degree of medical certainty?

16  A       I do.

17  Q       Let's talk about your clinical and neurological

18  assessment of Ms. Montgomery, if we could.

19  A       Sure.

20  Q       When did you conduct clinical interviews and assessment

21  with Ms. Montgomery?

22  A       My first interview was January 17th, 2013.  My second

23  was February 8th, 2013.

24  Q       And then did you go two times again this year?

25  A       That's correct.

1    Q      So fair to say the first two visits were before your

2    initial report, the second two before the supplement?

3    A      That's correct.

4    Q      Let's just start basically with what do you mean by

5    clinical interview?

6    A      Well, a clinical interview is an ability to gain some

7    understanding of this person's social history, of their medical

8    history, of their neurological history, of the way they present

9    to the world.

10          In my case the clinical interview or assessment also

11   includes a neurological examination, if at all possible.  So

12   that's what we did here.  I sat and I took her social history,

13   her family history, her medication history, her educational

14   history.  I talked to her about her various children, her

15   relationships.  I talked with her to some degree about her

16   sexual history and abuse, and I think it was on the second

17   interview that I did a neurological examination.

18   Q      And, Dr. Woods, we'll go more into detail in a moment

19   in terms of all of the information you had already reviewed

20   when you did those things, but fair to say you didn't walk in

21   and ask Ms. Montgomery those questions without any context or

22   sense of what was known and documented in her social history?

23   A      That's correct.  That's very different than -- that's

24   the difference between a clinical examination and a forensic

25   examination.

1    Q       So what is a differential diagnosis?

2    A       A differential diagnosis is the range of possible

3    diagnoses that one finds based upon the symptoms, presentation,

4    testing.  If I can give you an example?

5    Q       Sure.

6    A       You go into the doctor's office or you go into the

7    emergency room and you say, I'm having chest pain, left-sided

8    chest pain.  It's radiating to the arm and it's radiating to

9    the back.  If your doctor only does an EKG and only looks for

10   enzymes that relate to a heart attack, they may have made a

11   mistake.  There are 52 different causes for left-sided chest

12   pain.  So a differential diagnosis takes into consideration all

13   the possible causes that one may have with the symptoms you

14   see.

15   Q       And is that your approach to arriving at ultimately a

16   diagnosis?

17   A       Yes.

18   Q       How many times do you tend to assess a patient?

19   A       I try to assess a patient a number of times, if

20   possible.  That's not always possible in the forensic setting,

21   but in this particular case I saw her four times over the

22   course of three years.

23   Q       And why is it fortunate to see someone multiple times?

24   A       Because people present differently at different times.

25   That's particularly true if you have someone that you think has

1    a mood disorder like a bipolar disorder.  You might see them

2    one time when they are depressed.  You might see them another

3    time they may be more irritable or elevated.  You may see them

4    another time and they look good.  So rather than an extended

5    one-day or two-day examination, I try to catch people over the

6    course of several weeks or several months, if possible.

7    Q     And I'm going to ask a layperson question.  Would it

8    not do the same thing to stay longer one time?

9    A     No.

10   Q     And why not?

11   A     Because if you catch that person on that day, if you

12   catch them on that day, there's no indication that you will see

13   those other symptoms on that day.  Let me give you an example.

14   If you have someone that is traumatized, that you know has a

15   history of trauma and you sit there and you go for eight or ten

16   hours and you ask them about all of these symptoms of trauma

17   and did this happen to you and did that happen to you and how

18   did they do this and when did they do that, you are in fact

19   retraumatizing that person.  Because keep in mind that one of

20   the things that's most important about trauma is not having

21   them relive the trauma.  They try to avoid that.  So if you do

22   that over the course of time, you have an excellent chance of

23   creating symptoms, creating cognitive impairment that wasn't

24   there in the first place.  So I try to do it in bites over a

25   period of time to not create new symptoms.

1   Q     Dr. Woods, I don't know if the Court knows but I went

2   with you for your clinical assessment of Ms. Montgomery.  Would

3   you tell the Court why that was important?

4   A     Yes.  Ms. Montgomery is very -- afraid of men isn't

5   quite the question.  She's in fear in a different way, in an

6   avoidant way, in a traumatic way, and I felt it would be

7   important for you as her counsel to be there.

8   Q     When I went, did I interfere in any way?

9   A     No.  No.  You sat away.  You sat away.  There was no

10  interaction at all.

11  Q     Did I do anything that indicated I was cueing her or

12  inserting myself?

13  A     No.

14  Q     Let's talk about when a traumatized person tries to

15  tell their story.  The Court's heard a lot about the

16  difficulties a traumatized person has in telling that story.

17  From a neuropsychiatric perspective, is that person's inability

18  to tell their story intentional or unintentional?

19  A     Well, it's hard for me to put it in terms of intent.

20  Q     Maybe I'm asking the wrong question.  Is it something

21  the person deliberately does?

22  A     Well, certainly what we see with people that are

23  traumatized is that it impairs their memory.  There are

24  three -- there are multiple types of memory, probably 15 types

25  of memory, but there are three main types of components of

1   memory; registration, retention, and recall.  Registration is

2   do you see it?  Do you get it in?  Retention is can you hold

3   it?  And recall is can you pull it out when you need it?

4           Trauma really impacts registration, whether it comes in

5   or not, and that's exactly what happens in trauma.  A good

6   example would be the literature on eyewitness situations.  For

7   many, many years we thought this eyewitness testimony would be

8   the best testimony because they were right there.  They saw it.

9   That's exactly how it happened.  But when you are facing

10  something that's going on, you're not thinking, okay, he's got

11  a plaid shirt on.  It's got five buttons on it.  They've got

12  blue eyes.  It's the rare person that can do that.  And that's

13  why eyewitness testimony went out the window.  That's what

14  happens in trauma.

15  Q       What role -- or does Ms. Montgomery's mood disorder and

16  her cognitive impairments also play a role in her ability to

17  recount things separate and apart from the trauma?

18  A       Yes.

19  Q       And how so?

20  A       Ms. Montgomery has two particular neurological deficits

21  that impact her ability to recall.  The first one is she has

22  significant right brain -- I didn't bring my brain.  I can't

23  believe that.  I'm sorry.  I usually carry a brain.  Not

24  usually, but when I'm in court, I carry a brain where I can

25  kind of show these things.

1    But the right parietal lobe is right here, right

2    here on the right side of the brain and it's the part of the

3    brain that allows you to get the big picture, right?  To put

4    all the pieces together to really kind of figure out what it is

5    that we're looking at and what we see not only from the

6    neuroimaging but from the neuropsychological testing.  And from

7    Dr. Nadkarni as well as by neurological exam, she has

8    impairments of her right brain.  Her right frontal lobe doesn't

9    allow her to pick up things as easily.  Her right motor strip

10   is reflected in poor -- she has some weakness on her left side.

11   So her ability to kind of get the big picture, to really hold

12   everything in place is impaired.

13        The other part is her cerebellum, the back of the

14   brain, again, cannot be tested through neuropsychological

15   testing; but, again, Dr. Nadkarni and my testing through really

16   physical examination showed that she has cerebellum injuries.

17   Again, the cerebellum is the fine tuning of executive

18   functioning.  The cerebellum is the part of the brain that

19   allows you to really fine tune that sequencing, et cetera.

20   Q    And I'm trying to translate what you said so I can ask

21   an intelligent question.  Does that mean Ms. Montgomery does

22   have or doesn't have complete memories of things that happened

23   to her?

24   A    It's not either/or.

25   Q    Okay.  Tell me.

1    A        I apologize.  But it's not.  There may be things that

2    she has complete memory.  We call it patchy memory.  Depending

3    upon the degree of stress that she's under, the degree of chaos

4    that's going on around her, she may catch less.  If she is in a

5    testing situation, where none of that is going on and she's in

6    a quiet room, she may get more.  So it depends upon what we

7    call ecological validity.  What's going on in the environment

8    around her?

9    Q        And how can we assess her memory?

10   A        We can only tell about memories by trying to get the

11   information.  The biopsychosocial history really that's what it

12   does, it allows us to inform our interviews, and obviously that

13   was so terribly important in this case because David Kidwell's

14   declaration allowed us to move the ball further in terms of

15   understanding what really had occurred to her.

16   Q        When you reference David Kidwell's information, what do

17   you understand or what do you know about that?  Let's just

18   establish your baseline.

19   A        Sure.  David Kidwell knew Ms. -- knew Ms. Montgomery

20   when she was around 15 or 16 years old.  He would visit the

21   home.  She described to him the sexual abuse that was going on

22   in the home with the multiple persons, et cetera.

23   Q        Is it fair to say we provided you Mr. Kidwell's

24   declaration?

25   A        That's correct.

1    Q       So you have those facts?

2    A       That's correct.

3    Q       Do you also have the facts of the declaration from Ms.

4    Montgomery's ex-husband, Carl Boman?

5    A       Yes.

6    Q       And what do you understand to have happened, I mean the

7    nature of the trauma?  We don't have to go into everything

8    about it but what's salient for your opinions?

9    A       What is salient is that Mr. Boman met Ms. Montgomery

10   around this same time, around the time she was 16.  He was a

11   bit older.  He was 21, I believe.  And she told him similar

12   stories of being abused by -- they called it the family secret.

13   Of being abused by multiple men, being raped by her stepdad, by

14   other associates of her stepdad in multiple different ways,

15   being physically abused.  So I won't go into it but I think

16   you've heard that.

17   Q       What did the fact that Ms. Montgomery's mother was

18   involved with this abuse signify to you?  How is that

19   significant in your psychiatric evaluation?

20   A       Well, her mother betrayed her.  Parents are there to

21   train their children and children will be trained regardless.

22   Particularly young children will run to slaps as well as hugs,

23   and what we see -- when we really talk about trafficking, we're

24   talking about Judy Shaughnessy, I believe.

25   Q       Shaughnessy, yes.

1    A       Shaughnessy.  Who trafficked her child out to the

2    plumber, to the electrician who told her it was necessary for

3    her to do this in order to get the services.  So she developed

4    a mindset of coping mechanisms that had already been groomed by

5    her stepdad who had been bathing her naked, disciplining her

6    naked as early as eight or nine years old.

7    Q       You mentioned the role of parents and I think you

8    talked about parents teaching coping mechanisms.  So we'll skip

9    over this slide.  In your opinion, did Ms. Montgomery ever

10   become a complete integrated person?

11   A       She is better now than she's ever been.  She is with

12   the antipsychotic medication with the addition of Risperidone

13   and with the addition of that treatment for years now, not just

14   for months.  It takes years to train a brain.  She's better

15   now.  And then even now she says there are certain thoughts

16   that she can't entertain.  There are certain behaviors.  But

17   she's much better in functioning in the world.

18   Q       The way you discuss the role of parents and the way in

19   which parents are to teach coping mechanisms, does the absence

20   of those sort of coping mechanisms in Ms. Montgomery's history

21   explain why she followed her mother around for years and years?

22   A       Well, Ms. Harwell, you don't have an absence of coping

23   mechanisms.  You have a substitution of coping mechanisms.

24   Q       Help me understand the difference.

25   A       Right.  Children are going to cope.  Children are going

```
 1    to compensate.  And so the fact that she was not given

 2    appropriate coping mechanisms meant that was given

 3    inappropriate coping mechanisms.  She was given sexuality, for

 4    example.  She was given prostitution.  She was given, you know,

 5    being able to utilize her body in multiple different ways; and,

 6    frankly, there are times when she may have been sexual and it

 7    was in fact consensual.  She may have been hypersexual, but

 8    what we see really are the substitution of appropriate coping

 9    mechanisms for inappropriate coping mechanisms.

10    Q      I want to pause a moment there in the discussion of

11    sort of sexuality and ask you if in your -- both your opinion

12    as a clinician and then your opinion forensically, could Ms.

13    Montgomery as a 12-, 13-, 14-year-old girl consent to the

14    sexual abuse by her stepfather and his friends?

15    A      I thought about this a lot and I don't want to get

16    semantic about it, but there's a difference between agree and

17    consent.

18    Q      Say more.

19    A      Consent has a certain legal understanding.  Consent

20    implies that you are able to weigh and deliberate.  You're able

21    to think about your decision and you agree.  When you just

22    agree to something, that's what we see children do.  That

23    doesn't necessarily mean that they understand all of the

24    implications.  So the idea that a -- I'm just talking about

25    that 11 to 12 -- 11- to 16-year-old period that somehow her
```

1785

1    going along with something was the same as her consenting.  We

2    have laws against that.

3    Q        Is there a distinction between sort of compliance or

4    acquiescence agreement or using agreement to sort of mean

5    acquiescence?

6    A        The term for the trauma in respect is this learned

7    helplessness.

8    Q        What does that mean?

9    A        It means that over time you give up yourself and you

10   acquiesce to what's been done and what you know that is coming.

11   You know, one of the things we haven't talked about a lot is

12   that anticipatory anxiety.  Now we know that Ms. Montgomery

13   could anticipate being raped because it happened so many times.

14   She could anticipate these things that were going to -- so that

15   anticipatory anxiety was every bit as overwhelming in the long

16   run as the act itself.

17   Q        How can that be?

18   A        Because anticipatory anxiety erodes your ability to

19   concentrate.  It erodes your ability to function.  The

20   anticipatory anxiety is what is described by family members

21   when they talk about, well, she was always kind of ditzy.  She

22   was always out to lunch.  She really couldn't quite pick

23   things.  It occurred at an early age and it occurred so

24   frequently that it became a part of her, and you certainly see

25   that when you try to interview her.

1    Q      Dr. Woods, I'd like to turn for a little bit to that

2    which you found relevant in the biopsychosocial history.

3    A      Sure.

4    Q      How that factored into your assessment.  And the Court

5    heard quite a bit of our biopsychosocial assessment, and I

6    think I've made you aware that the government stipulated to the

7    fact that Ms. Vogelsang's report was well sourced and

8    authoritative in many regards.  So I don't want to get into too

9    much detail here but if we could look at that which was

10   important to you specifically in making your determination.  If

11   you could highlight for Court the things you saw in the

12   biopsychosocial history that most informed your opinions.

13   A      Well, if you could go with the first bullet point, the

14   third bullet point, and the fifth bullet point.  The first

15   bullet point, maternal and paternal history of neglect,

16   abandonment, and sexual dysfunction.  That should be -- for any

17   clinician that should be a clue in your differential as to

18   whether there is a mood disorder in the family.  Mood disorders

19   manifest themselves with these kinds of behaviors.  People that

20   have severe mood disorders have these kinds of behaviors.  That

21   doesn't mean that you say, Well, I'm not saying they're bad

22   people, but you want to look and see.

23           No. 3, the maternal and paternal history of mood

24   disorders.  This is what's call an affectively latent family.

25   Q      What do you mean by that?

1    A      In fact, I'll give you an example.  Psychiatric

2    disorders -- and this is not totally genetically accurate, but

3    psychiatric disorders are distributed in very much the same way

4    that diabetes is distributed.  These are heterogeneous

5    illnesses and what that means is if it's in a family, you've

6    got a higher chance of getting it.  It may not show up the same

7    in every family member.  Some people may get -- like myself,

8    you get late onset diabetes.  You may get early onset diabetes.

9         So it's the same thing with mood disorders.  When

10   you see mood disorders early in life, there's a greater chance

11   of those mood disorders have a strong genetic component, but

12   what we do know is that mood disorders run in families.

13        What we have here is something that is really rare

14   in my experience, and that is a family history where you have

15   not only diagnosed mood disorders, diagnosed bipolar disorders,

16   but family members that at this point in history are actually

17   using the same medicines, that are on Risperidone, that are on

18   Depakote.  They're actually using the same medicines that has

19   made Ms. Montgomery so much more better.  So much more better?

20   So much better.

21   Q      You also indicated that the fifth of those bullet

22   points regarding cognitive impairments throughout the

23   generations was important to you?

24   A      Right.  Again, this is what really kind of threw me at

25   first is we see cognitive impairments, intellectual disability,

1    other autism, other types of brain-based impairments not only

2    before Ms. Montgomery, but we're now seeing these impairments

3    in the children as well and the children of her children.

4    Q      And, Dr. Woods, I think you talked some about the

5    physical trauma and sexual trauma, but what else did you think

6    was important in the biopsychosocial history for arriving at

7    your conclusions?

8    A      The multigenerational history of alcoholism, the severe

9    sexual and physical trauma that clearly is power oriented,

10   sexual trauma issues.  Power oriented, not sexually oriented.

11   Exposure to alcohol in utero.  We know that her mother

12   acknowledged heavy drinking.  We also -- other family members

13   acknowledged -- acknowledged her mother drinking during her

14   pregnancy.  We know there are multiple head traumas.  And

15   obviously the sex trafficking by her mother and stepfather.

16   Q      Did the biopsychosocial history provide you with

17   symptoms that were consistent across Ms. Montgomery's life?

18   A      Yes.

19   Q      And what were some of those?  I mean, the Court can

20   read our slide but just to highlight the ones that were most

21   significant to you.

22   A      Well, I think the ones most significant were the loss

23   of contact with reality.

24   Q      That sounds a little bit like a term of art.  I mean,

25   it is and it isn't.  Tell us what you mean by that.

1    A      It's someone who can't maintain good contact with

2    what's occurring around them.  It doesn't mean they go off into

3    their own world necessarily, but it means that they -- it's

4    like hearing something far away and not being able to quite

5    catch it.  You can barely hear.  Sometimes it's closer and

6    sometimes it's further away, and that's exactly how people

7    describe Ms. Montgomery outside of the forensic setting,

8    growing up, in marriage, as a parent, as a sister.  They

9    consistently describe her as not being able to stay connected,

10   not being able to -- I think it was her sister who said

11   sometimes we would have to yell at her in order to kind of

12   bring her back.

13            I think the other part that I think is important is

14   the psychosis.  Her sister said, you know, She's crazy but I

15   don't think she's crazy like schizophrenia.  The social worker

16   in 2003 said, Wow, I'm wondering if she may be somewhat

17   delusional.  Dr. Kuncel said, you know, again, She sounds

18   delusional.  Dr. Hutchinson says, I think you need to look at

19   her thought disorder.  You know, Dr. Vogelsang says, Wow, she's

20   psychotic.  And then what do we see?  We see the antipsychotic

21   being the treatment that makes the most difference.  So those

22   are the two that I think are really the most important.

23   Q      Did you assess Ms. Montgomery's neurological history?

24   A      Yes.

25   Q      And what did you find out about her activities of daily

1    living?

2    A      That she had difficulty performing simple tasks.  She

3    had difficulty finishing tasks.  She had real difficulty, as I

4    talk about, sequencing, being able to really take stock and

5    say, okay, I need a loaf of bread.  I need some milk.  I've got

6    four kids.  I got to do this, that, and the other.  She had

7    difficulty budgeting.  She had problems braiding and brushing

8    her hair.  I put that there specifically because braiding and

9    brushing is a sequential phenomenon.

10             You have to -- there's a neurological test that Dr.

11   Nadkarni did that is consistent with her problems in braiding

12   and brushing, and I'll talk about that.  She had difficulty

13   planning meals.  These are all cognitive tasks that we tend to

14   do fairly easily, but with someone that has the trauma history

15   and the brain impairments that she has would be problematic.

16   Q      And the information outlined in this slide, is this

17   what you mean by ecological validity?

18   A      Yes.

19   Q      And that's to say these are signs of the impairments in

20   terms of functioning in real life?

21   A      That's correct.

22   Q      Can you tell us what your actual findings in a clinical

23   sense were from your neurological assessment?

24   A      Yes.  I did a neurological examination and I think the

25   most -- most significant part of my neurological examination

1    were three tests.  One of them is skipping.  Skipping may not

2    sound like a test.

3    Q       It really doesn't.

4    A       But skipping is actually a neurological function.  It

5    requires the cerebellum in order to -- even if you work with

6    children, you know that early on in preschool they look to see

7    if kids can skip.  And what they're doing is looking to see how

8    their cerebellum is functioning.

9            The second test -- she could not skip.  The second

10   test is a test of what we call tandem walking, and most of you

11   may be familiar with tandem walking in terms of a field

12   sobriety test.  With people below 60, you don't allow them to

13   put their hands out.  You have them put their hands at their

14   side and you have them walk heel toe, heel toe, heel toe.

15   That, again, is a test of cerebellar functioning.  She could

16   not do that.

17           I also did what's called the Luria test, which is a

18   similar test that Dr. Nadkarni did, and this is a test where

19   you have someone hit their palm, the side of their hand, and

20   their fist.  Palm, side, fist.  Palm, side, fist.  And you have

21   them do this rapidly.  This is actually a test of brain

22   functioning and primarily a test of frontal lobe functioning.

23   And she could not do this.

24           So what we really see are neurological functions

25   that are impaired.  Impaired motor control, impaired cognitive

1    functions.  She had problems with attention and language, and

2    she had problems regulating fears as well as pleasure.

3    Q       Let me ask you, does cerebellar function show up on

4    neurological testing?

5    A       No.

6    Q       What are the effects of cerebellar dysfunction?   I

7    mean, what is the ecological significance?

8    A       Cerebellar -- if I can take a moment.  Up until 1998

9    when Dr. Jeremy Schmahmann started doing really pioneering

10   work -- he started in 1984, but he published it in 1998 -- on

11   the cerebellum, we just thought the cerebellum was a part of

12   the brain that just controlled motor functioning; standing,

13   walking, et cetera.  Dr. Schmahmann, a neurologist at Harvard,

14   really began to pull out what he called the cerebellar

15   affective syndrome, and these are the symptoms that one sees;

16   distractibility, when one becomes distracted, hyperactivity,

17   impulsivity, disinhibition, not able to control one's anxiety,

18   irritability, rumination, thinking things over and over and

19   over, not being able to let go, over and over, obsessive

20   behaviors, dysphoria.

21   Q       What is dysphoria?

22   A       It's a sad mood.  Depression, again, tactical

23   defensiveness.  You can't stand being touched.  You have

24   problems being touched.  Sensory overload, which is also called

25   the gating mechanism, too much overwhelms you.  She talked

1    consistently about having to be away from her kids because --

2    although any of us who have kids think this, but sometimes you

3    just can't be there.  You just can't be with them.  But that's

4    not the same as not being able to take care of their lives, et

5    cetera, apathy and childlike behavior.  These are all examples

6    of cerebellar dysfunction.

7         We now know that the cerebellum has connections to

8    the frontal lobe, and the frontal lobe is kind of the gross

9    executive functioning, but the cerebellum is kind of the fine

10   tuning of that executive functioning.  And clearly she has

11   difficulty.  And these are the kinds of dysfunctions that one

12   would see in someone with a history of drinking, their mother

13   drinking.

14   Q     You also conducted -- we referenced briefly earlier a

15   third and fourth interview this year with Ms. Montgomery?

16   A     Yes.

17   Q     What was the purpose of those interviews?

18   A     The purpose of the third and fourth interview was to do

19   two things, to talk with Ms. Montgomery about Mr. Kidwell's

20   revelations, but also I did a Barkley Deficits in Executive

21   Functioning Scale.  The Barkley is an interview.  It's actually

22   not a test.  It's an interview that Russell Barkley at the

23   University of South Carolina developed that looks at real life

24   executive functioning, this kind of functioning in the real

25   world.

1    Q       I want us to focus for a moment on your attempts to

2    interview Ms. Montgomery around the issues of trauma.  I think

3    you've already sort of set out most of the things in this slide

4    in terms that which you knew about the trauma before you began

5    interviewing her about it.  I do want to ask you since this

6    slide talks about the trauma moving Ms. Montgomery to

7    dissociative states, I want to ask you for clarification.  Is

8    dissociation volitional?

9    A       Dissociation is purposeful but it's not volitional in

10   the sense of you weigh it, you think about it.  There's

11   purposeful behavior, then there's intentional behavior.

12   Purposeful behavior is like driving a car.  When you're driving

13   a car, you do about 10,000 -- you do about 10,000 things in a

14   four-block area.  You turn on the radio.  You see if there's a

15   person standing there.  You turn the corner.  Hopefully you

16   don't text.  That's purposeful behavior.  You're not weighing

17   each and every one of those situations.  That's purposeful

18   behavior.  But it's not intentional behavior.  That's what you

19   really see with dissociation is that it's purposeful.  It

20   serves a purpose, but not every time someone dissociates is in

21   fact intentional.

22   Q       Let's talk about Ms. Montgomery's clinical presentation

23   before you began introducing the subject of the sexual trauma.

24   A       Sure.

25   Q       Just briefly, succinctly, how was the interviewing

1  going before you brought that up?

2   A       She was guarded.  She was pleasant.  She appeared to be

3  cognitively attached.  She could hold a conversation.  She

4  likes to read.  I like to read.  So we talked about that.  We

5  spent some time talking about her daily activities.  We spent

6  some time talking about the projects.  These are primarily

7  crafts that she's involved in, and yet -- and this goes back to

8  mood and affect.  Her mood, the feeling that she imparted to

9  the environment was one of fragility and anticipation.

10   Q       What did you observe clinically about Ms. Montgomery

11  when she confirmed the things that Mr. Kidwell told about the

12  trafficking?

13   A       She physically flushed.  Her cheeks became red.  Her

14  answers became delayed, and as we go, we'll talk about delayed

15  reaction time.  I saw delayed reaction time.  She was unable to

16  elaborate.  This is one of the things that Dr. Nadkarni talks

17  about when he talks about her finding it difficult to initiate

18  abulia, a-b-u-l-i-a, difficulty to initiate a conversation, and

19  she became dissociative.  In fact, she would not talk about it.

20  If you don't mind me continuing?

21   Q       No.  Go on.

22   A       She would not talk about it, and I was like, What would

23  happen if we talked about it?  And she said, I just can't.  I

24  just can't.  I don't know.  I don't know.

25   Q       Were you able to talk around it a bit?

1    A        I was able to ask her if what Mr. Kidwell said was

2    accurate.  She said that it was.

3    Q        During your third meeting with Ms. Montgomery, you

4    talked quite a bit with her about her medication regimen?

5    A        Yes.

6    Q        What was she able to tell you or reflect to you about

7    the way her medication affects her functioning?

8    A        Well, first of all, Ms. Montgomery was started in 2010,

9    so I guess it's been six years now she's been -- was started on

10   Risperdal or Risperidone.  She's been treated with it once

11   before briefly in 2009 and did well but was taken off of it.

12   Then she was placed on it again in 2010.  She's done extremely

13   well.  There never has been a question by her treating

14   psychiatrist or treating people at Carswell about taking her

15   off of it.  They have monitored her dose.  They actually have

16   taken her off other psychiatric medications, and she says that

17   it allows -- it helps her recognize what is real and what is

18   not real.  She says it allows her to plan, organize, and carry

19   out activities.

20            I might add she doesn't say that she's at the top of

21   her game.  She says it's better than she used to be but she

22   does it with compensatory mechanisms.  She's able to read and

23   remember what she has read, which was a real problem for her

24   before.  She can focus, pay attention, and concentrate much

25   better, and she was able to disclose certain details of trauma

1  as it relates to perhaps her husband or her stepfather to some

2  degree but not to the complete degree.

3  Q     And you were aware that ultimately she was able to

4  disclose more than she could to you to Dr. Porterfield?

5  A     That's correct.

6  Q     I think you've already covered to some extent the

7  difference in the medication during trial and after trial.

8  Fair to say the main difference is the introduction of the

9  Risperidone?

10  A     Yes.

11  Q     Is it important to know, I think you mentioned earlier,

12  about other family members being on the medications that Ms.

13  Montgomery is on?

14  A     Yes.  I'd like to go through this quickly if I could?

15  Q     Let's do.

16  A     Because I think it's so relevant.  These are the family

17  members and medications, and what we see -- and this is part of

18  why the biopsychosocial history is so important.  What we see

19  is that certain medications were given to this family across

20  generations.  So at this point her brother, Tommy, has been on

21  Paxil, an antidepressant; Lithium, whose only indication is

22  bipolar disorder; Depakote, which is a primary medicine for

23  bipolar disorder, which she was on and completely; and

24  Risperidone.  He's now on Risperidone.

25           Her brother, Teddy, took Geodon -- I'm sorry.

1  That's misspelled.  And Zyprexa, again medication,

2  antipsychotics that are used in bipolar disorder.

3          Her cousin, Kenny, took Haldol, an antipsychotic;

4  Lithium, again, for mood disorder; and Depakote, again, for

5  mood disorder.  Again, we're seeing in this family the

6  significant psychiatric history.

7  Q      You mentioned earlier that in your fourth visit with

8  Ms. Montgomery you administered the Barkley test regarding

9  deficits?

10 A      Yes.

11 Q      Could you discuss very succinctly what that showed you?

12 A      Sure.  The Barkley is a test of measured executive

13 functioning deficits over time.  You ask a person at a certain

14 period of time, not currently, but six months ago or a year

15 ago.  So obviously my reference was before you came into the

16 correctional system, and it's arranged in five different

17 sections; self-organization, self-restraint, self-motivation,

18 self-regulation of emotion, self-management to time.

19 Q      And what does this -- the Barkley measure?

20 A      The Barkley really looks at attention.  You can't

21 remember if you can't attend.  I think that's what her problem

22 was with reading was because she couldn't attend.  She could

23 read the words but she couldn't hold them.  She couldn't hold

24 on to them; alertness; visual-spatial functions.  What I mean

25 by visual-spatial functions is being able to look at all of the

1    situations, being able to see the big picture, a right parietal

2    lobe function, being able to see the big picture.  Autonomic

3    emotional function, being able to cry.  Her blushing was an

4    autonomic function.  Memory; sensory/perceptual functioning.

5    That's like being able to -- when she talks about not like

6    being touched; problems with language; motor functions;

7    cognition, being able to think; and self-awareness.

8    Q      Let's talk very in a sort of summary manner about her

9    scores on the Barkley.  Fair to say from this slide that Ms.

10   Montgomery was markedly deficient in several areas?

11   A      Yes.  She was markedly deficient in her time

12   organization, time management.  She was markedly deficient in

13   her organization.  She was markedly deficient in her ability to

14   restrain.  She was markedly deficient in her motivation.  She

15   told actually a story about leaving jobs without even picking

16   up a check.

17   Q      And so what do these scores tell us about Ms.

18   Montgomery's functioning in the world?

19   A      That before she was -- that before she was adequately

20   treated she had impaired functioning in being able to be

21   independent, in being purposive and organized, and her own

22   self-serving behavior.  We note stories of her being very, very

23   dirty, smelling terribly even at the Wendy's where they would

24   have to put her in a separate area so that the customers would

25   not have to smell her.

1    Q      I want to talk now about some of the other sources of

2    data that you considered in forming your opinions, if I could.

3    A      Sure.

4    Q      In addition to your interview and assessment of Ms.

5    Montgomery, did you take into consideration observations of lay

6    witnesses, people like attorneys, paralegals, mitigation

7    specialists in reaching your opinion?

8    A      Sure.

9    Q      How do you weigh those reports of people who are lay

10   witnesses?

11   A      Well, you just try to gather the data.  You try to get

12   some understanding of what their expertise is.  That can often

13   be problematic with someone to say -- I had attorneys that say

14   I have a family member who is mentally ill so I know this about

15   mental illness, but you just try to gather that data.  Yet it's

16   very, very important if they don't normalize.

17   Q      What do you mean by normalize?

18   A      Normalizing is when someone attributes certain behavior

19   to, oh, well, everybody does that or she always did that or it

20   didn't really mean -- they didn't really mean it that way

21   without really having an understanding of what that behavior

22   means.  Sometimes, as I said earlier today, behaviors are

23   symptoms; and if you don't look at those behaviors as symptoms,

24   you may miss important telltale signs.

25   Q      Are you saying that there are no behaviors that are

1  ever just normal?

2   A      No.  Most behaviors are absolutely normal, but you

3  really want to make sure that you don't overread something

4  either culturally or neurologically.

5   Q      So what causes people to normalize symptoms?

6   A      Wow.  Most times we don't have a range of understanding

7  of what a symptom means and, therefore, we just think of it as

8  a behavior.  And I'm sorry.  If I could give you another

9  example?

10   Q      Sure.

11   A      This is really not normalizing but it's what tends to

12  happen.  One of the things you see so commonly in the United

13  States particularly is eye contact, right, where a mental

14  health professional will say, This person did not make eye

15  contact with me.  Okay.  And they will read that as something

16  being wrong with that person; paranoid, they're avoiding them,

17  you know.  But you don't really know the culture that person

18  came from.  You can't really know the context of that eye

19  contact.

20          Here we're talking about a very impaired family

21  where multiple sexual behaviors are going on and the mother

22  says, Well, I think that she was trying to take my husband,

23  right?  I think she was trying to have -- that's kind of a

24  normalization.  This is very, very bizarre, you know, behavior.

25  So that's normalization where they're trying to attach it and

1    that's an example.

2    Q       Do you see even professionals normalizing symptomatic

3    behavior?  I think you've worked a lot with legal teams.  Do

4    you see lawyers do it?

5    A       Oh, absolutely, and mental health providers and myself.

6    Q       And did our team provide you with a copy of Fred

7    Duchardt's declaration in this case?

8    A       Yes.

9    Q       Did you find examples of Mr. Duchardt normalizing

10   behaviors that he saw in Ms. Montgomery?

11   A       In my opinion, yes.

12   Q       If we could look at the things you pulled out of Mr.

13   Duchardt's declaration.  What did you see as Mr. Duchardt's

14   inadvertent -- let's give him the benefit and call them

15   inadvertent normalization.

16   A       Mr. Duchardt noted that she never appeared mentally ill

17   as postulating in my report; that she was able to engage in

18   conversation; that she never had trouble understanding

19   proceedings; she never had problems asking questions; she never

20   had problems understanding why attorneys were asking her the

21   questions they were asking her; and she let down her protective

22   shield and was able to answer questions.

23   Q       Why do you call those sorts of conclusions by Mr.

24   Duchardt normalizing?

25   A       Well, because at the same time, at the very same time

1    that Mr. Duchardt was observing this, she was being treated

2    with multiple medications for her bipolar disorder.  She was

3    having symptoms where they were describing her as irritable,

4    mood disorders, depressed, impaired concentration.  I'm not

5    sure whether Mr. Duchardt had the opportunity to review the

6    medical records of Dr. McCandless, but she was being treated

7    for psychiatric disorders during this entire period from 2006

8    through 2009.  And there was -- and this was unusual.  There

9    was never a period in there where she was not being treated.

10   So you'll often see someone come in and they'll go, Well, is

11   she malingering?  They'll take her off the medications or it's

12   situational.  It's because she's gotten in trouble and,

13   therefore, now we can take -- she was treated with very strong

14   multiple mood stabilizers specific for bipolar disorder from

15   2006 through 2009.  So at the time that he's describing these,

16   she's being treated for a significant psychiatric disorder.

17   Q     What consideration did you give to Mr. Duchardt's

18   observations?

19   A     Well, Mr. Duchardt is not a psychiatrist, and so I

20   can't anticipate that he would be able to look at her or anyone

21   else be able to look at her and say, Oh, that's just a bipolar

22   symptom.  He certainly did not take into consideration the

23   mental illness as it was described by Dr. McCandless in her

24   records over the course of years.  He certainly didn't take

25   into consideration that she was being treated with Depakote,

1   she was being treated with valproic acid, she was being treated

2   with Wellbutrin, an antidepressant.  An antidepressant that in

3   fact was developed for bipolar depression.

4   Q      Fair to say, then, that Mr. Duchardt's conclusions or

5   the way he expressed himself about his observations of Ms.

6   Montgomery conflicted with your observation?

7   A      Well, no, no.  They conflicted with the treatment she

8   was getting.  It wasn't my observations.  I did not observe

9   this.  I read the records, and in the records you see that

10  she's being treated daily with mood stabilizers and

11  medications.

12  Q      And let me ask the question another way.  Do they also

13  conflict with your conclusions both clinically and

14  forensically?

15  A      That's correct.

16  Q      Let's pause for a moment here, Dr. Woods.  I've made

17  you aware of some criticism of you by Mr. Duchardt in his

18  declaration.  If we might talk for a moment about Mr.

19  Duchardt's claim that you've developed an unfortunate

20  reputation.  I believe Mr. Duchardt cited a book written by a

21  man named Blecker.  Have you had a chance to review that book?

22  A      I have had the opportunity to review the chapters that

23  relate to me.  It's a very small part of the book.

24  Q      If you could just orient the Court, what do you

25  understand from the blurb on the back of the book who is Mr.

1  Blecker?

2   A      Mr. Blecker is a professor at New York University.

3  He's a strong advocate for the death penalty.

4   Q      Is he a mental health professional?

5   A      Huh?

6   Q      Is he a mental health professional?

7   A      No, he's not.

8   Q      What does he teach?

9   A      He teaches law.

10   Q      And what was Mr. Blecker's beef with you?

11   A      Well, I'm not sure he has a beef with me.  In kind of

12  looking through his research, it's a little bit unclear.  First

13  of all, he says I'm a psychologist.  I'm not a psychologist.

14  I've never been a psychologist.  So that -- it's pretty easy to

15  find out I am a psychiatrist.

16          Secondly, he describes my examination in this one

17  particular case, and it appears as though he's saying that

18  because this person committed a horrific offense, which in fact

19  he did, that he couldn't have been incompetent; but, I mean, my

20  understanding is that's not the standard.  The quality of the

21  offense is not the standard as to whether someone is

22  incompetent or not.

23   Q      Well, and to just sort of track back to those little

24  clumps we just traipsed you over, Mr. Duchardt cited Mr.

25  Blecker's book for the proposition you have an unfortunate

1  reputation?

2  A     Right.

3  Q     But Mr. Blecker cited your opinion in one case?

4  A     That's correct.

5  Q     And, in fact, I think you and I checked the footnotes

6  there and he actually cited to the state's expert?

7  A     Dr. Sedler (ph) right.

8  Q     So really Mr. Duchardt is through many modalities

9  almost citing to an opposing expert in one case?

10  A     That's correct.

11  Q     So not a fair representation, I think, to say that you

12  have this reputation across the country?

13  A     Well, certainly not in that situation, that's correct.

14  Q     And Mr. Duchardt also dropped a footnote regarding he

15  said a sanction that you received from the medical board.  If

16  you could just clear that up for us.

17  A     Sure.  Mr. Duchardt said that my license had been

18  suspended.

19  Q     Is that true?

20  A     No.  My license has never been suspended.  In 1990 --

21  between 1990 and 1993 I was involved in a medical board action.

22  The findings were that I had not written a discharge diagnosis

23  of alcoholism on a client and that I had prescribed her three

24  refills.  There was no action taken on my license.  There has

25  never been an action taken on my license.  The judge

1    actually -- administrative law judge in that case also said

2    that there was no action taken on my license.  So I've never

3    had my license impacted in any way.

4    Q      Thank you for clearing that up for us.

5           Let's move now from your clinical assessment and

6    review of the records and then move more into your

7    understanding of and how you considered the reports of other

8    professionals who looked at Ms. Montgomery.

9    A      Sure.

10   Q      You talked some about how you strongly considered the

11   fact that Ms. Montgomery was medicated for a long period of

12   time, but let's kind of move in chronological order through the

13   various assessments, if we can.

14   A      Sure.

15   Q      Let's start with Marilyn Hutchinson.  Do you recall

16   that Marilyn Hutchinson saw Ms. Montgomery on three different

17   dates early in 2005 shortly after Ms. Montgomery's arrest?

18   A      That's correct.

19   Q      What about Marilyn Hutchinson's findings did you find

20   most significant?  And, again, his Honor can read the whole

21   slide, but if you will sort of highlight for us that which was

22   important to you.

23   A      Dr. Hutchinson is a very good psychologist here in

24   town.  She picked up when you look at her --

25           MR. VALENTI:  Your Honor, at this time as we get

1    into this PowerPoint, I was just given this, as you know, right

2    before lunch.  This gets into a fairly summary testimony of

3    every witness you've heard the last seven days, and I don't

4    think we need to hear it again what Dr. Hutchinson had to say

5    as she testified or the other doctors that have testified.

6    Certainly as it relates to Dr. Bradford, we agreed we could go

7    into that, and I think there's some 24 slides related to Dr.

8    Bradford and since she's passed.  But to go over testimony that

9    is already before the Court on numerous occasions seems

10   cumulative and unnecessary, in my opinion.

11            THE COURT:  I've heard these witnesses and so if you

12   can just --

13            MS. HARWELL:  I was trying to direct Dr. Woods

14   towards that which was significant to his findings.

15            THE COURT:  Doctor, you understand I've heard the

16   testimony of these experts, so if you can just kind of skip

17   over specifically what was said and have the slides up and the

18   slides are before me and Dr. Woods can give his conclusions

19   from that.

20            MS. HARWELL:  And that's what I was trying to do.

21   We do have the data here for the Court.  At some point I'll ask

22   to make that an exhibit.  I'm going to ask -- try to focus Dr.

23   Woods' testimony on that which was important for his opinions.

24   Q      (By Ms. Harwell)  So if we could talk about Dr.

25   Hutchinson, who, I believe you worked with in the past?

1    A      Yes.

2    Q      If we could focus on that which she saw that was of

3    clinical and forensic significance in your opinions.

4    A      Dr. Hutchinson saw symptoms consistent with a bipolar

5    disorder and consistent with trauma.  That's elevated mood, the

6    mood changes, and the dissociation.

7    Q      If we could then talk about Dr. Logan, who I believe --

8    A      One thing on Dr. Hutchinson.  Dr. Hutchinson also

9    suggested that she be looked at for a thought disorder,

10   psychosis.  That's really all I wanted to add.

11   Q      And Dr. Hutchinson's indication of psychosis was

12   important to you why?

13   A      Because we now know that her psychosis is being treated

14   and she's doing much, much better.

15   Q      Let's talk, then, briefly about Dr. Logan.  What was

16   important to you about Dr. Logan's observations of Ms.

17   Montgomery?

18   A      Dr. Logan noted symptoms of psychosis.  Dr. Logan did

19   not have a biopsychosocial history.

20   Q      Then turning to Dr. Fucetola.

21   A      Dr. Fucetola recommended neuroimaging.  He realized the

22   difficulty that the 29-point difference between performance IQ

23   and verbal IQ was important and the conclusions.  He

24   recommended neuroimaging because he recognized the limitations

25   of neuropsychological testing.

1    Q      What about Linda McCandless, the doctor who

2    prescribed -- you referred many times, I think, essentially

3    to her work in talking about the medications at CCA.  Is there

4    something you would like to add in terms of what Dr. McCandless

5    gave to you in performing your assessment?

6    A      Well, Dr. McCandless has what I rarely see and that's a

7    long-term treatment of someone that's in this particular

8    situation within the setting of the trial; pretrial, trial, and

9    posttrial.  She diagnosed her with bipolar disorder.  She

10   called it rapid cycling.  She saw symptoms of psychosis and

11   diagnosed her with a brief reactive psychosis.  She treated her

12   with mood stabilizers, valproic acid, Depakote.  She treated

13   her with Elavil for actually pain but realized that the Elavil

14   made her sedated and documented that she was sedated.  More

15   importantly, she documented that as the Elavil was decreased,

16   Ms. Montgomery said she felt better.  So there was kinds of --

17   Q      Why would a decrease in a medication be significant to

18   you?

19   A      Because the symptoms that Ms. Montgomery was

20   manifesting in court; the flat face, the flat affect, are

21   symptoms of medication.

22   Q      Did you also take into account information from Ruben

23   Gur?

24   A      Yes.

25   Q      Could you tell the Court -- the Court actually hasn't

1    heard from Dr. Gur yet, but what about the reports that we

2    provided to you from Dr. Gur was of significance to you?

3    A      Overall the importance of Dr. Gur's testing is that Dr.

4    Gur was able to give us information about parts of the brain

5    that cannot be tested from a neuroimaging point of view -- I

6    mean from a neuropsychological point of view.  So he's giving

7    us information about that new brain -- I'm sorry -- moving too

8    fast.  About that old brain, about that brain, limbic system,

9    the amygdala.  He's able to give us information about parts of

10   the brain the neuropsychological testing doesn't get to.

11           He's also able to give us information about changes

12   in the brain.  When he talks about in the first two sentences

13   enlarged ventricles, loss of tissue around midline or tissue

14   never present, the reason your ventricles are enlarged is

15   because your brain is shrinking.  It's really just like a

16   shore.  If you look at a shore at a lake and over time as that

17   shore recedes, the lake gets bigger.  That's exactly what Dr.

18   Gur's describing here.  These are aspects of neuropsychological

19   and neurological functioning that cannot be picked up in a

20   neuropsychological test.

21   Q      Just for clarity for the record, did you also review

22   the reports of Dr. Daviztikos and Dr. Newberg who worked with

23   Ruben Gur?

24   A      Yes, I did.

25   Q      Let's talk now about Ruth Kuncel who I believe saw Ms.

1    Montgomery in April of 2007.  What was significant to you about

2    Dr. Kuncel's work?

3    A      Dr. Kuncel picked up significant head injuries, the

4    multiple head injuries, I believe there were three, with the

5    automobiles as well as the trampoline in 1993 and 1992.  One in

6    1993, two in 1998.  I think the trampoline was 1999.  The fact

7    that her mother drank heavily during pregnancy, and the fact

8    that she does have signs putting her somewhere on the fetal

9    alcohol spectrum; wide-set eyes, slight rotation and deformity

10   of the spine.  These are all what we call midline features.

11   These are features that develop in the middle of the body and

12   are all consistent with prenatal alcohol use.

13   Q      I believe that Dr. Kuncel's materials also reflected

14   the work of a social worker, Rhonda Gales.  Do you remember

15   reviewing --

16   A      Yes, 2003.

17   Q      And what was significant to you about Rhonda Gales?

18   A      Ms. Gales -- this is 2003, two years before the

19   occurrence, found Ms. Montgomery to be mentally unstable, very

20   moody, a little delusional, maybe bipolar.  She noted that two

21   cousins had been psychiatrically hospitalized.  She documented

22   the stepfather physically and sexually abusing Ms. Montgomery

23   from 11 to 12 to 16.  So what we really see here is a mental

24   health provider seeing the instability, seeing the mood

25   disorder, seeing the psychosis, the delusion, seeing the

1813

1   family, and seeing the bipolar disorder.

2   Q       All before the crime?

3   A       All before the crime.

4   Q       Turning back then to Dr. Kuncel -- and like the Court

5   said, we shouldn't summarize everything Dr. Kuncel saw, but why

6   was it significant to you that Dr. Kuncel noted the midline

7   defects?  Did that correspond with your observations?

8   A       Yes.  It certainly corresponded with the cerebellar

9   problem that you see.  If we could just hold this up for a

10  minute with Dr. Kuncel really quickly.  Again, we're seeing

11  symptoms of bipolar, sleep disturbance, eat too much, eat too

12  little, what are called neurovegetative signs, tangential

13  thinking, pressured speech.  Pressured speech is a type of

14  speech that is specific to bipolar disorder.  It's a rapid type

15  of speech, not just rapid speech, but a special type of

16  repetitive.  It's a term of art.

17  Q       And certainly Dr. Kuncel was qualified to recognize

18  that symptom?

19  A       That's correct.

20  Q       In a way that a layperson wouldn't necessarily?

21  A       That's correct.

22  Q       What else was -- I don't want to cut you off from

23  anything else that you thought was really significant about Dr.

24  Kuncel's observations that was important for your evaluation.

25  A       No.  No.

1   Q      We have, as it's noted actually on the slide before

2   you, many sources talking about Ms. Montgomery saying she's not

3   sure what's real or not real?

4   A      Correct.

5   Q      In a neuropsychiatric sense, what does than signify?

6   A      It signifies cognitive dissociation, this inability to

7   really perceive the world accurately.  It's not constantly

8   there but in Ms. Montgomery's case because of the tremendous

9   overwhelming trauma that she experienced, you would see -- it

10  would be a state that she could slip into fairly quickly.

11  Q      Do you recall whether Dr. Kuncel noted that Ms.

12  Montgomery experienced auditory hallucinations?

13  A      Yes.

14  Q      I'm going to ask you now about the government's expert,

15  Dr. Dietz.  Was there anything of significance to you, not

16  outlining Dr. Dietz' testimony, but anything that was

17  significant to you in terms of either your clinical or forensic

18  conclusions in this case?

19  A      Certainly.  Well, certainly Ms. Montgomery denied to

20  Dr. Dietz the observations of her behavior by family and

21  others.

22  Q      I'm not sure what you mean by that.

23  A      Ms. Montgomery described herself as a good mother.

24  That's one example, right?  Where family members, her children,

25  her husbands all described her as a loving mother but not a

1    good mother.  So that certainly was inconsistent.

2              Dr. Dietz said there was no evidence of psychosis

3    and yet in the records in 2003 the social worker who was not

4    involved in the forensic case who described her as being

5    slightly somewhat delusional.  Certainly we see Dr. McCandless

6    describing her as having a brief reactive psychosis as well,

7    and we see other people describing her with auditory

8    hallucinations, et cetera.

9              Dr. Dietz notes that she does not have bipolar

10   because he did not see mania.  But, again, when you go through

11   the medical records, you see irritability.  You see agitation.

12   Dr. Hutchinson described this elevated mood and this

13   unreasonably elevated mood, which is what mania is.  And the

14   really difficult part, of course, is that she's being treated

15   for bipolar during this entire time.

16   Q     So when you are -- I'm hearing some criticism of these

17   things you're talking about with Dr. Dietz; fair to say?

18   A     I'm concerned just because I think there are -- there's

19   information in the records that are inconsistent with his

20   findings.

21   Q     That's what I was going to ask.  Is this just a matter

22   of a battle of experts or you just have different opinions?

23   A     Well, we obviously have different opinions.  I also

24   think if you look at the medical records, if you look at the

25   current medical records, if you look at Dr. Kuncel, if you look

1   at the social history, there's an internal inconsistency that

2   is hard to ignore.

3   Q      You addressed briefly earlier Dr. Dietz' treatment of

4   disputed sexual claims?

5   A      Yes.

6   Q      And that you found that inappropriate?

7   A      Yes.

8   Q      Wouldn't you agree, Dr. Woods, there are cultures in

9   which children that young engage in sexual conduct?

10  A      Well, not this culture.  We, in fact, have laws that

11  say a 12- to 16-year-old cannot have sex with a 56-year-old

12  whether they choose to have sex or not and it goes back to your

13  question of what is consensual versus what may be agreeing.

14  I'm not even sure there's agreement.  But the whole idea to

15  debate whether this was willing or not, whether this sexual

16  contact is willing or not is really a red herring.  This is

17  inappropriate sexual behavior.  This is a child.  This is

18  someone that is a teenager, in their early teens.  That type of

19  behavior cannot be justified.  And it certainly cannot be

20  justified clinically.  My big concern is that to be able to

21  debate this is to ignore all we know about developmental

22  psychology and how children develop, how sexuality develops.

23  Q      Is it fair to say that as a forensic expert, it matters

24  to you that the behavior that Dr. Dietz was sort of willing to

25  equivocate on is illegal behavior?

1    A       That's correct.

2    Q       Let's talk briefly about Dr. Martell.  What did you

3    find significant in Dr. Martell's findings?

4    A       Dr. Martell did capture again these terms of art

5    "emotionally labile."  He talked about the MMPI being invalid

6    due to symptom exaggeration.  However, Dr. Martell did not talk

7    about the differential diagnosis of an elevated MMPI, that a

8    person may not be able to read very well or that a person may

9    be crying for help, and what is not reported, if I recall

10   correctly in Dr. Martell's report, is that there is no

11   discussion of the fact that at the time she took this MMPI she

12   was actually being treated for bipolar disorder.  She was on

13   medications for bipolar disorder.

14   Q       And you find that omission to be very significant?

15   A       It's very significant because she was also being

16   incompletely treated.  It wasn't as though those symptoms were

17   completely under control.

18   Q       Let's talk very briefly about --

19   A       One more thing about Dr. Martell.

20   Q       Sure.

21   A       And this really goes back to something I said in my

22   report in terms of Dr. Fucetola.  When you do a

23   neuropsychological examination, it's important to also do a

24   neurological examination because we know that the -- that

25   neuropsychological testing really only tests 2 to 5 percent

1    of the brain.  So if you are able to do a neurological

2    examination -- so when Dr. Martell says there's no -- or

3    conditionally he's relying completely on his neuropsychological

4    testing.  He didn't do any neurological testing, which may have

5    given him other findings.

6    Q      Let's speak briefly about Dr. Ramachandran.  You're

7    aware that Dr. Ramachandran diagnosed Ms. Montgomery with

8    pseudocyesis?

9    A      Yes.

10   Q      And we've provided you with a copy of Dr.

11   Ramachandran's 2016 deposition?

12   A      Yes.

13   Q      Was one of the things striking about the deposition is

14   that Dr. Ramachandran admitted he doesn't have a medical

15   license to practice in the United States?

16   A      That's correct.

17   Q      Why is that important to you?

18   A      Well, he does not diagnose.  He does not treat.  And

19   so, consequently, he doesn't have the methodology that one

20   would normally expect either clinically or forensically.

21   Q      Is it not also true that in that deposition he admitted

22   that he didn't know the legal standard for NGRI?

23   A      That's correct.

24   Q      That was important to you as well?

25   A      That's correct.

1    Q      Let's talk just a little bit about the mental health

2    evaluations that occurred after trial and what was -- I think

3    you've -- I'm sorry.  Let's talk about Dr. Nadkarni for a

4    moment.  What did you find of importance in Dr. Nadkarni's

5    report?

6    A      Dr. Nadkarni did some neurological testing I didn't do.

7    He did a smell test.  Olfactory -- the first cranial nerve is

8    the olfactory nerve.  It comes out of the nose into the bottom

9    of the frontal lobe; and when people have olfactory

10   hallucinations of being a bad smell or et cetera, that's

11   evidence of a frontal lobe dysfunction.

12          So at this point we've got frontal lobe dysfunction

13   because of the cerebellum.  We've got it from motor

14   perspective, the Nebraska-Luria test.  We've got it from

15   functional perspective, bad smells.  We've got it from

16   executive perspective, not being able to sequence.  We know

17   she's got a bad frontal lobe.  Okay.

18          We have episodes of lost time, memory experiences

19   that she is not really -- she's not sure what occurred.  Word

20   finding problems.  Word finding problems, again, is a right

21   parietal functioning.  So we, again, shall see where other

22   evidence that the right -- that's consistent with Dr. Gur that

23   the right side of her brain does not work very well.

24   Q      I'm hearing you say that you considered Dr. Nadkarni's

25   findings to be not just consistent with yours but further

1  confirmation of your opinions?

2   A      And further social history.

3   Q      I apparently passed over a slide.  Let me -- let's talk

4  about Camille Kempke very briefly.  I think you have pretty

5  much talked about her in terms of the Risperdal that was

6  prescribed in the BOP?

7   A      Yes.  Just quickly.  Dr. Kempke, after experimenting

8  with other medications, tried Risperdal.  Again, Ms. -- I might

9  add that these are extremely powerful medications.  When I was

10  in medical school at the University of Utah, Louis Goodman

11  required that we take antipsychotic medications, that we

12  actually wanted to have any specialization, he would give us

13  just a small -- these are extraordinarily powerful medications.

14  If you're not psychotic, you're not going to be taking

15  Risperdal.  You're not going to be taking Haldol.

16          Dr. Kempke noted that Ms. Montgomery did extremely

17  well almost immediately on the Risperdal, put her on a regimen

18  of Risperdal, took other medications off.  Took the Depakote

19  off, and now I think she's also on Prozac, but it's now been

20  six years that Ms. Montgomery has been on Risperdal.  She's

21  done extremely well.

22   Q      And by your repeated references back to that, I'm

23  hearing you say that is, again, confirmatory information?

24   A      That's exactly right.

25   Q      Let's talk briefly about Dr. Porterfield.  What was of

1    significance to the formation of your opinions or confirmatory

2    of your opinions contained in the reports of Dr. Porterfield?

3    A      Dr. Porterfield is well known, well respected in the

4    field of trauma and complex trauma, torture.  She recognized --

5    she said massive and pervasive impairments that come with the

6    type of trauma, ongoing trauma and made the diagnosis of

7    complex PTSD.

8    Q      Let's talk then about Charles Sanislow.

9           THE COURT:  Ms. Harwell, I was hoping to get to the

10   point where you were finished with Dr. Woods before we take a

11   break, but I think we'll go ahead and take a break now.

12          MS. HARWELL:  I'm glad to sit down.

13          THE WITNESS:  I'm glad too.

14          THE COURT:  That makes it unanimous then.  I'll be

15   back at 3:20.

16          THE WITNESS:  Thank you, Your Honor.

17          (Recess taken at 3:05 p.m.)

18          THE COURT:  Thank you.  You can all be seated.

19          Ms. Harwell.

20          MS. HARWELL:  Yes, Your Honor.  Thank you.

21   GEORGE WASHINGTON WOODS, JR. resumed the stand and testified:

22   DIRECT EXAMINATION (continued) BY MS. HARWELL:

23   Q      Dr. Woods, I think in our speed round of final Jeopardy

24   here we were approaching a discussion of what you found

25   important in the report of Dr. Sanislow, and I would remind you

1    the Court heard from Dr. Sanislow at some length yesterday.   So

2    if you'd just tell us what was important to you as you were

3    looking at Ms. Montgomery's clinical and forensic picture.

4    A        Bullet point 4 and 5, "Comorbid disorders create

5    atypical symptoms."  We've got complex PTSD.  We've got bipolar

6    disorder.  We've got brain impairment.  When you mix those

7    together, they create more severe and more atypical symptoms,

8    and those comorbid disorders show up as multiple profiles on

9    the MMPI-2.

10   Q        If we might now kind of take a step back from our rapid

11   march through all those experts, I believe you said that you

12   knew Dr. DiAnne Bradford; is that correct?

13   A        Yes.

14   Q        And you heard me make representations to the Court

15   earlier that Dr. Bradford died just last month?

16   A        I think that's correct.

17   Q        How did you know Dr. Bradford?

18   A        Dr. Bradford was a professor at Morehouse School of

19   Medicine when I first started teaching there in 2002.

20   Q        Is that how you came into contact with her?

21   A        Yes.  She had been teaching there for about five years

22   at that time.

23   Q        Are you familiar both with Dr. Bradford's

24   qualifications and then also with her opinions in this case?

25   A        Yes.

1    Q       I'm going to ask you some fairly extensive questions

2  about that.

3               MS. HARWELL:  If someone might pull Dr. Bradford's

4  CV for me.

5    Q     (By Ms. Harwell)  While we're pulling that CV, and I

6  apologize for not having it ready, if you might just explain,

7  Dr. Woods, what you know about Dr. Bradford's professional

8  career, hit the highlights.

9    A     Dr. Bradford spent her entire professional career until

10 she came back teaching -- well, that's not true.  She started

11 teaching at Johns Hopkins.  She then went to Europe and

12 developed -- was the director of a large pharmaceutical

13 company, Solvay, S-o-l-v-a-y, where the next 20 to 25 years she

14 developed psychiatric medications.

15              She was the principal researcher for about 72

16 research projects over time and was a brilliant, brilliant

17 psychopharmacologist.

18              She also had -- at the end of her career she was a

19 principal investigator for research also here with National

20 Institutes of Health.

21              MS. HARWELL:  I'm going to ask to approach the

22 witness, Your Honor, and show him what's been marked as

23 Exhibit 25

24   Q     (By Ms. Harwell)  Dr. Woods, I'll ask if you're

25 familiar with this document as the CV of DiAnne Bradford?

1    A       Yes.

2    Q       And I'm going to ask you if you would look at

3    Exhibit 24 and see if you recognize that as the report of Dr.

4    DiAnne Bradford that you previously reviewed?

5    A       That's correct.

6            MS. HARWELL:  Your Honor, again, just to remind the

7    Court that the parties have stipulated that Dr. Woods will

8    testify essentially in Dr. Bradford's stead.

9    Q       (By Ms. Harwell)  Dr. Woods, if we could review quickly

10   the referral questions our team posed to Dr. Bradford, please.

11   A       Yes.  "Did Ms. Montgomery's medication regimen at the

12   time of the trial affect her outward behavior, manner,

13   appearance, interfere with her ability to respond appropriately

14   to her external environment?

15           "How can genetics and stressful life events have

16   played a role in her disorders?

17           "Based on her consensus diagnosis, Dr. McCandless,

18   Dr. Woods, Dr. Kempke, was she receiving appropriate

19   medications for her diagnosis and presenting symptoms at the

20   time of the trial?"

21   Q       Does Dr. Bradford in her report set out the list of

22   materials that she reviewed in order to arrive at her

23   conclusions?

24   A       Yes, she does.

25   Q       And what medications did Dr. Bradford report that Ms.

1    Montgomery took -- I'm sorry.  Just briefly.  The Court can see

2    there Dr. Bradford reviewed CCA medical records, BOP medical

3    records, and then the reports of all the experts that we've

4    proffered in this case; is that right?

5    A     That's correct.

6    Q     Did she also review the social history documentation?

7    A     Yes.

8    Q     What medications did Dr. Bradford report Ms. Montgomery

9    took during her trial?

10   A     She took valproic acid.  She took bupropion.  She took

11   amitriptyline.  She took ranitidine.  Ranitidine is a

12   medication that is used for -- to help with the stomach, help

13   control your stomach because valproic acid can upset your

14   stomach.

15   Q     What can you tell us in Dr. Bradford's stead about the

16   medications in that chart?

17   A     Well, the valproic acid is an antiseizure medicine.  It

18   started out as an antiseizure medicine in the 1980s.  It was

19   found to be very, very helpful in bipolar disorder.

20   Q     Do we need to get you some water?

21         THE COURT:  Do you have some water?

22         THE WITNESS:  I do have some water but I don't want

23   to drink too much of it.

24         THE COURT:  We never know when Ms. Harwell is going

25   to be done.

1              MS. HARWELL:  Well, Judge Fenner, I have to point

2      out this is the first time I've ever in my experience had a

3      witness, especially an expert witness, take the stand and admit

4      he forgot his brain.  That sort of took me aback as we were

5      getting kind of started here that the witness forgot his brain.

6              THE COURT:  Maybe it was a good thing there was no

7      jury here.

8      Q       (By Ms. Harwell)  Okay.  I'm sorry.

9      A       Bupropion is a second-generation antidepressant.  As I

10     mentioned earlier, bupropion was actually developed for bipolar

11     disorder because most antidepressants are -- they cause

12     problems with bipolar disorder.  They flip people into what's

13     called -- they flip people into mania, called the manic switch.

14     So bupropion was actually developed for bipolar disorder,

15     depression and bipolar disorder.

16              Elavil is an older tricyclic antidepressant used for

17     pain, and some of you may be familiar with Elavil being used

18     for diabetic pain, which is neuropathic pain, pains of the

19     nerve.  And ranitidine, as I said, is for the stomach, an acid

20     reducer.

21     Q       And I realized that we went ahead and qualified you

22     earlier as a specialist in this field as well, but what were

23     Dr. Bradford's findings in regards to the side effects created

24     by these drugs?

25     A       Each of these -- each of the drugs that we just

1   described have sedation and somnolence as side effects.  They

2   also have motor sedation because you can have cognitive

3   sedation.  Your brain kind of slows down.  You get kind of

4   foggy.  We can have motor sedation where you don't respond so

5   quickly.  You have problems driving.  You know, how many

6   medicines will say, Don't drive until you figure this out.

7   That's motor sedation.

8              So a combination of these drugs goes back to exactly

9   what we talked about in terms of comorbid diseases.  When

10  diseases are comorbid, they have greater effects.  When drugs

11  are comorbid, they interact and they create greater effects.

12  Now, as it turns out, there is a relationship between

13  amitriptyline, which is the Elavil, and valproic acid.  If I

14  can explain that quickly.

15  Q      Yes, please.

16  A      Both of these drugs compete for sites in the liver.

17  Usually valproic acid wins.  When valproic acid wins, greater

18  amounts of Elavil get backed up.  So you get higher amounts of

19  Elavil in your blood system than you normally would.

20  Q      What's the behavioral effect or the physiological

21  symptoms of that?

22  A      You have much greater somnolence.  You have much

23  greater sedation than you would without the valproic acid.  So,

24  as I said -- and also with head trauma sedation and somnolence

25  are side effects.  They're often exaggerated when people suffer

1    from head trauma.

2    Q      What does Dr. Bradford's chart reflected here in our

3    slide indicate for you?  I know this was included in her

4    report.

5    A      This slide separates out sedation and somnolence.

6    Q      And what are the distinctions between the two?

7    A      Sedation actually affects how your brain works.

8    Sedation affects cognitive functioning.  It affects your

9    attention.  I think you may recall that one of the things that

10   we saw in the medical records was that Ms. McCandless would be

11   trying to read discovery -- I mean Ms. Montgomery would be

12   trying to read the discovery and she couldn't stay focused.

13   She couldn't concentrate.  It affects your coordination, your

14   physical coordination.  It affects your psychomotor activities

15   like driving, et cetera.

16          Somnolence, on the other hand, makes you sleepy,

17   makes you drowsy.  It doesn't necessarily affect your thinking

18   as much.  So when you have sedation and somnolence, they can be

19   very problematic.

20   Q      Then let's talk about the other chart that appeared in

21   Dr. Bradford's report.  What does this chart represent?

22   A      This chart is a chart that we normally use, and these

23   are all first-generation antidepressant medications, and what

24   you really want to look at here is how much sedation do they

25   have.  Now, you see anticholinergic, the second.  That also

1    causes sedation and cardiac effects.  So you really see the

2    Elavil, very sedative, very anticholinergic.  It causes bad

3    heart effects.

4    Q     What other negative effects are there with

5    amitriptyline?

6    A     I'm just going to read No. 1.  I can do No. 2 and 3 if

7    you'd like me to or the judge would like me to.  I'm more than

8    willing to.  The ones that are most relevant here are the

9    moderately severe sedation.  So we're talking about brain

10   impairment.  And the somnolence, we're talking about

11   sleepiness.

12   Q     Do we know if 25 milligrams of Elavil is sufficient to

13   produce this effect of sedation or somnolence the next day?

14   A     These amitriptyline, particularly Elavil, is not dose

15   related.  So the sedation of Elavil is not a dose-related

16   phenomenon.  It doesn't matter, the dose.  It matters how the

17   person responds to it.  There are others.  Trazodone is another

18   one that's dose related.

19         So regardless of the dose, depending upon the

20   person, you would look at these kinds of symptoms, and what you

21   see even at this dose, it can create -- decreases -- it

22   increases reaction time, meaning it takes it longer for you to

23   respond.  It diminishes accuracy.  Driving is not relevant

24   here.

25   Q     Dr. Bradford in her report, as reflected in the slide,

1    talks about tolerance?

2    A      Yes.

3    Q      What does that concept have to do with amitriptyline in

4    this setting?

5    A      Okay.  Tolerance works like this.  Your liver is the

6    organ that breaks down, what we call metabolizes, most drugs

7    and it has these enzymes in the liver.  If you think of these

8    little enzymes like Pacman, you know that Pacman, chop, chop,

9    chop, chop, chop.  So what really happens is when you give a

10   drug, those enzymes come and they break that drug down.  Now,

11   if you give that drug again, those enzymes say, Oh, here it is

12   again.  We need more support.  We need more reinforcements.  So

13   the second or third time you take that drug, it may not last as

14   long.  By the fourth time it may not be as effective.  So you

15   end up having to take more of the drug.  On the streets when

16   people are using drugs, it's called going on a mission.  You

17   can't get back to that same high.  That's what tolerance is.

18   Q      Does Dr. Bradford in her report and then as reflected

19   in the slide indicate that actually with amitriptyline there

20   isn't a tolerance?

21   A      That's right.

22   Q      That is to say it's still just as potent even after

23   taking it a long time?

24   A      You can take it for years, the same dose and you would

25   not have the same -- and you would have the same effects.

1   Q       And Dr. Bradford concluded that even at the 25

2   milligram dose the amitriptyline was sufficient to produce both

3   sedation and somnolence during the day?

4   A       That's correct.

5   Q       Does that correspond with your opinion, since you're

6   trained in psychopharmacology?

7   A       Well, it corresponds with my opinion clinically, but I

8   think more relevant it corresponds to the records, and what we

9   see in the records -- and perhaps I'm jumping ahead.  What we

10  see in the records is that Dr. McCandless has to decrease the

11  amitriptyline because Ms. Montgomery is becoming so sedated.

12  Dr. McCandless actually uses the word "sedated."  She's

13  becoming sedated at 50 milligrams of the Elavil.  She drops

14  that to 25 milligrams and Ms. Montgomery feels better.  And so,

15  again, you see these kind of ipsative steps.  She eventually

16  eliminates the Elavil and Ms. Montgomery is doing better.

17  Q       What do we know about the -- and I'm probably going to

18  get the drug wrong -- the valproic tablets that are extended

19  release --

20  A       Right.

21  Q       -- that Ms. Montgomery was taking during and after

22  trial?

23  A       Valproic is an acid.  Extended release means that it

24  lasts longer in the body.  The same dose lasts longer because

25  it's constructed -- the actual molecule is constructed

1   differently so it breaks down differently; and because they

2   were having difficulty getting control of Ms. Montgomery's

3   symptoms, they decided to go with an extended-release drug.

4   They couldn't use -- they just couldn't increase her

5   medications because she was having such bad stomach problems on

6   the medication.  So they wanted to go with the same dose but

7   give an extended release which is an artificial way of

8   elevating the dose.

9   Q    And what does this chart show about the effects of the

10  valproic acid in terms of the way it affects someone, how they

11  feel?

12  A    When you elevate the dose, you have more problems,

13  right?  And that's what we see here.  It's d-y-s-p-e-p-s-i-a,

14  dyspepsia; and if you, again, go through the records, you'll

15  see that all the time that Ms. Montgomery was being treated,

16  she was also on some medicine to try to control her stomach

17  problems secondary to the treatment.

18  Q    But more important for sort of the forensic evaluation

19  here in terms of Ms. Montgomery's competency at trial and her

20  appearance in front of the jury, would you agree that this

21  table shows also the high degree of somnolence?

22  A    Absolutely.

23  Q    What effect does valproic acids have on amitriptyline?

24  A    Valproic acid, as I said, increases the amount of

25  amitriptyline in the system.

1    Q       And what are the sedative effects with ranitidine?

2    A       Right.  Ranitidine.

3    Q       I'm sorry.

4    A       It really is another sedating medication.  It is an

5    antihistamine.  It's the kind of thing that if you were to

6    separate out, the kind of thing that you would use if you got

7    poison ivy, right, or if you got the hives.  They would give

8    you this antihistamine to kind of sedate you to kind of make

9    that go away.

10           So during most of her treatment -- I mean during

11   most of her trial, pretrial, trial, posttrial, she was treated

12   with one type or another.  Before this she was treated with

13   Phenylgesic.  Then she was treated with ranitidine.  She was on

14   valproic acid.  She was also on Elavil.  So she was on multiple

15   drugs that cause sedation.

16   Q       So at the time of the trial I'm hearing you that at

17   least three drugs on board that cause sedation?

18   A       At least.

19   Q       Is there information in Dr. Bradford's report about the

20   genetic history of Ms. Montgomery's family and how that

21   interplayed with the drugs, psychopharmacology?

22   A       Again, you see that Dr. Bradford had documented bipolar

23   disorder, bipolar disorder with psychotic features being both

24   maternal and paternal family, a half sibling, her brothers with

25   the same problem.  There's a question about her grandmother and

1   other family members; but we certainly know that there are,

2   again, older family members and then there are younger family

3   members that suffer from these mood disorders and other

4   cognitive impairments.

5   Q      Did Dr. Bradford consider and then analyze in her

6   report the symptoms of psychosis that were reported in Ms.

7   Montgomery's records?

8   A      She noted, again, gross impairment in reality testing,

9   delusions and hallucinations.  We talked today about the

10  olfactory hallucinations, lack of insight, grossly disorganized

11  behavior, the flat affect, and difficulty in initiating

12  important activities.

13  Q      And then in Dr. Bradford's opinion and in yours were

14  these psychotic symptoms being treated effectively at the time

15  of trial?

16  A      I'm glad you said that.  I actually kind of not thought

17  about that point for a moment.  Even though Ms. Montgomery was

18  being treated continuously, Dr. McCandless was struggling

19  because she was still symptomatic.  Even though Ms. Montgomery

20  was being treated during the entire three years, Dr. McCandless

21  could not get control over her delusions, could not get control

22  over her agitation, could not get control over her anxiety,

23  could not get control over her organization, and she tried --

24  she actually added another medicine.  I think it was Tegretol

25  to the regimen.  So at one point she was on Elavil, Wellbutrin,

1    and two mood stabilizers trying to control her symptoms.

2              Dr. McCandless never backed off of trying to control

3    her symptoms but was not totally successful, and so she was

4    symptomatic through the pretrial, trial, and posttrial until

5    the Risperidone.

6    Q      Does Elavil impair facial muscle movement?

7    A      Any sedation but certainly Elavil impairs facial

8    movement because it has a motor function.  If you recall where

9    it said there was a motor sedation as well as a cognitive

10   sedation.  A motor sedation is a relaxing of a smooth muscle.

11   That's why you give it when someone -- so that relaxing of the

12   smooth muscle is what's called masked facies, f-a-c-i-e-s, and

13   that masked facies can often look like someone is not

14   interested or has no facial expression.

15   Q      If the Court heard last week descriptions from people

16   who were at counsel table talking about Ms. Montgomery just

17   sitting slumped and looking flat, looking not present, would

18   that jive, for lack of a better word, with the descriptions

19   you're talking about the effects of the Elavil?

20   A      That would be consistent, yes.

21   Q      Were Dr. Bradford's conclusion that -- did Dr.

22   Bradford, like you, conclude that Ms. Montgomery's history of

23   psychosis and her mental illness was not adequately treated at

24   the time of trial?

25   A      That's correct.

1    Q      Were Dr. Bradford's conclusions -- and let's see if I

2    can ask it a better way.  You are also a psychopharmacologist.

3    Why was it important to you to also have Dr. Bradford's input?

4    A      Say that again.

5    Q      Why was it important to you to have Dr. Bradford's

6    expertise and input?

7    A      Dr. Bradford was probably one of the top five

8    psychopharmacologists in the world.  She had practiced

9    internationally.  She knows more about medications than -- she

10   knew more about medications than anybody, and there's little

11   subtle differences like between motor sedation and cognitive

12   sedation that has to be made.

13   Q      Do you know if Dr. Bradford has been declared to be an

14   expert witness in other courts of law?

15   A      Yes, she has.

16          MS. HARWELL:  And, Your Honor, were Dr. Bradford

17   here, I would, of course, ask you to consider her expert

18   opinions, and I believe the government didn't have any

19   objection to that.

20          MR. VALENTI:  Do not.

21   Q      (By Ms. Harwell)  Let's talk, Dr. Woods, then about Dr.

22   Bradford's conclusions.  What did Dr. Bradford conclude and

23   then I'll ask you to say whether you agree or disagree?

24   A      Sure.  Dr. Bradford concluded that the combination of

25   these drugs had cumulative effects that affected her outward

1    appearance and that it reduced her ability to react to

2    appropriate external cues.

3    Q      And was that across all of the time period of pretrial

4    and trial?

5    A      Yes.

6    Q      I'm sorry.  I interrupted.

7    A      That the medications caused a dulling of the senses,

8    caused increased reaction time, which meant -- that's kind of

9    an oxymoron.  It takes longer to react.  Decreased accuracy and

10   unresponsiveness to external stimuli, caused flat affect, which

11   is undistinguishable from the flat affect that is also seen in

12   psychosis.

13   Q      And, Dr. Woods, just very briefly, affect?

14   A      Affect is the external expression that one presents to

15   the world, smile, frown, when someone tells a joke, you laugh.

16   Affect is measured by range.  There's ranges of affect.

17   Depression, blunted affect; psychosis, flattened affect.

18   Q      What's the difference in blunted affect and a flattened

19   affect?

20   A      Blunted affect means someone tells a joke, everybody

21   else is just guffawing and that person is just kind of smiling

22   a little bit.  Flat affect means your face looks frozen.  You

23   literally have difficult moving.  It's like Botox.  Your face

24   is literally frozen.

25   Q      Thank you for that clarification.

1838

1           Dr. Bradford, as you were reading, concluded that

2    there was flat affect from the medication?

3    A       That's correct.

4    Q       You seem to be suggesting that it could also be present

5    from psychosis?

6    A       That's correct.  As she said -- it's, again, what we

7    have here, Ms. Harwell, are multiple cumulative effects.

8    Cumulative effects from the medication.  Cumulative effects

9    from the disorders themselves.  We have multiple cumulative

10   effects.

11   Q       Did Dr. Bradford offer an opinion about the role of

12   genetics and the stressful traumatic life events in Ms.

13   Montgomery's disorders?

14   A       Yes.

15   Q       And what did she say?

16   A       That she had a moderately high risk genetically for

17   bipolar disorder; that the childhood maltreatment contributed

18   to her mental illness, as I talked about earlier; that the

19   severe trauma contributed to her psychotic symptoms.  In DSM-5,

20   2013 it was acknowledged that trauma can create psychosis, and

21   that her genetic makeup plus traumatic childhood contributed to

22   bipolar disorder with psychotic features.

23   Q       What was Dr. Bradford's conclusion about Ms.

24   Montgomery's medications at trial?

25   A       No. 1, that she had no treatment for psychotic

1839

1   symptoms; that she had therapeutic levels of valproic acid and

2   Wellbutrin.  And I can explain that.  Basically it means they

3   were as high as they should be.  This is an important one, that

4   some bipolar symptoms were reduced.  If you talk to Ms.

5   Montgomery, she said, Yeah, I mean, my mood was kind of

6   stabilized a bit but my concentration was still impaired, my

7   ability to focus was still impaired.  She still reported

8   frequent bouts of depression and manic and the negative

9   symptoms, as I talked about, flat affect, were present in the

10  courtroom.

11  Q      Dr. Woods, when you now sort of related what Ms.

12  Montgomery said, I just want to be clear.  Those aren't the

13  words she uses to express those things.  That's your sort of

14  psychiatric translation of that which she described?

15  A      That's correct.

16  Q      She doesn't speak to you in terms of my cognition is

17  impaired?

18  A      That's correct.

19  Q      I wanted to make sure that was clear on the record.

20         And is it also true that when you've had the

21  conversations with Ms. Montgomery that you were talking about

22  just there, that the way she's able to reflect with you the

23  differences that you're describing is because she now knows

24  what it is for her thinking to be clearer?

25  A      That's correct.

1    Q       Let's talk about your opinions and conclusions.  And

2    I'd like to make clear, Dr. Woods, that I think I know that all

3    of your opinions and conclusions are based on science and

4    learning and evidence that was available in 2007; is that

5    correct?

6    A       Absolutely.

7    Q       Okay.  Was Ms. Montgomery's capacity to appreciate the

8    wrongfulness of her conduct or to conform her conduct to the

9    requirements of the law significantly impaired at the time of

10   her offense?

11   A       In my professional opinion, yes.

12   Q       And why is that?

13   A       Ms. Montgomery was suffering from lifelong impairments.

14   The impairment of concentration, the impairment of being able

15   to think effectively through a problem, the impairment of being

16   able to effectively weigh and deliberate situations had been

17   problematic for most of her life, and certainly things like her

18   brain injury are things that do not go away.  Her bipolar

19   disorder at times, it can wax and wane, but what we see is that

20   shortly after her coming into the jail facility, she was

21   starting to get treated with medication.  Someone picked that

22   up.  That even -- and even beforehand they picked that up that

23   she had significant and multiple problems.  Those problems

24   existed at the time of the offense as well.

25   Q       Was Ms. Montgomery under a severe mental or emotional

1   disturbance at the time of the offense?

2   A     Yes.

3   Q     And why do you say that?

4   A     Again, the symptoms that Ms. Montgomery was suffering

5   from were not acute.  The environment in which she was in was a

6   stressful environment so that certainly added to it, but we see

7   the symptoms that we are now describing as being there with Ms.

8   Montgomery for much of her life.

9         This was a woman who was homeless, whose children

10  were homeless at times, who was fighting with the family

11  consistently, who others in her family considered to be, quote,

12  crazy in that nontechnical sense, who had real difficulty

13  managing her day-to-day life.  That was not any less at the

14  time of the offense.

15  Q     I'm sorry.  It may just be that you were going one

16  direction in your sentence, then changed.  Did you say her

17  symptoms were not acute at the time of the crime?

18  A     What I said was that -- when I used "acute," I meant in

19  the terms they didn't just start.

20  Q     Oh, okay.

21  A     That they had been there for a significant period of

22  time.  They just hadn't started a week before or two weeks

23  before.

24  Q     I'm sorry.  You taught me a new meaning of acute.

25  A     I apologize.  Poor choice of words.

1    Q      Was Ms. Montgomery's neurobehavioral history an

2    important component of her social history?

3    A      Her neurobehavioral history puts it all together.

4    Q      What do you mean by that?

5    A      When you understand that her brain does not function

6    properly, it takes these behaviors and it translates them into

7    symptoms.  When you understand that the part of the brain, the

8    right side of the brain, does not work accurately and there are

9    motor findings of that as well as emotional findings, but if

10   you don't have that, then your differential diagnosis, your

11   ability to really understand where her symptoms come from is

12   limited.  So her neurological status is very, very important.

13   Q      Did the prior assessments of Ms. Montgomery by the

14   trial defense and government experts accurately reflect Ms.

15   Montgomery's neurobehavioral history?

16   A      No.

17   Q      And what were the limitations that you saw?

18   A      The limitations were that there was no neurological

19   testing done, there was no psychological testing, and it gave

20   us some clues, but there was no neurological testing done to

21   get at her difficulty in other ways.

22          The understanding of the role of neuroimaging was

23   limited, and the fact that the amygdala and hippocampus and

24   other parts of her brain that really do impact trauma and

25   behavior was not well understood.  Certainly the role of her

1  being treated was not understood.

2  Q      And when you say "was not understood," is that because

3  the knowledge was not available in the period between 2005 to

4  2007 or is it because the experts didn't delve in?

5  A      The knowledge was not available.

6  Q      Must a reliable psychiatric assessment of Ms.

7  Montgomery include the consideration of these neurological

8  deficits that you've been discussing?

9  A      Yes.

10 Q      And why do you say that?

11 A      Because we now know and we certainly knew in 2005

12 and we actually knew in 1995 that the brain counts; that the

13 things -- that the behaviors that come from the brain, that are

14 driven by the brain make a difference.  Our understanding about

15 how vulnerable the brain is was not really clear until the mid,

16 I would say, 1984, 1985.  But now we've had 30 years and at

17 that time we had 20 years of looking at it.  So this brain

18 behavior is very, very important and it allows us to look at

19 the difference of diagnosis much more accurately.

20 Q      Did Ms. Montgomery's impairments and medications affect

21 her ability to rationally assist her counsel prior to and

22 during the trial in your opinion?

23 A      In my opinion, yes.

24 Q      And, again, why do you say that?

25 A      Sure.  Well, first of all, she did not receive

1    appropriate medication for her symptom complex.  She received

2    appropriate medication for parts of it but not for that part

3    that allowed her to think, to concentrate, to read; and without

4    that medication, she was unable to disclose the nature and

5    extent of her trauma.

6              But we see this vulnerability, Ms. Harwell, back as

7    early as 2003 where at that point the social worker is

8    describing her thinking as being impaired, and in 2007 with Dr.

9    Kuncel she doesn't speak to competency but she talks to being

10   very concerned about how she's going to be able to handle a

11   trial and how she's going to be able to function.  Nothing

12   changed between Dr. Kuncel's observation or that 2003

13   observation and the time that she was in trial.

14             If I might say one more thing.  Again, if you look

15   at the medical records of Dr. McCandless, she talks about her

16   trying to read and not being able to read, looking at discovery

17   and not being able to read discovery, not being able to focus,

18   not being able to concentrate.  All of that is within the CCA

19   medical records.

20   Q    And what effect does medication have on the ability to

21   disclose complex trauma?

22   A     It provides a foundation for your thoughts and your

23   emotions.  It provides a safety net that allows -- it's like

24   building a building.  Medications, when they work, really

25   allows one to organize your mind, to think in much more

1    effective ways.  Now Ms. Montgomery has been on medications for

2    six years, and she continues to describe appropriately

3    improvement in her thinking over those six years.

4    Q       Did Ms. Montgomery, in your expert opinion, did her

5    impairments and medication affect her demeanor at the trial?

6    A       Yes.  We talked about the motor sedation.  Again, we

7    can look at the records to see that she was feeling sedated

8    during this period of time.  It certainly is reflected in

9    people's description of her as having flat affect, of being

10   apparently uninvolved and difficulty showing emotion.

11   Q       And, Dr. Woods, I didn't ask you in the formal legal

12   magic language each time, but all of those opinions you just

13   expressed you hold to a reasonable degree of neuropsychiatric

14   certainty; is that correct?

15   A       Yes, I do.

16   Q       And, Dr. Woods, I want to ask you one more question

17   about how all of these pieces you've described fit together.

18   That is to say you sort of described many different component

19   problems and I think you've indicated that some of them

20   compound each other?

21   A       Yes.

22   Q       The problems that you've seen and that you've described

23   in neuropsychiatric terms, were those borne out in Ms.

24   Montgomery's functioning in the real world?

25   A       Yes.

1    Q      And what makes you say that?

2    A      We see a young woman who, according to lay witnesses,

3    was never able to function effectively, who had children she

4    could not take care of, who had marriages that she could not be

5    a part of, who moved from place to place often from a better

6    home to a less effective home, and that's clear, who traveled

7    at a whim without shoes.  She talked about going to the Grand

8    Canyon in the middle of the winter with just shorts on, just

9    taking her children, and we see this in her workplace and we

10   see it in multiple other places.

11          We see a family history of bipolar disorder and

12   other disorders that can lead to psychosis, and we see in the

13   long run treatment that has been effective, and that's a sad

14   comment but it's true.

15          MS. HARWELL:  Let me have just one moment, Your

16   Honor.

17          I don't have any further questions.  I believe the

18   government may have some.

19          MR. VALENTI:  May it please the Court.

20          THE COURT:  Mr. Valenti.

21   CROSS-EXAMINATION BY MR. VALENTI:

22   Q      Dr. Woods, before we get too deep into this, I want to

23   make sure I understand a couple pieces of your testimony

24   clearly.  I think during your examination you indicated that

25   the use of valproic acid in conjunction with amitriptyline

1    increased the amount of amitriptyline in her blood; is that

2    correct?

3    A      That's correct.

4    Q      But didn't you tell me -- or didn't you tell us,

5    rather, that the valproic acid and amitriptyline compete for

6    sites in the liver; is that fair?

7    A      That's correct.

8    Q      So if they're both given in the diagnostic way at a

9    similar time, the valproic acids tends to exert dominance and

10   go and take up the liver absorption spots, correct?

11   A      That's correct.

12   Q      So rather than valproic acid actually increasing the

13   amount of amitriptyline in the blood, it simply prevents the

14   amitriptyline from being readily absorbed and it prolongs the

15   time the amitriptyline would be absorbed; is that correct?

16   A      That's not correct.

17   Q      You're saying that it makes more amitriptyline in the

18   blood?

19   A      It doesn't make more amitriptyline.  The goal of the

20   liver is to break down, to metabolize, these drugs.  So if

21   you've got the valproic acid taking up the sites, there's no

22   place for the amitriptyline to be metabolized.

23   Q      I agree.  I thought that's what I said.  Rather than

24   increasing the amitriptyline in the blood, the amitriptyline is

25   simply in the blood without an exit point?

1   A       Right.  That lack of -- that being in the blood means

2   that it's exerting its effects on the rest of the body.

3   Q       But it's not increasing the quantity of amitriptyline

4   in there.  When you say it "increased it," it prolongs its

5   presence in the bloodstream, correct?

6   A       It actually does both because it prolongs it but it

7   also increases it because it's getting backed up.  It's like if

8   you think of the valproic acid as closing down that tunnel,

9   okay, it does prolong the time that the amitriptyline can get

10  in, but it also backs up the amount of amitriptyline in the

11  body.  So it does increase the blood level.

12  Q       I think we're saying the same thing.  We're saying it

13  in different ways.

14  A       Okay.

15  Q       Let me get some timeline questions now.  You got

16  involved in this case in 2013; is that correct?

17  A       That's correct.

18  Q       So you would have gotten on the case some four years or

19  so after Ms. Montgomery was prescribed Risperdal in July of

20  2009?

21  A       That's correct.

22  Q       And I believe, if I understand your testimony

23  correctly, the Risperdal starting in 2009 July has been the

24  most effective medication for clearing her thoughts?

25  A       Yes.  I think actually she was started shortly in 2009

1    and then was taken off and started again in 2010.

2    Q       Okay.  Regardless, she got it in 2009, then got it more

3    full-time in 2010, correct?

4    A       I think taken off, then put back on, yes.

5    Q       But that's been the drug that's been the most effective

6    in clearing up her thinking?

7    A       That's correct.

8    Q       And you've seen her subsequent to her being prescribed

9    that medication on an ongoing basis from sometime in 2010 or

10   thereabouts?

11   A       Yes, sir.  And I apologize.  I don't know your last

12   name.

13   Q       Valenti.

14   A       Mr. Valenti, I apologize.

15   Q       Yes.  When you were going through your credentials,

16   sir, you indicated that you are a licensed medical doctor

17   practicing psychiatry and neuropsychiatry in California,

18   correct?

19   A       Yes, sir.

20   Q       Are you board certified in your specialty?

21   A       In psychiatry, yes.

22   Q       What about neuropsychiatry?

23   A       I'm not board certified in neuropsychiatry.

24   Q       Is there a board certification available in

25   neuropsychiatry?

1  A     About three years ago there became a board

2  certification in neuropsychiatry.

3  Q     And you've not sat for that board?

4  A     I have not.

5  Q     Can you tell the Court what it means to be board

6  certified in a particular specialty, please?

7  A     Sure.  It depends upon the specialty, but board

8  certification means that you have taken -- at this point in

9  history you've taken an examination, it's a written

10  examination, in order to pass your certification.

11  Q     Is the board certification you hold in psychiatry for

12  clinical psychiatry?

13  A     It's general psychiatry.

14  Q     Okay.  Thank you.

15       Do you hold board certification in forensic

16  psychiatry?

17  A     No, I don't.

18  Q     During the course of your testimony, you were asked

19  about withholding in the context of Ms. Montgomery's discussion

20  with various clinicians about her symptomatology.  Can you tell

21  the Court what a definition in psychiatry would be of the term

22  "withholding"?

23  A     Sure.  A person that is withholding is someone that may

24  not be willing to provide certain information.

25  Q     In the legal system we have used and the Court has

1851

1    heard testimony and the jury would have when this case was

2    tried in 2007 about malingering.  Are you familiar with that

3    term?

4    A      Yes.

5    Q      And withholding and malingering are certainly different

6    terms but do they have similar meanings?  Someone not being

7    completely truthful about their symptomatology?

8    A      It could be.

9    Q      You indicated through the course of your testimony the

10   reliance upon several different experts and the conclusions

11   they drew from the results of their individual analysis of Ms.

12   Montgomery?

13   A      Yes.

14   Q      One of the people you talked about was Dr. Hutchinson,

15   correct?

16   A      Yes.

17   Q      Were you made aware of the testing that she did in the

18   neuropsychological setting regarding her psychometric testing?

19   A      Well, she did not do psychological testing.  She did

20   psychometric testing.

21   Q      Better answer than my question.  You were aware that

22   technically she didn't do it.  A doctor working for her named

23   Dr. Willing did psychometric testing on Ms. Montgomery?

24   A      That's correct.

25   Q      You were made aware of that?

1    A      Yes.

2    Q      Were you made aware of the computer profile indication

3    that symptom exaggeration was going on when that psychometric

4    testing was done on Ms. Montgomery?

5    A      Yes.

6    Q      Were you made aware when you talked with Dr. Kuncel --

7    I'm not sure I'm saying her name right.

8    A      You're probably right.

9    Q      Were you aware that Dr. Kuncel did psychometric testing

10   on Ms. Montgomery?

11   A      Yes.

12   Q      Were you aware that she also had similar indications

13   that Ms. Montgomery was involved in malingering, specifically

14   in her instance while giving her the SIMS test?  Are you

15   familiar with that test?

16   A      I am familiar with the SIMS.  I don't recall it being

17   malingering in either case, but it was certainly one of the

18   differentials would be symptom exaggeration.

19   Q      And to be clear so that I'm not asking you an unfair

20   question, the SIMS, Structured Inventory of Malingering Scales

21   test, you're familiar with that?

22   A      Yes.

23   Q      And in that scale it indicates that if someone scores

24   greater than 14 on that particular scale, malingering is

25   suggested but obviously more needs to be done, correct?  Does

```
 1   that sound familiar to you?
 2    A      Yes.  It's actually a little bit -- if I can just, if
 3   you don't mind?
 4    Q      Sure.
 5    A      The SIMS was developed by Richard Rogers along with the
 6   SIRS.  Both of these tests really -- and Richard Rogers, I
 7   think as late as 2001, acknowledged that neither of these tests
 8   were utilized or normed with people with any type of cognitive
 9   impairment, and so the difficulty with the SIMS, if you will
10   note is not used anymore, is that it was not normed on a
11   population that had brain injury or brain impairment of any
12   type.  So that makes it much more difficult to read in terms of
13   malingering when the normative sample was not accurate.
14    Q      Were you aware that Ms. Montgomery scored 16 on that
15   scale?
16    A      Yes.
17    Q      Were you aware, and I believe you were, that Dr.
18   Martell did psychometric testing?
19    A      Yes.
20    Q      And ultimately that Dr. Martell invalidated the MMPI
21   because in his mind she had symptom exaggeration or malingered
22   the results?
23    A      Yes.
24    Q      You took all of that into account when you testified
25   today?
```

```
 1    A       Yes, sir.

 2    Q       You were aware of it.  All right.

 3            You also talked, I believe, Doctor, about affect,

 4    and I believe you broke it down into blunt versus flat affect;

 5    is that correct?

 6    A       Yes, sir.

 7    Q       You would agree that's probably a term for an expert in

 8    your field, blunt versus flat, correct?

 9    A       Yes, sir.

10    Q       What I mean by that is that laymen probably don't use

11    it in such a discerning manner?

12    A       That's correct.

13    Q       All right.  If somebody or the average person

14    understands intoxicated affect, jovial affect?

15    A       Right.

16    Q       And maybe something's not right, but blunt versus flat

17    might be a bit too technical?

18    A       That's correct.

19    Q       All right.  You indicated that in your testimony that

20    her affect as it was testified to by some people could be a

21    result of the drug interaction that you described, correct?

22    A       That's correct.

23    Q       You also indicated that it could be a symptom of

24    psychosis that she was experiencing?

25    A       Yes, sir.
```

1    Q       Let me ask you this, Doctor, could it also be a

2    reflection of the grave situation in which she found herself?

3    A       No.  And that's a very interesting question because we

4    always assume that that's true.  The grave situation that she

5    found herself is an emotionally latent situation.  Blunt affect

6    and particularly flat affect are really cognitive findings.  So

7    we're talking about the flat affect of psychosis is cognitively

8    developed.  The flat affect of drugs is pharmacologically

9    developed.  So those are different.  If you were saying she had

10   another type of affect, yes, but not in that particular case.

11   Q       Well, the reason I asked you earlier about the

12   technical way you're using the term versus what a layman,

13   because all the reports about her affect are all layman

14   reports?

15   A       Right.

16   Q       So we're not -- technical people didn't describe her

17   affect so we're stuck with flat?

18   A       Actually Dr. McCandless did describe her affect as

19   flat.

20   Q       But not in trial?

21   A       Not in trial, during trial.

22   Q       The reason I ask you that is, sir, have you witnessed

23   many defendants while they stand trial?

24   A       Yes.

25   Q       You've seen them in court?

```
1    A       Yes.

2    Q       You've seen many defendants in court while they're

3    facing death penalty allegations?

4    A       Yes.

5    Q       Okay.  And their affect can change greatly based upon

6    the situation they're in, can't it?

7    A       Yes.

8    Q       Okay.  And you treat patients, correct?

9    A       Yes.

10   Q       And you give those patients advice and treatment and

11   regimens to try to improve their situation; is that correct?

12   A       That's correct.

13   Q       You would agree with me that lawyers who represent a

14   criminal defendant are similarly, not in the mental health

15   capacity, but provide a service to their client?

16   A       Yes, sir.

17   Q       And if the lawyer is suggesting to a client to maintain

18   a certain affect, that would be important to your calculation,

19   right?

20   A       Yes, sir.

21   Q       Okay.  Because you can't appear too happy in front of a

22   criminal jury?

23   A       Yes.

24   Q       You can't appear overly excited or jovial?

25   A       Yes.
```

1    Q      There's kind of a narrow window you would expect that a

2    criminal defendant needs to, for appearances sake, need to

3    maintain, correct?

4    A      I can't really answer that.  I understand -- but I

5    understand the question that you're asking.

6    Q      Okay.  I think lastly, sir, I want to talk about some

7    of your testimony in -- I believe you were talking about the

8    brain impairment section of Ms. Montgomery, and in that you

9    were indicating that a very important piece to you was

10   sequencing, correct?

11   A      Yes, sir.

12   Q      And I believe the example you gave about sequencing

13   issues was inability to create a menu; and as I understood your

14   explanation, it actually sounded like your ability to follow a

15   recipe.  Is that what you meant?

16   A      By and large, yes.

17   Q      Okay.  In other words, if you're going to make cookies,

18   you know, when you put the flour in, the sugar, the eggs?

19   A      Yes, sir.

20   Q      Doing things in a logically progressive way?

21   A      Yes.

22   Q      Now, in December of 2014 there are some pretty

23   sequenced events in Lisa Montgomery's life, weren't there?

24   A      2004?

25   Q      December of 2004.  I said '14.  December of 2004.

1    Excuse me.

2    A      Yes.

3    Q      By that I mean you were aware that she did research --

4    A      Yes.

5    Q      -- on the victim in this case, Bobbie Jo Stinnett,

6    right?

7    A      Yes.

8    Q      Not only did she do research on her, she did research

9    on dogs, specifically Rat Terrier dogs?

10   A      Yes.

11   Q      Not only did she do that, she did research on how to

12   conduct C-sections?

13   A      Yes.

14   Q      Not only that, she was able to create a false persona

15   or fake person by the name of Darlene Fisher to engage in email

16   communications with Bobbie Jo Stinnett?

17   A      Yes.

18   Q      Not only that, she was able to delete her criminal

19   history in indication of trying to cover up what she was doing,

20   correct?

21   A      Yes.

22   Q      In that sequencing she was able to bring a rope with

23   her?

24   A      That's my understanding, yes.

25   Q      She was able to bring a knife with her?

1    A      Yes.

2    Q      She was able to bring a home birthing kit with her, and

3    she was able to manage her way from where she lived in Kansas

4    to Skidmore, Missouri, to Bobbie Jo Stinnett's house?

5    A      Yes.

6    Q      And with scant minutes of training on the Internet,

7    able to successfully perform a Caesarean section on a live

8    human?

9    A      Yes, she did.  She did cut her open, yes.

10   Q      You're a medical doctor?

11   A      Yes.

12   Q      Learned how to do a C-section.  It's not something you

13   just do as in the Easy Bake Oven over night, is it?

14   A      Yeah.  I wouldn't hardly call it an effective

15   C-section, but I do understand what you're saying.

16   Q      Well, an effective C-section for you is where the

17   mother and the child both live?

18   A      Yes.

19   Q      An effective C-section for a Caesarean abductor means

20   getting the baby, and she got that done, didn't she?

21   A      Yes, she did.

22   Q      And that's a pretty well -- good sequence of events

23   that she was able to accomplish in December of 2004 before she

24   was being treated for any mental health issues and before she

25   was on Risperdal?

1    A      It's difficult to look at the sequences.  Those are all

2    the things she did.  It's much, much different to say these

3    were a function of a sequence, but she did do each of those

4    things.

5                MR. VALENTI:  That's all I have, Your Honor.

6                MS. HARWELL:  If I might have a moment, Your Honor?

7                THE COURT:  All right.

8                MS. HARWELL:  Very few questions, Your Honor.  Just

9    a tiny bit of cleanup.

10   REDIRECT EXAMINATION BY MS. HARWELL:

11   Q      Dr. Woods, I know you reviewed at some length our

12   referral questions to you.  We did not ask you to opine as to

13   whether Ms. Montgomery was NGRI or not?

14   A      That's correct.

15   Q      You talked about a differential diagnosis being a part

16   of the things indicated, I think, on the SIMS?

17   A      Yes.

18   Q      And that one of the things that should be considered

19   according to the report generated was symptom exaggeration.

20   Fair to say there were other things to be considered as well?

21   A      Yes.  Malingering is not a diagnosis.  Malingering is a

22   lack of a diagnosis.  Malingering is not part of DSM-5.  It's

23   in the -- in terms of system, it's really what we call the

24   V codes.  So when you look at each one of the tests that Mr.

25   Valenti described, symptom exaggeration is what was found.

1           The cause of this symptom exaggeration is really much,

2    much different.  Symptom exaggeration usually looks at three

3    areas; can this person read effectively for the MMPI?  It's a

4    fourth grade level.  MMPI-1 is sixth level.

5           Can the person -- does the person have significant

6    psychiatric pathology, and is this in fact a cry for help?  So

7    what we see is that at each time that she was given the MMPI,

8    she was -- at least with Dr. Hutchinson, with Dr. Martell, she

9    was actually -- and with Dr. Kuncel now that I think about it,

10   maybe she was being treated for a significant psychiatric

11   disorder.  In many ways she was really in an inpatient setting

12   being treated with psychiatric medications at the time that she

13   was taking these tests.  So it makes sense that one would look

14   at that symptom exaggeration, and I might also add symptoms

15   that were not completely under control.

16   Q      And, Dr. Woods, the Court heard yesterday a long --

17   you've read Dr. Sanislow's report -- discussion of sort of the

18   subscales of the MMPI?

19   A      Yes.

20   Q      You're familiar with a lot of that data and how those

21   scales are weighed and what they indicate?

22   A      Yes.

23   Q      I'm not going to ask you to go into any of those

24   subscales.  I just want to ask you if in your review of some of

25   that underlying data, you found actually a lot of the things

1    indicated were things borne out in the biopsychosocial history?

2    A       When you look at the overall question of symptom

3    exaggeration on those tests, particularly Dr. Martell's

4    testing, you have to go into the details.  If you look at the

5    detail of the subscales, you'll find that in fact there is not

6    evidence of willful exaggeration.  There is evidence of symptom

7    descriptions that are -- that are severe.  So if she talks

8    about family alienation, well, that makes perfect sense given

9    her social history.  She talks about personal alienation.  That

10   makes perfect sense given her social history.  So these

11   extremes are extremes in the very area that the biopsychosocial

12   history reinforces.

13   Q       Mr. Valenti made the point that Dr. McCandless wasn't

14   observing Ms. Montgomery's affect during the trial.  Dr.

15   McCandless was not actually in the courtroom observing Ms.

16   Montgomery in the courtroom?

17   A       Sure.

18   Q       But she was observing her during the time period which

19   encompassed the trial?

20   A       That's correct.

21   Q       And she was taking notes and making reflections?

22   A       That's correct.

23   Q       All throughout the trial; is that fair to say?

24   A       That's correct.

25   Q       When we talk about -- when Mr. Valenti talked about

1    attorney instructions, you admitted, of course, you don't know

2    what counsel told Ms. Montgomery to attempt to do with her face

3    as she sat at counsel table?

4    A      That's correct.

5    Q      Fair to say with these drugs on board, those drugs

6    would overwhelm many of her abilities to appear in any

7    particular way?

8    A      Yes.  These affect directly the motor functioning of

9    those muscles.  So no matter what they may have told her the

10   drugs were No. 1.

11   Q      Thank you.

12          MS. HARWELL:  No further questions.

13          MR. VALENTI:  Nothing further, Your Honor.

14          THE COURT:  Thank you, Doctor.  You're excused.

15          THE WITNESS:  Thank you very much.

16          (Witness excused.)

17          MS. HENRY:  Your Honor, movant calls John O'Connor.

18   JOHN O'CONNOR, being sworn by the courtroom deputy, testified:

19   DIRECT EXAMINATION BY MS. HENRY:

20   Q      Good afternoon, Mr. O'Connor.

21   A      Good afternoon.

22   Q      If you would state your name for the record, and I

23   think the court reporter probably knows how to spell it.

24   A      John O'Connor.

25   Q      Mr. O'Connor, thank you so much for your willingness to

1   wait for us for a few hours this afternoon.  We do appreciate

2   that.

3            MS. HENRY:  Your Honor, before we start with Mr.

4   O'Connor's testimony, I'm sorry, I neglected to inform the

5   Court and should at this point that movant will now withdraw

6   claims -- three claims in our motion, and I would like to state

7   for you what those claims are and where they are found in the

8   motion, with the Court's indulgence.

9            Those are all under what is subheading 5,

10  ineffective assistance of counsel, and we are withdrawing

11  subclaim 11 as it is referred to in the Court's memo, which

12  would be page 2 of the Court's memo regarding matters for

13  hearing that would be found on page 167 of the motion, and that

14  relates to ineffective assistance of counsel and the handling

15  of the Mary Case testimony.  That's the first claim.

16            Secondly, we are withdrawing subclaim 20 of claim

17  Roman V, which is found at page 3 of the Court's memo and

18  page 188 of the movant's 2255 motion that relates to

19  ineffective assistance of counsel with respect to the handling

20  of the Laboy, Espey, and Gatewood testimony

21            And, finally, we are now withdrawing subclaim, I

22  believe that's 24, of Roman V, page 3 of the Court's memo and

23  page 193 of movant's motion, and that relates to ineffective

24  assistance of counsel with respect to seeking to exclude the

25  911 tape.

1          Can we be in agreement with that, Mr. Valenti?

2               MR. VALENTI:  I'm okay with it.

3               THE COURT:  All right.

4               MS. HENRY:  Thank you, Your Honor.  We'll move

5    forward from there.  If I can have a minute to get my exhibits

6    in order.

7    Q     (By Ms. Henry)  So that should shorten things up a bit,

8    Mr. O'Connor.

9    A     Thank you.

10   Q     Mr. O'Connor, I'd like to -- that's a predicate

11   question.  You were appointed counsel on behalf of Mrs.

12   Montgomery in May of 2006; is that fair to say?

13   A     That's correct.

14   Q     And you were contacted by Magistrate Maughmer shortly,

15   three or four days, before you were actually formally appointed

16   and he inquired of you whether or not you would accept

17   appointment in the matter; is that correct?

18   A     I believe it was Judge Maughmer.  It could have been

19   Judge Fenner.  I honestly don't have a recollection of that,

20   but it was one or the other.

21   Q     And when you were approached about your willingness to

22   accept the Montgomery case, you reached out to resource

23   counsel, a man by the name of Dick Burr, and inquired of him

24   whether or not he might suggest co-counsel for you in the

25   Montgomery matter; isn't that true?

1   A      Again, I don't have a recollection of that.  If Mr.

2   Burr does, I would go by his word.  I don't remember doing

3   that; but if you say I did and he says I did, I don't say I

4   didn't.

5   Q      So if Mr. Burr testified before his Honor last week

6   that you had asked him for a list of qualified capital lawyers

7   who might come in and assist you, you have no reason to dispute

8   his testimony?

9   A      I don't but I -- honestly, when you asked me that last

10  week, I do not have a recollection of doing that.  I don't.

11  But it's been nine years so I would have to say I don't know

12  for sure.

13  Q      Sure.  So last week when I asked you about it, you

14  didn't remember it; but if he's testified to it and you're not

15  disagreeing, we're not going to get into a big fight about

16  that, right?

17  A      Again, I don't have a recollection of it, and I don't

18  know Mr. Burr.  So if he said that he did talk to me and maybe

19  there will be some long distance call or something, I would not

20  say -- but I honestly do not remember doing that and somewhat

21  believe I wouldn't have; but, again, I don't -- I don't have a

22  recollection.  I apologize.

23  Q      At some point Fred Duchardt came in as your co-counsel

24  in this matter; is that correct?

25  A      That is correct.

1    Q        And when you agreed to accept appointment on behalf of

2    Mrs. Montgomery, you recognized even before you were appointed

3    that this case was going to involve issues of Mrs. Montgomery's

4    mental or psychiatric illness?

5    A        And, again, I read about the case in the paper.   I

6    wasn't following it in terms of who the lawyers were involved

7    until I found out later.   Obviously first thought about that

8    kind of a case was mental -- it would be a mental defense.   So

9    I think, then, once getting here and hearing about the case, it

10   seemed very apparent to me that would be the case.

11   Q        And I want to be very clear, Mr. O'Connor, I'm not

12   going to ask you any questions about issues relating to the

13   removal of previous counsel, because that has already been

14   ruled on.   His Honor has made it clear he doesn't want us to

15   delve into those areas.

16   A        Okay.

17   Q        So I think you've answered my question.   You recognize

18   this was a case involving psychiatric illness and you -- I

19   think you shared with us when you sat down with us in the

20   United States Attorney's Office, that that wasn't particularly

21   your strong suit.   You needed some help?

22   A        Well, basically when you're in private practice, you

23   get very few murder cases where you're hired.   Most of the

24   cases that I've had are of those type.   Although I have had and

25   we've had mental defenses.

1           As you know, the public defender handles the lion's

2   share of the murder cases and cases where mental disease or

3   defect is the defense.  I've had it as a defense but not as

4   often as someone like Mr. Duchardt or yourself or others who

5   have done this for a longer period of time.

6           So if given the choice of having another counsel,

7   and I'm not saying I was given a choice, but I did make a

8   request, but that was certainly up to the Court to make an

9   independent decision on that, I preferred to have someone who

10  had that experience.

11          I had just gotten off a capital case that Fred and I

12  did together over in Kansas City, Kansas, and we got to talking

13  and I knew about the Purkey case and I just knew anecdotally

14  about Fred's career of handling cases involving cases of mental

15  disease or defect; and so I thought, you know, where someone's

16  facing the death penalty, you want to bring to bear as much as

17  you can their experience if it's allowed.

18  Q    So the answer to my question is yes?

19  A    I guess maybe that's a long way of saying yes.

20  Q    And recognizing that you wanted someone else to come in

21  and help you, you did know that David Owen for the Federal

22  Public Defender's Office was already assigned to the case?

23  A    I was aware of that, yes.

24  Q    And David Owen was very clear and candid with you that

25  he did not have the type of experience necessary to be able to

1    shoulder the psychiatric illness mitigation aspect of this

2    case?

3    A       Again, I had not talked to David at the point I was

4    appointed.  I only figured that out in terms of the fact that

5    others were also involved.  I don't think they would have been

6    involved just kind of knowing other capital cases because in

7    other capital cases when the attorneys are appointed, there are

8    normally two; and if the public defender could be appointed,

9    they would be because of their resources, and they haven't

10   been, meaning they didn't have someone there with the

11   experience of capital cases.  So I just assumed that.  It

12   turned out to be true, but I did not know that for sure.

13   Q       Now, you've mentioned -- well, let me ask you this:

14   I'm going to pull apart that question about Mr. Duchardt and

15   his reputation.  But let's talk about David Owen.  Were you

16   aware at the time that Mr. Duchardt was appointed as second

17   chair counsel, learned counsel, I should say, in this case that

18   Mr. Owen and Mr. Duchardt -- or actually -- well, let's just

19   leave it with Mr. Owen.  Mr. Owen and Mr. Duchardt preferred

20   not to work with one another?

21   A       I don't believe I knew that, no.

22   Q       Let me ask you, sir, about the case that you and Mr.

23   Duchardt worked on together over in Kansas City, Kansas.  I

24   believe when I asked you about that case -- well, back up.

25   That case involved a gentleman by the name of Demetrius

1    Hargrove; is that correct?

2     A     That's correct.

3     Q     And I believe when I asked you about Mr. Hargrove's

4    case, again, when we sat down in the United States Attorney's

5    Office, you told me that that case wasn't so much a mental

6    health case as it was one of factual guilt or innocence?

7     A     I think that's a fair statement.

8     Q     And Mr. Hargrove was actually convicted of first-degree

9    murder?

10    A     That is correct.

11    Q     And you would agree with me that residual doubt is a

12    very strong mitigating circumstance?

13    A     Sure.

14    Q     And Mr. Hargrove was sentenced to life without parole?

15    A     That is correct.

16    Q     You mentioned Mr. Duchardt's work on the Purkey case.

17    You said you were aware of that?

18    A     Just in conversations with Fred during when -- we were

19    together for, like, two years so we got to talk a lot about our

20    cases, and so that's how I learned about the Purkey case.

21    Q     Told war stories like lawyers do?

22    A     Exactly.

23    Q     And you were aware that Mr. Purkey received a death

24    sentence?

25    A     That's correct.

1   Q       And were you aware of the fact -- well, let's talk for

2   a moment about his State work.  You said you were aware of his

3   work in State court?

4   A       Just anecdotally over the years.  And then, again, we

5   talked about different cases over the years, as you have said.

6   Q       So you were aware that he represented a very mentally

7   ill young man, 16-year-old young man, Keith Wilkins, in Clay

8   County, Missouri, correct?

9   A       I don't know names and I don't remember.

10  Q       Mr. Wilkins was the subject of a United States Supreme

11  Court opinion, Wilkins v. Missouri, that upheld the death

12  penalty for 16-year-olds.  You knew that?

13  A       I may have heard about that back at the time; but,

14  again, I don't -- I kind of remember you saying it, but do I

15  remember it or did Mr. Duchardt mention that case?  I can't say

16  he did or he didn't.

17  Q       So were you aware with Mr. Duchardt's vast experience

18  with capital cases in the state of Missouri that he allowed a

19  mentally ill 16-year-old to waive counsel, plead guilty, and

20  ask to be sentenced to death?

21  A       I was not aware of that.

22  Q       And were you aware of the fact that conviction was

23  ultimately overturned prior to Roper v. Simmons and that Mr.

24  Wilkins is now in prison?

25  A       I was not.  I may have been aware of it, like maybe I

1    read about it, but I did not put the two together.

2    Q      And were you aware of the fact that Mr. Duchardt has

3    the distinction of having the most people on federal death row?

4              THE COURT:  Now or then?

5              MS. HENRY:  Then and now.

6    A      I was not aware of that.

7    Q      (By Ms. Henry)  Now, with respect to the work that

8    began on Mrs. Montgomery's case after Mr. Duchardt came into

9    the case, you were appointed lead counsel; is that correct?

10   A      That's correct.

11   Q      And Mr. Duchardt was appointed learned counsel; is that

12   correct?

13   A      That was my understanding.

14   Q      And you and Mr. Duchardt agreed to split

15   responsibilities, wherein, you would be responsibility for the

16   guilt/innocence aspect of the case; and when I say that, I mean

17   factual guilt/innocence; is that correct?

18   A      In essence of dividing the work, yes; but as to his

19   responsibility as to the whole case, I think we were both

20   responsible.  I guess me being lead counsel you want to say

21   more responsible, but I never gave up that responsibility other

22   than the idea of Mr. Duchardt would handle a certain part of

23   the case and I would handle a certain part and in discussions

24   with Dave Owen he was going to handle a certain aspect of the

25   case.

1873

1    Q      Certainly.  And to be clear, I mean, you've made it

2    clear in your statement that you filed with the Court that you

3    accept full responsibility for all of the decisions that were

4    made as lead counsel but in capital cases you do have to

5    delegate; is that fair to say?

6    A      That's fair.

7    Q      And you delegated the mental health and mitigation

8    aspects of the case to Mr. Duchardt based on your understanding

9    of his expertise with mental health issues?

10   A      I would say to a great extent, yes, but not to a full

11   extent, if that makes sense.

12   Q      Sure.  And we'll be talking later about the work you

13   ultimately did in October of 2007 with Dr. Logan; but backing

14   up to the beginning stages when you're preparing the case to

15   move forward, temporally we are in the summer of 2006.  Mr.

16   Duchardt was at that point charged with beginning to put

17   together the mental health aspect of the case?

18   A      I would say that's probably fair.

19   Q      And Mr. Owen ultimately was charged with handling the

20   computer forensic aspect of the case because that was his

21   particular skill set?

22   A      I think that's a fair statement.

23   Q      Now, almost immediately upon accepting appointment in

24   the Montgomery case, Mr. Duchardt made it clear to you that he

25   was not going to be able to develop -- devote much time to Mrs.

1  Montgomery's case because of his responsibilities in another

2  capital case; isn't that true?

3  A    I'm not aware of that, no.

4  Q    He didn't tell you that he was going to have to work on

5  the Street case that was tried in 2006 and that he couldn't

6  really turn his attention to Mrs. Montgomery until after the

7  Street case?

8  A    I do not have a recollection of that conversation.

9  Q    If Mr. Duchardt recalls that in his sworn statement,

10  would you have any reason to disagree with him?

11  A    If he said it in the way you're saying it, I think --

12  and I don't know how you're saying it.  If you're telling me he

13  doesn't have time to do the work, then I would hope and believe

14  he would not have accepted appointment; but if he said, I may

15  need to devote more time to the Street case for a period of

16  time before I can devote time to this case but I can devote the

17  time, then I'm not saying that didn't happen, but I don't have

18  a recollection, no.

19           MS. HENRY:  Your Honor, we would ask the Court to

20  take judicial notice of the docket entry in the case of United

21  States v. Phil Street, which is 4-04-CR-00298-GAF.

22           THE COURT:  Notice is taken.

23           MS. HENRY:  Thank you.

24  Q    (By Ms. Henry)  Now, as the case moved forward during

25  the summer of 2006, Mr. O'Connor, you were aware, were you not,

1   from Mr. Owen that there had been another mitigation specialist

2   in the case that Mr. Owen had fired from the case, a woman by

3   the name of Holly Jackson?

4   A       I think -- again, my recollection is there was some

5   discussion about that, yes.

6   Q       And Mr. Owen then hired another mitigation specialist

7   from the Federal Public Defender's Office named Dani Waller?

8   A       I think that's correct.

9   Q       If Ms. Waller has testified before the Court that she

10  doesn't have much of a recollection of ever meeting with you,

11  would you dispute her memory?

12  A       I would dispute her memory because I remember talking

13  with her.

14  Q       When do you remember talking with her?

15  A       Again, we're going back nine years.  We had discussions

16  at some point in time, I'm confident, but to tell you, as I sit

17  here right now, an exact time and exact conversation, I cannot.

18  Q       Nothing really sticks out?

19  A       No, ma'am.

20  Q       And this team that was put together, this final team

21  that was put together for Mrs. Montgomery's capital murder

22  trial was one that did not have very many lengthy team

23  meetings; is that fair to say?

24  A       I would say that's fair, yeah.

25  Q       And when we're talking about trying to put things in

1    time, Mr. O'Connor, your time sheets, your time records in

2    this case have already been moved into evidence as Movant's

3    Exhibit 84, and you've talked about your time records and I

4    asked you about them before.

5    A       Sure.

6    Q       And is it what you told us that in your statement, your

7    sworn statement before the Court that your time records do not

8    accurately reflect the time you spent in this case?

9    A       Let me make sure that we're saying that right.  The

10   records -- the time that I did put in the records are accurate.

11   In terms of the amount of time that was spent that was not in

12   the records would be, I guess, inaccurate to that extent; and I

13   think, as I think I told you, I'm not trying to be

14   self-aggrandizing to myself, but about every federal case I've

15   ever done I don't bill for all my time, and I'm just -- so I

16   know that there's a lot of time, especially in this case, and

17   others, that I just don't -- I'm not good at doing that

18   probably, and I don't do a lot of it because, again, I have

19   another practice, and so with people who do this all the time

20   and every hour that they spend they write down.  I just don't.

21   Q       And let's talk about it.  You told us very candidly

22   that you're not a really good guy, not really good about

23   keeping track of your time and every month when you're trying

24   to put together your vouchers, you're having to go back and try

25   to recreate what you did and how long you spent.  And no one is

1    suggesting an overbill.  Let's be very clear.  But what you

2    told us is that you're trying to recreate your billing and you

3    do it to the best of your memory at the end of the month; is

4    that fair to say?

5    A       Yeah.

6    Q       And if you -- you might let a two-minute phone call go;

7    fair to say?

8    A       I could let a 30-minute, 40-minute, hour, two hours.  I

9    mean -- and, again, I'm just trying to be candid without being

10   self-aggrandizing.  I think there could be as many as 80 hours

11   that are not in there.  I mean, I honestly do because I just

12   don't keep track in that terms, and I don't sit and write every

13   time I move as to what I'm doing, which is probably not a good

14   practice; but in the criminal practice I've had over my career,

15   you normally set fees because people are not used to paying by

16   the hour; and, of course, if they're not happy with the

17   outcome, chances are you won't get paid at the end.  So you

18   kind of set your fees accordingly.  So an hourly way in terms

19   of other than appointments, I would bet you I've had hourly

20   clients, maybe a dozen over the years, because if you're not

21   representing corporations, you're representing people in that

22   regard.  So that's something that I never got kind of

23   accustomed to or used to.

24   Q       Sure.  And I'm not trying to be quarrelsome.  I'm just

25   trying to figure out how to be accurate.  And so you were

1   appointed in May of 2016 and you served until January of 2008.

2   So that is, by my count, 12 plus nine is 21, 21 months and

3   about 80 hours short on the time.  We can accept that.

4    A      Again, I don't even want to say 80 hours.  It could be

5   more.  It could be less.  I mean, I'm just telling you that it

6   could be that big of a number is, I guess, what I'm trying to

7   tell you.

8    Q      And so you would, for example, agree with me that one

9   of the things we talked about, you said Mr. Duchardt does do

10  these capital cases for a living so he does bill all of his

11  time.  So any time that he's billed as far as meeting with you

12  or having a team meeting, you would accept his time records as

13  accurately reflecting the time the team met?

14   A      I would assume he would be a better bill keeper than

15  me; and if he had in his records that he met with me or had

16  times he met with me, I would accept those to be true.

17   Q      And so if the time records that Mr. Duchardt kept

18  showed that the team did not meet as a full team more than

19  about ten hours between May of 2006 and January of 2007, you

20  would have no reason to dispute that?

21   A      As it relates to his records on whether we met.  I

22  don't know there would be records where I met where he wasn't

23  there.  I don't know.  I know that that happened but I don't

24  know to the extent of it.

25   Q      So we'll have to rely on whatever records we have?

1   A       I guess so.

2   Q       Fair to say?

3   A       I guess that's fair to say.

4   Q       And also fair to say you do cases on retainer, you do

5   cases appointed under CJA.  When you get appointed on cases

6   that are capital cases, that's the highest paying case you're

7   going to get as somebody who takes appointments; fair to say?

8   A       Because of the hourly rates, I guess that's correct.

9   Q       So -- and you're a businessman.  You have overhead?

10  A       Yes.

11  Q       You have a secretary to pay?

12  A       Yes.

13  Q       And you have office overhead to pay for?

14  A       Yes.

15  Q       And you're a pretty successful businessman so you must

16  have made sure that you didn't go broke?

17  A       I haven't yet.

18  Q       Okay.  And also with respect to the time that you met

19  with Mrs. Montgomery, if we can't rely on your time records,

20  we'll have to rely on the CCA visitation records; fair to say?

21  A       I think that -- and you asked me that question the

22  other day.  The only other time -- obviously we had court

23  hearings and we also had court hearings regarding the expert

24  testimony when Ms. Montgomery was here where we would meet with

25  her and talk with her during those periods of time.  So after I

1    left your office, I'd forgotten about that, and that would be

2    obvious, I think, from that.  So as it relates to that, that

3    would be -- those records at CCA plus anytime we were in court

4    with her, recesses, lunch hour, whatever where we had

5    discussions with her about her case.

6    Q      So sure, of course, during the trial you talk with her

7    at lockup, maybe over lunch break, something like that?

8    A      I'm talking about the motion hearings.

9    Q      So there was a motion hearing in August of 2007 shortly

10   before the trial.  So you would have met her at lockup then?

11   A      Again, I don't have an independent recollection but I

12   would assume we would have since she was here.

13   Q      Well, the only pretrial motions I'm aware of, sir, are

14   the motion for continuance in April of 2007.  You remember that

15   one?

16   A      I have no memory of it, but I'm sure -- I'll take your

17   word for it if you have the dates.

18   Q      Then there was an untranscribed hearing on May the 9th

19   regarding problems that Mrs. Montgomery had with this

20   government's evaluation.  You recall that?

21   A      I don't recall it, but I don't -- again, when we

22   talked, I'm not casting anything to you, but I'm just saying if

23   you had something you wanted me to look at before I came, but I

24   turned over all my records to the defense counsel, not you but

25   Ms. Nouri when she requested, I don't know, three years ago.  I

1  have no records.  I have nothing to go back to to refresh my

2  recollection.  So I'm just trying to do the best I can from

3  memory.  So all I can do is that.  I'm sorry.

4  Q     So whatever the records reflect, the pretrial motions;

5  motion for continuance, motion regarding mental health exam,

6  and Daubert hearing, you would have met with Mrs. Montgomery

7  all of those occasions?

8  A     I would have assumed we would have, yes.

9  Q     But you have no independent memory of meeting with her?

10  A     I don't, but I mean every defendant I've represented

11  during recesses, and so on, we're up talking to the defendant

12  or interacting or out here interacting.  So I would have

13  assumed that we would have, but to tell you right now I have an

14  independent recollection of that, I'm sorry, I can't.

15  Q     If the CCA visitation records show that between May of

16  2006 when you were appointed and January 11th of 2007 you spent

17  approximately four hours with Mrs. Montgomery at CCA, would you

18  have any reason to dispute those records?

19  A     If that's what the records say.

20  Q     If the records indicate that you did not meet again

21  with Mrs. Montgomery from January 11th, 2007, until you were in

22  court on April the 3rd, 2007, you would have no reason to

23  dispute that?

24  A     Again, I've not seen the records; but if that's what

25  you say the records say, that's what the records say.

1    Q      And we're going to discuss the April 3rd, 2007, motion

2    in some detail, but let me check my notes to see if we can back

3    up a little bit in terms of our chronology here because I want

4    to be able to keep us in order.

5           So going back to that summer of 2006, I want to ask

6    you some questions about individuals who you may or may not

7    have reached out to.

8           MS. HENRY:  And to be clear for the United States,

9    for the government and for Court, I'm asking these questions

10   about information gathering, not about questions on claims 1,

11   2, and 3 in the motion.

12   Q      (By Ms. Henry)  Did you have a conversation with an

13   attorney by the name of Judy Clarke regarding information that

14   she obtained during her representation of Lisa Montgomery?

15   A      I did not.

16   Q      Did you have a conversation with a mitigation

17   specialist by the name of Debra Garvey regarding her work that

18   she had conducted and the information she had gathered on

19   behalf of Mrs. Montgomery while she represented her?

20   A      Again, I'm pretty confident I did not, but I can't sit

21   here and say absolute that I'm pretty confident.  I don't

22   remember having a conversation with anyone outside.

23   Q      And so then that would mean that you also did not have

24   a conversation with a man by the name of David Freedman who was

25   the person charged with identifying the mental health themes of

1883

1  Mrs. Montgomery's case prior to your taking over the

2  representation?

3  A      I do not believe I did.

4  Q      And you did not have a conversation -- you didn't even

5  know who these people were at that time; is that correct?

6  A      Again, I don't have a recollection one way or the other

7  to be honest with you.

8  Q      Let's talk a little bit about your training in capital

9  cases, Mr. O'Connor.  I believe you told us when we met with

10 you at the United States Attorney's Office that you have not

11 attended any federal death penalty strategy sessions that are

12 sponsored by the Federal Death Penalty Resource Counsel

13 Project; is that correct?

14 A      I had not.

15 Q      And you have not attended any seminars specializing in

16 death penalty litigation by the National Legal Aid Defender

17 Association, specifically Life in the Balance?

18 A      Had not.

19 Q      You have not attended the annual capital case seminar

20 sponsored by the California Association for Criminal Justice

21 held in Monterey, California, every February?

22 A      Had not.

23 Q      And, in fact, you have not attended any capital

24 specific seminars outside the state of Missouri?

25 A      I think that's a fair statement.

1    Q       The extent of your training on capital representation

2    involves attendance at seminars sponsored by the Missouri

3    Association of Criminal Defense Lawyers; is that fair to say?

4    A       Again, that's my best recollection.

5    Q       Now, when you --

6            MS. HENRY:  Your Honor, I note that it is five till

7    five.  I'm about to get into another area, and I don't think

8    I'm going to be able to complete my direct examination of Mr.

9    O'Connor at this time, and I was wondering if it would be an

10   appropriate time to recess?

11           THE COURT:  How long do you have with Mr. O'Connor?

12           MS. HENRY:  I probably have about another 45

13   minutes.

14           THE COURT:  Is the government going to have a fair

15   amount of cross?

16           MR. VALENTI:  I will take 15 minutes, Your Honor, in

17   respect to the schedule.  If you want to keep going, I'll keep

18   going.

19           THE COURT:  Do you have a preference?

20           THE WITNESS:  Judge, I'd rather keep going only

21   because I'm supposed to be in Jeff City in the morning for

22   sentencing, for federal sentencing at 11 and 1, but I'm willing

23   to come back.  I've let the other Court know of the potential

24   problem.

25           THE COURT:  Well, let's go a little bit longer and

```
 1   we'll see where we're at at 5:15.  If we can finish up today,
 2   that would be good.  If not, we'll get as far as we can.
 3              THE WITNESS:  Thank you, sir.
 4              MS. HENRY:  I would also let Your Honor know that we
 5   do intend to complete our proof tomorrow.
 6              THE COURT:  Pardon?
 7              MS. HENRY:  We intend to complete all of our proof
 8   tomorrow, just for your scheduling purposes.
 9              THE COURT:  All right.  Not to delay Mr. O'Connor,
10   but are you going to take all day tomorrow?  Just so the
11   government knows about their witnesses.
12              MS. HENRY:  Depending on their cross-examination, I
13   think it's likely we will take all day, at least until about
14   three o'clock.
15              THE COURT:  All right.  We'll talk about that more.
16              MS. HENRY:  Thank you, sir.  I apologize for the
17   interruption.
18   Q    (By Ms. Henry)  I want to ask you, sir, about your --
19   I'm going to jump out of chronological order and I'll skip back
20   to the chronology in a minute.  But I want to talk with you a
21   little bit about David Owen.
22   A    Okay.
23   Q    Okay.  Did there come a time in your representation of
24   Lisa Montgomery that you became aware that David Owen had been
25   demoted as First Assistant Federal Public Defender?
```

1    A        You asked me that the other day and I might have.  I

2    don't have a recollection of that.  I don't.  But it seemed

3    like something -- like I told you, there was something that

4    happened that I was made aware of by Mr. Conrad, but the

5    specifics of it I couldn't tell you.  I absolutely didn't know.

6    Q        And just to get our chronology straight, you know who

7    Laine Cardarella is?

8    A        Yes, I do.

9    Q        And she's testified before the Court that Mr. Owen was

10   demoted after the public defender's office was ordered to

11   withdraw from the Elbert case, United States v. Elbert case.

12   You wouldn't dispute her testimony?

13   A        I wouldn't dispute anyone's testimony that I'm not

14   aware of.  I'm assuming she testified truthfully, so I guess

15   no.

16           MS. HENRY:  Your Honor, I'd like the Court to take

17   judicial notice of the docket in United States v. Elbert, Case

18   No. 06-00257-01, docket entry on February 20th, 2007, which was

19   the date on which the public defender's office was ordered to

20   withdraw.

21           THE COURT:  Granted.

22   Q        (By Ms. Henry)  We'll get back to February 20th, 2007,

23   as a tipping point in this case, Mr. O'Connor.

24   A        Okay.

25   Q        Having not had an opportunity to reach out to and talk

1  with the previous members of Mrs. Montgomery's trial team, did

2  you rely on Mr. Owen to inform you of any significant event or

3  discoveries that had been made previous to your representation?

4    A     I don't know that I understand your question.  I'm

5  sorry.

6    Q     Would you have wanted Mr. Owen to tell you any

7  significant discoveries that had been made by the previous

8  team?

9    A     I would assume.  You know, he's an attorney.  If he had

10 information he thought that we should be aware of, hopefully he

11 would have told us, yes.

12   Q     And did you count on him to volunteer that information

13 on his own?

14   A     Again, I would hope if he had information that he

15 thought was helpful to the defense of any client and we were

16 not involved as a team together, that he would provide whatever

17 information he had and for us to all decide whether or not that

18 was important or not.

19   Q     Do you think that it would be fair for the previous

20 counsel who had been removed from the case to assume that Mr.

21 Owen would share with you the discoveries that had been made in

22 the case?

23   A     I don't know if that's for me to answer.

24   Q     Let me ask you this:  If previous counsel had already

25 investigated the Tommy defense and determined that Mr. Kleiner

1    had an alibi, is that something you would have wanted to know?

2    A       Well, in light of what later happened, absolutely.

3    Q       And if the previous counsel had investigated Dr.

4    Ramachandran and already decided that they weren't going to use

5    him as an expert in the case because they didn't feel he was

6    qualified, is that something you would have wanted to know?

7    A       It would be something you would want to consider.

8    Q       If the previous team had already decided that

9    pseudocyesis as a basis for a not guilty by reason of insanity

10   defense was not going to be a credible defense on behalf of

11   Mrs. Montgomery, is that something you would have wanted to

12   know?

13   A       Again, you want all information that you can get in any

14   case to make independent decisions.  Now, whether your

15   decisions would be different or you may disagree with their

16   analysis of what may or may not be appropriate, that's another

17   question.  But in terms of if you can have as much information

18   as you can have, information is good.

19   Q       Sure.  So if you knew that, for example, a man by the

20   name of David Freedman had said, You know what, I've looked at

21   this, it doesn't work with the facts and the evidence, would

22   you have wanted to have a conversation with him and say, Well,

23   why did you think that and let's talk about it?

24   A       I'm assuming you probably want to talk about it, yes.

25   Q       But because you weren't present at those previous team

1  meetings, you would need Mr. Owen to share that information

2  with you to know what had happened?

3  A      I think that's a good assumption.

4  Q      Or to call David Freedman yourself?

5  A      Again, if you don't know that information, I wouldn't

6  have called Mr. Freedman.

7  Q      Or Mr. Duchardt to call Mr. Freedman?

8  A      Again, that would have been -- I don't know what

9  knowledge Mr. Duchardt had, whether or not Mr. Owen shared

10  information with Mr. Duchardt that he didn't share with me.  I

11  only know what I know.

12  Q      Now, we spoke about Mr. Duchardt and his

13  representations to you and your conversations with him during

14  the Hargrove case about his knowledge of mental health.  Were

15  you aware of Mr. Duchardt's disregard for experts who are

16  called mitigation specialists?

17  A      I don't think we had any conversation along those

18  lines.  If we did, I don't remember them.

19  Q      Were you aware of the fact when you were working with

20  Mr. Duchardt that he has expressed, openly expressed disdain

21  for the use of mitigation specialists in capital cases?

22  A      Again, I don't remember that in discussions between him

23  and I.

24  Q      Do you believe in the use of mitigation specialists?

25  A      I do.

1    Q      Do you believe the mitigation specialist can be an

2    important part of a capital team?

3    A      I do.

4    Q      And do you believe it's important to read all of the

5    reports that a mitigation specialist provides to counsel in the

6    case?

7    A      Assuming the reports -- the information they're

8    gathering is -- that's the purpose of getting the information

9    is for it to be reviewed and used.

10   Q      And you've been a trial lawyer for a really long time

11   so -- I don't mean to date you.  I've been a trial lawyer -- I

12   wasn't a trial lawyer for a long.  We may be about the same

13   generation.  Anyway, you've been a trial lawyer so you're aware

14   of the fact that sometimes when you're working on a team, folks

15   don't write things down, they just call each other up?

16   A      That's probably fair.

17   Q      And so if there were conversations that the previous

18   trial team had where they maybe ruled things out so they didn't

19   take the time to say, Hey, you know, let's write a memo about

20   the fact that we're not going to follow up with this pipe

21   dream, that's not going to surprise you that they wouldn't

22   write something like that down?

23   A      I mean, what I don't have I don't have.  What they

24   didn't write down they didn't write down.  I don't know one way

25   or the other.

1    Q    And so sometimes those breakdowns in communication,

2    turnover happens and information gets lost in the turnover,

3    right?

4    A    I assume that can happen, sure.

5    Q    Now, you knew that Mrs. Montgomery -- you were aware of

6    the fact that in the summer of 2006 when you and Mr. Duchardt

7    began your representation of Mrs. Montgomery that she had some

8    serious trust issues with the Office of the Federal Public

9    Defender, the local office here?  You were aware of that?

10   A    I don't know if we were made aware of it once we got

11   together with Ray Conrad and with Stephanie and everyone, but

12   there was clearly -- it came up that she had issues with men.

13   Now, whether specifically with the public defender's office, I

14   don't have an independent recollection of that, but I do

15   remember distinctly that there were issues about that for sure.

16   Q    So you recall that Mrs. Montgomery did have trust

17   issues with men and you attributed that to her -- let me ask

18   that.  That was a compound question.  That's a bad thing to do.

19   Let's back up.  You were aware of her trust problems with men?

20   A    Of what I was told, yes.

21   Q    You were told that was because of her trauma history?

22   A    Her what?

23   Q    Her sexual abuse history?

24   A    I don't know that I was told the reason, but I think

25   eventually I learned the reason, but at the time when we first

1    got in the case, there were just -- there were trust issues

2    with men is kind of what I was told as a generalized statement.

3    Q     And yet to be clear, because it may not be clear from

4    the record, the mitigation specialist's name is Dani Waller and

5    Ms. Waller is in fact female; is that correct?

6    A     Yes.

7    Q     So the members -- female members of the defense team

8    from 2000 -- May 2006 through January 2008 were Ms. Waller and

9    Ms. Elliott?

10   A     Correct.

11   Q     The mitigation specialist and the paralegal?

12   A     Right.

13   Q     But Ms. Elliott, though she's a lawyer, had no previous

14   capital experience and no mental health experience?

15   A     That's correct.  But it was my understanding, I

16   believe, that she had developed or had developed some

17   relationship with Lisa and was visiting Lisa either with Ron

18   Ninemire or at least Stephanie herself and had built up a

19   rapport that we wanted to continue with until Fred and I could

20   try to build that relationship that we needed.

21   Q     Sure.  So Ms. Elliott continued to visit with Ms.

22   Montgomery but in doing so, she didn't have training and

23   background or experience to identify mental health symptoms?

24   A     Again, I didn't know much about Ms. Elliott's

25   experience other than what you've said, so I didn't have

1    information that she had that expertise or not other than just

2    someone that, as I understood it, felt comfortable with, talked

3    with, trusted.  So as long as we had someone in that

4    communication role, we kind of felt -- or at least I felt we

5    needed to ease into it, for lack of a better word.

6    Q      So Ms. Elliott would have social visits with Ms.

7    Montgomery?

8    A      That was my understanding.

9    Q      So the only female member of the team who had any sort

10   of training in mitigation was Ms. Waller?

11   A      Female member you're saying?

12   Q      Yes.

13   A      I think that's true.

14   Q      And Ms. Waller visited with Mrs. Montgomery only a

15   handful of times?

16   A      And, again, whatever she said she did, I don't have a

17   recollection of that.

18   Q      And Ms. Waller, because she was employed by the Office

19   of the Federal Public Defender, took her direction from Mr.

20   Owen?

21   A      Well, again, I'm assuming that either Mr. Owen or Ray

22   Conrad had talked with her about that.  I don't know.  But I'm

23   assuming that that probably happened.

24   Q      And is it also fair to say that the Office of the

25   Federal Public Defender, Ray Conrad and through him Dave Owen,

1    controlled the purse strings for the experts in the case?

2    A      I don't know if that's a true statement or not in this

3    regard.  I mean, I always felt in that case or any other case

4    if there was a need for some other expert, that we always

5    resort back to the Court for that kind of a situation.  So I

6    guess to some extent they were able to provide funding, but I

7    don't think they were the sole -- in my opinion, wouldn't have

8    been the sole funder unless the Court rejected our request for

9    funding.

10   Q      You never made any request for funding to the Court,

11   correct?

12   A      I don't believe we did.

13   Q      Now, I want to get into this issue of women on the case

14   because there came a time, you later learned after the fact,

15   that Mr. Duchardt brought his wife in to visit with Mrs.

16   Montgomery; is that correct?

17   A      I think that's when they were out in Pennsylvania doing

18   the testing.

19   Q      And you were aware only after the fact that Ryland

20   Duchardt had accompanied her husband, Fred Duchardt, to visit

21   with Mrs. Montgomery?

22   A      Again, could Fred have told me that before he went?

23   Yes.  Could he have told me afterwards?  Yes.  I don't know for

24   sure.  I can't say that definitively.

25   Q      Two weeks ago in the United States Attorney's Office

1    you told me in front of Ms. Nouri, Ms. Harwell, Mr. Pascal, and

2    Mr. Leonard that you learned of Ms. Duchardt's presence in

3    Philadelphia only after she had gone there.

4    A       And, again, I'm not saying that wasn't when I learned

5    it, okay?  But did he call me when he was there because we

6    communicated -- and I don't know that he did.  I'm not saying

7    that he did.  So I would be more inclined of what you just said

8    was probably what happened after I got to thinking about it,

9    but could he have called me before when he was there?  I guess

10   so.  Do I have an independent recollection of that?  No.

11   Q       And you didn't take your wife to meet Mrs. Duchardt --

12   to meet Ms. Montgomery?

13   A       I did not.

14   Q       Taking your wife to meet with a capital client who's

15   facing the death penalty is sort of an odd move, don't you

16   think?

17   A       Well, I would defer to Mr. Duchardt on that in this

18   regard.  Some things that happen in defending criminal cases

19   can be unorthodox, may not fit with someone's right or wrong.

20   If Fred had the belief that his wife was of some help in terms

21   of Lisa's mental state while she was there in dealing with

22   maybe men that were going to be dealing with her, I would trust

23   his judgment on that.  So I don't think that's for me to say.

24   Q       Were you aware of the fact that Mr. Duchardt

25   represented to the officials in Philadelphia that his wife was

1   an expert?

2    A      I was not.

3    Q      And Mr. Duchardt didn't discuss his decision to bring

4   his wife in on confidential attorney-client conversations with

5   you before he did it?

6    A      Again, my recollection is no, but could he have?  Yes.

7    Q      And the reason for asking his wife to be present for

8   these confidential attorney-client conversations is because Mr.

9   Duchardt sensed that even after he had been appointed for

10  nearly ten months and was approximately two months away from

11  trial, he still didn't have a relationship of trust that he

12  felt was necessary to be able to defend Mrs. Montgomery?

13   A      I think that's a fair answer.

14   Q      I want to talk with you now about Dr. Ramachandran.

15   A      Okay.

16   Q      Mr. Duchardt is the one who, on this team at least,

17  brought Dr. Ramachandran into the case; is that fair to say?

18   A      Yes.

19   Q      And Mr. Duchardt represented to you that Dr.

20  Ramachandran was a psychiatrist, did he not?

21   A      Again, I don't have a recollection as to what degrees

22  he told me he had or didn't have but -- so I can't answer that.

23  I'm sorry.

24   Q      Mr. Duchardt represented to you that Dr. Ramachandran

25  was the world's foremost expert on pseudocyesis; isn't that

1    correct?

2    A      I think he represented to me that he was the only

3    person who had actually dealt with patients who manifest those

4    physical symptoms and that he had dealt with, I think, a half

5    dozen patients or more and so he had an expertise that others

6    did not have.

7    Q      You did not independently research Dr. Ramachandran?

8    A      I don't believe I did, no.

9    Q      So you did not know that all Dr. Ramachandran had done

10   is publish a book that had one chapter that had five pages

11   about pseudocyesis?

12   A      If you are telling me that's true, I'll accept it.

13   Q      And you did not know that Dr. Ramachandran was not a

14   licensed psychiatrist in the United States?

15   A      Again, I'm not saying -- I don't remember one way or

16   the other what I knew or didn't know.

17   Q      And you did meet with Dr. Ramachandran, correct?

18   A      Yes.

19   Q      But you didn't know that his understanding of the

20   insanity defense was based on his training at Cambridge and

21   that he thought it was the McNaughton rule?

22   A      Again, if you're telling me that's what he has said or

23   someone has said, I was not aware of it, no.

24   Q      If he said that in his sworn deposition testimony

25   that's in evidence in this court, you wouldn't dispute it?

1    A       Again, what I knew is what I told you is I did not

2    know.

3    Q       So if Dr. Ramachandran has testified under oath in his

4    deposition in this court that he was not the world's foremost

5    expert on pseudocyesis but that his book cited to who those

6    experts were, you would have no reason to dispute that?

7    A       I don't think it's right for me to comment on someone

8    else's testimony.

9    Q       Now, I want to talk with you now about efforts -- well,

10   actually I want to ask you one more question before we get into

11   the Leona Hayes issue.

12           With respect to the defense that was presented at

13   trial, you are aware of the fact that Mr. Duchardt was planning

14   to and did try to represent to the jury that Mrs. Montgomery

15   was a good and loving mother?  You're aware of that?

16   A       I think that happened during the trial is my

17   recollection.

18   Q       And you recall that the trial team was devastated when

19   the children testified about the abuse and neglect that they

20   suffered while they were living with Mrs. Montgomery?

21   A       I don't have a recollection of that, no.

22   Q       You don't recall the trial team walking out of the

23   courtroom saying they're so surprised, that the kids have never

24   said anything like that to them before?

25   A       I think there was some discussion about the fact that

1   they -- what they had said and what they'd told Fred were two

2   different things, yes.

3   Q       And so what has been already introduced into evidence,

4   Movant's Exhibit 130, wherein Mrs. Waller pointed out to the

5   defense team, It's going to come out that Lisa was mean to

6   these kids at certain points and that was a strategic

7   consideration that counsel needed to consider prior to the

8   trial, you weren't aware of that?

9   A       She didn't tell me that, I don't believe.

10  Q       And do you recall during I believe it was Desiree's

11  testimony that Assistant United States Attorney Roseann

12  Ketchmark was questioning Mrs. Montgomery's daughter about her

13  interview that she had had the night before wherein Mr.

14  Duchardt was sitting right there when the child discussed the

15  physical abuse that she had experienced while living with her

16  mother?  Do you recall that testimony?

17  A       I'm sorry, I don't.

18  Q       I want to talk with you now, sir, about an issue

19  related to efforts to seek de-authorization in this case.  I'm

20  sorry.  I need to back up.  Let's talk some more about the

21  trial, then we'll talk about the de-authorization.

22          Ms. Waller has testified before the Court that

23  during the trial, Lisa Montgomery's mother was intimidating

24  witnesses in the hall and that she came to -- she gave that

25  information to Ron Ninemire and assumed that Ron Ninemire had

1    provided that information to counsel.  Do you recall ever

2    learning that Judy Shaughnessy was intimidating witnesses in

3    the hall?

4    A      I don't.

5    Q      Do you know who Judy Shaughnessy is?

6    A      Lisa's mother, I believe.

7    Q      And during the May 16th, 2007, era to the time of the

8    trial, David Owen had been the person who was the primary

9    contact between the trial team and Judy Shaughnessy?

10   A      Again, I don't recall that but if you say that, I don't

11   dispute it.

12   Q      If David Owen testified to that, you wouldn't dispute

13   it?

14   A      Correct.

15   Q      And you don't -- you didn't know that the previous

16   trial team had some real problems with David Owen being the

17   primary point of contact with Judy Shaughnessy?

18   A      I was not aware, no.

19   Q      Let's turn now to the effort to de-authorize the case

20   such that it was.  So we have already introduced into evidence

21   a letter dated September 29th, 2007, which is addressed to

22   Margaret Griffey and a Gwynn-Charlie Kinsey with the United

23   States Department of Justice and it's signed by Frederick

24   Duchardt and copied to Matt Whitworth.  The letter does not

25   show that you were copied.  Were you aware of the request for

1    de-authorization that Mr. Duchardt filed on the eve of trial?

2    A      I'm confident I was but I don't have an independent

3    recollection as I sit here.

4    Q      Would you have taken any role in crafting this two-page

5    letter?

6    A      I'm sure Mr. Duchardt and I would have talked about it

7    but as far as writing it, probably not.

8    Q      In his letter dated September 29th, 2007, Mr. Duchardt

9    states, "It has recently come to my attention that, when

10   previous counsel had met with your committee early on in the

11   case, you had invited them to provide to you any mental health

12   evidence that might develop in the case so that the committee

13   might consider that, and possibly reconsider its recommendation

14   to the Attorney General regarding seeking of the death penalty

15   against Mrs. Montgomery."  I'm particularly interested in the

16   phrase, "it has recently come to my attention."  If I

17   represent to you, sir, the de-authorization meeting was

18   September the 26th of 2005, this letter is almost two years to

19   the day later.  Did Mr. Owen not share with you all that the

20   committee had said they were open to hearing additional

21   information?

22   A      I don't have -- I do not have an independent

23   recollection of that, and I think you have to ask Fred what he

24   meant by "recently," so I don't know what that meant to him.

25   Q      I mean, you would agree with me, sir, that it's proper

1    to characterize a letter sent two days before jury selection as

2    eve of trial?

3    A       That's probably a fair statement.

4    Q       And later there's -- attached to Movant's Exhibit 139

5    is an email chain between Mr. Duchardt and DOJ counsel as well

6    as Matt Whitworth and you're copied on the email where Mr.

7    Duchardt notes at 10:42 p.m. in the evening on September 29th

8    that his attachments did not go through.  So now we're getting

9    this information to the government really on September 30th,

10   the day before jury selection; fair to say?

11   A       If that's what that says, I agree with you.

12   Q       And that same email exchange indicates that the

13   government's theory of the case is that Mrs. Montgomery has no

14   mental illness whatsoever and instead simply malingering mental

15   illness.  Was that your understanding of the government's

16   position at trial?

17   A       I think if that's what that says, I don't dispute it.

18   Q       And, of course, it goes without saying that the

19   government ten days later denied their request for

20   de-authorization?

21   A       Correct.  I mean, I think it would be -- in this case I

22   would have never thought that they would not seek the death

23   penalty based on the facts of this particular case.  So the

24   de-authorization, although obviously you're going to ask for

25   it, and even though in this case when the so-called Tommy

1    defense came up, that we went back to try to get life without

2    parole, which was the goal line here, that this, in their mind,

3    was a death penalty case.  I don't think I thought differently

4    or anybody else thought differently.  So any less effort to try

5    to keep that from happening, of course, I would applaud, but at

6    the same time I don't think a realistic attempt was ever going

7    to have any hope, absent some other evidence.

8    Q       You would agree with me the two-page letter sent on the

9    eve of trial setting forth the fact that the government's

10   experts think that she's a malingerer and our experts think

11   she's crazy didn't have much of a hope?

12   A       Not because it was sent two days later; because it

13   didn't have much hope ten days before, a month before, or two

14   months before, in my opinion.

15   Q       And, of course, you weren't part of the case during the

16   critical pre-authorization stage when it would have been very

17   important for that trial team to make a presentation to the

18   Department of Justice regarding the sort of evidence I know you

19   haven't heard but the Court has heard regarding Mrs.

20   Montgomery's severe, serious, and debilitating mental illness?

21   A       All efforts at the pre-authorization that can be made

22   on behalf of a client should be made, and I agree with that 100

23   percent.

24   Q       And you mentioned the April 3rd attempt at a plea offer

25   and I want to get into that important detail, but before we do

1    that I want to talk about a hearing that was held on May the

2    9th of 2007 before his Honor regarding problems that developed

3    with respect to the government's mental health evaluation of

4    Mrs. Montgomery.  And backing up from that because you --

5                THE COURT:  Ms. Henry, before we get into that.

6                MS. HENRY:  Yes, sir.

7                THE COURT:  How much longer do you have?

8                MS. HENRY:  Well, the April 3rd, Leona Hayes chapter

9    is probably a good 15 minutes.

10               THE COURT:  Okay.  I think we better adjourn for the

11   day and come back tomorrow morning.  We can start before nine

12   o'clock.  We'll be done with Mr. O'Connor by ten o'clock

13   tomorrow if we start at nine?

14               MS. HENRY:  Yes, sir.

15               THE COURT:  Would you agree, Mr. Valenti?

16               MR. VALENTI:  Yes, Your Honor.

17               THE COURT:  Does that work with you, Mr. O'Connor?

18               THE WITNESS:  I have the case at one, but they moved

19   the other cases.  I could be in Jeff City in two hours for

20   those, so that's fine.

21               THE COURT:  Okay.  Sorry for the inconvenience.

22               THE WITNESS:  No problem.

23               THE COURT:  We're going to adjourn for the day and

24   we'll reconvene at 9 a.m. tomorrow morning.

25               What are you projecting is the earliest you may be

1   finished tomorrow?

2           MS. HENRY:  The earliest is three depending on how

3   long the cross-examination of Dr. Gur goes.  And, I mean, well,

4   Mr. Duchardt, that's a wild card.

5           THE COURT:  Can you have some witnesses ready

6   tomorrow afternoon?

7           MR. VALENTI:  I can have some people here by three.

8   If we get Dr. Dietz and Dr. Martell, if I can't get them here

9   tomorrow, we have to arrange for them for Thursday.

10          THE COURT:  Can you get them here Thursday?

11          MR. VALENTI:  I don't know the answer to that, but

12   I'll give you the answer tomorrow morning.

13          THE COURT:  And what's your estimate on how long

14   your evidence is going to take?

15          MR. VALENTI:  No more than a day.

16          THE COURT:  No more than a day.  Okay.

17          MR. VALENTI:  If that -- quite frankly, Judge, we

18   might not call anyone.  We have not yet made that decision.  We

19   want to look at a couple things.

20          THE COURT:  Okay.  All right.  Well, we'll see you

21   at nine o'clock tomorrow morning.

22          MS. HENRY:  Thank you.

23          MR. VALENTI:  Thank you.

24          (Court adjourned at 5:25 p.m. until 9 a.m.

25   Wednesday, November 9, 2016.)