# Ex. 9

## DECLARATION OF MARTIN HORN

I, Martin Horn, declare:

## Qualifications

1. I earned a Bachelor of Arts in Government from Franklin & Marshall College in 1969 and a Masters of Arts in Criminal Justice from John Jay College in 1974.  Until January 20, 2020, I was Distinguished Lecturer in Corrections at the John Jay College of Criminal Justice, City University of New York, and served as Executive Director of the New York State Sentencing Commission by appointment of the Chief Judge of the State of New York.

2. I began my career as a New York State Parole Officer in 1969.  After six years in that position, I worked as an assistant professor of criminal justice at the State University College in Utica, New York from 1975 to 1977.  I then served in a variety of roles for the New York State Department of Correctional Services from 1978-1985, including as the Assistant Commissioner for the department and later as the Superintendent of the Hudson Correctional Facility.  In 1985, I returned to work for the New York State Division of Parole as the Director of Parole Operations until 1991 and then as Executive Director until 1995.

3. After that, I served as Pennsylvania's Secretary of Corrections until 2000.  During my tenure, staff and inmate safety and health care improved, suicides were reduced, three long-standing consent decrees that predated my arrival were dissolved, and classification and information systems were modernized. We created an innovative addiction treatment program that for the first time provided funding for post release treatment of released offenders. Under my leadership, improvements to the provision of mental health services were made, including an enlargement of facility-based acute care and step-down programs, "rule out" protocols to keep mentally ill inmates out of punitive segregation, and innovative release programs for inmates with mental illness. I was responsible for policy and procedures including those relating to use of force.

4. During my tenure, Pennsylvania resumed executions after a hiatus of many years. I was responsible for implementing the newly written execution protocol for the first execution by lethal injection in Pennsylvania. As part of that protocol, we opened an execution chamber for lethal injections at SCI Rockview. The first execution during my tenure was Keith Zettlemoyer in May 1995 followed by Leon Moser in August 1995 and Gary Heidnik in July 1999.

5. I subsequently served from January 2001 until December 2001 as Secretary of Administration of the Commonwealth of Pennsylvania, in which role I was responsible for all non-budgetary administrative activities of state government including labor relations, health benefits and pension administration, information technology,

telecommunications, and management training. I was also appointed by the Governor to serve as the first chair of the Tobacco Settlement Investment Fund.

6. I was then appointed by Mayor Michael Bloomberg to serve as Commissioner of the New York City Department of Probation, effective January 1, 2002. A year later, Mayor Bloomberg appointed me to simultaneously serve as Commissioner of the New York City Department of Correction, the City's jail system, and I held both positions simultaneously until July 31, 2009.  As New York City Correction Commissioner, I introduced programs and training that reduced suicides[1] and cut jail violence in half.[2]  I also authored and approved the use of force policies of the New York City Department of Correction and oversaw a reduction in the use of force resulting in serious injury to inmates.  Under my leadership several conditions of confinement lawsuits that predated my arrival were satisfactorily resolved.  In a major case alleging excessive use of force by officers, a settlement was reached in 2006; that settlement successfully expired in 2009.[3]  During my tenure, we reduced the introduction of drugs into jail by initiating New York's first drug interdiction program, including the first wide scale drug testing in the City's jails, and reduced suicides among inmates.  We created one of the largest and most ambitious jail reentry programs in the nation. We reengineered the intake process to ensure that inmates were properly screened for vulnerability. We worked with the City's housing and homeless services community to institute programs and systems designed to assist inmates and detainees post release with housing and employment. We assisted them in gathering documents needed to work upon release and created transitional job opportunities for persons released from jail. We also implemented systems to identify high frequency jail and shelter users in order to be more proactive in addressing their particular needs.

7. I have also served as co-chair of the American Bar Association Corrections Committee and chaired the policy and resolutions committees of both the American Correctional Association and the Association of State Corrections Administrators. I have served as a member of the Board of Governors of the American Correctional Association and a Commissioner of the Commission on Accreditation for Corrections and am a member of the Psychiatric Corrections Advisory Board of the New York State Justice Center established by the State's Special Housing Unit Exclusion Law (NYS Correction Law § 401-a(3)).

---

[1] Mayor's Management Report, City of New York, 136 (Sept. 2009), https://www1.nyc.gov/assets/operations/downloads/pdf/mmr/0909_mmr.pdf (reporting that there were two suicides in 2002, six in 2003, one in 2004, five in 2005, three in 2006, two in 2007, two in 2008, and none in 2009).
[2] Mayor's Management Report, City of New York, 135 (Sept. 2009), http://www1.nyc.gov/assets/operations/downloads/pdf/mmr/0909_mmr.pdf.
[3] *Ingles v. Toro*, No. 1:01-CV-08279 DC-DCF (S.D.N.Y. 2009) (dissolving settlement approved in *Ingles v. Toro,* 438 F. Supp. 2d 203 (S.D.N.Y. 2006).)

8.  I have written and published articles and delivered addresses to professional meetings throughout my career. A representative list of those articles and addresses is included in my CV, which is attached as Exhibit A to this declaration. I have testified on behalf of government agencies before Congress and legislative bodies.   I have served as an expert witness and consultant in both state and federal litigation and have been qualified as an expert in both state and federal courts.

9.  I am not being paid for this engagement.

10. I have been asked to opine on the appropriateness of transferring a female inmate, Lisa Montgomery, from a female BOP facility (specifically FMC Carswell) to an all-male BOP facility (specifically, FCC Terre Haute) for execution.

### Opinions and Conclusions

### FMC Carswell

11. The Federal Medical Center, Carswell is an all-female Administrative Security facility which includes a satellite prison camp located across campus from the main facility. Activated in 1994, FMC Carswell is the only federal medical center for female offenders and is a fully accredited medical facility, receiving initial accreditation in September 1999. FMC/SCP Carswell housed approximately 1,635 inmates during the week of the 2019 on-site PREA audit. FMC Carswell contains the Bureau of Prisons' female Administrative Unit, consisting of 43 beds, activated in May 1998. This unit houses offenders who require increased security and is the only one of its kind in the Bureau for females.[4]

### FCC Terre Haute

12. FCC Terre Haute comprises a United States Penitentiary (USP), a high-security complex; a Federal Correctional Institution (FCI), a medium-security complex; and a Satellite Prison Camp (SCP), a minimum-security complex. These facilities, consisting of 90 buildings, are situated on approximately 1,200 acres of land in Terre Haute, Indiana. The complex is located approximately 70 miles from Indianapolis, Indiana. FCC Terre Haute's United States Penitentiary (USP) was activated in March 2005. This 719,000 square-foot complex has a rated capacity of 910 with six housing units.[5]

---

[4] PREA Audit Report of FMC Carswell, 7 (June 27, 2019),
https://www.bop.gov/locations/institutions/crw/prea_crw.pdf.
[5] PREA Audit Report of FCC Terre Haute, 6 (May 29, 2019),
https://www.bop.gov/locations/institutions/tha/PREA_tha.pdf.

13. Additionally, USP Terre Haute contains the Special Confinement Unit, which houses male inmates who have received a sentence of death in the Federal Court system, with a rated capacity of 50 single housing cells.[6] FCC Terre Haute is a Care Level 3 medical and mental health complex. However, it is not a Federal Medical Center or a Medical Referral Center.[7]

## Lisa Montgomery

14. Lisa Marie Montgomery was born February 27, 1968.  She was convicted October 22, 2007 of the federal offense of "kidnapping resulting in death" for the killing of Bobbie Jo Stinnett on December 16, 2004. On October 26, 2007 the jury recommended a death sentence. On April 4, 2008, a judge upheld the jury's recommendation for death. She has been confined at FMC Carswell since her sentencing in 2008. She attempted suicide multiple times during her incarceration, most recently in 2012 by ingesting 70 Tylenol. She reports that in the past, she deliberately cut herself on several occasions.[8]

15. According to one evaluation, "The extreme trauma suffered by Lisa Montgomery cannot be simply labeled 'abuse:' this trauma was complex, unrelenting, derived from multiple perpetrators and was so extreme as to constitute torture."[9] That evaluation concluded, "Lisa continues to be psychotic as a result of co-morbid conditions of serious mental illness, neurological impairment, and complex trauma reactions.  Lisa experiences sustained loss of contact with reality and extremely disordered perceptions of time, personhood, and events. She experiences temporal disconnection from events, relationships and situations in which she is a major participant. This disconnection is greater, and more than dissociation associated with traumatic events. She is ashamed, fearful, distrustful, paranoid, suicidal, anxious, depressed sleep disturbed, hypervigilant, and self-loathing."[10]

16. Upon her committal to the Bureau of Prisons, prison doctors diagnosed her with bi-polar disorder, anxiety, depression, and psychotic symptoms, and prescribed mood stabilizers, anti-anxiety medications, and anti-pyschotic medications, including Lithium, Zoloft, Ativan, Effexor, Elavil, Risperdal, Depakote and Trilpetal.

---

[6] *Id.* at 7.
[7] Federal Bureau of Prisons, *Medical Care,* https://www.bop.gov/inmates/custody_and_care/medical_care.jsp (distinguishing Federal Medical Centers (FMCs) as accredited by the Joint Commission, in contrast to Care Level 3 BOP Institutions, which are accredited by Accreditation Association for Ambulatory Health Care (AAAHC).)
[8] Nadkarni Decl., Sept. 27, 2013 at 4.
[9] Vogelsang Decl., August 5, 2016 at 173.
[10] *Id.* at 180.

17. When seen by a physician at Carswell on August 7, 2020 the doctor reported, "52-year-old inmate treated for history of mood and anxiety symptoms continues to maintain daily adherence to prescription medical and psychiatric medication. . . . All current clinical indications support maintaining current prescriptions without adjustment."[11]

18. A review of her medical records at Carswell reveals that she has had a fruitful relationship with the care staff at that facility in an environment that is gender appropriate and where her mental status has improved.

**Pending transfer to USP Terre Haute**

19. I am informed by counsel for Mrs. Montgomery that the Bureau of Prisons proposes to transfer her to USP Terre Haute death row prior to her scheduled execution.

20. I understand further that Mrs. Montgomery has been placed on suicide watch at Carswell.

21. A prisoner on suicide watch is in a precarious situation. It is important that a person on suicide watch receive consistent treatment in a manner that they can understand and anticipate. For this reason, it is my opinion that it is inappropriate to transfer a prisoner on suicide watch, except when transfer to a medical center is necessary. Transfer in other situations risks destabilization, and the results could be catastrophic for the prisoner's mental health as well as the risk of suicide.  I note that the Bureau of Prisons Program Statement P 5324.08 dated April 5, 2007 and entitled Suicide Prevention Program states, "No inmate who is determined to be imminently suicidal will be transferred to another institution, except to a medical center on an emergency basis."[12] FCC Terre Haute and USP Terre Haute are not medical centers. I am not aware of any provision of the Bureau of Prison regulations, or good correctional practice, that supersedes the provisions of Program Statement P 5324.08.

**There is no necessity to transfer Lisa Montgomery to USP Terre Haute**

22. Based upon my experience with the execution process, my education, training and experience I do not believe there is a necessity to transfer Mrs. Montgomery to USP Terre Haute.

---

[11] Jose Silvas, MD, Bureau of Prisons Health Services Clinical Encounter - Administrative Note, Montgomery Medical Files 73, August 7, 2020.
[12] Federal Bureau of Prisons Program Statement P5324.08, *Suicide Prevention Program*, 16 (April 5, 2007).

23. Such a move is contrary to good correctional practice and to BOP's own standards. It would be inherently traumatizing and likely to cause serious mental health problems for any woman to be transferred to an all-male prison. According to the Inspector General of the U.S. Department of Justice (DOJ), approximately 90% of women incarcerated in the federal system have experienced trauma, most commonly sexual assault and intimate partner violence.[13] Exposing a woman, especially one with a history of sexual trauma as extensive as Mrs. Montgomery's, to an all-male prison is virtually certain to cause her severe distress and decompensation.

24. In addition, it is necessary for all staff at a facility that houses women to engage in trauma-informed training to ensure that the women are not re-traumatized and to preserve the safety and security of the prisoners and staff. This training is also necessary to ensure that correctional staff do not mistake behaviors that are responses to trauma as disobedience. In my opinion and experience, untrained correctional staff may end up penalizing or even re-traumatizing women who have trauma reactions to their environment or staff actions when they mistake those reactions for noncompliance.

25. For this reason, the Bureau of Prisons requires that all staff members who work in institutions that house women must complete trauma-informed correctional training, and wardens at these facilities must maintain up-to-date knowledge on gender responsivity issues.[14] Staff at FMC Carswell must have this training; staff at USP Terre Haute do not.[15] Similarly, under the DOJ's Female Offender Manual, FMC Carswell, but not USP Terre Haute, must offer gender-responsive programs.[16]  Such programming must be offered by staff trained in gender-responsive programs, and currently, includes programs targeted at helping prisoners address their trauma.[17] Such programming is, in my opinion, appropriate and necessary to ensure that women prisoners are not re-traumatized and can maintain mental stability and therefore security within the institution.

26. PREA regulations also require specific training and actions from staff at female prisons. According to the most recent PREA report, FMC Carswell abides by Standard 115.15, which prohibits cross-gender strip searches, cross-gender pat down searches of women, and cross-gender viewing of women prisoners while they shower, perform bodily

---

[13] Office of the Inspector General, *Review of the Federal Bureau of Prisons' Management of Its Female Inmate Population*, 6 (Sept. 2018), https://oig.justice.gov/reports/2018/e1805.pdf.
[14] Department of Justice Program Statement 5200.02, *Female Offender Manual*, 5-6 (Nov. 23, 2016).
[15] Federal Bureau of Prisons, *Operation and Security of the Special Confinement Unit at FCC Terre Haute THX-5217.02B,* Institution Supplement (May 10, 2019) (emphasizing throughout that staff must be familiar with and adhere to security policies, but never indicating a need for trauma-informed or gender-responsive training.)
[16] Female Offender Manual at 9.
[17] U.S. Commission on Civil Rights, *Women in Prison: Seeking Justice Behind Bars,* 168 (Feb. 2020), https://www.usccr.gov/pubs/2020/02-26-Women-in-Prison.pdf.

functions, and change clothing except in exigent circumstances.[18] The facility staff is also trained on conducting cross-gender searches of women when necessary for security purposes, and that cross-gender strip searches or visual body cavity searches were not performed during the audit period.[19] It is not clear that staff at USP Terre Haute have been trained in the same way on their interactions with female prisoners. At Terre Haute, there are regular announcements over the speaker system that opposite-gender staff may enter the area, a reminder that would likely disturb a victim of significant sexual trauma such as Mrs. Montgomery.[20] Under standard 115.31, staff must be trained in a way that is tailored to the gender of the prisoners they supervise, so staff at FMC Carswell will have been trained on sexual harassment and abuse specific to women, and staff at Terre Haute will have been trained on these issues specific to men.[21]

27. As the DOJ and BOP recognize, it is necessary for women to be housed in a facility at which staff have had the proper training in order to protect prisoners' and others' safety and security and to avoid retraumatizing or otherwise harming women prisoners.  The need for staff properly trained in trauma-informed, gender-responsive correctional practices, as well as access to trauma-informed programming, is especially necessary for Mrs. Montgomery.

28. In my opinion, moving Lisa Montgomery from FMC Carswell compromises her well-being and, in light of the above, is entirely unnecessary.  Mrs. Montgomery has been the victim herself of well documented, unspeakable brutality and torture. She has been diagnosed with several mental illnesses brought on by her traumatization, physical abuse, mental and emotional abuse as well as pre-natal alcohol abuse by her mother. However, at FMC Carswell she has been receiving medical and mental health care and it appears that the treatment regimen, particularly the administration of the antipsychotic Risperdal, has improved her functioning.

29. From a corrections management perspective, I am concerned that Mrs. Montgomery's transfer to USP Terre Haute -- a large maximum-security prison for men -- unnecessarily risks her health, which is already fragile. Mrs. Montgomery would be the only woman at Terre Haute – indeed, the only woman ever confined there in the prison's entire history, as far as I understand – and would watched over by a work force that is predominantly male and with little or no experience with or training on working with female inmates. The likelihood of her unnecessarily being re-traumatized, during a period when she should be preparing for her execution and working with her legal team,

[18] PREA Audit Report of FMC Carswell, 20 (June 27, 2019), https://www.bop.gov/locations/institutions/crw/prea_crw.pdf.
[19] *Id.* at 21-22.
[20] PREA Audit Report of FCC Terre Haute, 18 (May 29, 2019), https://www.bop.gov/locations/institutions/tha/PREA_tha.pdf.
[21] *See id.* at 29; PREA Audit Report of FMC Carswell at 35.

is high.  Adding to the trauma, the loss of privacy attendant on her conditions of confinement there will unnecessarily heighten her anxiety and may well lead to further deterioration in her mental condition.

30. I have read the FCC Terre Haute policy document issued by T.J. Watson, Complex Warden, entitled "Operation and Security of the Special Confinement Unit" dated May 10, 2019, and it leads me to believe that USP Terre Haute will not operate in a manner that is appropriate to the confinement of a lone female prisoner. For example, the document calls for orderlies to perform certain sanitation duties on the range.[22] Presumably the only "orderlies" at USP Terre Haute are male inmates who should not be permitted on the range where Mrs. Montgomery will be held. Additionally, according to the policy, inmates, including Phase III inmates, are to be afforded five hours of out of cell recreation activity per week. And Phase III inmates are to be recreated in an individual enclosure.[23] Mrs. Montgomery's recreation privileges will be compromised if she can't recreate because the male inmates are using the recreation pens, or she will be traumatized if she has to recreate at the same time as they do. Finally, looking at the personal property allowed to inmates I see that it is a male-centric list with no female items allowed such as brassieres.[24] , I question whether the commissary at USP Terre Haute sells the items that Mrs. Montgomery may need, such as bras and female underwear. Overall the document reinforces my belief that USP Terre Haute is not an appropriate placement for Mrs. Montgomery.[25]

**The execution could be conducted at FMC Carswell**

31. I am familiar with the steps necessary to ensure that an inmate facing execution is safe and secure in the period following signing of the execution warrant. I recognize that prison officials have an interest in preventing the condemned person from harming themselves; preventing others from harming the condemned person; and preventing the condemned person from escaping.

32. In addition, I have personal experience with transferring condemned prisoners in the final hours prior to the execution from death row to a prison where the execution is to take place and with the training and preparations necessary to effectuate an execution with an experienced team.  I was responsible for the first execution by lethal injection in Pennsylvania and the construction of an execution chamber including statutory

---

[22] Federal Bureau of Prisons, *Operation and Security of the Special Confinement Unit at FCC Terre Haute THX-5217.02B,* Institution Supplement ¶ V (May 10, 2019).
[23] *Id*. at ¶ VIII.A.
[24] *Id*. at ¶ XVIII.
[25] *Id*.

modifications enacted just prior to the first execution to permit victim witnesses to sit separate and apart from the press and public witnesses.

33. Given the harmful consequences that may result, I see no valid reason to transfer Mrs. Montgomery to USP Terre Haute. Indeed, in light of my experience, I believe the execution could be carried out at FMC Carswell.  As an FMC, the facility likely has a supply of the equipment necessary to create an execution chamber. I am well familiar with the layout and design of an execution chamber and it need not be elaborated. A view of the execution chamber in Pennsylvania is below:[26]



34. This is how a room may be set up to perform an execution. There is no need, especially for a single occasion, to have the wall and glass window—a curtain and table behind it would allow for administration of the lethal injection. A gurney could be bolted to the floor.

35. Additionally, there are likely several personnel at FMC Carswell with the requisite training to perform an execution. The Pennsylvania Department of Corrections engages the services of individuals technically competent by virtue of training or experience to carry out the lethal injection procedure. It does not require a physician or nurse to carry out the execution.[27] Nor do the Bureau's regulations.[28] Texas law specifies only

---

[26] Image available at
https://www.pacast.com/players/cmsplayerHD.asp?video_filename=10246_DOC_B_Roll_01.m4v:.
[27] 61 Pa.C.S. § 4304.
[28] Bureau of Prisons, *Execution Protocol*, Add. ¶ D (Aug 1, 2008) ("Qualified personnel includes currently licensed physicians, nurses, EMTs, Paramedics, phlebotomists, other medically trained personnel, including those trained in

"such execution procedure to be determined and supervised by the director of the correctional institutions division of the Texas Department of Criminal Justice"[29] and the Federal Death Penalty Act allows for implementation according to state law, with no requirement to adhere to less formal state protocols that contain more stringent requirements than the statute.[30]

36.  Additionally, the Bureau has demonstrated an ability and willingness to deploy staff, including redeploying staff from other locations.[31] That could be done in this case to provide experienced execution team members to supplement the staff at FMC Carswell.

37.  It is conceivable that there are legitimate reasons why the execution cannot be carried out at Carswell. However, I see nothing in the Bureau of Prisons Execution Protocol that prohibits it.[32]  Conducting the execution at Carswell would minimize the security challenges of moving Mrs. Montgomery and obviate the deleterious effects of transferring and holding her at a men's prison.

38.  Any time spent at Terre Haute would be contrary to sound correctional practice and risk destabilizing Mrs. Montgomery's mental health.

## Conclusion

39.  Based upon the foregoing, in light of all the considerations, and with a concern both for the duty of care owed by the Bureau of Prisons to all persons in its custody as well as the possible effects upon Mrs. Montgomery of transfer to USP Terre Haute, I believe that Mrs. Montgomery should remain at FMC Carswell.

40.  Corrections officials are obligated to ensure the safety and well-being of those placed in their custody, no matter the crime committed, or the sentence imposed. It is not for us as corrections officials to impose greater or additional punishments upon those committed to our care and custody. It is a basic principle of corrections administration that people are sent to prison as punishment, not for punishment. Corrections officials are not free to impose harsher punishment or treatment upon persons committed to them based upon

---

the United States Military having at least one year professional experience and other personnel with necessary training and experience in a specific execution related function.").

[29] Tex. Code Crim. Proc. Ann. art. 43.14.

[30] *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 112 (D.C. Cir. 2020), *cert. denied sub nom. Bourgeois v. Barr*, No. (19A1050), 2020 WL 3492763 (U.S. June 29, 2020) (holding that federal executions need not comply with state protocol more specific than the state's law); 18 U.S.C.A. § 3596.

[31] Lia Russell, *Federal prison riot squads deployed to D.C.*, Federal Computer Week (June 8, 2020), https://fcw.com/articles/2020/06/08/russell-bop-afge-floyd-protests.aspx.

[32] Bureau of Prisons, *BOP Execution Protocol* (2004); Bureau of Prisons, *Execution Protocol*, (Aug 1, 2008).

their view about the crime committed or the offender's background.  The imprisonment is the punishment.

41. In my opinion, based upon my education, training, and experience, that transferring Lisa Montgomery to USP Terre Haute is inadvisable as a matter of corrections administration, and because of her history of brutalization, abuse, and trauma, such a transfer will be unnecessarily traumatizing. To unnecessarily subject her to re-traumatization and possibly precipitate the return of acute mental illness amounts to torture and therefore should not be undertaken.

42. In forming my opinion regarding the appropriateness of such a transfer, generally, I have reviewed the items listed in Appendix A.

43. While it is my expert opinion that such a transfer is not only unnecessary but actually contrary to penological and safety goals of the BOP and of corrections, I also believe that moving this inmate creates additional, unnecessary risks:

    a) There is always the risk of escape or an accident during a high security prisoner transfer.

    b) The risk of isolating her further than she already is by virtue of the suicide precautions taken at Carswell and separating her from the staff she knows and trusts.

    c) The risk of traumatizing her by subjecting her to staff observation by primarily male officers who have not had experience working with female inmates and who have not been specially received in trauma-informed correctional training and gender-responsive inmate supervision.

    d) The risk of traumatizing her by being within a large male maximum-security prison where her presence may lead to taunting or other verbal harassment by the inmates.

I declare under penalty of perjury that the foregoing is true and correct.

Martin Horn

Signed this 10th day of November 2020.

11

APPENDIX A

Index of Documents Used

1. Social History of Lisa Montgomery by Jan Vogelsang, M.S.W. August 5, 2016.

2. Supplemental Declaration of Jan Vogelsang, M.S.W.

3. Report of Dr. George Woods, March 17, 2013.

4. Report of Dr. Katherine Porterfield, April 22, 2016.

5. Report of Dr. Siddartha Nadkarai, September 27, 2013.

6. Federal Bureau of Prisons Medical Records of Lisa Montgomery, 2017-2020.

7. Pennsylvania Department of Corrections, Press Office, *Information on the Execution Process*, (September 2012).

8. Bureau of Prisons Program Statement P5324.08 *Suicide Prevention Program* 16 (April 5, 2007).

9. Federal Bureau of Prisons, *Clinical Guidance: Care Level Classification for Medical and Mental Health Conditions or Disabilities* (May 2019).

10. Letter from Warden M. Carr to Kelley J. Henry, Esq. (October 23, 2020).

11. Letter from Kelly J. Henry to Mrs. Kacie Inman Senior CLC Attorney Federal Bureau of Prisons, FMC Carswell (November 3, 2020).

12. Federal Bureau of Prisons, *FCC-Terre Haute,* Indiana A&O Handbook (June 27, 2017).

13. Federal Bureau of Prisons, *Operation and Security of the Special Confinement Unit at FCC Terre Haute THX-5217.02B,* Institution Supplement (May 10, 2019).

14. Federal Bureau of Prisons Program Statement P5324.08 *Suicide Prevention Program* (April 5, 2007).

15. FMC Carswell, *PREA Audit Report* (June 27, 2019), https://www.bop.gov/locations/institutions/crw/prea_crw.pdf (downloaded November 2, 2020).

16. FCI Terre Haute, *PREA Audit Report* (May 29, 2019), https://www.bop.gov/locations/institutions/tha/PREA_tha.pdf (downloaded November 2, 2020).

APPENDIX B

Martin F. Horn
Curriculum Vitae

**EXPERIENCE**

Distinguished Lecturer
John Jay College of Criminal Justice

City University of New York September 2009-January 2020

Executive Director
New York State Sentencing Commission New York State Unified Court System October 2010-October 2018 (as assignment John Jay College)

Commissioner of Corrections City of New York Department of Corrections January 2003-August 2009

Commissioner of Probation City of New York Department of Probation January 2002-August 2009 (Simultaneous appointments by the Mayor)

Secretary of Administration Governor's Office of Administration Commonwealth of Pennsylvania January 2011-December 2011

Secretary of Corrections Department of Corrections Commonwealth of Pennsylvania March 2005-December 2010

Executive Director
New York State Division of Parole August 1991-February 1995

Director of Parole Operations New York State Division of Parole April 1985-August 1991

Superintendent
Hudson Correctional Facility
New York State Department of Correctional Services April 1984-April 1985

Assistant Commissioner
New York State Department of Correctional Services December 1980-April 1984

Assistant to the Commissioner
New York State Department of Correctional Services December 1978-December 1980

13

<u>Director, Temporary Release Programs</u>
New York State Department of Correctional Services June 1977-December 1978

<u>Assistant Professor</u>, Criminal Justice State University of New York College at Utica-Rome
January 1975-June 1977

<u>Parole Officer, Senior Parole Officer</u> New York State Division of Parole June 1969-January
1975

**EDUCATION**

**Master of Arts, Criminal Justice** | June 1974 John Jay College of Criminal Justice
City University of New York

**Bachelor of Arts, Government** | May 1969 Franklin and Marshall College, Lancaster, PA

**PUBLICATIONS**

Bonacum, William T., Farmer, Michael T., Fein, Scott N., and Horn, Martin F. Crime and Justice
in New York: **Proceedings of the Governor's Conference on Crime. Albany: Office of the
Governor**, 1982.

Dvoskin, J. and Horn, M. (July August 1994). *Parole Mental Health Evaluations*, **Community
Corrections Report**, 1(6), 5-6.

Greifinger, R.B., Horn, M. *Quality Improvement through Care Management,* chapter in Puisis,
M. (Ed.), **Clinical Practice in Correctional Medicine**, St. Louis: Mosby, 1998.
Horn, M. (1999, Feb.-March). *Avoiding 20-20 Hindsight by Getting Back to*

Horn, M. *Basics: Lessons Learned From a Major Escape.* **Correctional Security Report**, 1(1),
1-2, 13.

Horn, M. (1999, winter). *Change and Challenge: Pennsylvania's Prison System.* **Corrections:
The Newsletter of the Pennsylvania Bar Association Committee on the Corrections System**,
1(3), 1-4.

Horn, M. *Rethinking Sentencing.* **Corrections Management Quarterly**, (2001, summer). 5(3),
34-40.

Smith, D. and Horn, M, *Public Safety Policy in New York State*. Chapter in Benjamin, G. (Ed.),
**Oxford Handbook of New York State Politics**, New York: Oxford University Press, 2012.

Horn, M. F. *Corrections in the 21st Century*. Chapter in Carlson, Peter (Ed.), **Prison and Jail
Administration: Theory and Practice** (3 ed.) (2013). Sudbury, MA: Jones and Bartlett.

14

Horn, M.F. and Moser, R.J. (Winter 2014) *NYC FUSE Reentry Housing: A Scalable, Data-Driven Solution for a "Wicked Issue*," **Government Law and Policy Journal**, 16:2. New York State Bar Association and Albany Law School.

## PAPERS PRESENTED

Horn, M. "Project Zero: Pathway to Reform," a paper presented at the Disproportionate Minority Confinement Conference of the Franklin H. Williams Judicial Commission on Minorities, New York State Judicial Institute, White Plains NY (September 18, 2006);

"Overall Systems Management in Corrections," A paper presented at the US Dept of State Latin America Regional Workshop, Bridgetown, Barbados October 23, 2009;

"Creating Safe Correctional Environments," A paper presented at the AGM of the International Corrections and Prisons Association, Bridgetown Barbados, October 27,2009;

" Practitioner Reflections on the Use of Evidence in Management of Correctional Facilities," Fall Research Conference of the Association for Policy Analysis and Management Washington, DC November 6, 2009;

"Using Performance Measurement to Improve Human Rights in Prisons and Jails," A Paper presented at the 9th Biennial International Conference, John Jay College of Criminal Justice, Marrakech, Morocco June 4.2010;

"Acts of Violence, Death and Suicide in the Context of Prisons" A paper presented at the IId Latin American Regional Corrections Seminar, Buenos Aires, Argentina, June 9, 2010;

"Safe Lawful and Ethical Correctional Environments and Human Rights," a paper presented at Conferencia Regional Penitenciaria Sur-Sureste de Mexico, Sistema Penitenciario Federal Mexico, Quintana Roo, Mexico, Non- Academic, International, Invited. (May 6, 2012).

"Creating A Jail Reentry Program in a Large Urban Setting," a paper presented at the Annual General Meeting and Conference, International Corrections and Prisons Association, Singapore. (September 13, 2012).

"Determining Readiness to Undertake Prison Reform: A Modest Proposal," a paper presented with Gabriela Perez Garcia at the Annual General Meeting of the International Corrections and Prisons Association, Colorado Springs, CO. October 30, 2013.

Horn, M. "Prison Reform: Problematic Necessity," The Human Dignity Lecture presented at the Center for Church Life, University of Notre Dame, October 8, 2014, South Bend, IN**.**

## EXPERT WITNESS

Jeanette Perez v State of New York, et. Al New York State Court of Claims, Claim No. 108710 (2010) (Testified as Expert in New York Court of Claims on behalf of respondent Defendant State of New York)

Alan Newton v. City of New York et. Al SDNY 07-CV6211SAS (2010) (Prepared report on behalf of respondent defendant City of New York)

Tamarra Sowell, (as personal representative,) administrator for the Estate, and on behalf of the heirs of Adekunle Odumabo v. Roy Dominguez, individually and in his official capacity as sheriff of Lake County, Indiana; Northern District Indiana, Hammond, 2:09-CV-0047 (Prepared report and provided deposition on behalf of plaintiff)

Israel Bornstein as Administrator v County of Monmouth, Monmouth County Sheriff's Office, et. Al U. S. District Court District of New Jersey 3:11-cv-05336- PGS-DEA (Testified as expert on behalf of plaintiff Israel Bornstein, US District Court, District of New Jersey.)

Farris v. Franklin County, 14-cv-05083 Eastern District of Washington (report for plaintiff assessing overall jail conditions and recommendations for improvement)

Ellis Walker, v. Deborah Schult, et. Al Civil Action No. 11-CV-00287 (LEK-RFT) United States District Court for the Northern District of New York (report, deposition, testimony for plaintiff)

State v Daniel Charles, resentencing hearing, Meade Co. South Dakota October 22, 2015, (report and testified as expert for defendant Daniel Charles)

Sheppard v Zavis, 1:11-cv-02398-NLH-KMW, United States District Court for the District of New Jersey, deposition. (report and deposition for plaintiff)

Bradley Peterson v Christopher Holmes; James Kiel, Captain R. Ortiz, et. Al 11-cv-02594, United States District Court for the District of New Jersey, deposition. (report, deposition and court appearance for plaintiff)

Reginald Potts v John Manos et. Al, 11-cv-3952, United States District Court, Northern District of Illinois, (report and deposition for defendant)

Reginald Potts v Daniel Moreci et. Al, 11-cv-5310, United States District Court, Northern District of Illinois, (report and deposition for defendant)

Mark Duke, et al v Jefferson Dunn, et. Al, 4:14-CV-1952 VEH, United States District Court, Northern District of Alabama, report and deposition (for plaintiff)

Arthur Johnson v. John Wetzel, et. Al, 1:16-cv-00863-CCC-MCC, United States District Court, Middle District of Pennsylvania, (testified as expert for plaintiff)

Lillyan Ryan, as Administrator, of the Estate Bartholomew Ryan, deceased, and Lillyann Ryan, individually v. County of Nassau, et al. 12-CV-5343, United States District Court, Eastern District of New York (expert trial testimony for plaintiff)

Charles Gifford v. Orlando Harper, et. Al, 2:15-cv-00613, United States District Court for the Western District of Pennsylvania (report and trial testimony for plaintiff)

Kalvin Donnell Howard v. A. David Robinson, et. Al 1:10-cv-147 (LMB/TRJ) United States District Court for the Eastern District of Virginia (report and expert trial testimony for plaintiff)

Kendrid Hamlin, petitioner v William J. Smith, et. Al respondents Case No. 2015 CF3 9721, Case No. 2015 CF 18179 Superior Court of the District of Columbia, Criminal Division. (Report and testimony for petitioner)

Mary Jane Rivas v. WA State Dept of Corrections, Dick Morgan, Bernie Warner, Dan Pacholke, Donna Zavislan, Margaret Gilbert, George Gilbert, Superior Court of Washington, County of Thurston (October 2017 Report for Defendant State employees)

Elliot Cortes v. Correctional Officers Donovan Bynum, Terrell Felts, et. Al Court of Common Pleas, Philadelphia PA Docket 000744 (report for plaintiff December 2017)

P.D. (a pseudonym) v Middlesex Co. Superior Court of the State of New Jersey, Law Division: Middlesex Co. MID-L-3811-14 (report and deposition for respondent County)

Reynolds v. Arnone, et. Al United States District Court, District of Connecticut CV3: 13: CV 1465 (SRU) (report and deposition for plaintiff)

Carol Ann Conforti, Individually and as *Administratrix ad Prosequendum* of the Estate of Kenneth Conforti and as Parent, Natural Guardian and Guardian *ad Litem* of A.C., a minor, Plaintiff, v. County of Ocean; Ocean County Board of Chosen Freeholders (in their individual and official capacities); Ocean County Department of Corrections; Warden Theodore J. Hutler (in his individual and official capacity); et. Al, Defendants. Superior Court of New Jersey, Law Division: Ocean County Docket No.: OCN-L-2340- 15 (consolidated with Docket No. OCN-L-1215-15) (report and testimony for plaintiff)

Antoine Miles v. David Guice, et al., 5:13-CT-3193-FL, United States District Court, Eastern District of North Carolina (report for plaintiff)

Johnny Morgan v. United States of America, 14 Civ. 7921 (DCF) United States District Court, Southern District of New York (report, deposition and trial testimony for plaintiff)

MATTHEW ANDERSON v. LIEUTENANT JOHN BONNEWELL, individually, SERGEANT BRUCE TAYLOR, individually, CORRECTIONAL OFFICER ZACHARY PETTYJOHN, individually, CORRECTIONAL OFFICER EDGAR VERDE, individually, and

17

CORRECTIONAL OFFICER JOHN BUNTING, individually C.A. No. N17C-02-080 FWW, SUPERIOR COURT OF THE STATE OF DELAWARE (report and deposition for plaintiff)

Walker v City of St Ann, Case No. 4:16-cv-1302 United States District Court Eastern District of Missouri Eastern Division (report for plaintiff)

Kelvin A. Alexander, plaintiff v. Willis J. Fowler et. Al. No. 16 CVS 13337 General Court of Justice Superior Court Division, State of North Carolina, County of Wake (report for plaintiff)

Anthony Reid, et. Al, plaintiffs v John Wetzel, et. Al No. 18-CV-0176 United States District Court Middle District of Pennsylvania (report for plaintiff)

Clay, et al. v. Cuyahoga County, et al. U.S. District Court N.D. Ohio Case No. 1:18-cv-02929 Parties' Joint Consulting Correctional Expert (ongoing to prepare reports and recommendations concerning conditions of the Cuyahoga County Jail)

18

**DOMESTIC AND INTERNATIONAL CONSULTING**

- Morocco Juvenile Corrections Project- consultant to Government of Morocco through KeyPoint Government Solutions under their subcontract with BlueLaw International, as part of an initiative funded by the US State Department Bureau of International Narcotics and Law Enforcement Affairs. I assisted in the development of standards for Child Protection Centers, advised on creation of inspection services and provided training of their first inspectors.
- Training consultant to the Federal Penitentiary Service United States of Mexico 2010-2012
- Developed Corrections Needs Assessment Methodology for Inter- American Development Bank, Washington, D.C. November 2013. Contract purchase order 72524
- Consultant to Gartner Consulting 2012-2016
  - Las Vegas, Nev. Jail Management System Operational Assessment
- Correctional Education Centers, Delaware County PA, George W. Hill Correctional Facility-consultancy to evaluate admission and release procedures through KeyPoint Government Solutions 2010.